UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
CASE NO. 6:08-CV-01349-GAP-DAB

ALBERT ALUNNI, ET AL,

              Plaintiffs,

vs.

DEVELOPMENT RESOURCES GROUP,
LLC, a Florida limited liability
company, LEGACY DUNES
CONDOMINIUM, LLC, a Florida
limited liability company,
MICHAEL K. HALPIN, JAMES E.
WEAR, TIMOTHY S. TINSLEY, THE
REAL ESTATE INVESTMENT GROUP,
LTD., an Illinois corporation,
JOSEPH ALDEGUER, JILL MOORE,
REAL ESTATE DREAMS, LLC, a
Florida limited liability
company, SEAN C. PARKES, JEREMY
HOLLY, GENEVA HOSPITALITY
MANAGEMENT, LLC, a Wisconsin
limited liability company, SAL
SARDINIA, and CHANDRA WEBSTER,

              Defendants.
_____/


THE DEPOSITION OF

MAUREEN HAYES PHILLIPS

VOLUME I


Seiden, Alder, Matthewman & Bloch, P.A.

Boca Raton, Florida

February 26, 2009

10:00 a.m.

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 5

APPEARANCES:
On behalf of the Plaintiffs:
SEIDEN, ALDER, MATTHEWMAN & BLOCH, P.A.
7795 NW Beacon Square Boulevard
Suite 201
Boca Raton, Florida 33487
561.416.0170
BY: JOEL B. ROTHMAN, ESQ.

RONALD S. NISONSON, P.A.
120 East Palmetto Park Road
Suite 100
Boca Raton, Florida 33432
561.544.8980
BY: RONALD S. NISONSON, ESQ.
On behalf of the Defendants:
SHUTTS & BOWEN, LLP
300 South Orange Avenue
Suite 1000
Orlando, Florida 32802
407.423.3300
BY: MICHAEL L. GORE, ESQ.

Shutts & Bowen, LLP
201 South Biscayne Boulevard
Suite 1500
Miami, Florida 33131
305.3586300
BY: JONATHAN COHEN, ESQ.
GREENBERG TRAURIG, P.A.
450 South Orange Avenue
Suite 650
Orlando, Florida 32801
407.418.2360
BY: TUCKER BYRD, ESQ. (via telephone)
CLAY A. DEATHERAGE, ESQ.
On behalf of the Defendants:
Ullman & Ullman, P.A.
150 E. Palmetto Park Road
Suite 650
Boca Raton, Florida 33432
561.338.3535
BY: ANTHONY ARAGONA, ESQ.

1   Phillips 00001-00271                          19

2   DVD: Making Money in Real Estate 7/20/06      22

3   DVD: Making Money in Real Estate - MM01-MM05  22

4   Transcript:  Making Money in Real Estate      24

    7/20/06

5   PowerPoint Presentation Research              25

6   CD: GENEVA-LEGACY DUNES 6/6/06                28

7   Geneva 1-71                                   104

Page 5

Also present:
Sal Sardinia
James Wear
Ryan Reinke

REPORTED BY:
Alexa R. Goldman, FPR
U.S. Legal Support, Inc.
Klein, Bury, Reif, Applebaum & Associates, Inc.
444 West Railroad Avenue, Suite 300
West Palm Beach, FL 33401
561.835.0220

1           P R O C E E D I N G S
2                  - - -
3        Taken before Alexa Goldman, Florida
4   Professional Reporter and Notary Public in and for the
5   State of Florida at Large, in the above cause.
6                  - - -
7   Thereupon,
8            Maureen Hayes Phillips,
9   having been first duly sworn or affirmed, was examined
10  and testified as follows:
11          THE WITNESS:  I do.
12             DIRECT EXAMINATION
13  BY MR. ROTHMAN:
14      Q.  Good morning.
15      A.  Good morning.
16      Q.  Please state your name for the record.
17      A.  Maureen Hayes Phillips.
18      Q.  Ms. Phillips, have you ever been deposed
19  before?
20      A.  Yes.
21      Q.  So you know a couple of the ground rules for
22  giving a good deposition and that would be answer
23  audibly.  So if I ask a question and the answer is
24  yes or no, don't nod your head; answer yes or answer
25  no so that the court reporter can take a good record.

U.S. Legal Support
(561) 835-0220

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 6

1    A. Okay.
2    Q. Try and speak in a normal voice, try not to
3  speak too quickly because the court reporter will
4  have trouble taking down your testimony if you go too
5  quickly.
6        Listen to the question. If you have any
7  problems with the question I ask, you don't
8  understand it, let me know. I'm not asking you to
9  guess, let me know and I'll rephrase it.
10   A. Okay.
11   Q. All right. And if at any point you want to
12 take a break, let me know. We've got water, coffee
13 here, whatever you need. If you need to use the rest
14 room, just let us know.
15   A. Okay.
16   Q. Okay. Thanks.
17       Now, are you here voluntarily?
18   A. I am.
19   Q. Okay. Have any promises been made to you in
20 connection with giving your testimony today?
21   A. Yes.
22   Q. What are those?
23   A. That as long as I'm truthful and the
24 information is found to be valid, that I will be
25 released from -- as a defendant.

Page 7

1    Q. Okay. You were previously a defendant in
2  this case?
3    A. Yes.
4    Q. And you were dismissed as a defendant without
5  prejudice?
6    A. Correct.
7    Q. Okay. Now you understand that you could be
8  made a defendant again in the case simply by being
9  added as a defendant, do you understand that?
10   A. Explain further. Are you saying I could go
11 through the whole exercise and have done it for
12 naught?
13   Q. Well, what I'm saying is as of this point,
14 sitting here today, you haven't signed or been given
15 any written releases for your testimony?
16   A. Correct.
17   Q. And there's been no -- withdrawn.
18       With respect to your -- the dismissal without
19 prejudice, that was done in exchange for your
20 cooperation to testify voluntarily and tell the
21 truth; is that right?
22   A. Correct.
23   Q. Okay. You raised your right hand and swore
24 you would tell truth here today. Are you prepared to
25 tell truth about the matters that you're asked about

Page 8

1  today?
2    A. Yes.
3    Q. With respect to what you mentioned about a
4  release, that you would be released, has -- have you
5  been presented with any written documents to the
6  effect that if you testify a particular way, you will
7  be given a release?
8    A. No. No. Nothing in writing.
9    Q. Okay. So explain, then, in some more detail
10 what you meant when you said that you would be given
11 a release in this case?
12   A. It is my belief when I answer all questions
13 and am truthful and answer everything of every lawyer
14 and every deposition that there needs to be, that
15 there's not -- that there should be a release with
16 prejudice. Understanding that I would have to
17 testify in court, understanding I would have to
18 probably be part of this until it's done. But then
19 unless it's viewed to be that I was a critical part
20 of something other than what I represented, that I
21 should not -- hopefully should not be a part of the
22 suit as it proceeds to court.
23   Q. Okay. That's your understanding?
24   A. That's my layman's understanding.
25   Q. Is that a -- that's not based on any written

Page 9

1  document that you have been given?
2    A. No.
3    Q. And is that based on any promises that I or
4  anybody else have made to you?
5    A. No.
6    Q. You were an employee of The Mortgage
7  Exchange?
8    A. Yes.
9    Q. Until when were you employed by The Mortgage
10 Exchange?
11   A. The end of 2007.
12   Q. And what happened at the end of 2007 that led
13 to you leaving your employment with The Mortgage
14 Exchange?
15   A. It had been a transition out for a large
16 portion of that year, financial hardship, and a
17 difference in management approach.
18   Q. Okay. And what was your position with The
19 Mortgage Exchange?
20   A. I was the operations manager.
21   Q. How long had you been operations manager?
22   A. Since 2004.
23   Q. And how long total had you worked for The
24 Mortgage Exchange?
25   A. Nine years.

3 (Pages 6 to 9)

U.S. Legal Support
(561) 835-0220

63ecaa65-d0fc-4d88-8c16-31a96e089d95

1    Q.  Nine years?
2    A.  Approximately.  I think the exact start
3  date -- nine years.
4    Q.  What were your duties as operations manager?
5    A.  They evolved as we moved to different
6  offices.  But to make sure that we had procedures in
7  place; make sure the overall business plan was
8  operating; and that as we evolved and moved, the
9  operations of the office were in place.
10    Q.  Okay.  What operations of the office were you
11  responsible for?
12    A.  The teams within the office:  Where they sat,
13  their support system, that their superiors in
14  management were in place; coordinating with
15  accounting, billing, processing; coordination to make
16  sure the actual process of the actual operations of
17  the office worked.
18    Q.  What is Real Estate Investment Group?
19    A.  REIG was a real estate company that was
20  created in 2006 so that The Mortgage Exchange could
21  venture into the real estate arena in Florida.
22    Q.  Was that in the beginning of 2006?
23    A.  I don't know the exact opening date, but I
24  would look to March of 2006, February or March 2006.
25    Q.  Were you also responsible for supervising the

1  operations of REIG?
2    A.  Yes.
3    Q.  Were there any other businesses of The
4  Mortgage Exchange at the time that you were there?
5    A.  The Financial Exchange was a portion within
6  The Mortgage Exchange and Own a Hotel Room.
7    Q.  What was The Financial Exchange?
8    A.  Financial planning, retirement planning.  The
9  point was to have -- we use the term "to put your
10  financial house in order."  It was to make sure that
11  not only was their mortgage looked at but their
12  retirement.  Whether it was buying annuity, life
13  insurance, home insurance, and that their retirement
14  funds were planned out.
15    Q.  Okay.  Was it part of your responsibility to
16  supervise the operation of The Financial Exchange?
17    A.  The operations of The Financial Exchange were
18  within The Mortgage Exchange office so it all fell
19  under that.  The actual sales of The Financial
20  Exchange was Pete Becker.
21    Q.  What about Own a Hotel Room?
22    A.  Own a Hotel Room was created out of necessity
23  with Runaway Beach Club, which is another property,
24  when there was a change in management companies early
25  on in '06 and Own a Hotel Room was a Florida entity

1  that would allow The Mortgage Exchange owners to open
2  a new company that would allow them to be paid for
3  hotel operations.
4    Q.  Who were The Mortgage Exchange owners?
5    A.  Joe Aldeguer and Jill Moore.
6    Q.  Were you an owner of The Mortgage Exchange or
7  any of these entities you mentioned?
8    A.  No.
9    Q.  Any other businesses of The Mortgage
10  Exchange?
11    A.  The Title Exchange was a company because
12  Stewart Title and The Title Exchange worked together
13  during the refi boom.  It was another entity within
14  The Mortgage Exchange.
15    Q.  What about X Management?
16    A.  X Management was created, again, for the
17  management aspect working with Own a Hotel Room
18  for -- actually, you know what, I misspoke.  I
19  answered Own a Hotel Room with X Management's
20  description, so I would have to go back to Own a
21  Hotel.
22        X Management was created to manage the
23  entities and receive the income.  Own a Hotel Room
24  was the sister company to REIG, but that was the name
25  of the Florida entity.  REIG, an Illinois company;

1  Own a Hotel Room, a Florida company; and X
2  Management, a Florida company to receive income from
3  management services.
4    Q.  These were all entities that were owned
5  either by The Mortgage Exchange or by Jill Moore and
6  Joe Aldeguer?
7    A.  Correct.
8    Q.  You are familiar with a development in
9  Kissimmee, Florida, known as Legacy Dunes?
10    A.  I am.
11    Q.  When did you first become familiar with
12  Legacy Dunes?
13    A.  The first time I heard of it or visited?
14    Q.  The first time you ever heard of it.
15    A.  Spring of 2006.
16    Q.  Okay.  And how did you hear of it in spring
17  of 2006?
18    A.  Jay Holly and Sean Parkes.
19    Q.  And who are Jay Holly and Sean Parkes?
20    A.  At the time they were real estate agents for
21  McAnthony Realty.  And they were connected -- Stacey
22  Michelon, who I worked with at REIG, had connected in
23  a business conversation with Jay Holly and the
24  opportunity came up in discussion.
25    Q.  Okay.  So who was part of this discussion

U.S. Legal Support
(561) 835-0220

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 14

1    that you referred to when you first learned the
2    Legacy Dunes?
3        A.  I don't recall even who was there at the
4    time.  I know the discussion would have been with
5    Jay, Sean, Stacey, myself, and Joe.
6        Q.  Joe Aldeguer?
7        A.  Um-hmm (nodding head).
8        Q.  And what was it that you learned about Legacy
9    Dunes in that first conversation?
10       A.  The basics of the number of units, where it
11   was located, you know, all the perks of the property,
12   and that they had worked with the developer -- just
13   the basics at the time.
14       Q.  And what was the purpose for the interest on
15   the part of The Mortgage Exchange or its related
16   entities in Legacy?  Why were they interested?
17       A.  Because REIG, along with Own a Hotel Room,
18   wanted to offer real estate opportunities.  The
19   Mortgage Exchange would benefit from doing the
20   mortgage and REIG would benefit from the sales of the
21   real estate.
22       Q.  The Mortgage Exchange was a mortgage
23   brokerage company?
24       A.  Correct.
25       Q.  And REIG was a real estate brokerage company?

Page 15

1        A.  Correct.
2        Q.  And Own a Hotel Room was the Florida real
3    estate brokerage company?
4        A.  Correct.
5        Q.  And to whom would sales of units in Legacy
6    Dunes be made?  Who would be the purchasers of these
7    units?
8        A.  From Illinois' perspective, hundreds of the
9    units had been sold before we were brought to the
10   property.
11       Q.  But the sales you referred to, okay, the
12   reason for the conversation as I understood it was
13   because there was a opportunity to make sales of real
14   estate in Legacy Dunes?
15       A.  Correct.
16       Q.  Okay.  And so who was it that The Mortgage
17   Exchange was contemplating selling this real estate
18   to?
19       A.  The listeners to the radio show on WLS.
20       Q.  What is the radio show on WLS?
21       A.  It was a radio show that was created for two
22   purposes:  One, to create leads for the mortgages
23   and, second, to basically share the process of what
24   we were doing.
25       Q.  And what was this radio show called?

Page 16

1        A.  Making Money in Real Estate with Joe
2    Aldeguer.
3        Q.  And Joe Aldeguer was the host?
4        A.  He was the host.
5        Q.  How long had the -- when did this radio
6    program first start?
7        A.  February -- I want to say 2006, maybe it was
8    2005.  I have to think about that.
9        Q.  It was sometime before this conversation
10   about Legacy Dunes?
11       A.  Correct.  We were already on the air.
12       Q.  And you said the title of the radio program
13   was Making Money in Real Estate with Joe Aldeguer,
14   but can you describe in a little bit more detail what
15   the radio program generally discussed, what was
16   talked about on the air?
17       A.  It evolved.  In the beginning it was Tom
18   Burn, myself, and Joe Aldeguer.  Joe Aldeguer would
19   talk about the opportunities he had seen that week,
20   be it a new mortgage product, be it a piece of real
21   estate.  Tom's job which then became filled with Pete
22   Becker was to describe the financial market of the
23   week, making sure people had really thought about
24   retirement.  And my job was to make sure they
25   understood how mortgages and the new mortgage

Page 17

1    products worked and what the caveats of buying real
2    estate were and here are the rules.  That was the
3    beginning.
4        Q.  And I think you mentioned that this was an
5    A.M. station, WLS?
6        A.  WLS 890 AM.
7        Q.  In Chicago?
8        A.  In Chicago.
9        Q.  Where was The Mortgage Exchange's offices at
10   the time that you first had this conversation when
11   you learned of Legacy Dunes?
12       A.  Downers Grove, Illinois?
13       Q.  Outside of Chicago?
14       A.  3010 Highland Parkway.
15       Q.  And how big were the offices?
16       A.  Just over 50,000 square feet.
17       Q.  How many employees were employed there?
18       A.  At what point?
19       Q.  At the point that you had the conversation
20   for the first time about Legacy Dunes.
21       A.  150 approximate.
22       Q.  Did The Mortgage Exchange and the other
23   businesses you mentioned subsequently move?
24       A.  Yes.
25       Q.  When was that?

U.S. Legal Support
(561) 835-0220

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 18

1  A. July 2007.
2  Q. Where did they move to?
3  A. The Sears Tower.
4  Q. And do you know how many employees there were
5  at that time?
6  A. The day before the move or the day after the
7  move?
8  Q. Give me both.
9  A. Probably 70 the day before and maybe 40 by
10  the time we moved.
11  Q. What was the reason for the reduction?
12  A. The commute downtown.
13  Q. A lot of people didn't want to work downtown?
14  A. No.
15  Q. Do you know what the status of The Mortgage
16  Exchange and the Real Estate Investment Group is now?
17  A. Bankrupt.
18  Q. You were subpoenaed to appear here today?
19  A. Yes.
20  Q. And the subpoena requested that you produce
21  documents, do you recall that?
22  A. I don't.
23  Q. You don't recall that?
24  A. If I -- if I hadn't produced them already, I
25  probably hadn't.

Page 19

1  Q. You previously have provided my office with
2  documents; is that right?
3  A. Correct.
4  Q. Okay. We have met before?
5  A. Yes.
6  Q. Do you remember when that was?
7  A. I don't recall the exact date.
8  Q. It was in Chicago, though?
9  A. Correct.
10  Q. And you provided me with a set of documents
11  at that time?
12  A. Yes.
13  Q. Okay. Let me just show you what I have
14  marked as Exhibit 1.
15  (Thereupon, Exhibit 1 was marked for
16  identification.)
17  BY MR. ROTHMAN:
18  Q. You can take a look through those and let me
19  know if these are all the documents that you
20  previously provided me with.
21  A. They definitely look like everything that was
22  out of my desk.
23  Q. And you recall we had a conversation before
24  you and I met in person where I had asked you to
25  provide me with all the documentation that you have

Page 20

1  regarding Legacy Dunes?
2  A. Correct.
3  Q. And is this Exhibit 1, which is actually
4  Bates stamped Phillips 1 through Phillips 271, all
5  the documents you could find after a diligent search
6  regarding Legacy Dunes?
7  A. Yes.
8  (Brief interruption.)
9  MR. ROTHMAN: Off the record for a second.
10  (Off the record.)
11  BY MR. ROTHMAN:
12  Q. So is Exhibit 1 all the documents that you
13  provided me?
14  A. Yes.
15  Q. Okay. You also provided my office with some
16  CDs and DVDs, do you recall that?
17  A. Yes.
18  Q. By the way, my office copied the documents
19  and the CDs and DVDs and we returned them to you?
20  A. Correct.
21  Q. Okay. One of the CDs -- excuse me, DVDs you
22  provided was called -- it was a DVD of a workshop
23  that had a date of July 20th, 2006, do you recall
24  that?
25  A. Yes.

Page 21

1  MR. ROTHMAN: I have produced this, yes, the
2  DVD?
3  MR. ARAGONA: The audio, I don't believe I
4  got a video, no.
5  MR. DEATHERAGE: We got the transcripts
6  attached.
7  MR. ROTHMAN: I apologize. It was my intent
8  to provide you with the actual video.
9  MR. ARAGONA: Is the video the same date as
10  the audio you did provide, do you know, and/or the
11  transcript?
12  MR. ROTHMAN: Okay. You said the audio.
13  MR. ARAGONA: You provided us an audiotape of
14  a presentation.
15  MR. ROTHMAN: I provided an audiotape?
16  MR. GORE: We got a transcript. I didn't get
17  an audio tape.
18  MR. ARAGONA: I don't know if I listened to
19  it, but one of them said audio. One of the discs
20  I got said audio.
21  MR. ROTHMAN: Okay.
22  MR. ARAGONA: I'll verify and we'll figure
23  out what it was.
24  MR. ROTHMAN: Okay. Well, please let me
25  know. I'm not sure.

6 (Pages 18 to 21)

U.S. Legal Support
(561) 835-0220

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 22

```
1        I'm just dealing with Ms. Phillips at the
2    moment, so I'm going to mark this DVD as Exhibit 2.
3        (Thereupon, Exhibit 2 was marked for
4    identification.)
5    BY MR. ROTHMAN:
6        Q.  I don't recall that I heard your answer, but
7    you did provide us with the DVD of a workshop dated
8    July 20th, 2006, correct?
9        A.  Correct.
10       Q.  Okay.  So I have three of these.
11           And do you recall also providing our office
12   with DVDs entitled Making Money in Real Estate with
13   Joe Aldeguer episodes MM01, MM02, MM03, MM04, and
14   MM05?
15       A.  Yes.
16           MR. ROTHMAN:  And I'm going to mark these
17   five DVDs as composite three.
18       (Thereupon, Exhibit 3 was marked for
19   identification.)
20   BY MR. ROTHMAN:
21       Q.  And what are those DVDs?  What do they
22   contain?
23       A.  Exhibit 2 or Exhibit 3?
24       Q.  I'm sorry, Exhibit 3.
25       A.  Exhibit 3 are recordings of the radio show on
```

Page 23

```
1    WLS, to my recollection.  It's either that or CLTV,
2    which was the television show that mimicked the radio
3    show.
4        Q.  Okay.
5        A.  Honestly, everything I had in the box that
6    touched on Legacy Dunes I turned over.
7        Q.  Okay.  My recollection was it was a
8    television program.
9        A.  CLTV television show.
10       Q.  Okay.
11       A.  My mistake.
12           MR. ROTHMAN:  Gentlemen, you were also
13   provided with or not?
14           MR. GORE:  No.
15           MR. ROTHMAN:  I apologize.
16           MR. GORE:  Unless I'm different than others,
17   I got two discs.  One was a compilation of the
18   plaintiff information sheets; the other was
19   identified as Rule 26 Disclosures and had a series
20   of documents, PDFs, attributable to different
21   plaintiffs.
22           MR. ROTHMAN:  Okay.
23           MR. GORE:  And there were no audio or video
24   information provided.
25           MR. ROTHMAN:  Okay.  I apologize.  That was
```

Page 24

```
1    supposed to be provided.  I will -- I have two
2    sets of these.  I don't have enough to give out.
3    I will have copies made.  If I can have copies
4    made of them before you leave today, I will.
5        I'm not intending to ask questions about
6    Exhibit 3, and you have already gotten what I'll
7    ask the witness about, a transcript of Exhibit 2.
8    BY MR. ROTHMAN:
9        Q.  Let me show you what I have marked as Exhibit
10   4.
11       (Thereupon, Exhibit 4 was marked for
12   identification.)
13   BY MR. ROTHMAN:
14       Q.  I'll represent that Exhibit 4 is a transcript
15   that we had prepared based upon the DVD of the
16   presentation that's marked as Exhibit 2.
17       Have you reviewed that transcript?
18       A.  I have.
19       Q.  Okay.  And is the transcript a fair and
20   accurate transcription of what is contained in the
21   DVD that's marked as Exhibit 2?
22       A.  Yes.  With minor corrections on my own
23   presentation just where the -- where it was
24   inaudible.
25       Q.  Okay.  All right.  And we can go through that
```

Page 25

```
1    and you can make some corrections to it where you
2    feel necessary in a minute.
3        Was there anything else, other than the
4    documents marked as Exhibit 1, the DVD marked Exhibit
5    2, or the DVDs marked as Exhibit 3, that you have
6    provided my office with in this case?
7        A.  No.  That's complete.  Nothing additional.
8        Q.  Do you have any other documents in your
9    possession concerning Legacy Dunes that you haven't
10   provided us with?
11       A.  Not to my knowledge.
12       Q.  You also gave me a CD of presentations,
13   PowerPoint, from Geneva, do you recall that?
14       A.  Yes.  I apologize.
15       Q.  That's all right.  Let me show you what's
16   being marked as Exhibit 5.
17       (Thereupon, Exhibit 5 was marked for
18   identification.)
19   BY MR. ROTHMAN:
20       Q.  Do you recognize that document?
21       A.  Yes.
22       Q.  And what is that document?
23       A.  Research I put into a presentation of the
24   statistics for the Florida rental market at Joe's
25   request.
```

U.S. Legal Support
(561) 835-0220

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 26

1    Q.  At Joe Aldeguer's request?
2    A.  (Nodding head.)
3    Q.  I want to show you the DVD or the CD that we
4  have printed that off from that Mr. Nisonson went to
5  go get. He'll be right back.
6       Let's put Exhibit 5 to the side for a second.
7    A.  Okay.
8    Q.  All right. So you describe a meeting or a
9  conversation that occurred in 2006 in which you first
10  learned about the Legacy Dunes development?
11    A.  Correct.
12    Q.  Okay. What happened next with respect to
13  Legacy Dunes at The Mortgage Exchange after that
14  conversation?
15    A.  At The Mortgage Exchange? What do you mean
16  at The Mortgage Exchange? Do you mean Downers Grove?
17    Q.  What happened at either The Mortgage Exchange
18  or Real Estate Investment Group or any of the
19  entities that you were directing the operations of?
20    A.  Stacey, Jay, and Sean discussed the
21  opportunity with Joe. I believe, and I wasn't
22  present, Stacey, Jay, and Sean met with DRG and
23  visited the property and discussed working together
24  on the opportunity of offering the property up in
25  Chicago.

Page 27

1    Q.  And when you say offering the property in
2  Chicago, are you talking about offering it to
3  purchasers?
4    A.  Typically it was a workshop, an invitation in
5  the radio show to come to a workshop where a
6  developer would be there to offer an opportunity that
7  Joe was endorsing or embracing.
8    Q.  Did there come a time that a workshop took
9  place in which the opportunity to purchase at Legacy
10  Dunes was offered by DRG?
11    A.  Yes.
12    Q.  And do you recall when that first workshop
13  was?
14    A.  I don't recall the exact date. I think it
15  was June. I'm not sure if it was June or July of
16  '07. I don't recall the very first time. But the
17  date's on the purchase contracts, so that much can be
18  confirmed.
19    Q.  Okay. Give me a second. I just want to go
20  back and ask you since I have the CD here.
21    MR. ROTHMAN:  Off the record.
22    (Off the record.)
23  BY MR. ROTHMAN:
24    Q.  Do you recall providing me with a CD ROM that
25  contained a single PowerPoint file entitled

Page 28

1  Legacy+Resort+Final?
2    A.  I don't recall the name, but.
3    Q.  Do you remember providing me --
4    A.  Visually I can see if --
5    Q.  Do you recall providing me with a CD ROM that
6  said on it Geneva-Legacy Dunes PowerPoint 06/06/06?
7    A.  Yes.
8    Q.  Is Exhibit 5 the PowerPoint that was on that
9  CD?
10    A.  Yes.
11    MR. ROTHMAN:  And for the record, I'm going
12  to mark the CD as Exhibit 6.
13    (Thereupon, Exhibit 6 was marked for
14  identification.)
15  BY MR. ROTHMAN:
16    Q.  All right. Are you ready?
17    A.  Yes.
18    Q.  Okay. Explain the process that occurred when
19  The Mortgage Exchange and Real Estate Investment
20  Group, et cetera, when they sold these Legacy Dunes
21  units to individuals.
22       If you can give me an explanation of how it
23  worked from the beginning before you knew who a
24  potential buyer was through the signing of a contract
25  to purchase.

Page 29

1    A.  I would say we didn't have a standard process
2  being so new in the industry at the time. Meet with
3  the developer, negotiate the commissions with the
4  developer, have as much information as we could about
5  the property, put -- offer a workshop, invite people
6  on the radio for weeks prior, then try and put the
7  details in place; meaning, knowing the timing of
8  closings to the best of our ability, the information
9  about the property.
10       And this had been the first property we had
11  been involved with where the developer didn't own it
12  yet. So it was relatively new ground. And just
13  trying to get every day that went on somewhat of a
14  learning process to make sure we had all of the
15  information.
16       And then with Legacy Dunes specifically,
17  knowing that Joe's intention was to try and make it
18  short-term, which was not the intention of the
19  developer when we met them, that was a whole new
20  process. So when you say standard process, this was
21  a new process. We had done a property before,
22  Runaway Beach Club, which was short-term condo
23  conversion into a resort, so we had been working
24  through that process at the same time.
25       So now we had invited people for several

8 (Pages 26 to 29)

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 30

```
 1    weeks on the radio, taking reservations when they
 2    called into the system, which recorded everything.
 3    Then they were requested to meet with a loan officer
 4    prior to their arrival, basically to vet the people
 5    coming in to confirm, for one, they could qualify for
 6    a mortgage if they chose to purchase, and if not,
 7    people who didn't qualify, they could restructure the
 8    debt they had and maybe be ready for the next
 9    opportunity.  It also allowed those people who called
10    in to meet with Pete Becker for a retirement plan or
11    insurance and so forth as that process continued.
12         Then we would start to set up procedures
13    administratively.  So we had decorative boards, knew
14    the availability of the inventory.  And prior to the
15    workshop we would have photocopies and multiple
16    folders of every contract, purchase prices, and an
17    inventory list.  So that by the time we had workshop,
18    which was on the ninth floor, the eighth floor would
19    be completely set up with -- we usually used key
20    chains so people would know what unit they picked off
21    the map.
22         We had file folders that had contracts
23    already printed in them.  And then a disclosure that
24    need to be signed from the Real Estate Investment
25    Group, which was a disclosure naming all of their
```

Page 31

```
 1    companies, be it an escrow agreement or a document
 2    that the developer needed them to sign.  And then
 3    usually the day before the workshop we would need
 4    from the developer's team, the Florida real estate
 5    individuals all meet to talk about the flow.
 6         And then this was the first time we had
 7    Geneva came.  They were not the management company
 8    the first time we did Legacy Dunes.  There was a
 9    different management company there.  So that was not
10    a standard procedure.  We had asked for some data so
11    we had some idea of the rentals in the area.
12         So now we have a list of clients who called
13    in having heard from the radio show.  They have name
14    tags that are printed and ready so we know who's
15    coming in and know who attends.  They're given
16    numbers when they enter so we have a numeric process.
17    So when the workshop was finished, they would go to
18    the eighth floor based on a numeric assignment, which
19    was just random as they came in, and they would
20    usually have a luncheon afterwards.  Or for a night
21    time presentation, we had dinner prior to the
22    presentation.
23         So we would usually prepare all of the
24    employees, every employee hands on deck was there.
25    We were greeting on the first floor in the door, we
```

Page 32

```
 1    would do the radio show if it was a Saturday prior
 2    to, again pumping up the workshop that was open
 3    invitation.  And typically we would have standing
 4    room only and we would begin the workshop, go through
 5    the process of the presentations.
 6         There would be an introduction, Joe would do
 7    his shtick on stage.  Alone, we were all miked up.  I
 8    would go on -- specifically you can see from the
 9    transcripts -- talk about mortgage, retirement, and
10    being prepared.  I would exit the stage.
11         And usually at that point the developer had
12    the opportunity to -- and regardless which property
13    we were working on -- the developer would have the
14    opportunity to go up on stage and talk about how they
15    found the property, who they were, the validity --
16    basically like a walking credibility board.  And Joe
17    would start a conversation back and forth with them.
18         I was miked up and usually off in an alcove.
19    Many times he would shoot out questions.  Because on
20    stage the lights were on, so you can't see who else
21    was there, so he would shoot questions to the
22    audience, myself, or whatever member of the team was
23    there.
24         There would be closure to the presentation on
25    the ninth floor.  And people were invited -- if they
```

Page 33

```
 1    liked the opportunity the developer had, they were
 2    invited to go to the eighth floor and meet with the
 3    real estate team.  If they wanted to purchase a
 4    property, then they would go through from the eighth
 5    floor to the ninth floor.
 6         And let's say I picked key 101.  I want to
 7    buy unit 101, I've seen it on the map, that's the one
 8    I want, it's a two bedroom.  They would then go sit
 9    with the realtor and go through the contract.  That
10    contract then went to the administration department,
11    which was Jill Moore's group.  And it would be Misty,
12    Karen, or Jill would make sure there were three
13    copies of the contract.
14         With the Legacy Dunes presentation they also
15    had two team members to make sure we had signatures,
16    driver's license fronts were copied, backs of checks,
17    and Real Estate Dreams would confirm as well.  And
18    the individual left with a copy, the original went
19    to -- I don't want to misspeak, I don't know if the
20    developer or who kept the original.  I think the
21    developer got the original and we had retained a
22    copy.  And that would be of all documents,
23    disclosures, be it the developers, Real Estate
24    Investment Group, The Mortgage Exchange or anyone
25    else.
```

U.S. Legal Support
(561) 835-0220

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 34

1     And then if the individuals chose, and they
2  didn't all, but they would go to the war room, which
3  was a large conference room, if they wanted to meet
4  with the management company and ask questions, they
5  could go in there.
6     Q.  And how many of these presentations about
7  Legacy Dunes were held at The Mortgage Exchange?
8     A.  Large presentations like I just described, I
9  believe there were three.  There may have been
10 smaller subsequent presentations.
11    Q.  When you say large, approximately how many
12 potential purchasers were in attendance?
13    A.  Couples or individuals?
14    Q.  If you know either, if you can give me a
15 total number of individuals or if you don't know
16 that, you can give me a total number of couples.
17    A.  I would say on average 100 to 150 individuals
18 present.
19    Q.  When you say individuals, you're talking
20 these are potential purchasers and the employees of
21 The Mortgage Exchange?
22    A.  Correct.
23    Q.  And do you know how many smaller
24 presentations there were?
25    A.  I don't want to misspeak and say an exact

Page 35

1  amount, but at least three times we had individuals
2  invited back who had already signed a contract.
3     Q.  All right.  And do you know how many people
4  would have attended those -- potential purchasers
5  would have attended those?
6     A.  I would say several dozen.
7     Q.  Could you also receive a presentation, either
8  an individual or a couple, one-on-one with a Mortgage
9  Exchange employee?
10    A.  No.
11    Q.  Okay.  Was there any way that you could learn
12 about and purchase other than by attending one of
13 these presentations in the large group or in a
14 smaller group?
15    A.  Yes.
16    Q.  How was that?
17    A.  There were several ways:  One, the radio show
18 continued to discuss the property, discuss the
19 opportunity, invite them to visit the office, look at
20 the collateral materials, watch a DVD, or meet with
21 real estate individuals.
22        The loan officers, who were then also real
23 estate agents, would discuss the opportunity.  And if
24 they were interested, they could then meet with one
25 of the real estate people.  They were all also

Page 36

1  invited to visit the property.
2     Q.  So someone could hear about the opportunity
3  on the radio but not attend a presentation and still
4  purchase the property?
5     A.  Correct.
6     Q.  By meeting with someone from The Mortgage
7  Exchange?
8     A.  Correct.
9     Q.  You said the loan officers were also real
10 estate agents, is that always the case?
11    A.  No.
12    Q.  The first time you learned about Legacy Dunes
13 at that first meeting you discussed, were the loan
14 officers also real estate agents?
15    A.  No.  Some.  I don't want to misspeak, but we
16 did have some brokers and real estate agents who were
17 duly licensed in mortgage.  Not the majority, that it
18 became later.
19    Q.  How did it come to pass then that the loan
20 officers became real estate agents?
21    A.  It was required.
22    Q.  It was required by whom?
23    A.  Joe Aldeguer.
24    Q.  What were the circumstances in which Joe
25 Aldeguer required the real estate agents to become --

Page 37

1  excuse me, the mortgage brokers to become real estate
2  agents?
3     A.  He promised them a commission.
4     Q.  Can you describe the circumstances under
5  which Mr. Aldeguer promised the mortgage brokers a
6  commission?
7     A.  I was on a plane flying from Florida with the
8  DRG team.  We landed in Chicago the night -- I
9  believe it was the afternoon of the presentation --
10 and Joe had a meeting -- so some is hearsay --
11 with the loan officers and promised them a $10,000
12 commission for the -- for bringing a client or a
13 prospect if they purchased.
14    Q.  Okay.  Was this before the first presentation
15 concerning Legacy Dunes?
16    A.  Yes.
17    Q.  And what, if anything, happened after that
18 when you learned this?
19    A.  Several things had to happen quite quickly:
20 The purchase price was then increased by $10,000 to
21 accommodate for the commission.
22    Q.  Okay.
23    A.  And this was the purchase price that we were
24 utilizing at the workshop that day.  And subsequent
25 to that, after communications with myself and Coman

U.S. Legal Support
(561) 835-0220

63ecaa65-d0fc-4d88-8c16-31a96e089d95

| Page 38 |
| --- |

1    and Anderson, it was required to have a real estate
2    license to receive that commission.
3       Q.  Were the individual mortgage brokers who were
4    promised this commission ever paid the commission?
5       A.  There were two structures of commission.
6    Some additional loan officers were offered another
7    level of bonus, but the original commission some were
8    paid. I don't know the extent they were paid, but
9    the majority were not.
10      Q.  Do you know if the purchase price was ever
11    adjusted back down again to account for commissions
12    that were not paid?
13      A.  Never.
14      Q.  When you discussed the presentation, the
15    large presentations, you said that there were in
16    attendance: The developer, real estate broker, Joe
17    Aldeguer, you, you referred to the management group.
18    Was Jill Moore also in attendance at those
19    presentations?
20      A.  You have to clarify. The presentations were
21    done on the ninth floor, Jill Moore was present at
22    them but not on the stage. I want to understand
23    "present."
24         And the management company was different for
25    the presentations. On the first presentation on the

| Page 39 |
| --- |

1    ninth floor, the subsequent presentations on the
2    eighth floor.
3      Q.  The very first presentation the
4    representatives of a management company were on the
5    ninth floor in the room where the presentation
6    occurred?
7      A.  Correct.
8      Q.  Was that Geneva?
9      A.  No.
10      Q.  Subsequent presentations it was Geneva, who
11    was present?
12      A.  On the eighth floor.
13      Q.  But they were on the floor below?
14      A.  Correct.
15      Q.  Why on the floor below as opposed to the
16    ninth floor?
17      A.  After -- I want to refer to Exhibit 5, which
18    was put together at our request to have the data,
19    Chandra Webster was uncomfortable being on the ninth
20    floor being on stage or discussing it on the same
21    stage.
22      Q.  And Chandra Webster, she's one of the owners
23    of Geneva?
24      A.  Correct.
25      Q.  Why was she uncomfortable?

| Page 40 |
| --- |

1      A.  This was a new business approach for them.
2    She did not believe it was appropriate. And I
3    believe she had contacted her counsel, and her
4    counsel suggested that she not be present on the
5    ninth floor.
6      Q.  So instead she was on a floor below?
7      A.  Correct.
8      Q.  Were you ever on that floor below to see what
9    it was that Ms. Webster and Geneva were representing
10    to potential purchasers?
11      A.  Me personally?
12      Q.  Yeah. Did you ever go on the eighth floor?
13      A.  I was not in the war room with them, but
14    definitely on the eighth floor.
15      Q.  Did you ever go in the war room to see what
16    was said?
17      A.  No.
18      Q.  Did you ever see the PowerPoint presentation,
19    that's marked as Exhibit 5, presented to any
20    potential purchasers?
21      A.  I was not in the room for it no, but I do
22    know we have it.
23      Q.  Okay. What is contained in Exhibit 5?
24      A.  Statistics based on the actual ADRs in
25    Orlando that I believe were taken from the Orlando

| Page 41 |
| --- |

1    CVB and were put in a projection so that we could
2    see -- we being REIG -- how it would work utilizing
3    the statistics that were existing in Orlando at the
4    time.
5         If we take what's out there, what can we do?
6    What will it look like? That's what we asked them.
7    I specifically asked Chandra to put together -- Joe
8    wanted to see it -- Joe Aldeguer wanted to see it --
9    but I'm the one who asked her to put the numbers
10    together to see.
11      Q.  Okay. And when you say what it would look
12    like, what do you mean by that?
13      A.  As I said before, Legacy Dunes was an
14    apartment complex going to condominium conversion.
15    And the plans had changed just prior to this workshop
16    to make this short-term rental so that it would be a
17    resort and the short-term rental rates would be
18    applicable if someone purchased and chose to keep a
19    long-term occupant, meaning a long-term tenant, which
20    they had the opportunity to, but if went short-term,
21    what was the opportunity -- what were the rental
22    rates in the area if it were to go short-term.
23      Q.  Is the term "condo-hotel" synonymous with
24    short-term rentals?
25      A.  I believe so.

U.S. Legal Support
(561) 835-0220

63ecaa65-d0fc-4d88-8c16-31a96e089d95

## Page 42

1    Q.  And on page two of Exhibit 5, also page three
2  and page four, there are things that say:  ADR
3  projections case scenario number one, conservative.
4  And then third page says:  Scenario two, average.
5  And the fourth page says:  Scenario number three,
6  aggressive.  What are these projections of?
7    A.  The ADR knowledge from the Orlando CVB was a
8  wide spectrum.  And I really didn't understand at the
9  time how they could go from $49 to 400.  And there
10  were different statistics.  Some were conservative,
11  some were average, some were aggressive.  So these
12  were scenarios of different breakdowns with what it
13  would look like if they had an aggressive projection
14  of what rents could be.  This was just to show a
15  client -- or actually, the point again, this was
16  given to me, was to show what the opportunity could
17  be if those rental rates could be achieved.
18    Q.  And ADR stands for what?
19    A.  Average daily rental.
20    Q.  When you say what could be achieved,
21  basically you're talking about how much could be
22  earned from renting the unit as a short-term
23  condo-hotel?
24    A.  Yes.
25    Q.  Now, I'm not sure if I got away from this,

## Page 43

1  but with respect to Ms. Moore and these
2  presentations, I just want to clarify this:  She
3  wasn't up on the stage?
4    A.  No.
5    Q.  But she was in the room?
6    A.  Yes.
7    Q.  Okay.  For every presentation?
8    A.  I don't want to misspeak and say every
9  presentation.
10    Q.  Okay.
11    A.  She had a baby in '07, so she may have missed
12  a few.
13    Q.  And you did also describe that she was
14  involved with the administrative process in making
15  sure all the contract paperwork was completed and
16  assembled?
17    A.  Absolutely.
18    Q.  Did she have any other responsibilities at
19  The Mortgage Exchange or Real Estate Investment Group
20  as it pertains to sales of Legacy Dunes?
21    A.  I want to make sure I clarify and understand
22  when you say, "pertains to Legacy Dunes."  Because
23  payroll was underneath Jill.  And how people were
24  paid, that's all from the pure operational
25  standpoint, yes.

## Page 44

1    Q.  Okay.  Well, she was the CFO of the company?
2    A.  Correct.
3    Q.  Okay.  And you were the director of
4  operations?
5    A.  Correct.
6    Q.  What I'm interested in understanding is what
7  was Ms. Moore's role in the process of selling Legacy
8  Dunes units other than what you have already
9  described.  You said she was in the presentation room
10  maybe not every time, but you recall that she was in
11  there a number of times and she was also involved
12  administratively making sure the contract paperwork
13  was together?
14    A.  Correct.
15    Q.  Did she have any other involvement?
16    A.  Jill, along with Coman and Anderson, would
17  work out the contract and confirm the contract was
18  done, complete, and signed prior to with the
19  developer, with REIG.  So the keeper of the papers.
20    Q.  Did she ever help potential purchasers
21  complete paperwork?
22    A.  Jill would never have sat with an individual.
23  Jill would open up files and if something was
24  missing, would identify.  And one of the individuals
25  who worked for Jill, would confirm the signature, but

## Page 45

1  Jill would never sit with an individual.
2    Q.  She would have a quality assurance role to
3  make sure the paperwork was done correctly and if she
4  found something that was incorrect, she would have
5  someone else fix it?
6    A.  Correct.
7    Q.  Was she involved at all in negotiating issues
8  relating to what The Mortgage Exchange or Real Estate
9  Investment Group would earn in connection with sales
10  of Legacy Dunes units, mortgages written on Legacy
11  Dunes units, and anything of that nature?
12    A.  Regarding the REIG aspect and real estate
13  aspect no, not involved in what negotiations would
14  be.  Regarding The Mortgage Exchange, there are no
15  negotiations with how The Mortgage Exchange would be
16  paid on the mortgages.
17       Would she be involved in how they were paid
18  and what that rate was?  Yes.  Because she was the
19  CFO of The Mortgage Exchange, meaning the yield
20  spread that we were paid was determined on that.
21       So yes on the mortgage side, but it wasn't a
22  negotiation and no from the real estate side, she was
23  not part of the negotiation of her real estate
24  commissions.
25    Q.  Did she have any, to your knowledge,

12  (Pages 42 to 45)

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 46

1　oversight or approval that was necessary for whatever
2　deals were arranged for how much Real Estate
3　Investment Group would earn from any of these sales?
4　　A.　She was the other half of the yes vote, but
5　Joe would basically determine.  And unless Jill
6　objected, the decision stood.
7　　Q.　Okay.  Were you ever part of any discussions
8　between Joe and Jill about issues like how much Real
9　Estate Investment Group would earn from a sale?
10　　A.　Yes.
11　　Q.　Were there ever situations that you recall
12　where Jill said to Joe, No, I want to earn more or,
13　No, that's not right -- where she exercised that
14　veto?
15　　A.　In the negotiations of what we were being
16　paid or after we were paid?
17　　Q.　Any part of the process at all.  I just want
18　to understand what Jill was doing with respect to
19　sales of the Legacy Dunes units and what The Mortgage
20　Exchange or Real Estate Investment Group would be
21　earning from those sales.
22　　A.　Other than to agree, I don't recall any
23　conversations where she disagreed.
24　　Q.　Okay.  But she was involved -- I think I
25　understood you correctly, she was involved, she had a

Page 47

1　vote, and she presumably went along with whatever it
2　is that ultimately transpired and what Real Estate
3　Investment Group was paid on these?
4　　A.　Correct.
5　　Q.　Okay.  You mentioned in these large
6　presentations that there would be the developer.  Who
7　from Legacy Dunes LLC or Development Resources Group
8　was at these presentations?
9　　A.　It would differ.  Typically Jimbo, Jim Wear.
10　　Q.　Jim Wear?
11　　A.　Um-hmm.
12　　　　Not Big Daddy on stage, but some of them Jim
13　Wear -- and I don't know if they're Junior or Senior.
14　There's two Jimbo's.  Jim Wear is the younger, Jimbo
15　is the constant.  And there would be two assistants
16　that would come up -- and I am not recalling their
17　names at the moment, but I'm sure the names are
18　within the paperwork -- they would process.  I don't
19　recall if Ryan ever attended.  I know Michael did
20　not.
21　　Q.　Michael Halpin?
22　　A.　Right.
23　　Q.　How about Tim Tinsley?
24　　A.　Tim was in the Chicago office, but I don't
25　recall if he was actually able to stay in the

Page 48

1　workshops.  Tim's visits to Chicago were very
2　limited.
3　　Q.　You referred to Big Daddy.  That's Jim Wear's
4　father?
5　　A.　Correct.
6　　Q.　Which is the Jim Wear that's one of the
7　owners of DRG?  The junior?
8　　A.　Jimbo.  I don't know if they're Junior and
9　Senior officially.
10　　Q.　Jimbo?
11　　A.　Was the member of DRG.
12　　Q.　Is that the same Jim Wear that's speaks in
13　the presentation, the transcript of which is marked
14　as Exhibit 4?
15　　A.　Yes.  Because it refers to him as Jimbo.
16　　Q.　Do you remember how many presentations
17　Mr. Wear, that being Jimbo, attended?
18　　A.　I don't want to be -- I am not sure if I'm
19　exact.  I want to say at least three and Big Daddy
20　was present at one as well.
21　　Q.　Was he there with his son?
22　　A.　Correct.
23　　Q.　Okay.  So you mentioned real estate brokers
24　or real estate people from Florida, I believe, that
25　were at these presentations, who was that?

Page 49

1　　A.　Real Estate Dreams.
2　　Q.　Who is Real Estate Dreams?
3　　A.　Sean Parkes and Jay Holly.  Sean Parkes is
4　the broker, Jay Holly, and their team of sales
5　people.
6　　Q.　And who from their team of sales people came
7　to Chicago for these presentations?
8　　A.　It would vary.  There was -- I don't recall
9　all the names.  Some of the larger presentations had
10　quite a few sales people.  I honestly wasn't that
11　intimately involved in who they would bring.
12　　Q.　Who would speak on stage at the presentations
13　on behalf of Real Estate Dreams?
14　　A.　If Joe forced them on stage, it would be Jay.
15　　Q.　Otherwise, they didn't like to go on stage?
16　　A.　Neither was very amenable to going up on
17　stage.
18　　Q.　There is a reference in the transcript marked
19　as Exhibit 4 to Jay Holly being on stage.
20　　A.　Yes.
21　　Q.　Okay.  Do you remember if he went on stage
22　for any other presentations?
23　　A.　Yes, he did.
24　　Q.　Who videotaped Exhibit 2 that's transcribed
25　in Exhibit 4?

13 (Pages 46 to 49)

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 50

1    A.  I am not sure.  We typically -- the only two
2    people who typically videoed are Noel Pili, who
3    headed the IT department or Cedric Castillo or CLTV,
4    who is the WGN affiliate, would sometimes record to
5    utilize it for web shows.
6    Q.  CLTV is like a cable channel in Chicago?
7    A.  It is.  It's a WGN affiliate.
8    Q.  Do you know what happened to the other
9    videotapes besides Exhibit 2?
10   A.  I don't.  I don't know.  I know that we had
11   them.
12   Q.  Who do you mean by "we"?
13   A.  I'm sorry, let me clarify.  The Mortgage
14   Exchange and REIG possessed copies.  I don't know
15   what became of them.  I produced everything to you.
16   When I left The Mortgage Exchange, I put my desk in a
17   box.  Everything I had in a box is what you see.
18   Q.  Okay.  I want to ask you some questions about
19   statements that are made in this transcript.
20   A.  What page?
21   Q.  The transcript starts off and identifies the
22   first speaker as "Introducer," do you recall who the
23   introducer was?
24   A.  I believe for this transcript it was Chuck
25   Chevrie, but I would have to watch the video to

Page 51

1    confirm.
2    Q.  Perhaps during the break you can take a look
3    at it.
4    A.  From the jokes it looks like Chuck.
5    Q.  Okay.  If you look at the bottom of page
6    three there's a statement, line 25, "But Joe does not
7    offer any property for sale that he does not invest
8    in himself."
9         With respect to Legacy Dunes was that true?
10   A.  Joe as of today, no.  At the time he had
11   purchased -- he had signed purchase contracts for
12   several units.
13   Q.  Did he ever complete those purchases and take
14   title to those units?
15   A.  No.
16   Q.  Is it true with respect to any other real
17   estate investments that Joe Aldeguer ever promoted
18   for sale?
19   A.  He never bought any.  Contracts, yes;
20   closings, no.
21   Q.  He would sign contracts but he would never
22   close?
23   A.  Correct.
24   Q.  Flip to page 15 beginning on line four, the
25   sentence that starts, "Well, there's a concept a

Page 52

1    while ago that's been since the early eighties called
2    the hotel condo concept."
3         Is that what Legacy Dunes was being sold as,
4    the hotel condo concept?
5    A.  When you say being sold as, prior to our
6    involvement it was a condo conversion.
7    Q.  Right.
8    A.  At the time he brought in short-term
9    management it was still being sold as a condo
10   conversion that would have the opportunity for
11   short-term rental pool.  Ultimately I believe it was
12   the intent to be a condo-hotel, but 300 plus buyers
13   were already in there.  So we knew at the time we
14   would not have a full conversion.
15        So I don't want to misspeak and say it was
16   ever said to everyone out there would be 488 hotel
17   rooms there because 300 something were already sold.
18   Q.  Okay.  But with respect to those that were
19   being -- you described the situation earlier
20   surrounding the presentation where there was a board
21   up on the wall and there were keys?
22   A.  Correct.
23   Q.  And they each pertained to a different unit?
24   A.  Correct.
25   Q.  Those units were available for purchase by

Page 53

1    individuals who attended these presentations?
2    A.  Correct.
3    Q.  And those keys all represented unsold units
4    in Legacy Dunes?
5    A.  Correct.
6    Q.  It's those unsold units that I'm interested
7    in.
8    A.  Okay.
9    Q.  With respect to those unsold units, was
10   Mr. Aldeguer selling those unsold units as hotel
11   condos?
12   A.  Yes.
13   Q.  On line 11 it says, "Well, when they didn't
14   stay there, they hired a management company to manage
15   the property.  Make sense to you guys?  Okay.  All of
16   a sudden these people started making money."
17        Is Mr. Aldeguer there referring to units that
18   were up on the board with those keys that were being
19   promoted to the individuals who attended the
20   presentations?
21        MR. GORE:  Object to the form of the
22   question.
23   BY MR. ROTHMAN:
24   Q.  You can answer.
25   A.  I don't believe he was referring to those

14 (Pages 50 to 53)

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 54

1  specific units; he was referring to others who had
2  made money with the same concept.
3      Q. Okay. And was the idea that others who made
4  money with the same concept that the individuals who
5  attended these presentation could, like those people,
6  make money if they purchased these units that were up
7  on the board?
8      A. Yes.
9      Q. Now, on the next page, 16, beginning at line
10  16 it says, "And that's why it continues to work
11  because it is, one, you are buying a property in a
12  great location and, two, the maintenance is being
13  managed for you."
14      Now with respect to the Legacy Dunes units
15  that were being promoted for sale, was the
16  maintenance going to be managed for the individual
17  purchasers?
18      A. That was the intent.
19      Q. What involvement would the individual
20  purchasers have in maintaining the unit that they
21  purchased at Legacy Dunes?
22      A. At the time of the presentation the intent?
23      Q. Yes.
24      A. It was to put in an auto deduction on their
25  mortgage. And for the first calender year they had a

Page 55

1  rent guarantee and a long-term management company
2  maintaining the property. So their involvement was,
3  other than their mortgage, was always their own
4  responsibility to pay and receive the funds for that.
5  And post it going short-term, again they still had to
6  pay their mortgage and receive the funds for the
7  management company maintaining the property and
8  handling from the electric to the cable to collecting
9  their rent.
10      Q. So would it be fair to say the purchasers
11  involvement as it was presented to them at these
12  presentations was going to be very minimal, if none
13  at all?
14      A. Correct.
15      Q. Further down 23, line 23, it says, "This is a
16  five years average rate of return on appreciation."
17      Was there discussion at these presentations
18  about the prospect for individuals who purchased
19  units at Legacy Dunes to receive the benefits of the
20  appreciation and value of those units?
21      A. I guess I want to make sure when you state
22  the question, the slide that would have been up would
23  have shown the historical appreciation in all the
24  states and in all the areas. The discussion was if
25  this continues, here's what your property would be

Page 56

1  worth.
2      Q. Okay. The next page beginning on line three
3  it talks about the Florida market. And then further
4  down on line 16 it talks about the Orlando market.
5  Was there discussion at the Legacy Dunes
6  presentations that the prospects for earning
7  appreciation in the Orlando market for purchases of
8  investments in Legacy Dunes units was good?
9      A. Yes.
10      Q. Take a look at page 35. First of all, on
11  line 23 where it says, "Jimbo."
12      A. Yes.
13      Q. That's James Wear one of the owners of DRG?
14      A. Correct.
15      Q. Beginning on line 13, and if you can turn
16  back a couple of pages to page 33, do you see on line
17  15 it says, "Maureen Phillips." That's you?
18      A. Correct.
19      Q. If you flip forward it appears that -- what
20  begins on line 13 it continues to be you speaking; is
21  that accurate?
22      A. By the content of what I'm reading,
23  absolutely those with would be my words.
24      Q. So it says that, "Legacy Dunes is the
25  property in Orlando that Joe fell in love. It's part

Page 57

1  of the reason you're here. And we have a developer
2  here, we have the realtors here, and who you'll meet
3  with later is the short-term management company."
4  And then it says, "SEC."
5      A. I think the transcription is probably not in
6  the appropriate order.
7      Q. Okay. And the developer is referring to DRG,
8  the representative being Mr. Wear?
9      A. Correct.
10      Q. And the realtors is referring to Real Estate
11  Dreams being Sean Parkes and Jay Holly?
12      A. Correct.
13      Q. And the short-term management company is
14  Geneva and Ms. Webster and Mr. Sardinia?
15      A. Correct.
16      Q. And then you say, "You can't put short-term
17  management on the stage because I don't like Martha
18  Stewart's jewelry being her ankle bracelet, so we
19  aren't going to go there."
20      Can you explain?
21      A. Being new in the industry what I did know was
22  in no way could I be the one who discussed short-term
23  management of a property that was being sold. And
24  from the SEC guidelines, my understanding as a
25  layman -- one, I didn't have a Series 7, so I knew I

15 (Pages 54 to 57)

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 58

1    couldn't discuss the prospects of an investment and
2    how short-term rental would apply to that.
3        I always joked about Martha Stewart because
4    at the time she was wearing an ankle bracelet because
5    of insider trading and the SEC on a technicality put
6    her in jail. I didn't want to cross any technicality
7    that I didn't understand completely.
8        Q.  So would it be fair to say that you were
9    concerned about securities law issues when you
10   referred to the comment about the Martha Stewart's
11   jewelry being her ankle bracelet?
12       A.  Yes.
13       Q.  What was it about securities laws
14   specifically as it relates to short-term management
15   that concerned you?
16       A.  My understanding from counsel at the time,
17   which was Coman and Anderson, was you can't infer a
18   return that has yet -- that you can't guarantee. And
19   that once you create it as an investment, it's a
20   security and you must have a Series 7.
21       Q.  Now, do you know whether Joe Aldeguer
22   understood that at the time of this presentation?
23       A.  Yes, he did understand it.
24       Q.  He understood it?
25       A.  Yes.

Page 59

1        Q.  How do you know that?
2        A.  Because I sat in a room with himself and his
3    counsel to have these discussions to make sure he
4    understood.
5        Q.  And when did that first occur?
6        A.  It was a series of discussions that began in
7    March of '06.
8        Q.  What precipitated the first discussion in
9    March of '06?
10       A.  As REIG ventured in the Florida real estate
11   market, the first property, Runaway Beach Club, had a
12   short-term management company. And we were learning
13   the rules regarding short-term management companies
14   at that time and our involvement and how that is
15   evolving. And with Legacy Dunes being that, again,
16   the developer had a long-term condo conversion, that
17   with it going short-term, we had to understand how to
18   bring those pieces together.
19       Q.  Okay. And what was it that you learned as a
20   result of that discussion?
21       A.  At the time we were not a management company,
22   so no matter what we had have that discussion
23   because we didn't exist as a management company. And
24   that most management companies -- now, if we're
25   talking specifically the July 20th, the prior

Page 60

1    management company had gone on stage and made a
2    presentation as with Runaway Beach Club also had Sky.
3        It was at this point with Geneva coming in
4    saying they would not be party on stage, we sat down
5    with Coman and Anderson and asked them what can we
6    do, what can't we do, who's allowed to say what.
7    Because it was our belief prior to this that if we
8    weren't saying it and the management company was, it
9    was okay. And Coman and Anderson told us no, it's
10   not. And Geneva told us they would not go on stage
11   that day.
12       Q.  Did anyone from Coman and Anderson say it was
13   okay for Geneva to be on the floor below?
14       A.  They didn't say exactly. They knew they
15   would be present in the office and we had a two floor
16   office. But it is my understanding if they were
17   there but not in the open area part of the office,
18   but in a closed room where someone would have to
19   choose to meet with them.
20       It was my understanding it was not their
21   choice, they would not prefer that, they didn't
22   really want them there, but as a business decision,
23   it was made that people needed to be able to ask
24   these questions, could we provide a location for them
25   to meet with Geneva. We did. Would I say Coman and

Page 61

1    Anderson say they encouraged it, no, but they knew
2    that's what we would do.
3        Q.  And the types of questions people were
4    asking, were those questions: How much can I earn
5    from renting my unit at Legacy Dunes for short-term
6    rental?
7        A.  Not being in the room I can only go with the
8    questions people had asked on the floor --
9        Q.  Okay.
10       A.  -- to where the people under my management
11   were told not to answer -- would hear a question,
12   say, how am I going to make this, what's this, and
13   ask specific numbers -- they all knew and were told
14   over and over days before, don't answer the question
15   even if you know. If they would like to talk to
16   Geneva, they can call. And one of the things we did
17   was we gave out cell phone numbers to any owner. So
18   if they wanted to call Chandra on her cell, they
19   could.
20       Q.  What sort of questions were you asked on
21   stage at these presentations that you referred to
22   Geneva to answer?
23       A.  Anything regarding the association, anything
24   regarding what falls into -- there were questions
25   that would go as far as what falls into an accessory

16 (Pages 58 to 61)

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 62

1  package. I did answer when someone asked me the
2  definition of an accessory package. I didn't believe
3  I would be violating anything by answering from
4  silverware to washcloths to so forth. But those were
5  the types of questions.
6       Sometimes there were very specific questions.
7  Some people wanted to know who handled the dues, who
8  handled the maintenance. If I was on stage, that
9  wouldn't be something I would answer. And honestly
10  when it came to the management of a property in
11  short-term, I was just in the middle of my lesson. I
12  was not knowledgeable and a hotelier at that point
13  and I usually had to defer because I didn't actually
14  know.
15     Q. Okay. So, for example, on page 63 at the
16  bottom line 23, Joe Aldeguer says, "No. I want
17  again, just like Monopoly, I want the hotels, right.
18  Okay, do the numbers yourself. $900 a month or add
19  what the Orlando Travel Bureau gave you up there. I
20  can't add it for you."
21     A. What page are we on 63? 64?
22     Q. I'm on the wrong page.
23     A. I see it, 64. At this point the workshop had
24  ended, the first wave of people had gone downstairs,
25  and this was the casual conversation usually walking

Page 63

1  within the audience, not necessarily a formal
2  presentation.
3     Q. The part where he says, "Add what the Orlando
4  Travel Bureau gave you up there."
5       What's that referring to?
6     A. It would have been a slide showing the
7  statistics from the Orlando Travel Bureau.
8     Q. The statistics of how much you can earn in a
9  daily rental of a unit?
10     A. Pretty close to photographic, but I believe
11  it was off the website from the travel bureau. And
12  it had ADRs and occupancy rates.
13     Q. And then he says, "I can't add it for you."
14  You say, "He's not allowed to." And Joe Aldeguer
15  says, "It's illegal for me."
16     A. Correct.
17     Q. Okay. What is it that you were saying he's
18  not allowed to do and he's saying it's illegal?
19     A. I had made it very clear that he was not
20  allowed to add and say this is what you would make
21  less your cost and ever state here's what your income
22  would be. Because it is illegal for him to do that
23  and I told him so.
24     Q. And I think I understood you saying that
25  instead of answering those questions, you would refer

Page 64

1  people to Geneva?
2     A. Correct.
3     Q. So beginning on line 11 -- actually, that
4  deals with a different issue.
5       If you go to page 41, I think line 21,
6  "Figure it out yourselves: If you bought a two
7  bedroom suite, right, at 25420, that's the published
8  rate, published with the occupancy for the year,
9  multiply it yourself. Who has their own calculator?"
10       Is Mr. Aldeguer referring to how much money
11  you could make from renting out your unit at Legacy
12  Dunes as a condo-hotel unit?
13     A. The reference is there, yes.
14     Q. Now, on page 43 beginning line 11, this is
15  Mr. Wear speaking. He says, "And now that it's a
16  short-term lease, we came to Joe originally as a
17  long-term play -- appreciation play, and he helped us
18  get it to where it is now".
19       You had previously indicated that at the time
20  that you first learned about Legacy Dunes, Legacy
21  Dunes units were an investment based upon long-term
22  rentals and then that changed?
23     A. Correct.
24     Q. Okay. And is that what Mr. Wear is referring
25  to here?

Page 65

1     A. I believe so.
2     Q. Okay. So do I understand it correctly then
3  that you learned about Legacy Dunes, it was set up
4  for long-term rentals; that is, there were tenants in
5  the apartments who were renting for periods of, say,
6  a year or more, but that changed when Joe Aldeguer
7  and The Mortgage Exchange became involved, and it
8  became instead a short-term condo-hotel property?
9     A. That's my belief, yes.
10     Q. Okay. Now, if you go to page 50 -- if you
11  just turn back to page 49, this appears to be Joe
12  Aldeguer speaking, and then on line 17. If you just
13  do me a favor and please read from line 19 on 49
14  through 17 so we can understand the context where its
15  beginning Joe Aldeguer.
16     A. I go, Jimbo, it's going to take a while --
17     Q. I'm sorry, I didn't mean for you to read it
18  out loud.
19     A. Okay. I can do that.
20     Q. Sorry.
21     A. Okay.
22     Q. I wanted you to understand the context so I
23  could ask a question.
24     A. Okay.
25     Q. All right. So line 17, it says, "That's when

17 (Pages 62 to 65)

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 66

1    I said you know what, I want you to guarantee me that
2    I don't have to do anything. I want the rental paid
3    to me no matter what for at least one year
4    guaranteed." And Jimbo says, "And management." And
5    Joe Aldeguer says, "And management."
6        What is that describing?
7        A. I believe the "and management" was the
8    long-term management company, that was there on
9    property, would be there for one year along with the
10   guaranteed rent.
11       Q. What is the guaranteed rent?
12       A. At the time we met DRG they were already
13   offering a one year guaranteed long-term rent of
14   whatever they had a lease on the unit. If I buy unit
15   101, the lease was $900, you would receive $900 until
16   June of '07.
17       So when I say a year, if it was a July '07
18   presentation, the lease still expired June of '07.
19       Q. Even if you weren't going to be a hotelier
20   renting your condo-hotel unit on a short-term basis,
21   you were going to have a long-term tenant in there
22   that you would be earning income from from the
23   get-go?
24       A. Correct.
25       Q. And the management would be taking care of so

Page 67

1    that you wouldn't have to do anything to maintain the
2    unit or respond to tenant problems or fix pipes or
3    anything like that?
4        A. Correct.
5        Q. On page 52, line 16 says again, "And that's
6    why I invested in it myself, every senior advisor
7    here did also".
8        Was that true?
9        A. When you say, "invested," did they sign
10   contract or reserve units? A large group did reserve
11   those units. They did not all execute contracts, and
12   very few of them executed to sale. But at this point
13   his core senior group had each chosen a unit that --
14   I know in retrospect, I didn't know at the time --
15   they had chosen a unit they were going to sell to
16   someone else and take at closing, basically flip it.
17       So if I'm John Smith and I'm Joe, senior
18   advisor, and I picked unit 101 for $100,000 and we're
19   going to sell for 110, I'm going to keep that
20   $10,000, we're going to do assignments at this point.
21       In retrospect this concept was not vetted
22   with DRG first and Tim Tinsley said -- I'm going to
23   swear -- "No way in hell." So they had reserved
24   units, but they were not going to be closing on them.
25       Q. On page 53 beginning on line 5, you say, "The

Page 68

1    developer is actually giving a development rebate and
2    a $7,000 closing cost credit."
3        What was that rebate and closing cost credit?
4        A. They were incentives the developer was using
5    at the time that credited -- closing costs in Florida
6    were significant and the developer was in a position
7    that they needed to move the remainder of those units
8    and they were offering those incentives to get there.
9        Q. Were these rebates and closing cost credits
10   always listed on the HUDs for these sales?
11       A. At this point there had been no closing, so
12   there were no HUDs to review. Do you mean post?
13       Q. When the closings eventually occurred -- let
14   me start it this way, when the closing eventually
15   happened, were these development rebates and closing
16   cost credits given to purchasers?
17       A. They were given.
18       Q. Were they always listed on the HUDs?
19       A. I can't recall all the HUDs. Some yes and
20   probably some no.
21       Q. Okay. On page 55 line 16 you talk about
22   short-term management company. You say on line 18,
23   "I don't like Martha Stewart's jewelry. They can't
24   be on stage." And then it continues, "But they are
25   Geneva Hospitality."

Page 69

1        Is that what you're referring to with respect
2    to SEC guidelines?
3        A. Yes.
4        Q. And then on the next page, on 56, beginning
5    on line 12, at the end of the line it says, "There's
6    a revenue sharing that you do with them."
7        What was that revenue sharing?
8        A. I believe there's a question from the
9    audience that I don't see. By what I can see, it
10   looks like I'm responding to what's the management
11   company? "They are the ones who collect the income,
12   they are the ones who put the heads in beds, they
13   change the sheets, they manage the property. There
14   is a revenue sharing you do with them."
15       That would refer to Geneva, but I don't see
16   anything in the transcript that would say whose
17   question I'm answering. -
18       Q. What I was asking was the revenue sharing,
19   what does that pertain to?
20       A. If there's a management company short-term or
21   long-term, long-term you get a fee off the top,
22   short-term if a nightly rate comes in, the revenue is
23   shared between the management company and the owner.
24       Q. So if someone rents the unit as a hotel room
25   for one night, some money goes to the management

18  (Pages 66 to 69)

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 70

1    company and some money goes to the owner?
2        A.   Correct.
3        Q.   On page 57 at line 18 you say, "They're going
4    to give you a developer rebate in 30 to 60 days post
5    closing depending on what type of unit you get."
6            So is that the rebate you were talking about
7    before where I asked you if these went on the HUDs?
8        A.   Correct.
9        Q.   Because it was 30 to 60 days post closing,
10   would it be on the HUDs?
11       A.   I think it was lender specific if it was on
12   the HUDs.  At this point I now knew, and that
13   statement would have come from me, that because DRG
14   had not closed on the property yet and had to pay the
15   first.  Lending had pay it off before revenues could
16   flow.  I knew there would be a delay in receipt of
17   cash.
18           I wasn't referring to the HUD, but I was
19   referring to the timing of the money because it would
20   be delayed.  The developer told us it would be delay
21   because they had to pay first position lender.
22       Q.   Page 62 you say at line 10, "When you get
23   downstairs and talk to the short-term management
24   company, they'll go through the details.  They
25   structured it in a very --" Then Joe Aldeguer starts

Page 71

1    and says, "We can't talk about certain things like
2    that.  It's against the SEC rules.  We're not trying
3    to stay away from questions, but we're definitely
4    trying to stay away from seeing, you know, the jail."
5            Would it be correct to say that it appeared
6    that you and Mr. Aldeguer understood that by
7    segregating the Geneva short-term management company
8    to the floor below, that that sufficed in terms of
9    protecting yourselves from potential claims of
10   violation of the securities laws?
11       A.   I would be misspeaking if I told you I
12   thought we were free and clear.  I knew it was the
13   best within Joe's plans to be accomplished at the
14   time.  Ultimately it would be preferential not to
15   have them there at all.  I knew that.
16       Q.   And correct me if I am wrong, there seems to
17   be the suggestion, at least, that Mr. Aldeguer and
18   you thought that you were protecting yourselves by
19   keeping Geneva downstairs and not making them part of
20   the presentation?
21       A.   Yes.
22       Q.   Do you own yourself or through others any
23   interest in a unit in Legacy Dunes?
24       A.   I share an interest with a friend.
25       Q.   With a friend?

Page 72

1        A.   Um-hmm.
2        Q.   Is that friend a plaintiff in this lawsuit?
3        A.   No.
4        Q.   And you're not a plaintiff in this lawsuit?
5        A.   No.
6        Q.   Okay.
7            MR. ROTHMAN:  Off the record.
8            (Short break.)
9    BY MR. ROTHMAN:
10       Q.   Turn your attention to the stack of documents
11   that's been marked as Exhibit 1.
12           Before we went off the record you were saying
13   you own an interest in one of the units in Legacy
14   Dunes.  Do you know what unit number it is, what
15   building?
16       A.   Honestly, I don't.  It was a financial
17   sharing.  I wouldn't even put myself down as a deed
18   or an owner.  It's a financial sharing with a friend
19   there.
20       Q.   Okay.  The first page of this exhibit --
21   these are all Bates marked.  So we're looking at
22   Phillips 00001 -- is a document on Real Estate
23   Investment Group, Limited letterhead.  And it has a
24   signature block at the bottom, "Sincerely, Joe
25   Aldeguer, President."  It's dated September 2006.

Page 73

1            Do you know if this was sent to Legacy Dunes
2    condominium purchasers?
3        A.   I do not believe it was.  The document was
4    created to be reviewed as a response to a loan
5    officer who had tried to go out on their own and
6    create and use their memory or their best
7    recollection to tell people what they thought the
8    guarantee was, interpreting the Legacy Dunes
9    information.  The letter was never to go out in -- I
10   don't believe counsel ever wanted it to go out.
11           I do believe that there were several loan
12   officers that did send out documents, but they were
13   not from -- anything that went out on letterhead had
14   to be approved and they were not approved.  They were
15   documents that went to clients that were not
16   approved.  But this was not meant or created for mass
17   distribution.
18       Q.   Okay.  So this was something then, as I
19   understand your testimony, this is something that was
20   created in draft but was never actually disseminated?
21       A.   I don't know if it was broadly disseminated.
22   I do know that some were sent out and some people
23   received them.  I know that I tried to track down
24   exactly how they went out as well as I know Jill
25   Moore did, but I don't believe we ever knew how many

19 (Pages 70 to 73)

63ecaa65-d0fc-4d88-8c16-31a96e089d95

1    people have.
2        And the clients shared information with one
3    another. So it's been seen by the clients, the
4    people who bought. I do not believe it ever went out
5    in mass distribution.
6    Q. Is there a reason why this document, why it
7    was not sent out for mass distribution?
8    A. Going on pure memory, I don't think we ever
9    came to complete agreement on how it was phrased.
10   And all the parties involved I don't believe we ever
11   came to a complete agreement on how that was done.
12   Q. What was the problem? What was it that --
13   about this document that was problematic in terms of
14   the phrasing?
15   A. It was more the monthly guaranteed amount was
16   slightly different. Throughout the process of Legacy
17   Dunes there were tweaking up and down, trying to
18   basically run numbers to see if it worked based on if
19   this is what the rent was on the unit.
20       We had a couple of rent rolls, it was
21   evolving, and what the guarantees were. So we were
22   tweaking the numbers up and down. And there were
23   several versions of this with different numbers.
24       And honestly it became a time management
25   issue, we had so many other crises to deal with that

1    this never got to be in the forefront.
2    Q. Okay. So the first paragraph says, beginning
3    in the second line, "You have the option to enter
4    into a short-term management program to provide for
5    the rental of your unit on a daily, weekly, or
6    monthly basis as a condominium hotel unit."
7        Was that true as of the date of this,
8    September '06?
9    A. September of '06 we didn't have closings yet,
10   so no one owned one yet. But they had the ability to
11   -- yes, they had the ability to rent those on daily,
12   weekly, or monthly because they were still long-term
13   rental. I don't know -- I think, again,
14   recollection, had the monthly on there and
15   condo-hotel, those didn't go together.
16       There were too many up in the air questions.
17   When would it be short-term? How long will it be
18   long-term? When would there be a takeover? It was
19   being discussed at the time that, yes, they would
20   have those options.
21   Q. And it continues and says, "The on-site
22   management company through whom the short-term
23   management program is offered is Geneva Hospitality."
24       Was that the intent or understanding at the
25   time in September of '06?

1    A. Yes.
2    Q. So now even though this letter wasn't sent
3    out, was the information about the ability to enter
4    into a short-term management program and that
5    management for the short-term program would be
6    offered by Geneva, was that information communicated
7    to potential purchasers of Legacy Dunes?
8    A. Yes. And it was actually communicated to
9    people who had purchased. Because, again, the first
10   wave of purchasers did not hear about Geneva
11   Hospitality. They were presented with a different
12   company.
13   Q. Okay.
14   A. So we brought them back in to introduce them.
15   Q. The second paragraph says that in order to,
16   and I'm not quoting it, but to encourage
17   participation in the short-term management through
18   Geneva, which it calls the "program," that there's an
19   incentive that's being offered by Real Estate
20   Investment Group and it's to purchasers who: One,
21   purchase their condominium units through REIG; two,
22   submit their units by June 1, 2007; and, three,
23   thereafter continue to offer their unit for rent
24   through the programs for 24 consecutive months.
25       Was this program that's being described here

1    something that was communicated to potential
2    purchasers around September of 2006?
3    A. Yes.
4    Q. Now it goes on to describe certain income
5    targets based upon types of units. Explain to me,
6    for example -- and let me ask you again, even though
7    this letter wasn't sent out, was the information
8    contained in the letter about monthly guarantees and
9    income targets, was that communicated to potential
10   purchasers of Legacy Dunes units?
11   A. In relation to what's on this paper?
12   Q. Well, are you aware that people who had
13   signed contracts to buy units in Legacy Dunes through
14   The Mortgage Exchange and Real Estate Investment
15   Group were told information that's contained in this
16   letter about monthly guarantees and monthly -- and 24
17   months growth income targets?
18   A. Yes, they were.
19   Q. So where it says a one bedroom, the monthly
20   guarantee is $783, is that information that was
21   conveyed to purchasers of one bedroom units as the
22   guarantee they would be entitled to provided they met
23   certain 24 month growth income target of $18,792?
24   A. Provided they signed up with Geneva, yes.
25   Q. And provided they signed up with Geneva?

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 78

1    A.  Yes.
2    Q.  Was the same information about the other
3  sizes of units and the monthly guarantees and income
4  target reflected here also conveyed to purchasers of
5  Legacy Dunes units?
6    A.  Yes.
7    Q.  And, again, even though there's some
8  reference to monthly rentals in here, this document
9  basically discusses the short-term rental program
10  which we also agreed was a condo-hotel program?
11    A.  Same structure, yes.
12    Q.  Okay.  Now, the bottom sentence before
13  "Sincerely" in all caps says, "You are not required
14  to participate in the short-term management program
15  offered through Geneva Hospitality and are free to
16  separately rent your unit through another management
17  company or through your own efforts."
18    A.  Um-hmm.
19    Q.  Now, would it be feasible for someone who
20  lived in the Chicago area to rent their unit without
21  a management company but through their own efforts on
22  a short-term condo-hotel nightly basis?
23    A.  No.
24    Q.  Was there any other management company -- at
25  this time in September of '06, was there any other

Page 79

1  management company that was available to do
2  short-term rentals at Legacy Dunes?
3    A.  Yes.  There's -- there were -- there's
4  hundreds of management companies in Orlando that
5  could do short-term management.
6    Q.  Understood.  But that's not my question.
7    My question was, was there, at Legacy Dunes,
8  in place, was there a management company that had --
9  that was there doing short-term rentals of Legacy
10  Dunes units?
11    A.  No short-term rentals at that time.
12    Q.  Flip to the next page.  You may want to
13  remove the binder clip.
14    Phillips 00002 looks like a draft of the
15  prior letter?
16    A.  Yes.
17    Q.  The information about the on-site management
18  company is missing in 0002 in the first paragraph.
19  Is there a reason why it wouldn't have been filled in
20  with Geneva management at that time?
21    A.  I believe it was probably very generic, just
22  trying to put names on it.  Honestly, from this
23  context that it doesn't have Joe's name on the bottom
24  and it was in draft form, probably it was very
25  specifically Misty, Karen, or Jill typed it not

Page 80

1  knowing the name Geneva's LLC might be in Florida.
2    At this point with LLC's and Florida licenses
3  and so forth, we didn't fill in the name until we
4  knew the exact legal name.  It was not for reference
5  of not knowing; it was making sure it was
6  specifically stated correctly.  That would probably
7  be the only reason for it not to be in there.
8    Q.  Is this your handwriting in the margin?
9    A.  No.
10    Q.  Next page, is this your handwriting?
11    A.  Yes.  I'm embarrassed to say yes, that's my
12  handwriting.
13    Q.  Two pages of notes?
14    A.  That looks like the outside of a photo copied
15  folder.
16    Q.  What are these notes about?
17    A.  We were trying to put in organizational chart
18  in place with distributions to give to counsel with
19  titles, because everyone was looking for specific
20  titles.  We were putting descriptions together for
21  counsel to review.  And this would have been probably
22  in my stack of documents of the job descriptions.
23    Q.  Do you recall when that was?
24    A.  This was an ongoing process through most of
25  '06 as REIG came on the scene.

Page 81

1    Q.  Do you recall why counsel wanted an
2  organizational chart?
3    A.  We have a lot of people using a lot of
4  titles.  And with the different companies trying to
5  separate the companies and separate the roles and
6  separate the titles, we grew very, very quickly, and
7  needed to try and put some structure in place.
8    Q.  Skip to Phillips 14.  Take a look at 14 and
9  then if you skip another page to 15 and then skip
10  another page to 16 and then another page to 17, it
11  all looks like org charts in progress?
12    A.  Correct.
13    Q.  So you tell me because you're more familiar
14  with this, which page should he look at if we wanted
15  to get an understanding of what the organizational
16  structure was of the company in the first half of
17  2006?
18    A.  The first half of 2006, I would say the
19  handwritten Phillips 14 would have been the closest.
20    Q.  So "J.A. President" is Joe Aldeguer?
21    A.  Correct.
22    Q.  And "J.M. CFO" is Jill Moore?
23    A.  Correct.
24    Q.  Who is it beneath "J.A"?  Who reports to him?
25    A.  Well, there's -- obviously you see that line

21 (Pages 78 to 81)

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 82

1   is shared. The one that's crossed out?
2      Q.   No.
3      A.   Senior VP of sales -- these were proposed
4   titles -- senior VP of ops and senior VP of I.T.
5      Q.   Let's do this instead. Let's look at
6   Phillips 16.
7      A.   Okay.
8      Q.   It seems a little clearer. Maybe if this is
9   not accurate, you can tell me.
10        Under Joe Aldeguer, chief executive officer
11  and president, you have you, senior VP of operations;
12  Neil Pili, senior VP of I.T; Dan Stramaglio, senior
13  VP of sales.
14     A.   Correct.
15     Q.   Did you all report only to Joe Aldeguer?
16     A.   No. This is why these were proposed at the
17  time. And what would be accurate would be my
18  handwritten one. This typed one is by Noel Pili.
19     Q.   Okay.
20     A.   And the handwritten one I would say I was
21  split between Jill and Joe, so.
22     Q.   You reported to both?
23     A.   Correct. Ultimately they're 50-50. The only
24  one I would say who didn't report to Jill because
25  would have been Dan Stramaglio, VP of sales because

Page 83

1   they tried to separate sales and administrative as
2   much as they could.
3      Q.   Other than sales at The Mortgage Exchange,
4   Real Estate Investment Group, et cetera, everybody
5   else reported either to just Jill Moore or Jill Moore
6   and Joe Aldeguer?
7      A.   I need to clarify that. Ultimately the
8   person who worked between them most would be me.
9   Noel Pili, although he was I.T. he reported to Joe
10  but he also answered to Jill. Sales very
11  specifically went directly to Joe. Everyone else
12  underneath, admin went up to Jill and sales went up
13  to Joe. The only ones that crossed with both were
14  myself and Noel.
15     Q.   Looking at 14 again on the right hand side,
16  the people who report only to Jill --
17     A.   Yes.
18     Q.   -- what are all of those functions?
19     A.   Administrative, accounting, payroll,
20  benefits, processing -- we were a mortgage company so
21  we had a very significant processing and quality
22  assurance department.
23     Q.   What about the processing functions as part
24  of the Real Estate Investment Group?
25     A.   Those were administrative and they were

Page 84

1   within the admin office with Jill.
2      Q.   Okay. On 15 Peter Becker is listed. Is he
3   replaced by Mr. Stramaglio?
4      A.   It's very confusing by this sales work chart.
5      Q.   I'm sorry, Dan Stramaglio is on top.
6      A.   Pete Becker had multiple roles. He was a
7   team leader within The Mortgage Exchange, he was also
8   The Financial Exchange with his licenses in
9   insurance.
10        These are different charts. The Mortgage
11  Exchange on top does not address The Financial
12  Exchange. This is Pete Becker's mortgage team. He
13  was a mortgage team leader as well.
14     Q.   Were any members of The Mortgage Exchange or
15  Real Estate Investment Group or any of the other
16  entities' staff licensed to sell securities?
17     A.   I do believe we had a few with Series 6 and
18  Series 7, but it wasn't anything related to -- we
19  didn't utilize it, but I would not say we didn't have
20  a C.V. who -- someone's C.V. may have had a six. And
21  most likely that would have been Pete Becker. I know
22  he was sitting for the seven. He may not have had
23  his seven at the time, but he had his six. And other
24  members of our staff who had been traders, most
25  likely had their six or their seven, but I couldn't

Page 85

1   say who. We had a lot of former traders doing
2   mortgage.
3      Q.   Did Joe Aldeguer have any securities
4   licenses?
5      A.   Not to my knowledge.
6      Q.   Did Jill Moore have any securities licenses?
7      A.   No.
8      Q.   On 17 the -- excuse me, 18, Lighthouse Key
9   Resort and Spa. This is a document that pertains to
10  that?
11     A.   Yes.
12     Q.   This has nothing to do with Legacy Dunes?
13     A.   No, it has nothing to do with Legacy Dunes.
14     Q.   This is another development that Real Estate
15  Investment Group and Mortgage Exchange promoted to
16  potential purchasers?
17     A.   Correct.
18     Q.   Skip to 27.
19     A.   Yes.
20     Q.   Park Place Private Residences.
21     A.   Yes.
22     Q.   Does this have anything to do with Legacy
23  Dunes?
24     A.   It does not.
25     Q.   Skip to 40, this is titled Real Estate Broker

22  (Pages 82 to 85)

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 86

1    Agency Disclosure?
2       A.  Yes.
3       Q.  And it lists towards the bottom entities that
4    are related to Real Estate Investment Group, Limited,
5    which is listed at the top, including Own a Hotel
6    Room, LLC; X Management, LLC; The Mortgage Exchange,
7    Inc.; The Title Exchange, Inc.; and The Financial
8    Exchange, Inc.  The Financial Exchange was just a
9    D/B/A, wasn't that right, it wasn't a real entity?
10      A.  Correct.
11      Q.  Were there any other related entities that
12   you haven't told us about?
13      A.  Not that I know of that are related to REIG.
14      Q.  Phillips 0042 looks like it starts with a
15   spreadsheet and continues through 0047?
16      A.  Yes.
17      Q.  Is this a spreadsheet of Legacy Dunes owners?
18      A.  It is.
19      Q.  Is this something that was maintained at The
20   Mortgage Exchange?
21      A.  No.
22      Q.  Is this your own?
23      A.  No.
24      Q.  Where did this come from?
25      A.  Chandra Webster had created, going through

Page 87

1    public record, confirming the owners within Legacy
2    Dunes for planning and business plan purposes.  But
3    seeking it through public record and public domain
4    she had created a spreadsheet of all that she could
5    access.
6       Q.  Do you know what she was doing with all this
7    information?
8       A.  At the time with the intention of managing
9    the property, trying to get an idea of where the
10   owners were located and how to contact them.
11      Q.  For the purposes of signing up more people to
12   manage on a short-term basis?
13      A.  Absolutely.
14      Q.  Do you remember when that was?
15      A.  No, I don't.
16      Q.  Skip to 48.  This is an e-mail.  It's from
17   MichaelJohnson2 at XSaloncorp-dot com.  Do you know
18   who he is?
19      A.  I do.
20      Q.  Who is that?
21      A.  A client of The Mortgage Exchange and REIG.
22      Q.  And who is K. Boudreaux -- or Kevin L.
23   Boudreaux is listed on the top?
24      A.  Kevin Boudreaux was a contract employee with
25   X Management.  He was the customer relations manager,

Page 88

1       Q.  This is an e-mail thread that looks like it's
2    several pages.  I find this a little bit easier to
3    read from the bottom up.  If you can go to Phillips
4    0051.
5       A.  Okay.
6       Q.  It appears to be an e-mail from Michael
7    Johnson.  How did you -- I didn't notice where you
8    were CC'd on any of these.  Do you know how you got
9    this?
10      A.  I would have probably been handed it to deal
11   with client.  If there were client issues or a client
12   requested a customer service phone call, many times I
13   was just handed a document to call and make sure the
14   client had contact, whether it was a Mortgage
15   Exchange client or a Financial Exchange client, and
16   make sure if they had a concern, I would answer it.
17         Many times someone will hand me a document of
18   a string.  I can't honestly recall the source.  Like
19   I said, everything that in a box that was Legacy
20   Dunes, I turned over without looking at it.  This was
21   handed to me to call Michael Johnson.
22      Q.  Do you have a recollection of speaking with
23   Michael Johnson about his Legacy Dunes unit or units?
24      A.  Many times.
25      Q.  Why don't you -- before we look at the actual

Page 89

1    document, why don't you tell us what is your
2    recollection of your conversations with Mr. Johnson?
3       A.  Mr. Johnson had become quite frustrated with
4    the delay in converting to short-term with the lack
5    of concrete answers.  He's a very structured,
6    engineering, type A personality who wants to know
7    where, when, how much, what day.  And at the time of
8    the closings there was -- it was very in flux, we
9    didn't have any concrete answers.
10         And at this point, if I'm looking at the
11   dates on here of '07, as the planner that Mr. Johnson
12   is, he would have been looking at the rental
13   guarantee expiring and would have wanted more
14   concrete dates.  And as we anticipated it being
15   short-term already, he was frustrated.
16      Q.  Explain to me what had transpired with
17   respect to short-term rentals of Legacy.  Because
18   when we were looking at the transcript of your
19   testimony, there was a lot of discussion about how
20   this would be a short-term property.
21      A.  Correct.
22      Q.  And we're looking at this e-mail and you're
23   describing conversations with Michael Johnson about
24   the property becoming short-term, which suggests to
25   me that something has happened in the interim.  So

U.S. Legal Support
(561) 835-0220

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 90

1  explain the situation at Legacy from the time the
2  closings began through this concern that Mr. Johnson
3  raises?
4      A.  By the time the closings started, we were
5  already delayed in schedule.  We were beginning in
6  September.  We had believed they were going to start
7  in August.  The developer was under incredible
8  pressure to pay off their financing.  Financial
9  duress started to create an adversarial position with
10 all parties.
11         I would say by the early part of the winter
12 of '06 there was a breakdown between every party in
13 the play except Geneva Hospitality, Own a Hotel Room,
14 REIG, and X Management, that was still a line of
15 communication.  But regarding Real Estate Dreams
16 regarding DRG and REIG and communications had long
17 since broken down, were adversarial at that point and
18 the transition to short-term was in limbo and not
19 moving forward.
20     Q.  Well, I understood from reading the
21 transcript of the presentation in July of 2006 that
22 these were short-term rental properties, was that
23 incorrect?
24     A.  They were not at the time.  They were not
25 short-term at the time.  They had long-term leases.

Page 91

1  But the zoning -- it had been determined, the zoning
2  was not an issue and was already approved for
3  short-term, it just needed an application.
4      Q.  Well, in September of 2006 if I had closed on
5  my Legacy Dunes unit and I didn't have a tenant in it
6  and I wanted to rent it on a short-term basis, were
7  the necessary zoning and other approvals in place so
8  that I could do that?
9      A.  When you say approvals, zoning -- my
10 understanding was the zoning didn't restrict it.  I
11 know the application was not in place to do that.  So
12 no, you could not have done the short-term.
13         And I also know that licenses would have been
14 required on the individual units and that had not
15 been done by Geneva.  And I don't believe it had been
16 done by anyone else.  So no, you couldn't rent on a
17 short-term base says in September 2006.
18     Q.  Okay.  Do you know when, if ever, the
19 necessary approvals and licenses were obtained to
20 allow for sort-term rentals of Legacy?
21     A.  Yes.
22     Q.  When was that?
23     A.  They were obtained by the board, the
24 association board, Jim Murphy and Osceola Management
25 along with the homeowners association board.  And the

Page 92

1  dates of that would have been, I believe, in early --
2  it would have been '07, August or September of '07.
3      Q.  Approximately one year after the first
4  closings on the Legacy Dunes units?
5      A.  Correct.
6      Q.  Let's take a look at page 51, Phillips 51, of
7  this Michael Johnson e-mail.  He's got three numbered
8  paragraphs on that page.
9          Number one says, "I purchased this unit with
10 the intention of short-term management but I was told
11 the delays are due to DRG."
12         What is he talking about there when he says
13 that the delays are due to DRG with respect to
14 short-term management?
15         MR. GORE:  Object to the form of the
16 question.
17 BY MR. ROTHMAN:
18     Q.  If you know?
19     A.  Do I believe what Michael Johnson was
20 referring to?
21     Q.  Do you know what he was referring to?
22     A.  I do.
23     Q.  What was he referring to?
24     A.  The application for short-term management
25 that needed to be completed by the board, the

Page 93

1  association board which was currently controlled by
2  DRG.
3      Q.  He says in the third line "Owners such as
4  myself have been put in a precarious cash flow
5  dilemma due to this delay."
6          Assuming for a second that he truly was in a
7  cash flow dilemma, do you know if anyone else, other
8  than Mr. Johnson, was similarly put a cash flow
9  dilemma because of this delay?
10     A.  Did I know at the time or do I know in
11 retrospect?
12     Q.  Well, sitting here now do you know?
13     A.  Yes.
14     Q.  What was the cash flow dilemma?  What was he
15 talking about when he says, "a cash flow dilemma," if
16 you know?
17     A.  The leases were about to expire, their units
18 were not re-rented out and they knew there would be
19 no guaranteed check coming in and their expenses
20 exceeded the amount coming to them.
21     Q.  So there was a long-term lease, say, for
22 example, on a unit that the lease expired, the tenant
23 in there doesn't renew, the unit is vacant but they
24 can't rent it on a short-term basis?
25     A.  Correct.

24  (Pages 90 to 93)

63ecaa65-d0fc-4d88-8c16-31a96e089d95



Page 94

1    Q.  So they're not able to earn the income from a
2  short-term rental?
3    A.  Correct.
4    Q.  It says on the next line, "The Mortgage
5  Exchange is handling their own short-term and hiring
6  their own management company."
7       Was that the case?
8    A.  Well, I mean, The Mortgage Exchange didn't.
9  REIG and Own a Hotel Room retained Geneva
10  Hospitality.
11   Q.  Okay.  It was -- he referred to The Mortgage
12  Exchange but it was actual REIG?
13   A.  Correct.
14   Q.  It says next line, "The project was turned
15  over from the developer to the board on 9/30/06 so
16  there were no delays due to DRG."
17      Is that correct?
18   A.  The board was turned over, correct, on
19  9/30/06.  That comment regarding no delays were due,
20  one, I can't tell what he's referring to and -- I
21  know for a fact the board was turned over 9/30/06.
22   Q.  Do you know whether anything that DRG did or
23  didn't do caused any delays with respect to the
24  ability to rent units on either a short-term or a
25  long-term basis?

Page 95

1    A.  ·I believe that no application for the
2  short-term definitely delayed short-term going
3  forward.
4    Q.  Okay.  Skip down to three.  It says, "My unit
5  was purchased through The Mortgage Exchange in
6  Chicago and this included a renovation/furniture
7  package to be completed prior to short-term.
8  Obviously this has been delayed, but I would like a
9  summary of what exactly this renovation includes and
10  the time frame it will take to complete when the time
11  comes.  It is my understanding DRG will be doing the
12  renovation work."
13      Was that the case with purchasers, did their
14  purchase include a renovation/furniture package?
15   A.  Their purchase did include both of those,
16  yes.
17   Q.  Was DRG supposed to do the renovation work?
18   A.  It was my understanding and our understanding
19  at the time they would be made rent-ready like we had
20  seen.  And some clients, it turns out in retrospect,
21  had on their contract that yes, they would make it
22  rent-ready.  So if the counters were destroyed and
23  appliances -- some didn't have that attachment.  But
24  it was my understanding the furniture was the
25  responsibility of Real Estate Dreams and REIG, but

Page 96

1  that the units being made rent-ready were DRG.
2    Q.  Did DRG do that?
3    A.  Like I said the adversarial disagreement at
4  this point was they said it was not their job.
5    Q.  So DRG, for whatever reason, did not do the
6  renovation work that the purchasers understood they
7  were going to do?
8    A.  They did not make them rent-ready, correct.
9    Q.  It says in the next line, and it's a little
10  unclear because this may be somebody replying to an
11  e-mail because there's bold, can you tell if the bold
12  is Mr. Johnson or if the bold is somebody replying to
13  it, do you have any idea?
14   A.  By history I would say that looks very much
15  like a Jessica response.
16   Q.  Okay.
17   A.  In my experience we respond right to the
18  question separating hers, usually in a different
19  color, but this is a black and white copy, so I -- I
20  would expect that she did.
21   Q.  Jessica, you are referring to Jessica Callow?
22   A.  Yes.
23   Q.  She worked for the Wear Group?
24   A.  She did.
25   Q.  What was the Wear Group's involvement, if

Page 97

1  any, in Legacy Dunes?
2    A.  I don't know the legal structure other than
3  we were introduced to the group.  And Jimbo, or Jim
4  Wear, was also part of the Wear Group and we also met
5  the Wear Group.  DRG we knew was the developer and
6  the Wear Group was basically part of the family.  I
7  don't know the legal involvement by any means.
8    Q.  Okay.  On -- let me ask you, on the top of 49
9  Phillips 49 --
10   ·A.  Yes.
11   Q.  -- this is an e-mail, it says, from
12  MichaelHelms at DRGFL dot com.  Michael Helms worked
13  for DRG?
14   A.  Yes.
15   Q.  And he was also president, according to his
16  signature here on April 3rd, 2007, of the Legacy
17  Dunes Condominium Association, Inc.?
18   A.  He was.
19   Q.  Okay.  If the turnover of the association
20  occurred in 2006, why would someone who worked for
21  DRG still be the president in 2007, do you know?
22   A.  He was on the current board.  I don't know
23  why he was, but.
24   Q.  Okay.
25   A.  I believe he was placed on the board.  I do

U.S. Legal Support
(561) 835-0220

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 98

1    not know if it was an election or not.
2        Q.  Okay.  Can you skip to Phillips 00053.  This
3    is something on Legacy Dunes letterhead dated
4    August 30th, 2007, and it has Osceola Management and
5    Consulting, Inc. on bottom --
6            MR. GORE:  Let me object to the form of the
7    question to the extent it represents it's on the
8    particular letterhead.  I would acknowledge it has
9    a logo at the top, but it appears to be a Osceola
10   Management and Consulting letterhead.
11           MR. ROTHMAN:  I actually haven't finished the
12   question.
13           MR. GORE:  Okay.
14   BY MR. ROTHMAN:
15       Q.  But do you know what this document is?
16       A.  My understanding is it was Osceola Management
17   starting to manage at Legacy Dunes.
18       Q.  Okay.  What does the started price refer to,
19   do you know?
20       A.  Long-term leases.  Monthly amounts -- without
21   having asked who constructed it, those look like the
22   monthly rental amounts they would have asked.
23   Long-term leases.
24       Q.  Okay.  Is that when Osceola Management took
25   over in August of 2007?

Page 99

1        A.  That is my understanding.
2        Q.  Okay.  The next page, property management was
3    a thing, a document called Property Marketing
4    Proposition from Advantage Vacation Homes.
5        A.  Yes.
6        Q.  Do you know what this is?
7        A.  This was the management company who we had
8    met with whose offices were literally located outside
9    of Legacy Dunes, not on Legacy Dunes property, I
10   think it's the west, but I am not sure of my
11   direction, that we had meet with us and originally
12   propose they rent the property short-term.
13       Q.  Did they ever become the short-term
14   management company?
15       A.  No.
16       Q.  Do you know if these documents that are part
17   of this presentation were ever distributed to any
18   potential purchasers?
19       A.  I don't know.
20       Q.  On Phillips 00070 it's got what's indicated
21   as 2005 Competitive Seasonal Rates.  Do you know if
22   this was ever given to any purchasers or potential
23   purchasers of Legacy?
24       A.  I do not know.  I know that this was the
25   bound presentation that this group had come to

Page 100

1    Chicago with, but I do not know how many were
2    distributed or if they were.
3        Q.  So was this the management company that was
4    at the very first presentation?
5        A.  Yes.
6        Q.  Okay.  And did they present on the stage?
7        A.  They did.
8        Q.  And did they present this presentation that
9    starts at Phillips 00054 and runs through Phillips
10   00072?
11       A.  I would be misspeaking if I told you they
12   used all of the screens, they used some.  I do not
13   know if they used all.
14       Q.  Do you know if they used the 2005 Competitive
15   Seasonal Rates in Phillips 00070?
16       A.  I don't know, only because it actually looks
17   like they started to make it look like '06.  This may
18   have been a draft.  I don't know.  Sorry.
19       Q.  Do you remember who it was that was on stage?
20       A.  Name?  No.
21       Q.  Name.
22       A.  Middle-aged British woman, but I don't
23   remember her name.
24       Q.  Look at Phillips 74.  What is this?
25       A.  Let me read it and look.

Page 101

1            Clearly a letter from Geneva.  And at that
2    point they truly believed they were proceeding with
3    short-term management and starting to prepare as a
4    management company would and saying what expenses and
5    what would be coming up.
6            People are signing contracts for Geneva to
7    manage their property short-term.
8        Q.  And this was in November of 2006?
9        A.  Correct.
10       Q.  The third paragraph of the letter refers to a
11   rental accessory package and a rental agreement?
12       A.  Yes.
13       Q.  And it refers to a fee as determined by the
14   unit size and number of units owned?
15       A.  Correct.
16       Q.  Do you know whether any Legacy Dunes
17   purchasers paid for the rental accessory package?
18       A.  The majority, yes.
19       Q.  Okay.  Were there any other fees that
20   required to be paid to Geneva at the outset from
21   purchasers at Legacy Dunes besides this rental
22   accessory package?
23       A.  There would have been an initiation charge
24   for them, as it was described.  To take a property
25   from apartment to short-term there would be start-up

26  (Pages 98 to 101)

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 102

1   cost, advertising, signage and so forth.  There was
2   an initiation fee.
3       Q.  Did any purchasers at Legacy Dunes pay the
4   initiation fee?
5       A.  Yes.
6       Q.  And this Phillips 74 appears to be signed by
7   Sal Sardinia as president of Geneva?
8       A.  Yes.
9       Q.  And the second to last line refers to a
10  Chandra and a phone number, that's Chandra Webster?
11      A.  Yes.
12      Q.  Did Geneva ever begin managing any units at
13  Legacy Dunes?
14      A.  No.
15      Q.  What happened that that didn't happen?  What
16  transpired such that Geneva did not begin to manage
17  any units at Legacy Dunes?
18      A.  Well, by this point X Management did exist.
19  So even had everything as planned gone forward, X
20  Management would have been the company subcontracting
21  to Geneva to manage Legacy Dunes, and that's what was
22  occurring at Runaway Beach Club.
23          At this point there was a breakdown of
24  communications to an extent I can hardly describe of
25  the developer, Real Estate Dreams, REIG, Sovereign,

Page 103

1   and the clients.  So at this point in order to go
2   forward, you would have to sit in a room together and
3   agree to proceed.  And honestly they couldn't sit in
4   a room together.
5       Q.  You said Sovereign.  Who was Sovereign?
6       A.  The long-term management company that had
7   been on property.
8       Q.  Is Sovereign related or owned by any of the
9   owners of DRG?
10      A.  I'm not sure of the relation, meaning from an
11  ownership principal or so forth, but Tim Tinsley was
12  the link to Sovereign.
13      Q.  You don't know whether he has an interest in
14  Sovereign or not?
15      A.  I don't know from a factual basis.  I know he
16  was -- I don't know if he ran it or it was his or how
17  it worked.  I know there was a relationship that
18  existed, I don't know what it is.
19      Q.  So there was a breakdown in communication and
20  as a result Geneva never became the management
21  company either directly or through X Management?
22      A.  Correct.
23      Q.  What happened to moneys that the purchasers
24  at Legacy had paid to Geneva for initiation fees and
25  accessory packages?

Page 104

1       A.  All of them were treated in one of two ways:
2   If they signed on with Osceola Management, the moneys
3   were transferred to Osceola Management.  If they
4   didn't, the moneys were refund.
5       Q.  Okay.
6       A.  And even those -- I do know for a fact that
7   even those that signed up with Osceola, some may have
8   still received checks back and chosen to write out
9   another check, but all of those funds were sent from
10  X Man and Geneva to the individuals.
11      Q.  Were there any conditions placed on those
12  refunds?
13      A.  From Geneva and X Man?
14      Q.  Yes.
15      A.  No.
16      Q.  There was no requirements for purchasers to
17  sign a release to Geneva?
18      A.  Release -- yes.  I apologize.  Yes, there was
19  a release that said they would not be managing their
20  unit and the funds were being given back.
21      Q.  Okay.  Let me show what I have marked as
22  Exhibit 7.
23          (Thereupon, Exhibit 7 was marked for
24  identification.)
25          MR. ROTHMAN:  Off the record.

Page 105

1           (Off the record.)
2   BY MR. ROTHMAN:
3       Q.  What I have handed you are Bates numbers
4   Geneva 1 through 71.  Have you ever seen these
5   documents?
6       A.  I'm intimately familiar.
7       Q.  So they all appear to be the same just signed
8   by different people?
9       A.  They are.
10      Q.  What are Exhibit 7?
11      A.  This is the culmination of meetings with
12  myself to DRG to OMC, which is Osceola Management, to
13  X Man to Geneva to Jill to Joe to try and find a way
14  to go forward with, basically, teams that were never
15  going to sit around the table again.
16          So I guess I would use it as Solomon's baby.
17  Rather than split it, I asked X Management and
18  Geneva, specifically, to let it go, to give the money
19  back, and I asked Osceola Management to accept these
20  clients.  And Osceola said they couldn't afford to do
21  it for the same reasons that the money had been
22  collected by Geneva.  Again, I'm not a hotelier
23  explain to me, I needed to buy accessories, I need to
24  do these things.  So we would need those moneys to be
25  transferred.

27 (Pages 102 to 105)

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 106

1    In fact, this one sits on me, I coordinated
2  for OMC to take units short-term that belonged to X
3  Management and Geneva and for them to sign them over
4  to Osceola for them to proceed. Because at this
5  moment Osceola was the long-term management company
6  on property and there was no light at the end of the
7  tunnel between DRG, Geneva, X Man, Real Estate Dreams
8  that we were ever going to get the parties to agree
9  to go forward with X Man being able to manage the
10 property.
11   Q. So Osceola Management took over from
12 Sovereign?
13   A. Osceola did -- well, I don't want to say took
14 over. Osceola boogied, they left. And Osceola came
15 in -- I think there was a slight gap, not a
16 transition, no torch being handed over -- if
17 anything, boxes -- they left with nothing, Osceola
18 walked in with nothing, and managed long-term when
19 they walked in and subsequently took on short-term
20 when the licensing was secured and the ability to go
21 forward short-term.
22   I believe Osceola's intent was to launch
23 short-term for the Labor Day holiday in September of
24 '07, but everything wasn't secured at the time and
25 had yet to launch. So by October their plans were

Page 107

1  Osceola was launching short-term, whether we were
2  part of it or not, OMC was on-site at Legacy to do
3  short-term.
4    We knew enough of short-term -- I say "we," I
5  was still part of team at REIG -- we knew that we
6  couldn't have competing short-term management
7  companies on the property.
8    Q. Why is that?
9    A. Imagine if you go in hotel it's half Hilton
10 and half Marriott, are they going to tackle you over
11 which desk you're going to? It's already a small
12 margin to function. There was no way to do it.
13   So I asked all the parties to agree. None
14 wanting to, none encouraged or happy, but it was a
15 necessary evil that had to be done.
16   Q. So you negotiated with Geneva, Osceola, X
17 Management?
18   A. Correct. Because I was never an employee or
19 part of X Management.
20   Q. X Management was another company owned by Joe
21 Aldeguer and Jill Moore?
22   A. Correct.
23   Q. How did they get involved? Because when we
24 last left --
25   A. Who is they?

Page 108

1    Q. X Management. How did X Management get
2  involved? Because when we were looking at Phillips
3  74 we were talking about Geneva being the management
4  company as of November of '06?
5    A. In November of '06. In fact, the first week
6  of November of '06 at Runaway Beach Club, which was
7  our first property, which is not related to Legacy
8  but the evolution of X Management was created, the
9  prior management company had been removed and X
10 Management was created to manage that property.
11   At this point in the business plan, Joe
12 Aldeguer then decided everything he was going to
13 brand. So just like Hilton, he wanted X Man or X.
14 Like W Hotel, he wanted X. He decided X Management
15 would manage the property.
16   So yes, Geneva was going to manage the
17 property. They did and still do manage Runaway Beach
18 Club, they had managed it under X Management. So an
19 individual, Joe Smith, signed with X Management, X
20 Management subcontracted with Geneva Hospitality.
21 And the same was to occur at Legacy Dunes. So,
22 again, the moneys were held and the contracts were
23 under X Management even though Geneva would be the
24 day-to-day operations.
25   Q. Okay. Why was there -- well, let's just look

Page 109

1  at the third paragraph. And it says, "Upon refund of
2  the deposit or if directed by the undersigned receipt
3  of the deposit by OMC, Osceola Management Corp.,
4  undersigned releases and forever discharges X
5  Management, Limited and Geneva Hospitality, including
6  their officers, directors, agents, and employees from
7  any and all claims, demands, liabilities, and causes
8  of action of any nature whatsoever and how ever
9  arising which the undersigned has or may have against
10 X Management Company Limited and Geneva Hospitality."
11   Why was that language inserted here?
12   A. At this point we were living in chaos with
13 this project. Finances were difficult and
14 specifically counsel involved for every party was not
15 about to have any transaction completed without the
16 language in there.
17   And I could honestly say Geneva's counsel was
18 probably most proactive in it to say I can't have
19 another financial transaction without another
20 documentation. This is what I'm asking, We've never
21 managed the property, your moneys have always been
22 secured, and I'm not handing over a dollar unless I
23 have this.
24   Q. Okay. Did you understand then that their
25 concern had to do with liability related to the funds

28 (Pages 106 to 109)

63ecaa65-d0fc-4d88-8c16-31a96e089d95

Page 110

1    that they had been holding for initiation fees and
2    furniture --
3        A.  They did not hold the furniture.
4        Q.  For rental accessory packages?
5        A.  Yes.  And that they had never actually
6    managed the property.  And they wanted to make sure
7    that what occurred wasn't under them.  And at this
8    point, actually of this time, there had been some
9    significant damage on the property from a storm and
10   they -- to the units, and they were aware of it but
11   had no party to it.  So more than ever they wanted to
12   make sure that they weren't held liable over
13   something they had no control over.
14       Q.  So their concerns were in addition to money
15   that they had received that they were now disbursing,
16   claims that may be made against them relating to
17   management of the property --
18       A.  Correct.
19       Q.  -- and they had never had any involvement in
20   actual day-to-day hands-on management?
21       A.  Correct.
22           MR. DEATHERAGE:  Objection as to form.
23   BY MR. ROTHMAN:
24       Q.  During the discussions leading up to the
25   creation, dissemination, and signature of the

Page 111

1    releases listed in paragraph seven, you were
2    involved?
3        A.  Yes.
4        Q.  During all of those conversations did anyone
5    ever mention we should get a release to protect
6    ourselves against being sued for violating securities
7    laws?
8            MR. DEATHERAGE:  Objection as to form.
9        A.  I don't recall any of those.  And I don't
10   think they would have come up for the fact that none
11   of these parties were actually present other than the
12   ownership of X Management at the original sale.
13           So no, it was never part of the discussion.
14   It was very much related to the funds, the liability
15   of management of the property -- this is my
16   recollection.  If subsequent conversations were had,
17   they weren't had with me.
18       Q.  So you have no recollection whatsoever of
19   anyone ever saying let's get a release in order to
20   protect ourselves if someone ever sues us for
21   violating the securities laws?
22           MR. DEATHERAGE:  Objection as to form.
23       A.  No.
24           And I have to -- in a deposition I'm giving
25   too much information, I have clarify that.  My

Page 112

1    conversations with Geneva were limited to it's over
2    and you're not going to manage it.  My conversations
3    were more with X Management of you have to let it go
4    and you need the money transferred.  And OMC my
5    conversations were begging them basically taking on
6    our clients who they knew were already unhappy.
7            So it really wasn't part of -- my focus on
8    this was truly just to get them in the management and
9    to get every one else to walk away from it.  That was
10   the focus.  That wasn't part of the discussion.
11           MR. ROTHMAN:  Let's take a break for lunch.
12           (Lunch break.)
13           (Thereupon, the testimony is continued in
14   Volume II.)

                                        29 (Pages 110 to 112)

63ecaa65-d0fc-4d88-8c16-31a96e089d95