UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
CASE NO. 6:08-CV-01349-GAP-DAB


ALBERT ALUNNI, ET AL,

          Plaintiffs,

vs.

DEVELOPMENT RESOURCES GROUP,
LLC, a Florida limited liability
company, LEGACY DUNES
CONDOMINIUM, LLC, a Florida
limited liability company,
MICHAEL K. HALPIN, JAMES E.
WEAR, TIMOTHY S. TINSLEY, THE
REAL ESTATE INVESTMENT GROUP,
LTD., an Illinois corporation,
JOSEPH ALDEGUER, JILL MOORE,
REAL ESTATE DREAMS, LLC, a
Florida limited liability
company, SEAN C. PARKES, JEREMY
HOLLY, GENEVA HOSPITALITY
MANAGEMENT, LLC, a Wisconsin
limited liability company, SAL
SARDINIA, and CHANDRA WEBSTER,

          Defendants.
_____/


THE DEPOSITION OF

MAUREEN HAYES PHILLIPS

VOLUME II


Seiden, Alder, Matthewman & Bloch, P.A.

Boca Raton, Florida

February 26, 2009

10:00 a.m.

7f632f8f-fce3-4069-9ca3-fd067624bba2

## Page 114

1  APPEARANCES:
2  On behalf of the Plaintiffs:
3  SEIDEN, ALDER, MATTHEWMAN & BLOCH, P.A.
    7795 NW Beacon Square Boulevard
4   Suite 201
    Boca Raton, Florida 33487
5   561.416.0170
    BY: JOEL B. ROTHMAN, ESQ.
6
    RONALD S. NISONSON, P.A.
7   120 East Palmetto Park Road
    Suite 100
8   Boca Raton, Florida 33432
    561.544.8980
9   BY: RONALD S. NISONSON, ESQ.
10 On behalf of the Defendants:
11 SHUTTS & BOWEN, LLP
    300 South Orange Avenue
12 Suite 1000
    Orlando, Florida 32802
13 407.423.3300
    BY: MICHAEL L. GORE, ESQ.
14
    Shutts & Bowen, LLP
15 201 South Biscayne Boulevard
    Suite 1500
16 Miami, Florida 33131
    305.3586300
17 BY: JONATHAN COHEN, ESQ.
18 GREENBERG TRAURIG, P.A.
    450 South Orange Avenue
19 Suite 650
    Orlando, Florida 32801
20 407.418.2360
    BY: TUCKER BYRD, ESQ. (via telephone)
21  CLAY A. DEATHERAGE, ESQ.
22 On behalf of the Defendants:
    Ullman & Ullman, P.A.
23 150 E. Palmetto Park Road
    Suite 650
24 Boca Raton, Florida 33432
    561.338.3535
25 BY: ANTHONY ARAGONA, ESQ.

## Page 115

 1  Also present:
 2  Sal Sardinia
    James Wear
 3  Ryan Reinke
 4
 5  REPORTED BY:
 6  Alexa R. Goldman, FPR
    U.S. Legal Support, Inc.
 7  Klein, Bury, Reif, Applebaum & Associates, Inc.
    444 West Railroad Avenue, Suite 300
 8  West Palm Beach, FL 33401
    561.835.0220
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 116

 8  Questionnaire                          39
 9  Notice of Public Hearing               49
10  Projections Spreadsheet                50
11  Cash Flow Projections                  51
12  Phillips Affidavit                     99
13  Moore Affidavit                       100
14  Legacy Dunes Contract                 124
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 117

 1      (Thereupon, the testimony is continued from
 2  Volume I.)
 3  BY MR. ROTHMAN:
 4      Q.  Let's go back to looking at these documents,
 5  Ms. Phillips.  We can put Exhibit 7 aside for the
 6  moment.
 7      A.  Okay.
 8      Q.  If you can take a look at Phillips 77, this
 9  is a letter dated November 1, 2006, on what appears
10  to be Legacy Dunes letterhead from Ryan Reinke, CFO
11  Development Resources Group.  It's regards to Legacy
12  Dunes Unit 18202 to Peter Deuschle.  This was in your
13  documents.  It's Phillips 77.
14      And it says, "Enclosed with this letter is
15  the payment associated with the leaseback of Legacy
16  Dunes Condominium Association Common Elements
17  outlined in the leaseback agreement that accompanied
18  your purchase agreement."
19      What is the leaseback of the Legacy Dunes
20  Condominium Association Common Elements?
21      A.  I think the word may have been
22  interchangeable with rebate, which was a leaseback.
23  There was contract terminology.  It was an incentive
24  to the client and the developer with leasing back
25  space.  We referred to it as a rebate because it was

U.S. Legal Support
(561) 835-0220

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 118

1  a lump sum payment, not to be confused with the
2  monthly payments coming from the renter. But this
3  was what we termed a rebate, but ultimately it's
4  termed as a leaseback, but we never used the term
5  "leaseback" before this.
6    Q.  This is money the developer paid to the
7  purchaser after the closing of the unit?
8    A.  Correct.
9    Q.  And you characterize it as, it sounded to me,
10  like an incentive for purchasing, you would get this
11  rebate later?
12    A.  Absolutely.
13    Q.  Next page, Phillips 78, this is a one-page
14  document. Did you prepare this?
15    A.  I did not, but if you look at the fax numbers
16  on the bottom of the page, whoever faxed it to me.
17    Q.  Okay.
18    A.  It's page three and four, so it came
19  together. I can't tell if it's 815 or 813, which
20  means Florida or western Illinois. This is, again,
21  where some of the confusion came through, the reason
22  this would have come into my possession, we use the
23  term rebate and the developer termed it leaseback.
24  It became confusing to people.
25      The second page is absolutely correct that

Page 119

1  part of the reason not only the initiation package
2  and the accessory package was meant to be painless,
3  was we told people the developer is giving you a
4  rebate if you utilize that for these payments up
5  front to enter short-term when they're able to go
6  short-term. It shouldn't be cash out of your pocket.
7  That was one of the discussions.
8      The rental incentive already existed. I'm
9  not positive, but I believe every one at Legacy -- I
10  call it a rebate, they call it a leaseback, but I
11  believe it's the same.
12    Q.  Okay. So in other words the $2500 initiation
13  fee and the 2,825.92 rental accessory package fee
14  which were preconditions for renting your unit on a
15  short-term basis --
16    A.  Correct.
17    Q.  -- that those fees could be paid with the
18  developer rebate or leaseback incentive payments that
19  the individual purchasers were receiving?
20    A.  That's what we encouraged them to do.
21    Q.  It sounds -- well, looks to me like even if
22  you let's say in Peter Deuschle's situation if you
23  apply the $6,580 leaseback to the initiation fee and
24  rental accessory package, you even have money left
25  over?

Page 120

1    A.  That was the intent and the intent was to
2  cover the shortfall of if your mortgage was $1,000
3  and your rent was 700, the reason we would look at
4  whole calculation if you took the incentive the
5  developer was giving you, you deducted the initiation
6  and the soft goods cost, you would still have enough
7  to cover the difference between your mortgage, at
8  least your primary mortgage payment not necessarily
9  taxes, and this was to be able to cover -- the goal
10  was to not be out of pocket for the first year.
11    Q.  Sounds like it was an additional selling
12  point for why one would want to purchase in Legacy
13  Dunes in order to use it as short-term rental, these
14  costs would be covered?
15    A.  Sure. Yes.
16    Q.  Seventy-nine, the next page, what is this?
17    A.  This was the date of -- those were the real
18  estate licenses list.
19    Q.  These are people with who worked for REIG?
20    A.  No. Well, I guess I need to clarify. These
21  are members of The Mortgage Exchange who were also
22  put the licenses under REIG, but REIG didn't actually
23  have employees. So to clarify that, there were no
24  employees of REIG, there were contractors, people who
25  held very typically in a real estate format.

Page 121

1    Q.  And so these employees of The Mortgage
2  Exchange that are listed here also, if it indicates,
3  had real estate licenses with the numbers reflected
4  there on the last column?
5    A.  Correct. Yes, they did.
6    Q.  These are all Illinois licenses?
7    A.  They are all Illinois licenses.
8    Q.  Not Florida?
9    A.  No. We do -- we probably have some who have
10  Florida, but this is my Illinois tracking.
11    Q.  Just scanning the list of dates of license in
12  the center column --
13    A.  Yes.
14    Q.  -- with very few exceptions most of the
15  license dates are after are June or after?
16    A.  Correct.
17    Q.  Of '06?
18    A.  Correct.
19    Q.  Does that have anything to do with the
20  discussion we had earlier about how you had gotten
21  off the plane and found out one day that Mr. Aldeguer
22  had offered a $10,000 payment to anyone who sold the
23  unit?
24    A.  Correct.
25    Q.  If someone had sold a unit before they got

3 (Pages 118 to 121)

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 122

1    their license, could they still receive a payment?
2       A.  They were not -- it's my understanding --
3    because we were not doing real estate commissions
4    because the actual sales were being done from Real
5    Estate Dreams, it's my understanding from Coman and
6    Anderson that the marketing referral fee, that's what
7    they were calling it, for bringing or encouraging a
8    client to buy, they would be able to be paid if they
9    had their license prior to the closing of that unit.
10      I do know, and actually I think part of that
11   crossing out, people whose licenses were obtained
12   after the one they referred closed, did not -- were
13   not closed.
14      Q.  Were people who had gotten their license
15   prior paid?
16      A.  If they had referred a client.  If they had
17   clients, but, again, there were a lot of commissions
18   that weren't paid.  I don't want to misspeak and say
19   every one who was promised to be paid, was paid.
20   They weren't.
21      Q.  The next page, Phillips 80, 81, this appears
22   to be an e-mail from you to loan officers dated
23   June 5, 2006?
24      A.  Correct.
25      Q.  The subject is Important Numbers.  What does

Page 123

1    this e-mail contain?
2       A.  People wanted to understand, the loan
3    officers, if they're looking at their clients from a
4    mortgage perspective, when they're looking at how
5    they could cover it, how the costs are in looking at
6    it for the one year.
7       What I did -- obviously we're talking about
8    the July 20th DRG, but this is June 5.  I took the
9    numbers I had from the developer for the average
10   current rent for each unit, looked at the rebate,
11   leaseback rebate -- I'm using the term
12   interchangeably -- looked at the current mortgages
13   that were going to be typically applied to these
14   units and tried to see where they would be in one
15   year.
16      What we did is, let's say, let me just walk
17   through it, here's a one bedroom.  If the long-term
18   rent is $815 and your average purchase price is
19   .  If you put 10 percent down -- these are all
20   assumptions -- if they had 10 percent down on what's
21   called a monthly treasury average or an option ARM on
22   a 40 year amortization, their payment's 514.40, and
23   then we took taxes of one and a half percent of the
24   purchase price, we didn't have a tax number to use,
25   that would be 269, and then here's the developer

Page 124

1    rebate which was 4535, that's on a one bedroom, one
2    bath.
3       So you take the first year's rent of 815, it
4    covers the mortgage and the taxes, that leaves $22 a
5    month.  The rebate check is 4535, that covers the one
6    time set up of 2500 and the rental package, that
7    leaves them short $194, and that's negated by the
8    $264 positive cash above and beyond the mortgage and
9    taxes.
10      So you took the rent and you took the rebate
11   and you put it in this format, and you're looking can
12   a client carry this for the first year, this is what
13   they would have to apply.  They needed to make sure
14   when they were qualifying a mortgage they didn't say
15   oh, here's this cashed check they can pay off this
16   credit card and then qualify.  You want to make sure
17   everyone understood that even though there was a
18   rebate, they couldn't use that money towards anything
19   else.  They couldn't use it towards closing costs,
20   they couldn't use towards a down payment, here's how
21   it was to be applied.
22      So we took what we knew, and you see the same
23   mortgage all the way up and down here.  If these
24   people qualified and could secure this mortgage,
25   here's what their payment would be, here's their

Page 125

1    estimate of taxes, here's the current rent as it
2    averaged on the rent rolls.  If you used this rebate
3    in this fashion, here's where they would be in one
4    year.
5       Q.  Where did you find the 1.5 percent figure for
6    taxes?
7       A.  At that point it was an estimate of what we
8    had begun encountering with the developers we had
9    been talking about over the six months prior.  We had
10   just closed Runaway Beach Club and that was the
11   amortization of the loan that lenders used at the
12   time.  We took it from the mortgage lenders who we
13   closed at Runaway Beach.
14      Q.  Did anyone check with the Osceola County
15   Property Appraisers Office or the tax collectors
16   office to determine what the millage rate was for
17   similar units in the county?
18      A.  No.
19      Q.  Okay.
20      A.  That's why I said it's estimated, and that's
21   what we had been told and used at the time.
22      Q.  So it was information that you had been given
23   from another source for a different development, and
24   you figured it's probably going to be about the same?
25      A.  We used it as an estimate.  Yes.

4  (Pages 122 to 125)

U.S. Legal Support
(561) 835-0220

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 126

1    Q. And the long-term rent amount was an estimate
2  based upon an average of what was being received at
3  the development at that time?
4    A. Yes. Of the rent rolls. Just took an
5  average of the rent roll.
6    Q. Okay. Your first year scenario in the second
7  paragraph of this e-mail suggests that there would be
8  $264 positive cash flow above and beyond the mortgage
9  and taxes with the current rent?
10   A. Right. Again, to the loan officers if you're
11 looking at those numbers, that's how much money was
12 left from a positive side to apply toward whatever
13 expenses.
14   Q. Was the information contained in the e-mail,
15 was it conveyed to potential purchasers?
16   A. It was not intended to. In retrospect did
17 some of them send it out? Yes, they did.
18   Q. You were giving this information to the loan
19 officers?
20   A. Correct.
21   Q. And the loan officers were speaking with
22 potential purchasers of Legacy Dunes?
23   A. By June 5th, yeah.
24   Q. Phillips 79, the list of REIG licenses, are
25 all of these people loan officers?

Page 127

1    A. Yes.
2    Q. So at the same time that the loan officers
3  are meeting and discussing with potential purchasers
4  the loans that they can obtain on Legacy Dunes units,
5  they are also discussing with potential purchasers
6  the cash flow that they would potentially receive
7  from Legacy Dunes units if they purchased them?
8    A. Yes. When any mortgage loan officer would
9  sit down with someone, whether buying a single family
10 home or condo or anywhere else, here's your monthly
11 nut, here's the rent, if they were buying an
12 apartment building or whatever it was, they're
13 looking at what's coming in versus what's going out.
14   Q. You're not going to look at what your cash
15 flor is in terms of how much you can earn on a rental
16 if you're just financing the home that you own that
17 you live in, right?
18   A. No. Not unless you had a rental property.
19   Q. Okay. This sheet that's marked Phillips
20 and 81, this e-mail, this is for rental properties?
21   A. Correct.
22   Q. And on the second -- on page 81 after these
23 different scenarios that you give, it says, "There's
24 no HOA to the client for the first year, thus their
25 nut is covered other than electric water and trash.

Page 128

1  We are planning on picking up water and trash the
2  first year."
3    So there was no charge for homeowners dues
4  the first year that you own?
5    A. They were credited -- this was all based on
6  Geneva being the management company, and we were
7  covering that going into short-term.
8    Again, these were sent out internally to loan
9  officers with the assumptions at the time definitely
10 being that we controlled the management.
11   Q. Did it in fact come to pass that homeowners
12 association dues were at no cost to the purchasers
13 the first year at Legacy?
14   A. There were credits given to clients for their
15 association dues, some on the HUDs from the developer
16 and some if it was missed on the HUD it was then paid
17 for through REIG.
18   Q. Okay. Then it says "HOA becomes the
19 homeowners expense the second year."
20   A. Correct.
21   Q. Does it indicate anywhere here what the
22 homeowners association expense is going to be?
23   A. No.
24   Q. Then it says, "The next two years are rental
25 credit at the increased amount of" and it has dollar

Page 129

1  figures for the different sizes of units. What is
2  that?
3    A. Those were -- and as we had seen in previous
4  ones -- the ideas of what the short-term rental would
5  be. If you look at a one bedroom with the current --
6  these were the rents, the intention was these were
7  the rents to be received in the short-term aspect.
8  So for the rental term guarantee we talked about in
9  the prior, if they signed with Geneva, this is amount
10 we guaranteed it for one year.
11   Q. And there's an example there?
12   A. Right. So if you look at -- I guess I'm
13 looking at bottom of page 80 -- two bedroom, two bath
14 to 1100 square feet. The current rent is 975,
15 but a two bedroom, two bath guarantee was 1202. So
16 it is expected to be a difference.
17   Q. It says on the bottom, "Remember after the
18 first year the rental amount increases but the HOA
19 becomes an expense for the buyer."
20   What does that mean?
21   A. The HOA is not covered the second year, but
22 the rental amounts are increasing in the short-term.
23 After the first year the leases are gone, the
24 long-term leases are gone. The guarantees are based
25 on short-term.

5 (Pages 126 to 129)

7f632f8f-fce3-4069-9ca3-fd067624bba2

1    So yes, there's an increase; however, when
2  you're anticipating someone's cash and if they can
3  carry this, the association dues have to be put into
4  the calculation because they're going to have to pay
5  it.  Remember, they still have to have their
6  association dues added into their anticipated carry.
7    Q.  When you say rental amount increases, you're
8  talking about in June of 2006 your projections for
9  the amount that would be earned for the short-term
10  rental?
11    A.  For the guarantee.
12    Q.  In the future?
13    A.  Right.  It's the difference between current
14  long-term and short-term with Geneva managing the
15  property.
16    Q.  I think you testified the short-term
17  guarantee was never put in place?
18    A.  By X Man or Geneva.
19    Q.  Right.
20    A.  By OMC.
21    Q.  Was it put in place by OMC?
22    A.  It was.
23    Q.  How long did it last?
24    A.  I actually think they're just dealing with
25  ramifications of that with checks.

1    Q.  We'll get back to that in a second.
2    You're scenarios here, do any of them
3  indicate a negative cash flow?
4    A.  In the first calender year?
5    Q.  Well, I'm just referring to Phillips 80 and
6  81.
7    A.  I'd have to go back and look.
8    Q.  Take a second look at these and tell me if
9  any of these scenarios reflect a negative cash flow.
10    A.  Yes.  The first year, I'm looking at the two
11  bedroom, one bath, 901 -- I'm just scanning this --
12    Q.  Okay.
13    A.  The current rent 895 goes towards the
14  mortgage and taxes of 1047.  The difference of 152 a
15  month is 1824 per year taken from the rebate.  The
16  remaining rebate is 4756 to cover the one time 2500
17  conversion fee and the 2742, leaving a 486 shortfall
18  to be paid by the buyer.
19    Q.  Is that 486 for the entire year?
20    A.  That was for the first year not including
21  electric, water, trash, and association because it
22  was being given back.
23    Q.  Any of these other scenarios show negative
24  cash flow?
25    A.  No.

1    Q.  Now, your familiar with what's transpired
2  since June 5th, 2006, with respect to Legacy Dunes,
3  correct?
4    A.  Yes.
5    Q.  Have any of these scenarios shown themselves
6  to be accurate?
7    A.  For the first calender year that this talked
8  about, every one of those numbers tied to what they
9  were getting.
10    Q.  Okay.
11    A.  And had the plan been followed just like
12  that, these would be the bottom lines for those.
13  These wouldn't have changed.
14    Q.  Okay.
15    A.  But some people may have bought other
16  properties or took the rebate and didn't utilize it
17  for what was in here and didn't cover the shortfall.
18  So for the first calender year for those who bought
19  Legacy Dunes had a rent guarantee, had a rebate, and
20  they had the ability to cover this and -- this was
21  also a caveat -- they had to qualify for their
22  mortgage.  If they didn't qualify for their mortgage
23  and their payment was different, then obviously they
24  didn't -- I don't want to misspeak to a hundred some
25  people, but if they fell within the formula, these

1  number stood.
2    Q.  These were all contingent --
3    A.  On qualifying for that mortgage, correct.
4  And choosing a 40 year amortization, which not every
5  client chose.  Nor did every client choose that loan.
6    Q.  What about the two years following the first
7  year?
8    A.  The only thing that would have resembled the
9  piece of paper is the name Legacy Dunes.
10    Q.  What do you mean by that?
11    A.  There was no rebate and most of their -- by
12  the time Sovereign had left there was quite a few
13  without tenants.  And with an unclear path of going
14  short-term, many people went many, many months with
15  no income at all.
16    Q.  Okay.  All right.  Phillips 82 looks to be --
17    A.  A love letter from Tim Tinsley to Mo.
18    Q.  This was something you received from Tim
19  Tinsley?
20    A.  Yes.
21    Q.  What does it say?  What does this mean, this
22  spread sheet?
23    A.  These were the delays.  And, again, I had
24  mentioned it had become a very adversarial position
25  amongst all parties and unfortunately I was the

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 134

1    mouthpiece to try to bring them all to the table.
2        This was what the developer felt were
3    expenses or delays or encumbrance -- things they
4    incurred because of the delays in closing. This is
5    where it became very adversarial because this was
6    Mortgage Exchange related when loans closed and this
7    was utilized regarding payments of moneys to REIG and
8    the argument became the mortgage has nothing to do
9    with REIG and we're mixing things.
10       But Tim wanted to emphasize to me this is,
11   look, when they were supposed to close, this is when
12   they closed, this is what it cost me, and I'm going
13   to charge you late fees. Then of course he added on
14   the bottom there were people who got their deposits
15   back and he wanted the difference.
16   Q.   Turn to Phillips 87. What is this document?
17   A.   That would -- this would have been from Real
18   Estate Dreams, the breakdown of commissions on those
19   units. Now, all the commissions were not paid at
20   closing. Again, like I said to you before, there
21   were first position lenders that needed to be paid
22   off before the balance of commissions could be paid.
23   They were paid in a combination of real estate
24   commissions and marketing fees and everyone knew
25   there was going to be a delay in payments from the

Page 135

1    developer.
2        This was from Real Estate Dreams because Real
3    Estate Dreams received the commissions, and then
4    disbursed to REIG their percentage. They paid the
5    amount to REIG that's listed in the fourth column
6    over, and the remaining to be paid to REIG is in the
7    following column that's still yet to be paid.
8    Q.   All right. It's got average market rent a
9    month numbers on it?
10   A.   This does? You're on the next page?
11       MR. GORE: Just for the record, you had
12   mentioned document number 87. I think she was
13   looking at 86.
14   A.   I'm sorry, were you talking about this
15   document?
16   BY MR. ROTHMAN:
17   Q.   Actually, I wasn't.
18   A.   Okay. I was looking at 86, which is -- I'm
19   sorry.
20       Document 87, this was a format that Legacy
21   Dunes had utilized, the developer, but we had changed
22   it. The reason it says MoJo at the top this was an
23   evolving number.
24       The best way to describe it is if you're the
25   developer and you have $100 and you're willing to

Page 136

1    give $30 to get the unit sold, you put this $30 in a
2    bucket, and how we put the $30 together was we
3    negotiated back and forth with the developer. So
4    part of it was the commissions were paid -- and this
5    was probably the most convoluted, most difficult way
6    to back into -- the commissions were paid on an
7    original purchase price, not one that had been --
8    like I said, the price changed with the commissions.
9    So the commissions were not based on the full
10   purchase price.
11       This document shows the incentives, the
12   developer rebate per unit, the average monthly market
13   rent was on there. I believe they were off the rent
14   roll, but I can't misspeak. These were given to us
15   and part of -- not published, but this structure of
16   this, the bottom part, the average rents were
17   utilized by the developer for sales. The upper part
18   was very specific to REIG.
19   Q.   Turn to 93.
20   A.   Yes.
21   Q.   The document that begins on 93 appears to be
22   entitled Referral Agreement, and it's between REIG
23   and Real Estate Dreams, LLC.
24   A.   Correct.
25   Q.   And it's dated May 3rd, 2006. Was this the

Page 137

1    original arrangement between REIG and Real Estate
2    Dreams under which you agreed to share commissions?
3    A.   Yes.
4    Q.   Does this deal with Legacy Dunes or does it
5    deal with other developments?
6    A.   Just Legacy Dunes.
7    Q.   Okay. And so under this agreement what is
8    Real Estate Dreams entitled to, what is REIG entitled
9    to with each sale?
10   A.   Again, where it became slightly convoluted
11   this agreement was done before there was this bump
12   of -- to the purchase price and commission. So this
13   document preceded the changes that were created. So
14   this document shows that it was broken down -- I have
15   to refresh myself. Give me just a minute. I'm
16   trying to figure out the best way to describe it.
17       There was a revenue sharing between REIG and
18   Real Estate Dreams. REIG would take a good portion
19   of it and up to a certain point Real Estate Dreams.
20   But after a certain threshold was achieved, it was a
21   50-50 split. The agreement when it was first created
22   was not really meant on the mass amount of closings
23   that we had.
24       So for each unit sold where REIG purchased a
25   unit, 80 percent of the total consideration up to

U.S. Legal Support
(561) 835-0220

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 138

1   ten percent of the purchase price paid by the owner,
2   developer, and anyone else.  And 50 percent of the
3   portion of consideration in excess of -- I don't want
4   to read out loud to you, but it was 80-20 split until
5   it reached a certain percentage and then it was a
6   50-50 split.
7       Q.   This arrangement was subsequently changed,
8   right?
9       A.   Yeah.  Not mutually -- I mean, mutually
10  changed to Real Estate Dreams who controlled the
11  purse strings, controlled how much was sent to whom.
12      Q.   If you can turn to Phillips 103, there's an
13  escrow agreement dated January 17th of 2007 that
14  refers to a dispute between The Mortgage Exchange and
15  Legacy Dunes with regard to amounts owed by TME or
16  its affiliate to Legacy?
17      A.   Yes.  Phillips 82, 83, and 84, my love letter
18  ties to this.
19      Q.   I'm a little confused because why would
20  Legacy owe money to The Mortgage Exchange, wouldn't
21  it owe money for -- or vice versa, wouldn't it be
22  with Real Estate Investment Group?
23      A.   It would be.
24      Q.   Because that's the real estate broker, not
25  Mortgage Exchange?

Page 139

1       A.   You are correct.
2       Q.   Okay.  But this Phillips 103 says the dispute
3   is between The Mortgage Exchange and Legacy?
4       A.   Because, like I referred to on the other
5   document, they believed that The Mortgage Exchange
6   had created this harmful situation that cost them
7   this money.
8       Q.   Oh.
9       A.   But when the mortgages closed, which had
10  nothing to do with the commissions due to REIG, thus
11  is part of the reason it was less than amicable in
12  the discussion.
13      Q.   And the reason for the costs to DRG was delay
14  in closings?
15      A.   Yes.
16      Q.   And DRG said you've cost us all this money
17  that we've had to pay because you were slow, and so
18  we don't think we owe you this or we think you owe us
19  this amount of money?
20      A.   Correct.
21      Q.   If you look at Phillips 106, this is called a
22  brokerage agreement between Real Estate Dreams and
23  Legacy dated May 2005.  Number one refers to a fee of
24  17 percent of the purchase price?
25      A.   Yes.

Page 140

1       Q.   So would it be correct that Real Estate
2   Dreams was entitled to 17 percent of the purchase
3   price of each the sales of each Legacy Dunes units
4   and negotiated and came to some agreement with Real
5   Estate Investment Group as to what it would split
6   with Real Estate Investment Group in connection with
7   the sales that occurred through The Mortgage
8   Exchange?
9       A.   Your order is reversed but you are correct.
10  REIG negotiations were prior to negotiations with
11  Legacy Dunes.
12      Q.   Skip to Phillips 114.
13      A.   Yes.
14      Q.   This is the first of a number of e-mails what
15  appear to be between you and Mr. Tinsley.  Do you
16  recall exchanging e-mails with Mr. Tinsley over
17  several months in 2006?
18      A.   Yes.
19      Q.   Were these e-mails generally pertaining to
20  the delays in closings of Legacy Dunes units?
21      A.   Yes.  I would say they were never casual in
22  nature.
23      Q.   All right.  So in Phillips 115 Mr. Tinsley
24  says, "Mo, have you started the appraisal process
25  yet?"  And you respond, "I have someone and as soon

Page 141

1   as they confirm with me I will let you know."
2       A.   Yes.
3       Q.   Who did you have to do the appraisals at that
4   time, it looks like it was dated June 12 of '06?
5       A.   Yes.  I -- at this point I don't know the
6   individuals or the company.  We had the lenders who
7   had approved the property, and we would go through
8   their list and those lenders that approved
9   appraisers, and then H Alan would coordinate with the
10  appraisers down in Florida.
11      Q.   Mr. Alan's first name is the letter "H"?
12      A.   Correct.
13      Q.   Have you ever met his parents?
14      A.   Yes, I have.
15      Q.   That's very strange.
16           Anyway, the -- when a client of The Mortgage
17  Exchange who was purchasing a property or refinancing
18  a property would come to The Mortgage Exchange to
19  become a client, would you require any sort of
20  payment from them to cover expenses?
21      A.   To become a client?
22      Q.   To become a client.
23           Let's say I came to you in 2006 and I want to
24  purchase a piece of property and I needed The
25  Mortgage Exchange's assistance to obtain financing

8 (Pages 138 to 141)

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 142

1  for that property.
2     A.  Okay.
3     Q.  Would I need to write a check to you to cover
4  the expenses?
5     A.  Yes.
6     Q.  What would I need to pay you?
7     A.  Pre-pay appraisal and a credit report.
8     Q.  How much did you generally require from a new
9  client for that?
10    A.  Depending what they were buying, single
11 family home and it was a refinance, 300 for the
12 appraisal and 50 for the credit.  If it was an
13 apartment complex or investment, it usually went up
14 slightly in increments of $50.  Some appraisals are
15 more expensive because of the type of property or
16 where they're located but typically very consistent.
17 And they would be applied to closing on the HUD.
18    Q.  All of the purchasers of Legacy Dunes, did
19 they write checks for $300 and $50 for a credit
20 report?
21    A.  I would be misspeaking if I told you I knew
22 that.  I don't because I wasn't involved in the
23 mortgage process of this but given our guidelines
24 were very rigorous, my assumption would be I don't
25 think we would open files that didn't have that

Page 143

1  paperwork.
2     Q.  Based upon the procedures as you understood
3  them as director of operations, everyone who
4  purchased a unit in Legacy Dunes through The Mortgage
5  Exchange would have, at the outset, written a check
6  to cover the cost of the appraisal before anything
7  else happened?
8     A.  When you say at the outset, if they started a
9  mortgage application process, yes.
10    Q.  If they were buying with cash?
11    A.  Not an issue.
12    Q.  But if they financed their purchase, then
13 yes?
14    A.  Yes.
15    Q.  Phillips 117 appears to be an e-mail from you
16 to Mr. Tinsley and Jim Wear at Yahoo dot com with a
17 document that's dated June 21st, 2006, with a
18 document that says Talking Points for Today.
19    A.  Yes.
20    Q.  Then there's a next page.  Are these the
21 talking points?
22    A.  Yes.
23    Q.  Phillips 118?
24    A.  Yes.
25    Q.  Was there a meeting June 21st, 2006, between

Page 144

1  you and Mr. Tinsley and Mr. Wear and Mr. Sardinia who
2  appears to be on the e-mail below?
3     A.  I do not know if it was in person or on a
4  conference call.  But yes, it was at a minimum a
5  conference call.
6     Q.  So there's a number of points on these
7  talking points, do you recall that the conversation?
8     A.  I do not believe I would have been part of
9  the conversation.  It would have been with Geneva and
10 DRG.
11    Q.  You don't recall being on that call?
12    A.  I'm familiar with the document and what was
13 being requested but not part of that conversation.
14    Q.  Are you familiar with any discussion of the
15 use of the exclusive use of a small banquet room for
16 a gift shop?
17    A.  I know it was a discussion, yes, very early
18 on.
19    Q.  Were potential purchasers of Legacy Dunes
20 told there would be a gift shop on the premises?
21    A.  I don't know.
22    Q.  Were they ever told there would be a
23 restaurant?
24    A.  I think they were told the plan would be to
25 put a restaurant on property.

Page 145

1     Q.  Were they ever told that there would be like
2  a club type facility, some sort of a bar and grill or
3  anything like that?
4     A.  Not that I know of.
5     Q.  Any other amenities that they were told would
6  be --
7     A.  The plan was to put a spa in place on
8  property.  And discussions very early on, even before
9  we had a presentation, were:  Would we use a four
10 bedroom for a spa?  Was there room in the clubhouse?
11 I think it was determined there would probably not be
12 room in the clubhouse.  And every amenity that they
13 could fit on property, they would.
14    Q.  In the middle paragraph there below the
15 initial bullet points four lines down in the middle
16 "Once the conversion from long-term to short-term is
17 complete the property value of each unit will
18 increase as the common elements will be included."
19    Was that information shared with potential
20 purchasers at Legacy?
21    A.  Not that I know of.
22    Q.  Do you recall any conversations with Geneva
23 or DRG or any of their representatives about the fact
24 that property values of unit would increase?
25    A.  My understanding, and again this was up the

U.S. Legal Support
(561) 835-0220

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 146

```
 1   learning curve for me, was learning the difference
 2   between the common, the limited common and non and
 3   commercial units and learning the difference and how
 4   they applied to the units. I did understand if
 5   amenities were included like a spa and so forth and
 6   they were common elements, the units were part owner
 7   of that and it did make an impact.
 8       Q.  Down at the bottom, the second to last item,
 9   says, "game room."
10       A.  Um-hmm.
11       Q.  Was there ever any statements made to
12   potential purchasers there would be a game room?
13       A.  I don't know if it was said to the
14   purchasers, but I know the discussion was we could
15   always make a small room with a lot of kids games. I
16   think they have them at the Cove as well. That was
17   renting machines and having the electric to plug
18   them. I'm sure it was cuss discussed.
19       Q.  There's a note on the bottom which says,
20   "restaurant," which we discussed and, "bar and spa."
21   Do you recall if people were told there would be a
22   bar as part of the restaurant?
23       A.  I don't recall the bar because my natural
24   instinct would be do we have a liquor license. I
25   know the restaurant was discussed and I believe it
```

Page 147

```
 1   was looked into if the alcohol could be served and
 2   the zoning aspect of it. That was the extent of my
 3   involvement on that. Again, X Management pretty much,
 4   from that point on, took that, and I'm not part of
 5   that.
 6       Q.  If you would flip to Phillips 120, it's an
 7   e-mail from you to Mr. Tinsley. It says, "The
 8   attorney will have a new addendum in the a.m.
 9   addressing the issues."
10           What does that mean?
11       A.  I'm not sure. I'm going to read the rest and
12   see if that triggers a memory.
13           Oh, there was a certain percentage that need
14   to be sold, and I believe this might have something
15   to do with the financing, not the end user financing
16   but DRG's financing, and how many units had to be
17   presold before they could close. And if I recall it
18   was really just coming down to when commissions and
19   rebates would be able to be processed, when the
20   property would be purchased, and I don't know if the
21   percent refers to how many had to be presold. I
22   would be guessing to say I remember at this point on
23   that.
24       Q.  Let's do this, skip to -- did there come a
25   time when Real Estate Dreams was no longer involved
```

Page 148

```
 1   in any of these transactions or the scope of their
 2   involvement changed?
 3       A.  Yes.
 4       Q.  When was that?
 5       A.  I don't know the exact time of the breakdown,
 6   but it began in August of '06.
 7       Q.  Okay.
 8       A.  And at that point most of the sales or
 9   purchase contracts for Legacy Dunes were already
10   complete. Real Estate Dreams was in Florida and
11   people were flying down to tour the property. So
12   it's very much a disconnect not only physically but
13   they were a thousand miles away from REIG. And there
14   was a breakdown in two different management
15   components being Joe and Sean.
16       Q.  Were there attempts made to try and negotiate
17   agreements between REIG or some other entity related
18   to The Mortgage Exchange and DRG directly with
19   respect to the sharing of commissions?
20       A.  Yes.
21       Q.  Okay. What do you recall about those
22   discussions?
23       A.  Basically where the breakdown in revenue
24   began to not flow from Real Estate Dreams up to REIG.
25   And there became, again, a point of a total impasse.
```

Page 149

```
 1   Discussions I had with DRG that these commissions are
 2   due, and even if it's just the portion that's due us,
 3   we need to find a way to secure it.
 4       Q.  Take a look at Phillips 231. About midway
 5   down the page it's from Tim Tinsley to Maureen
 6   Phillips, October 4, 2006. It says Mo and Eric?
 7       A.  Yes.
 8       Q.  It says, "Would you please think about
 9   changing the name of your brokerage LLC? Own a Hotel
10   Room, LLC, smacks of short-term rental and what
11   happens when one of The Mortgage Exchange's lenders
12   happens to review the HUD, sees Own a Hotel Room,
13   LLC, and then relooks at the condo questionnaire?"
14       A.  Well, the condo questionnaire would have been
15   based on the association and what the association was
16   at the time of closing, which was a long-term rental.
17       Q.  Okay.
18       A.  It was not currently short-term nor within
19   the first year. Condo questionnaires were what's the
20   past association and what's the current association.
21   It wasn't short-term at the time, so the fear would
22   have been we would have to produce short-term
23   budgets, which we didn't have, short-term management,
24   and show all the documents you would need for a
25   hotel, which it was not currently.
```

10 (Pages 146 to 149)

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 150

1  Q.  The questionnaire that is being referred to
2  there, is that a questionnaire that is given to
3  mortgage lenders?
4  A.  Lenders give mortgage questionnaires to the
5  association.
6  Q.  Then the association fills them out and gives
7  them back?
8  A.  Correct.
9  Q.  So is it the concern -- do I understand
10  correctly that the concern that's being expressed in
11  this e-mail is that representations made to the
12  lenders would not be consistent with the use of the
13  property; is that correct?
14  A.  Well, Tim was a stickler for detail and the
15  association questionnaires were filled out as they're
16  asked, what is it today.
17  Q.  Okay.
18  A.  What is your next 30 days, what is your next
19  days.  It doesn't ask a year from now.  His fear
20  was how do I explain something I don't have a budget
21  for.  The association questionnaires were filled out
22  as the documents existed, as the property existed.
23     And Tim's fear was what if they ask me --
24  what if they ask the association to produce it as a
25  short-term.  They couldn't have done it yet because,

Page 151

1  one, they hadn't filed licenses and they didn't have
2  a budget for short-term.  They weren't going to be
3  the management company and the association board was
4  basically long-term, that was the fear.
5  Q.  Let me show you what I have marked as Exhibit
6  8.
7     (Thereupon, Exhibit 8 was marked for
8  identification.)
9  BY MR. ROTHMAN:
10  Q.  Let me know after you've read it.
11  A.  Okay.
12  Q.  Is this an example of a questionnaire like
13  what's being referred to in that e-mail, Phillips
14  231?
15  A.  Yes.
16  Q.  Okay.  I don't see a date on this, but it
17  does indicate at the top that it was e-mail either
18  from or to Mortgage Exchange DRG, June 12th of 2006
19  and/or June 16th, 2006?
20  A.  Okay.  Yes.
21  Q.  Number ten says, "Do the project documents
22  allow short-term rentals, rent 30 days or less?"  And
23  the "No" is checked; is that right?
24  A.  Correct.
25  Q.  Okay.  Now, at this time had presentations

Page 152

1  regarding Legacy Dunes already been made to potential
2  purchasers at The Mortgage Exchange?
3  A.  I don't want to swear on the date.  It says
4  June 12, but I would say yes.
5  Q.  And in those presentations, had statements
6  been made such as those you referred to earlier
7  regarding the potential for short-term rental of
8  Legacy Dunes units?
9  A.  Yes.
10  Q.  And had at least one representative of DRG,
11  that being Mr. Jim Wear, been in attendance at those
12  presentations?
13  A.  Yes.
14  Q.  All right.  Go back to your stack of
15  documents.  You can put that aside for a second.
16  Flip to Phillips 235.
17     Do you see the second e-mail down from Tim
18  Tinsley to Maureen Phillips October 10, 2006.  It
19  says, "As long as OHR, LLC, is the entity we enter
20  the agreement with and not Own a Hotel Room, LLC, I
21  don't have a problem with it."
22     Do you see that?
23  A.  Yes.
24  Q.  So had you come to an agreement with DRG that
25  you could use an acronym for Own a Hotel Room as an

Page 153

1  entity receiving real estate commissions rather than
2  the full name of Own a Hotel, LLC?
3  A.  Yes.  This is for future sales.
4  Q.  Okay.  Skip to 241.  This is an e-mail string
5  that you seem to be a part of.  If you can take a
6  look at Phillips 241 or 242 for a second, I want to
7  ask you some questions about it.
8  A.  Yes.
9  Q.  Okay.  Do you see on the bottom of 241 it
10  says in this e-mail from H Alan, the gentleman we
11  mentioned earlier whose first name is a letter, to
12  Susan Lesczynski and CC'd you, "We will need to lower
13  the price of this unit to $408,000."
14     Do you know why that was?
15  A.  If it came from H Alan because H said it
16  couldn't -- it wouldn't appraise out.  It didn't have
17  a garage.
18  Q.  And Susan Lesczynski was someone who worked
19  at DRG that you dealt with?
20  A.  Yes.
21  Q.  Next e-mail above it says from Susan
22  Lesczynski to Tim Tinsley, "Please advise how to
23  proceed."  And then there's an e-mail above that the
24  case you were CC'd on.
25  A.  Right.

U.S. Legal Support
(561) 835-0220

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 154

1    Q. And that says, "Why do we have to lower any
2  price? Shouldn't TME just pay the difference between
3  what the bank will finance and the current sale price
4  of the unit?"
5        October 16, 2006. Do you recall that?
6    A. Yes.
7    Q. Did you understand what it was that
8  Mr. Tinsley was requesting.
9    A. I did, but as you see my e-mail above I think
10  Tim and I were on a different page. That's why I
11  must not have expressed it clearly on my part. We
12  just couldn't pay the difference. We couldn't sell
13  it for the higher amount and just pay the difference.
14  One, the lender wouldn't allow us to do it. It
15  limited with how many seller credits we could give.
16        So if you buy a house in peak market and you
17  and your neighbor bid out, the house was listed at
18  and you sold it for 275 but it appraises for 250,
19  you're allowed to buy it for 275. But as credits are
20  listed on the HUD, you have to be shown on the HUD.
21  You're limited to six percent. So we had already hit
22  the limit. There was no way to could that and give
23  the credit difference. We couldn't do it.
24    Q. Do you know what ultimately happened with
25  this particular unit?

Page 155

1    A. I don't believe they closed.
2    Q. Okay. Skip to Phillips 245. The bottom of
3  appears to be an e-mail from you to Mr. Tinsley
4  subject Etta McGregor Jones. Tim, we are requesting
5  you return all of Etta McGregor Jones' earnest
6  moneys."
7        Can you explain why you were asking that?
8    A. Etta McGregor Jones was a senior citizen, not
9  in good health, of African-American descent, who had
10  decided in her excitement that she would put deposits
11  down on three units. I believed that this would be
12  inappropriate and asked for her fund to be returned.
13        It was well beyond her recision. I knew that
14  the deposits had been utilized to reach their
15  contracts with their lender and so forth. But by
16  learning the information, there was no way we could
17  let her close. So beg, borrow or whatever I had to
18  do, we were getting the money back. She should have
19  never signed contracts.
20    Q. Why?
21    A. She wasn't qualified. She shouldn't have
22  done it.
23    Q. Why was -- what was it about her that didn't
24  qualify her?
25    A. She was on a fixed income in poor health

Page 156

1  investing in real estate in Florida with no ability
2  to carry. She couldn't carry the property beyond the
3  guarantee. She couldn't carry it on her own if it
4  never -- if it never rented -- if hurricanes came
5  every day for a year, she couldn't pay the bills.
6    Q. Why was -- so if that was the case, how was
7  it that she came to sign contracts for the purchase
8  of three units, forget even one.
9    A. I had denied and canceled. She did not want
10  to have a conversation with me and she convinced, I
11  believe, Linda Payne and Joe Aldeguer that she
12  absolutely wanted this, thought it was the greatest
13  thing, she was going into it with eyes wide open and
14  she wanted those units. So it was a disagreement.
15    Q. Okay. You felt that she was financially
16  incapable of engaging in this transaction?
17    A. Absolutely.
18    Q. Okay. Did you ever feel that way about
19  anybody else who purchased units at Legacy Dunes?
20    A. I would say from the financial knowledge I
21  was very limited on most of the people buying other
22  than a select few. This was one that I had learned
23  her finances because from The Financial Exchange she
24  had asked to talk to me. I talked to her, looked at
25  her paperwork, and that's when the decision was made

Page 157

1  by me that there's no way that this could go forward.
2    Q. Since that time have you come to -- have you
3  become acquainted with other purchasers at Legacy
4  Dunes who purchased their units through The Mortgage
5  Exchange?
6    A. About a 126 of them.
7    Q. Okay. And those individuals include clients
8  of ours?
9    A. Yes.
10    Q. Have you become familiar with the finances
11  either now or at the time of any of these purchasers?
12    A. Now?
13    Q. Um-hmm.
14    A. Almost all of them.
15    Q. Are there purchasers who, like Ms. Jones, had
16  you known at the time of what their financial
17  condition was, you would have, at the very least,
18  suggested to them that this was not an investment for
19  them?
20        MR. GORE: Let me object to the form of the
21  question.
22        Hold on just a second. I kind of have been
23  letting you go with the flow.
24        MR. ROTHMAN: I appreciate it.
25        MR. GORE: For the purposes of the deposition

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 158

1 we're on a short time frame to do discovery on a
2 limited issue. And I appreciate Ms. Phillips
3 being here today and being in Florida, certainly
4 given what the weather is like in Chicago, but at
5 the same time it's now 3:30.
6 MR. ROTHMAN: Okay.
7 MR. GORE: And it seems that you're inquiry
8 is pretty broad in terms of all issues. And while
9 I appreciate your right to make that inquiry, I
10 think another time may be appropriate.
11 MR. ROTHMAN: Let me focus it a bit better,
12 and I think you'll find that it is relevant to the
13 issues we're dealing with.
14 BY MR. ROTHMAN:
15 Q. Are you familiar with the term "accredited
16 investor" as that's understood under the securities
17 laws?
18 A. In a high level.
19 Q. Are you familiar with the fact that there are
20 certain securities investments that can be made
21 without registration, where the purchaser is someone
22 who has a high net worth who is considered an
23 accredited investor because they're certified or been
24 examined and it has been confirmed that, say, they
25 have a net worth of above a million dollars or they

Page 159

1 have an income of over $200,000 or $300,000 a year?
2 Have you heard the term high net worth individual or
3 accredited investor in those terms?
4 A. Yes.
5 Q. Of what you know regarding the individuals
6 who purchased units in Legacy Dunes, are the majority
7 of them accredited investors or high net worth
8 individuals?
9 A. No.
10 Q. Are the majority of them, in fact,
11 individuals living on fixed incomes?
12 A. Now or at the time?
13 Q. Well, let's take at the time.
14 A. Some. The small percentage were fixed
15 income.
16 Q. Are there many retirees?
17 A. Definitely not the majority.
18 Q. But there are some retirees?
19 A. Absolutely.
20 Q. But if one were to define a high net worth
21 individual as someone who has assets of a million
22 dollars or more, could you estimate the number of
23 those who purchased at Legacy Dunes who fit that
24 category?
25 A. I would be estimating, but if you added their

Page 160

1 home values and retirement funds with basic assets, a
2 large percentage would have hit a million or more.
3 Q. Didn't many refinance their home in order to
4 get equity to purchase units in Legacy Dunes?
5 A. They did.
6 Q. If you were to take out the group that
7 refinanced their homes in order to pull the equity
8 out --
9 A. I want to make sure. At the time they
10 purchased they did a subsequent refinance. So where
11 they stood at the time they made the purchase or
12 where they stood when they refinanced and then went
13 in, it's very different.
14 Q. I'm asking if you look at the transaction as
15 a whole, you look what would happen to them had they
16 refinanced their primary residence and took the
17 equity out and then purchased these units, okay, if
18 you looked at it as a whole at the time, can you
19 estimate the number or a percentage of those
20 purchasers that would be considered to have a million
21 dollars or more net worth?
22 A. I would probably say half.
23 Q. Half?
24 A. (Nodding head.)
25 Q. And that would indicate that at least half

Page 161

1 would not qualify under that particular criteria?
2 A. Half would not be able to buy securities on
3 credit, correct.
4 Q. Okay. Let me show you what I have marked as
5 Exhibit 9.
6 (Thereupon, Exhibit 9 was marked for
7 identification.)
8 BY MR. ROTHMAN:
9 Q. Entitled Notice of Public Hearing.
10 A. Okay.
11 Q. Have you ever seen this before?
12 A. No.
13 Q. It refers to a Legacy Dunes Condominium
14 Association request to amend the planned unit
15 development by changing 488 dwelling units from
16 long-term to short-term rental?
17 A. Okay.
18 Q. And it refers below that to a meeting on
19 August 13th, 2007, at 1:30 p.m.
20 A. Okay.
21 Q. Is that your recollection about the August
22 date of approximately when approval was given to
23 permit units at Legacy Dunes to be rented on a
24 short-term basis?
25 A. I hate to answer back, but, yes, that would

13 (Pages 158 to 161)

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 162

1    be about the time frame for the approval. But to be
2    able to have them rented at the property, they still
3    had to have additional licensure. So that would have
4    allowed them to put short-term in place but not to
5    allow them to immediately rent.
6        Q.   This might not have been the last step?
7        A.   No. First.
8        Q.   But this may be the first step in the
9    process?
10       A.   Correct.
11       Q.   I'll show you what I've marked as 10.
12           (Thereupon, Exhibit 10 was marked for
13    identification.)
14   BY MR. ROTHMAN:
15       Q.   Have you ever seen this document before?
16       A.   No.
17       Q.   Okay. According to the fax line at the
18    bottom I think that would indicate it was faxed from
19    The Mortgage Exchange September 12, 2006?
20       A.   That's what it would appear.
21       Q.   Do you know if the numbers on this pertain to
22    Legacy Dunes?
23       A.   I have no idea.
24       Q.   You don't know whether these are projections
25    for Legacy Dunes or not?

Page 163

1        A.   I don't even know the source. I have never
2    seen this.
3        Q.   Okay. Let me show you what I have marked as
4    .
5           (Thereupon, Exhibit 11 was marked for
6    identification.)
7    BY MR. ROTHMAN:
8        Q.   Let me know if you have ever seen this
9    document before?
10       A.   No.
11       Q.   Do you know whether these are?
12       A.   It says Legacy on them.
13       Q.   Do you know whether these are cash flow
14    projections for Legacy from The Mortgage Exchange or
15    anyone else involved in the transactions?
16       A.   When you say from The Mortgage Exchange,
17    documents that were supposed to follow procedure.
18    And the procedure was if I didn't sign off on it or
19    Jill Moore didn't sign off on it, it should not have
20    gone out on letterhead.
21           There's no letterhead on there. It
22    definitely refers to Legacy? I don't know who did it
23    or how they did it, but they certainly didn't do it
24    with any authorization.
25       Q.   The e-mail we were talking about earlier that

Page 164

1    contains a number of different scenarios for loan
2    officers?
3        A.   Yes.
4        Q.   Do you know if that was sent to clients?
5        A.   Loan officers may have sent it out, and they
6    probably did, but I don't believe at that point I
7    would have panicked about what was in that document.
8           That document you just handed me, I would
9    have panicked.
10       Q.   Why would you have panicked?
11       A.   For one I didn't have a chance to see it and,
12    two, it states cash flow, annualized cash flow, and
13    it talks bout a HELOC in it. And with that being
14    such a variable number, it never would have been
15    allowed.
16           MR. ROTHMAN: Can we take a couple minute
17    break?
18           MR. GORE: Okay.
19           (Short break.)
20   BY MR. ROTHMAN:
21       Q.   Now, Ms. Phillips, you have been a member of
22    the condominium association at Legacy in the past,
23    haven't you?
24       A.   Currently.
25       Q.   Now?

Page 165

1        A.   Yes.
2        Q.   How long have you been on the board?
3        A.   Too long. A year, coming up on a year.
4        Q.   And did you start that before or after you
5    left The Mortgage Exchange?
6        A.   After.
7        Q.   Now, I understand that there have been many
8    concerns and complaints raised by purchasers of units
9    in Legacy Dunes who learned about their purchases
10    through The Mortgage Exchange and Real Estate
11    Investment Group and that they have made complaints
12    to The Mortgage Exchange and Real Estate Investment
13    Group about their purchasers; is that accurate?
14       A.   Yes.
15       Q.   Okay. And where do you fit in the whole
16    scenario in terms of the complaints that were made?
17       A.   Rock and a hard spot. While I was still
18    there, most of them if they couldn't be fielded by a
19    customer service person dealing with the short-term
20    management, came to me. So when you say where am I?
21    I'm smack dab in the middle trying to fix what I
22    could, trying to bring the parties together in an
23    impossible scenario.
24           When I say the breakdown was there, there was
25    no pulling everybody in a room and saying let's just

14  (Pages 162 to 165)

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 166

1  be a happy family and fix this. It wasn't going to
2  happen. The clients ultimately were at the same
3  impasse with their only source to go to was REIG or
4  -- everyone refers to The Mortgage Exchange and
5  reverts to that, but it really wasn't TME other than
6  their mortgage. The real estate part came through
7  REIG and got to a point where nobody knew how to help
8  or was able to help.
9      Q.  Were you aware much complaints made to
10  Development Resources Group?
11     A.  Yes.
12     Q.  If you can for me, if you can list for me the
13  different types of complaints that were made by
14  subject?
15     A.  Starting when?
16     Q.  Throughout the time that you were employed by
17  The Mortgage Exchange and REIG through December of
18  , when you ceased to be an employee?
19     A.  Wow. Complaints specifically from clients?
20     Q.  Specifically from plaintiffs in this lawsuit
21  and other purchasers of units at Legacy Dunes.
22     A.  The first complaints began shortly after
23  closing with the problem of -- as units came up, is
24  my unit rent-ready?
25         And so the debate began over whose

Page 167

1  responsibility it is to make sure the appliances,
2  countertops, paint were made rent-ready, that was
3  problem number one and that was directed at all
4  parties, every one heard that.
5         Complaints number two was can I see the
6  breakdown of the furniture package? Can you show me
7  who has the money for the furniture package?
8         Then the complaints started to grow when
9  long-term renters were not renewing the lease and
10  short-term was not yet in place. That began a
11  snowball of a panic effect that began in the end of
12  '06, because now at this point the market had started
13  to change, short-term was not yet in place, and the
14  long-term leases were expiring. So, again, all
15  parties heard that.
16        Then the breakdown hit a silent patch for
17  probably the first three months in '07. Most people
18  are still getting their long-term rent and everyone
19  presumed short-term was still proceeding, because
20  everyone was still going forward as if that was the
21  case, Geneva and X were still doing their plans,
22  people were still going about budgeting and plans.
23        And then as the long-term leases were not
24  being renewed and people were asked to choose
25  long-term or short-term right now, that began a panic

Page 168

1  mode of all of us started to have phone calls of:
2  When is short-term launching? When does my guarantee
3  kick in? Why is my unit not leased? Where is my
4  rent, it's missing?
5         The challenges with Sovereign began at a
6  severe level March of '07 where people weren't
7  getting checks and were in a pure panic mode. And
8  some of them started doing down and visit property
9  and felt the property deteriorated. At that point
10  the association and DRG got phone calls of what's
11  going on? Sovereign, by May, wasn't responding. Now
12  we had complaints that were growing to: My unit's
13  not short-term ready. We don't have the ability to
14  do short-term. None of the amenities were placed on
15  property. Sovereign -- they're nowhere with
16  Sovereign. I don't have a long-term renter and I'm
17  in Chicago, what do I do?
18        And that's when -- about August in '07 we did
19  our best to bring together all the parties and say
20  let's let somebody go forward.
21     Q.  What happened then?
22     A.  Then I would say nine out of ten parties, I
23  don't want to say, walked away, but didn't have to
24  deal with it. Then the daily basis people who were
25  concerned and upset were still screaming and now

Page 169

1  losing money were calling myself or Osceola
2  Management. And Osceola, you know, walked into a
3  situation where the association took, I think,
4  weeks to get some of the funds back that were in the
5  association bank accounts, damage was done to the
6  property. The property at this point needed some
7  significant input of cash. And this is when people
8  started to go into arrears on their association dues.
9  We already had some typical arrearages based on
10  statistically what everyone else had, but then this
11  picked up quick.
12        So people at this point were trying to
13  convert to short-term, they needed to move their
14  moneys from X Man and GH over to OMC, and that was a
15  nightmare in and of itself to handle all of the
16  paperwork, all of the transfer funds, OMC taking it
17  on, trying to convert the unit, and then having to
18  deal with the furniture package at that point too.
19     Q.  And throughout this time what were you doing?
20     A.  On a daily basis?
21     Q.  Yes.
22     A.  Legacy specific?
23     Q.  Legacy specific. What were you doing with
24  respect to Legacy and these complaints?
25     A.  I started to have conference calls with

15 (Pages 166 to 169)

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 170

1    Osceola Management, myself, and all of the
2    Chicago-based owners invited to listen in. They were
3    paid for by REIG, and we were basically just trying
4    to disseminate data: Here's where we are, here's
5    what we know, X Man and GH are not part of this,
6    you're going forward with OMC, the real estate
7    portion is over. And pretty much at that point, be
8    it TME, X Man, GH, REIG, they were all -- that was
9    over, the loop was done.
10    Q. These efforts on your part to deal with these
11    complaints continue to?
12    A. They still do continue today.
13    Q. Did they continue through your departure at
14    The Mortgage Exchange?
15    A. Yes.
16    Q. And you said they continue today, people are
17    still contacting you to get your assistance to deal
18    with these problems?
19    A. I get e-mails even from people suing me: Can
20    you check this out for me, can you get me this help,
21    do you have this document? Absolutely.
22    Q. Okay.
23    A. Even from the ones who are suing me. With my
24    name on and they're the plaintiff, absolutely request
25    my help.

Page 171

1    Q. Okay. During the period that you were
2    employed by The Mortgage Exchange and REIG through
3    the end of 2007 when you left, did any of the
4    purchasers of units at Legacy Dunes say to you, I
5    think that the securities laws may have been violated
6    or words to that effect?
7    A. A few. Yes.
8    Q. When was that?
9    A. I don't recall exactly. It would have been
10    at the end of my tenure at REIG.
11    Q. Do you remember who?
12    A. Joe Lubomski, Helen Wilkinson, and I don't
13    remember if Sandy Griggs was part of the
14    conversation. It was a conversation held or we had a
15    meeting in the apartment complex of, I think, Maryann
16    Zaborsky, and that was part of the discussions, those
17    were part of discussions.
18    Q. And can you pinpoint the time period towards
19    the end of your tenure? You're talking about the
20    fall --
21    A. It would have been winter of '07.
22    Q. Winter of '07?
23    A. (Nodding head.)
24    Q. December of '07?
25    A. I don't know if it was -- I'm from Chicago --

Page 172

1    October, November, December. It's cold by that point
2    on.
3    Q. I'm going by Florida seasons.
4    A. All right.
5    Q. So the colder months --
6    A. Yes.
7    Q. -- of '07 at the end of the calender?
8    A. Yes.
9    Q. Do you recall anything more specifically
10    about what was said concerning the securities laws?
11    A. No. Other than at that point my fiduciary
12    was still to REIG, still trying to solve it and the
13    discussions were: What if when we sue everybody? I said
14    sue, at this point, for what?
15    That was the first time they discussed the
16    securities -- and I, you know, basically at that
17    point said, look, I'm still doing everything I can.
18    And they knew that. I think that subsided that for
19    what turns out to be almost a year. All I was trying
20    to do is try and make the best effort to do what I
21    can.
22    And the reason I went on the board is because
23    the association was very far behind and the owners
24    wanted to be able to have say and hear what's going
25    on. All I could tell them was, I'll stay involved

Page 173

1    and do whatever I can, that's all I can do. I can't
2    change the market, I can't change the short sales,
3    and I can't change the situation they're in.
4    MR. ROTHMAN: Okay. No further questions.
5    CROSS-EXAMINATION
6    BY MR. GORE:
7    Q. Ms. Phillips my name is Mike Gore. I am the
8    attorney for DRG, Legacy Dunes Condominiums, Tim
9    Tinsley, Jim Wear, and Mike Halpin, who is not here
10    today. I'm going to ask you a series of questions
11    based on the testimony you have given here today,
12    it's called cross-examination.
13    The same rules apply that Mr. Rothman
14    instructed you before in terms of responding. You've
15    done an excellent job as a witness, nobody's talked
16    over anybody, so it's worked out very well. If we
17    can keep that going, that would be great.
18    A. Sure.
19    Q. Let me ask you something that came up in the
20    last little bit of testimony and kind of go back to
21    it and see if I can understand it. You've talked
22    about in the mid-2007 time period of the change to
23    Osceola Management Corporation, which you refer to as
24    OMC, do you recall that?
25    A. I do.

16 (Pages 170 to 173)

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 174

1    Q.   As I understand the process prior to OMC
2  taking over, there have been a process by which a
3  company by the name of X Management and Geneva were
4  going to work together to be the short-term
5  management company; is that correct?
6    A.   Yes.
7    Q.   How is that relationship going to be set up
8  between X Management and Geneva?
9    A.   It was already set up by the fact that
10 earlier I discussed Runaway Beach Club.  X Management
11 was to be a brand, similar to W Hotel, and the hotel
12 was to be run or the property was to be run by Geneva
13 Hospitality.  X Man would remain on the contracts
14 with the owners, but Geneva would always be the
15 operator of that facility.
16   Q.   So geneva would be under contract to X
17 Management; is that correct?
18   A.   Correct.
19   Q.   X Management would collect a fee and then pay
20 for services rendered by Geneva?
21   A.   Yes.  Other than the flow of the cash is
22 different and the fact that the services and the fees
23 were collected by Geneva and the money then went from
24 Geneva to X Man.
25   Q.   What is it that happened to cause that plan

Page 175

1  not to go into effect and ultimately resulted in OMC
2  being the short-term management company?
3    A.   I wish I knew the breakdown.  When I became
4  involved at that point -- because, again, from the X
5  Management standpoint, myself and who ran X
6  Management within the team and I were oil and water.
7  And if we could be on the opposite sides of the
8  planet, it wasn't far enough apart.  So there never
9  were discussions between myself and X Man regarding
10 Legacy.  X Man and GH had conversations.  I do not
11 know to this day, and I wish I did, what broke down
12 that GH and X Man didn't end up managing DRG.
13          I don't have that knowledge other than the
14 adversarial atmosphere that was created by all the
15 parties, and I understand that flow, and in
16 retrospect I wish I could go back and change that.
17 But at that point we had so many adversaries, I had a
18 presume that was the reason.
19   Q.   Would it be fair to say that these
20 adversarial tensions, if you will, were during the
21 time period of the first six months of 2007?
22   A.   I believe they began, from my love letter, on
23 probably early October of 2006.
24   Q.   But for the purposes of my question let's
25 look at the first six months of 2007, that would have

Page 176

1  been a time period when these tensions were there,
2  correct?
3    A.   Very much so, yes.
4    Q.   What was DRG's involvement in that time
5  period after January 1st, 2007?
6    A.   Involvement with whom?
7    Q.   X Man and the Geneva tension that prevented
8  them from going forward with short-term?
9    A.   By my exclusion from that calculation, I have
10 no idea what their communication was.  I wasn't party
11 to that at that point at all.
12   Q.   Let me ask you to look at the last page of
13 the Phillips documents, it's document Phillips 271.
14 What is that document?
15   A.   A photocopy of all my business cards.
16   Q.   Okay.  And it indicates that -- let me ask
17 you about the business cards in the middle there that
18 reference The Mortgage Exchange and identified you as
19 an "executive loan officer."
20   A.   Yes.
21   Q.   You've already testified about your
22 responsibilities as director of operations.  What
23 type of responsibilities did you have as an executive
24 loan officer?
25   A.   These were -- well, they're older cards.

Page 177

1  When we first moved to -- you can see the transition
2  from the left side on One TransAm, which was in '01,
3  '02, '03, we moved over to Downers Grove.
4          And at that point when I first became
5  director of operations we did not have a very
6  significant staff at that point, large, but not in
7  the 150 range, I still did loans and performed loans.
8  I stopped -- other than my personal client load that
9  was, you know, family, friends, and so forth --
10 stopped doing mortgages, I think, probably '04.
11   Q.   Did you remain licensed as a licensed
12 mortgage broker?
13   A.   Yes.  Absolutely.
14   Q.   On the Real Estate Investment Group business
15 card you got "broker associate" under your name, are
16 you a licensed real estate broker as well?
17   A.   Yes, I am.
18   Q.   With regard to The Financial Exchange, I see,
19 again, business cards from both addresses.  It's
20 referenced there as your position as "senior
21 consultant."  What did you do as a senior consultant
22 for The Financial Exchange.
23   A.   I was licensed to sell both life insurance,
24 annuities, you know, health and life, and was able to
25 walk into a meeting, if Pete Becker was there, and

17 (Pages 174 to 177)

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 178

1    had all my licenses, if Peter's reviewing a financial
2    plan, or if I did, to look at someone and tell them
3    how an annuity worked, tell them how life insurance
4    worked and I was licensed to do so. I always had a
5    license for the first part of the conversation. I
6    had a license to be in the room.
7        Q.  Do you hold any other type of designations
8    such as, other than licenses, such as certified
9    financial planner or --
10       A.  No, I was not a CFPI. I had a valuation
11   license. I was a financial expert witness in the
12   eighties into the nineties, and have different
13   designations having to do with being a financial
14   witness.
15       Q.  You continue to hold your business valuation?
16       A.  That is expired currently.
17       Q.  Tell me, if you will, and I want to focus on
18   the relevant time period of 2006, what was it that
19   The Mortgage Exchange did?
20       A.  2006?
21       Q.  Correct.
22       A.  We were probably one of the largest mortgage
23   brokerages in the country at the time. We, as a
24   company, and Joe Aldeguer specifically, had the
25   ability to find a project -- not a project, a

Page 179

1    mortgage or a specific type of loan, and create a
2    niche and modify it and produce enough volume that a
3    lender would either pay him a bonus to sell their
4    product or that actual product -- which is the word I
5    was searching for before -- he would find products
6    and match them up to make -- create financial wealth
7    for individuals.
8        So at this point The Financial Exchange was
9    to secure people's wealth. And part of the reason we
10   were in that was because there had been conversations
11   years before where we all felt pains of, you know,
12   Black Monday and so forth, and it was the fixed rate
13   annuities and the EIVs and the EIAs. And Joe said,
14   You know, if we can fix people's assets, and then
15   with real estate we can lower their mortgage, think
16   of the wealth we can start to create.
17       He had been involved in a project where he
18   watched the amount of real estate commissions being
19   paid to others, not himself. He realized that if he
20   did the mortgage, he secured their financial future,
21   they were buying and would always come and ask his
22   opinion, he said I might as well get paid for someone
23   asking my opinion.
24       So at that point he decided if he can secure
25   the financial plan, give them the best mortgage

Page 180

1    product, find real estate that they can invest in,
2    because at this point Joe and Jill combined had a
3    significant number of properties, significant wealth
4    in real estate, and had purchased significant
5    properties. Joe was a speculator. He did quite
6    well, very well. Taking a property near Soldier
7    Field nobody would want and watching it increase by
8    ten times the value.
9        He started to do it for friends and family
10   and then decided that as the evolution of mortgages
11   were occurring, especially the subprime train,
12   couldn't keep going. This is in '06. So we stopped
13   doing subprime mortgages at the end of '05. We had
14   to find another way. The option ARM became or
15   predominant product. Most of our loans were that
16   loan.
17       He thought if he showed people how to use
18   this tool, you could find a way for them to then buy
19   life insurance with the monthly payment or buy an
20   annuity. So what he was trying to do is create
21   multiple levels of clients. From insurance product
22   from The Financial Exchange; mortgage products they
23   continually refinanced from The Mortgage Exchange; or
24   if they went to REIG, searching out different types
25   of property. It wasn't until the end of '06 with the

Page 181

1    debacle at Runaway Beach Club he decided to become a
2    hotelier.
3        When we went do the Legacy Dunes it was
4    originally only going to be with Geneva. When we
5    first approached Sal and Chandra it wasn't, Hey, can
6    you come work for us under X Man and we'll pay. You
7    run hotels and that's great, you run the Cove up in
8    Geneva, it's a very similar property, can you do
9    this. That's really what it was.
10       It wasn't until at Runaway that he stepped in
11   and created X Man that he started to realize there
12   was income to be had. So take some on the title, take
13   some on the mortgage, take some on the insurance,
14   annuities, and real estate and then take it from
15   there.
16       Q.  Would you classify of any of the loans used
17   by plaintiffs in this group to purchase Legacy Dunes
18   condos as subprime?
19       A.  No. I don't think there were any. No, no
20   Subprime loans.
21       Q.  Now you have previously testified about a
22   client coming in and writing a check for an appraisal
23   fee and a credit check?
24       A.  Right.
25       Q.  And typically if you were to go to Sun Trust

18 (Pages 178 to 181)

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 182

1    and apply for a mortgage they would have you do the
2    same thing, I would imagine?
3       A.   Right.
4       Q.   If I understand it correctly, that's kind of
5    a collection of fees in advance?
6       A.   Right.
7       Q.   That's not payment that goes to The Mortgage
8    Exchange?
9       A.   Never.
10      Q.   How does The Mortgage Exchange make money on
11   a transaction? Let's use Legacy Dunes as and
12   example.
13      A.   Just The Mortgage Exchange?
14      Q.   Just The Mortgage Exchange.
15      A.   Yield spread.  As a broker, if Bank United
16   was the lender and you came and bought unit 101 at
17   Legacy Dunes, I as the broker at The Mortgage
18   Exchange go to Bank United and say here's my client,
19   here's what they look like, here's the file, here's
20   the loan I am putting them in, here's the rate plus
21   the index plus the margin, if you're talking about an
22   option ARM, what's the yield spread?
23          A yield spread -- now it's not in every
24   state, Illinois and Florida it's completely legal and
25   we were mortgage licensed in both -- yield spread was

Page 183

1    not points up front, but a yield spread paid from the
2    lender for the volume we produced and the client
3    because of the default rate. The Mortgage Exchange
4    walked in different than most mortgage companies with
5    hundreds and hundreds of transactions per month with
6    a non default rate; meaning, we had the lowest
7    default rate of any mortgage broker in the country;
8    meaning, in the first 24 months on the mortgage -- I
9    don't mean a foreclosure, I mean not a late payment.
10   So our clients come in and we almost always had no
11   late payments from our clients.
12          Our goal at The Mortgage Exchange and was for
13   15 years -- at least the ten years I was there --
14   those clients were followed up on. Because, one, the
15   loan officer was looking for another refi. They
16   wanted to make sure and they checked in quite often,
17   how is the mortgage payment?  How were the finances
18   going?
19          So we had the ability to get the highest
20   yield spread probably of anyone in the country.  Our
21   option ARM was four-and-an-eighth and the other
22   brokers get two-and-a-quarter in the yield spread.
23      Q.   How does that translate to dollars in
24   layman's?
25      A.   Four point one percent of the purchase price.

Page 184

1       Q.   Now on the -- I have seen in the documents
2    produced by plaintiffs in this case that in certain
3    circumstances a potential purchasers, in order to
4    obtain money for a down payment, may refinance
5    certain property?
6       A.   Most, yes.
7       Q.   If I understand correctly, The Mortgage
8    Exchange would be involved in two financing
9    transactions related to one purchase?
10      A.   Correct.
11      Q.   In Legacy Dunes?
12      A.   Correct.
13      Q.   The Mortgage Exchange would refinance the
14   client's existing mortgage; is that correct?
15      A.   Correct.
16      Q.   And then generating cash from that traction
17   invest it, if you will, to the purchase as a down
18   payment of a Legacy Dunes unit, correct?
19      A.   Now, not all of them, but yes.
20      Q.   In certain circumstances?
21      A.   Typically, yes.  Client A would come in,
22   refinance their primary residence, if they didn't
23   already possess that type of loan.  If they already
24   possessed that type of loan, some would use a home
25   equity line of credit or utilize a 401K loan or if

Page 185

1    they wanted to use liquid assets, they would.
2       Q.   As part of your role in The Financial
3    Exchange, did you have a general strategy about the
4    borrowing of money for real estate investments
5    separate and apart from a traditional 80-20 loan on
6    that property?
7       A.   Can you clarify when you say "strategy"?
8       Q.   In terms of as The Financial Exchange portion
9    of your business, when you're talking to someone
10   about your portfolio or about their investments, was
11   it typical for you to suggest they borrowed money out
12   of existing assets in order to invest in other
13   assets?
14      A.   I would not say it was a typical strategy.
15   Every single one of those was so individual.  I think
16   if you look back at TFE, everyone was treated so
17   differently.  It really depended upon -- because it
18   was a business and the goal was to make money --
19   although The Financial Exchange really didn't make
20   money and had very few transactions -- was to first
21   look at the insurance policy and make sure there was
22   a insurance policy, because it was a safe, had a
23   great insurance policy for The Financial Exchange.
24          And typically if I had to put a strategy
25   together for Pete Becker, he would typically not pull

19 (Pages 182 to 185)

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 186

1    from a retirement asset if he could help it. He
2    would rather sell them a life insurance policy than
3    have them use that money toward a purchase of a
4    property. It would be contraindicating for REIG.
5    Pete would encourage them for life insurance or an
6    annuity first.
7        Q. Now in the scenarios that we have looked at
8    for particular units, and we had a document that you
9    had sent to loan officers with some numbers, you
10   talked about a -- there's used in your example is a
11   particular loan product, what was that? Was that the
12   loan product that Joe Aldeguer was, you know, I don't
13   want to say, pushing, but was that the loan product
14   of the year, if you will?
15       A. Joe would refer to it as the premium choice
16   mortgage.
17       Q. Okay.
18       A. He was the first to utilize it. He used it
19   with Washington Mutual eleven years ago when it was
20   called a fixed pay 60. He had been probably the
21   predominant user in the industry for years until the
22   option ARM became quite popular. I would say he sold
23   more option ARMs than most companies did. It was the
24   preferred product.
25       At this point he had seven years of history

Page 187

1    to show with that mortgage showing how it works for
2    people. It was what he called the premium choice, an
3    MTA or a monthly treasury average, or an option ARM,
4    and it was the preferred choice. It really was, he
5    believed.
6        And if you worked for him, you had to keep to
7    the company line that you believed this product made
8    the option the most comfortable and, I would say, the
9    safest at the time to invest.
10       Q. Is that what most of the plaintiffs in this
11   case utilized?
12       A. With rare exception yes, some chose not to.
13       Q. Tell me the characteristics of a premium
14   choice mortgage.
15       A. Okay. It is a negative amortization loan.
16   It is calculated on the monthly treasury average.
17   There is a 12-month average. So if you have 12 Dixie
18   cups on table and one month the treasury average
19   piqued up, that pitcher of water is averaged with the
20   prior 11 Dixie cups. So you have an index plus the
21   margin that was your interest rate every single
22   month; however, you had a minimum payment at
23   1.25 percent.
24       So if my index and my margin add up to five
25   percent and my payment was $2,000 and my payment at

Page 188

1    one-and-a-quarter was $4,000, I only had to pay the
2    $4,000. But the reality, most things added to much
3    higher and the industry was much higher. It was only
4    about $300 for every $100,000 borrowed. If you have
5    a $100,000 loan, your payment was $297. You accrued
6    more on the back end. It was deferred interest.
7        If you think about a bucket, so I owe $1200
8    I'm giving you 300 and I'm going to put 900 in a
9    bucket that I have to pay you later. And the whole
10   purpose for the mortgage for the 11 years prior was
11   as you had appreciation, as long as you utilized
12   those funds that you did not pay on the mortgage to
13   grow them somewhere else, the arbitrage was possible.
14   It had the lowest default rate of mortgages.
15       People went into those and had to qualify at
16   the full payment. So if you had the mortgage, you
17   still qualified at the full principal and interest
18   amount, but you were allowed to pay the lower amount.
19   So that's how it worked. And the index hit an upward
20   trend for 12 straight months and went through the
21   roof. I have them, I have this loan. And it went up
22   over 90 percent because the index plus the margin was
23   so high even though the interest rate is up only
24   seven-and-a-half.
25       But in the converse, right now the mortgage

Page 189

1    plus the index on my mortgage, I think, is
2    three-and-a-quarter. I still have neg am and I still
3    pay the minimum payment, but the loan also has the
4    ability in the third year to recast. Meaning I can
5    recast with what's owed and reamortize it, make a
6    principal payment, or start the clock over at 1.25
7    percent based on the current amount owed.
8        Q. So at the end of the three years period or
9    adjusting it three years, if there has been -- if you
10   have been putting money in that bucket as you've
11   described, we're going to add up that bucket at the
12   three years. So instead of paying 1.25 percent as
13   your minimum payment on the initial borrowed amount,
14   you're now going to pay that 1.25 percent on the --
15       A. No. The 1.25 is already escalated. Every
16   year your payment increases 7.5 percent. If your
17   payment was $1,000, it went up $7.50. So it goes up.
18   So each year there's already been an increase in that
19   payment.
20       There's a maximum amount you're allowed to
21   defer, but there's usually, depending on what you're
22   qualified for, some people are qualified for
23   percent of the purchase price, some for
24   percent, it's based on your credit and your income
25   how far they'll let the neg am go.

20 (Pages 186 to 189)

U.S. Legal Support
(561) 835-0220

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 190

1    Unfortunately, the loans never anticipated
2  the bottom falling out of the market.  So loans don't
3  have the caveat built into them for the house now
4  being worth half of what you bought it for or the
5  loans aren't structured that way.
6    Q.  How would -- but leaving aside the question
7  of the actual value of the asset today, how would
8  that affect your payment?
9    A.  The payment at the third year, one, your
10  loan, if you have only paid the minimum balance, it
11  could make it significantly higher.  That, of course,
12  depends on the interest rate.  If the interest rate
13  went up significantly -- remember, the accrual is
14  based on the actual interest rate, not the minimum
15  payment.  So if the interest rates hadn't gone up,
16  then the neg am is probably two percent,
17  three percent.  If the interest rate's skyrocketing,
18  you could max out at that nine percent, you could be
19  deferring at a much higher rate.
20    And when the third year comes, if I have a
21  $100,000 mortgage and I pay the minimum payments, the
22  mortgage is up to nine percent, I probably owe
23  $150,000 on that loan and my payment will now be
24  based on the 150.
25    Q.  You mentioned earlier in your testimony you

Page 191

1  had become familiar with the financial circumstances
2  of plaintiffs in this case?
3    A.  Yes.
4    Q.  How has the premium choice mortgage affected
5  them as they sit here today in the spring or late
6  winter of 2009?
7    MR. ROTHMAN:  Objection to form.  You can
8  answer.
9  BY MR. GORE:
10    Q.  If you know?
11    A.  I do know.  It's been two-fold.  One, the
12  minimum payment was the reason people didn't
13  foreclose on year two, but the deferred interest,
14  with the exception of the Obama plan, would be the
15  death sentence for all of them at the moment.
16  However, based on Monday's or Tuesday's speech, now
17  they'll probably have a loan modification if the
18  rules stand.  Right now it's a death sentence because
19  they owe, even if the property had stayed at the same
20  value and not decreased a dollar, because the
21  interest rate when up, they have an excessive amount
22  owed.
23    Q.  And if I understand correctly, that's going
24  to kick in at the three year anniversary?
25    A.  Yes.

Page 192

1    Q.  Which closings took place in September '06,
2  so we're looking at that right now?
3    A.  Correct.
4    Q.  Let me ask you about the closing schedule.
5  You testified a little bit about this love letter
6  that you got from Tim Tinsley with a list of charges
7  per customer or per purchaser.  Was there a closing
8  date requirement in the purchase contract?
9    A.  There was.
10    Q.  Was there a provision in the purchase
11  contract that if the purchaser missed the closing
12  date, the purchaser would be responsible for paying
13  costs or a fee or a late penalty for not closing?
14    A.  Yes.
15    Q.  Were the numbers you were receiving from
16  Mr. Tinsley or Mr. Halpin the calculation of late
17  fees as provided for in the contract?
18    A.  Yes.
19    Q.  Did the purchasers pay those late fees?
20    A.  No.
21    Q.  Did The Mortgage Exchange pay those late
22  fees?
23    A.  No.
24    Q.  Did anyone pay those late fees?
25    A.  No.

Page 193

1    Q.  How do you know that?
2    A.  I have a feeling if someone would have made
3  any of those checks or payments to them, they would
4  have told me.  If someone has paid them, I'm not
5  aware of it.  I don't know of any that were paid.
6    Q.  When did you first meet with Mr. Rothman or
7  anyone in his office?
8    A.  Probably with Jerry Gritter who was counsel I
9  retained down here in Florida post receiving
10  information about the suit.  And I would have to look
11  at the dates, but it was not long after I received
12  information of a lawsuit.
13    Q.  You indicated Jerry Gritter, that is your
14  attorney.
15    A.  That is my attorney.
16    Q.  I'm not asking any conversations with your
17  attorney, but can you tell me about the first time
18  you sat down with Mr. Rothman?
19    A.  He asked me about my involvement.  I actually
20  approached Joel and said there was no way I can
21  afford the $50,000 retainers in each state that were
22  needed.  I was up to my eyeballs with these clients
23  every day and that I don't know what money he's
24  looking for, but he's not getting it from me.  And,
25  you know, what -- I'm happy to give information, but

21 (Pages 190 to 193)

Page 194

1 I'm not going to be continually going through this
2 and being tortured.
3      I'm not sitting with millions of dollars. I
4 know the plaintiffs are looking for millions and
5 millions of dollars and everyone's looking at the
6 money on those HUDs, but I don't have millions, I
7 didn't get millions. I'm not sitting idle spending
8 hundreds of thousands of dollars on legal fees to
9 show I didn't have it.
10 Q. What did you, other than your explaining your
11 motivations, what did you talk to Mr. Rothman or
12 anyone at his office?
13 A. He wanted to know my role, my involvement.
14 He wanted to know if I'm still involved with the
15 plaintiffs, what did I know about the project, and
16 would I be willing to be cooperative.
17 Q. What did you tell him?
18 A. Yes.
19 Q. Tell me how you cooperated?
20 A. He asked me what documents I possessed. And
21 without even opening the box from when I moved my
22 desk, I handed it to them. I didn't even look. I
23 didn't want to be part of pilfering through or
24 deciding who sees what. I don't believe there's
25 secrets. I just believe there's delayed truth.

Page 195

1      And I have lived this for more days and more
2 hours than everyone in this room combined and
3 everyone on the phone combined. I need it to come to
4 an end. Whatever you need me -- ask me a question,
5 I'll answer it honestly, but I need the nightmare to
6 end for myself.
7 Q. Other than the documents we marked here today
8 and the DVDs and CDs we're getting copies of, do you
9 have anything else relating to anything associated
10 with Legacy Dunes?
11 A. Currently as a member of the board, clearly I
12 have other documents. And as I told Mr. Rothman,
13 certainly I'm not the greatest of housekeeping when I
14 moved and we had some remodeling done at the house.
15 I still have boxes to go through, but I have yet to
16 find a piece of paper related to Legacy. To my
17 knowledge this is everything.
18      I continue to go through things slowly, but
19 it was all in one box at one time. So I believed it
20 to be everything there was at the time. But I
21 continue to look every time I open another box, but I
22 don't believe so. If it is, it would be minimal and
23 nothing that I can recall at this time.
24 Q. How many times have you met with Mr. Rothman?
25 A. Twice.

Page 196

1 Q. And where were those meetings?
2 A. Down here with Jerry Gritter at his office
3 and then up in Chicago.
4 Q. You mentioned in passing I think The Mortgage
5 Exchange had filed for bankruptcy?
6 A. Yes.
7 Q. Do you know what triggered that?
8 A. Well, the filing was seven -- more than seven
9 or eight months after I had left. The finances were
10 actually at the point where, in my personal opinion,
11 bankruptcy should have been filed in July '06 or '07,
12 not '08. The eternal optimist Joe Aldeguer is, he
13 believed he could pull himself out of this.
14      There's no money, mortgages were gone, there
15 were no mortgages to do real estate, and the
16 insurance portion didn't support it. So basically
17 the overhead far exceed anything they could bring in.
18 Q. There was testimony about a document that is
19 submitted to a mortgage company when a loan is
20 generated that gives information about the property
21 that the purchaser's buying, do you remember that? I
22 think the Bank United form?
23 A. The condo questionnaire.
24 Q. We saw one of the questions is: Is the
25 property currently approved for short-term leasing

Page 197

1 or -- I can't remember exactly the term. I can pull
2 out the document.
3      Do you remember the question?
4 A. The question is very specifically: Do the
5 project documents identify this as a short-term
6 property.
7 Q. At the time those forms were being filled out
8 and returned to mortgage companies, were those
9 questions accurate?
10 A. Yes.
11 Q. And did you ever make any representations
12 back in the June, July time period to any potential
13 purchasers that were different than that information?
14 A. Did I? When you say I --
15 Q. Yes, you.
16 A. Did I specifically say anything different
17 than on the condo questionnaire? Ask me again.
18 Q. The documents do not provide for short-term
19 leasing, correct?
20 A. Correct.
21 Q. You mentioned that as of the time of the
22 condo questionnaire being provided, your belief is
23 that was an accurate statement when that box was
24 checked "No," correct?
25 A. Correct.

22 (Pages 194 to 197)

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 198

1    Q.  Did you ever make any representations to any
2  potential purchasers in June or July 2006 that the
3  condo documents did provide for short-term leasing?
4    A.  The project documents did not because the
5  application hadn't been filed.  We're mincing words.
6      The questionnaire is correct because the
7  project documents the P.O.S. and public filing did
8  not allow for it.  The zoning allowed for it, the dec
9  probably allowed for it.  So we're mincing words.
10      The property was not currently short-term and
11  it was not currently in the association docs nor was
12  it adopted by the association.  We knew it to be
13  correct, we knew the intention was to get that,
14  but -- so the only conversation was this is the plan
15  and we intend to get the cell zoning, and this is to
16  be applied to -- it is currently long-term.
17  Everything that it states in the condo questionnaire.
18    Q.  As far as representations to potential
19  purchasers, it was always something to be done in the
20  future, correct?
21    A.  Correct.
22    Q.  In terms of short-term leasing?
23    A.  Correct.
24    Q.  Did you ever guarantee to any potential
25  purchasers it would be short-term leasing?

Page 199

1    A.  When you say, "guarantee," I mean.
2    Q.  Did you ever say, I guarantee it's going to
3  be short-term leasing?
4    A.  I can tell you typically I don't use the "G"
5  word unless forced to, so no.
6    Q.  You indicated you were called that Jimbo,
7  since his father's is Big Jim or Big Daddy, you
8  mentioned you thought Jimbo was at more than one
9  presentation.  When we were talking about the
10  presentations, speaking of the big presentations, you
11  described that there were three of those regarding
12  Legacy Dunes?
13    A.  The one I recall was more significant in
14  size.
15    Q.  Do you recall Jimbo being there three times?
16    A.  I remember Jimbo being in Chicago at least
17  three times.  Whether I can remember him or recall
18  him -- mostly because of the transcript on the 20th
19  and the day he got out of the plane, which I think
20  was in June, and the British woman from the American
21  resort.  I can't remember if the third was a visit to
22  Chicago for a presentation or not.  That's why I
23  can't remember if he was at three.
24    Q.  Other than finding the video recording of the
25  presentations, are you aware of any other documents

Page 200

1  or things we can check -- maybe not in your
2  possession but maybe held by someone else that could
3  verify who from DRG or Legacy Dunes was at each of
4  these presentations?
5    A.  Other than an e-mail search, I don't know of
6  anything that would exist.  I mean, I guess if you
7  went through expense records and looked through
8  dinner expenses and who was at dinner or airline
9  reservations, but that would be about all I could
10  think of.
11    Q.  What happened to The Mortgage Exchange
12  documents, do you have any idea?
13    A.  I have no idea.
14    Q.  Where were they when you left at the end of
15  ?
16    A.  In the Sears Tower.
17    Q.  You mentioned a law firm Coman and Anderson?
18    A.  Yes.
19    Q.  Who are they?
20    A.  I'll use a broad description.  They were what
21  you would call corporate counsel.  They weren't
22  in-house counsel, they were counsel to The Mortgage
23  Exchange and had been their lawyers for most aspects
24  of mortgage specific advice on real estate for
25  probably pushing decade.

Page 201

1    Q.  Who was it at that firm that you dealt with?
2    A.  For which topic?
3    Q.  Well, just give me the list and tell me what
4  topic you would deal with them on.
5    A.  Dan Coman was also a CPA and basically an
6  artist when it came to mortgage and making sure we
7  were documented and accurate and above reproach when
8  it came to whether it was product or disclosures --
9  our disclosure package was huge for our mortgages.
10  And he was the best at making sure if there were any
11  out of state audits, those mortgages were fully
12  disclosed and everyone knew what they were.  George
13  Weams was for REIG and real estate.  And Maureen Beck
14  was more human resources regarding different -- other
15  equal opportunity type claims.
16    Q.  I do think you said earlier that you did not
17-  file a claim in the bankruptcy?
18    A.  I did not.
19    Q.  Have you been involved in any way in the
20  bankruptcy proceeding discussions with the trustee?
21  Any depositions, any court testimony?
22    A.  Yes.
23    Q.  Tell me about that in what way?
24    A.  Part of my cooperation request from
25  Mr. Rothman was to sit with the bankruptcy trustee.

23 (Pages 198 to 201)

Page 202

1    Eugene Crane called me and asked me if I would answer
2    question. I said, Sure. No reason not to. He asked
3    me a series of questions for an hour related to what
4    I knew prior to when I left.
5        Q. What did he ask you?
6        A. Pretty much looking for the location of
7    documents. We spent a lot of time on him trying to
8    understand that there were so much paper there and
9    how it could be gone. I explained to him a huge
10   portion of that was a loan portfolios that were
11   scanned. A lot of those file cabinets of client
12   documents were in an optical scanned disc and would
13   be on the servers and how to locate the servers and
14   get the client information off those. They were all
15   scanned and secured.
16       Q. What other things did you talk to the trustee
17   about?
18       A. He asked me specifically bank accounts;
19   companies, how they interacted; if I knew of any
20   other funds; if I knew of any other transactions.
21   And basically that he was a trustee for this company,
22   but trying to understand the flow -- he very much was
23   trying to understand the flow of how REIG, Own a
24   Hotel, and X Man with The Mortgage Exchange and how
25   those moneys flowed.

Page 203

1        Q. Have you given any testimony, other than
2    meeting with the trustee, have you appeared in a
3    court proceeding in the bankruptcy or given any
4    depositions in the bankruptcy action?
5        A. Not at all, no.
6        Q. Have you given any other testimony in any
7    other proceedings either in deposition or in court
8    involving The Mortgage Exchange, Real Estate
9    Investment Group, or any other Joe Aldeguer related
10   entities?
11       A. Related to Legacy Dunes?
12       Q. Related to anything with regard to the Joe
13   Aldeguer instance.
14       A. Yes.
15       Q. What type of testimony?
16       A. Conversations with counsel regarding a
17   pending lawsuit on Runaway Beach Club.
18       Q. Is that an actual pending lawsuit?
19       A. I believe it's been filed.
20       Q. Do you know where it's been filed?
21       A. Cook County.
22       Q. Any other discussions regarding litigation,
23   be it depositions, testimony, or just informal
24   communications?
25       A. Informal but counsel -- I had been contacted

Page 204

1    by many counsel related to Lighthouse Key, the
2    Mondrian, Port Charlotte, and all those other
3    transactions.
4        Q. Is there litigation ongoing with regard to
5    Lighthouse?
6        A. None that I know of. And I believe that
7    conversation I had is the reason there isn't.
8            MR. ROTHMAN: Excuse me, Mr. Gore, did you
9        ask about, in the bankruptcy, did you ask just
10       about court testimony?
11           MR. GORE: No. I asked about any
12       conversations with the trustee.
13           MR. ROTHMAN: Right.
14           MR. GORE: Any depositions or any court
15       testimony in the bankruptcy action.
16           MR. ROTHMAN: That would include sworn
17       statements?
18           MR. GORE: Yes, it would.
19       A. Then yes.
20   BY MR. GORE:
21       Q. What type of sworn statements have you given
22   in the bankruptcy action or to the trustee?
23       A. It was Eugene Crane and myself. And the
24   questions he asked, he had them reported and then I
25   just signed right then and there whatever she

Page 205

1    reported that I had said. He asked if he could ask
2    me the questions on the record. I said yes.
3        Q. Were those questions, obviously about The
4    Mortgage Exchange, did they include Legacy Dunes
5    questions?
6        A. I don't recall exact questions about Legacy
7    Dunes.
8        Q. We've talked about long-term management, we
9    talked about leases, we talked about short-term
10   management, and I believe we asked a lot of questions
11   about X Management and Geneva. Tell me about
12   long-term management. When a purchaser at Legacy
13   Dunes would buy a unit, were some -- my understanding
14   is some of them had tenants; is that accurate?
15       A. Yes. I wouldn't say some; I would say the
16   majority. They, actually, during the purchase would
17   usually ask the realtor if they knew it was rented.
18   We had a rent roll. I believe it was Susan had a
19   rent roll.
20       So if anyone at the time asked, she would let
21   them know if there was a lease and if there was a
22   right of recision. If they wanted one, I think many
23   of them did, they could get it from Ryan or someone
24   else, but they wanted to know what the lease was.
25   And they also needed the lease for the mortgage

24 (Pages 202 to 205)

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 206

1    application.
2        Q.  And my understanding is Sovereign was the
3    long-term management and was also initially the
4    association management; is that correct?
5        A.  That's correct.
6        Q.  Am I also correct that Sovereign was never
7    involved in short-term management?
8        A.  You are correct.
9        Q.  What was it that was required -- I know that
10   it happened in July of 2007 -- to effectuate
11   short-term rental availability at Legacy Dunes?
12       MR. ROTHMAN:  Objection to form.  You can
13   answer.
14       A.  What was required?
15   BY MR. GORE:
16       Q.  Yes.
17       A.  And I believe the notice was probably for
18   August of '07.  We had to go to the planning and
19   zoning.  And I don't mean to use the exact name of
20   the governing body, you had to go to Osceola County
21   and say, We want to make this long-term to
22   short-term.  We used to be short, we changed it to
23   long-term.  We want to go back to short-term.
24           And then there had to be documentation and
25   dotting the I's and crossings the T's from the

Page 207

1    association and the developers to be able to then
2    formally take short-term tenants on-site.
3        Q.  Was it required that the developer
4    participated in that process in July or August 2007?
5        A.  It is my understanding yes, they did.
6        Q.  Was there any type of discretion involved, to
7    your knowledge, by the local government or was it
8    simply if you ask for it, you get it?
9        MR. ROTHMAN:  Objection to form.
10       A.  I would be speaking purely from hearsay that
11   even if there was, Jim Murphy from Osceola Management
12   had intimate knowledge of Osceola County and would be
13   able to say this is what we want to do, can we please
14   do it.
15           At no point did I ever think anyone was going
16   to say no.  But I don't know from a legal standpoint
17   that there's -- there's always a chance for someone
18   to say no, but I don't believe there would be any
19   grounds.
20   BY MR. GORE:
21       Q.  Were there any circumstances -- you testified
22   about as part of the purchase the buyers would
23   receive a rent guarantee?
24       A.  Yes.
25       Q.  I want to make sure I understand that.  What

Page 208

1    was the rent guarantee?
2        A.  I would be quoting a Legacy document, a
3    Sovereign document, I don't want to misspeak, but my
4    understanding, my recollection, if I bought unit
5    getting $890 a month, I was guaranteed that rent
6    amount until June 2007.  It was very simple, not
7    complicated, just simply as stated.
8        Q.  Was there anything about that rent guarantee
9    that had anything to do with short-term rental?
10       A.  No.
11       Q.  You indicated that you left The Mortgage
12   Exchange, Real Estate Investment Group, Joe Aldeguer
13   related entities at the end of 2007, correct?
14       A.  Correct.
15       Q.  How are you currently employed and how have
16   you been employed since January 2008 till today?
17       A.  I own The Consulting Edge.
18       Q.  What is The Consulting Edge?
19       A.  It's a problem solving company.  It's a small
20   LLC that problem solves between lenders, developers,
21   zoning and stuff.  Basically I go in to solve the
22   problems so they don't have to bail or let their
23   property go and help them figure out a solution to
24   get them out and get them in and get their first
25   position paid.

Page 209

1        Q.  Are your clients typically -- well, tell me
2    who your clients are?
3        A.  My clients are hedge funds, developers, and
4    major banks.
5        Q.  You don't actually represent individual
6    property owners?
7        A.  No.
8        Q.  Okay.  You representing the other side?
9        A.  Yes.
10       Q.  Okay.  All right.  How do you get compensated
11   in that relationship?
12       A.  It's property specific.  I would say that in
13   the earlier part of '08, basically just accruing
14   moneys that would eventually be paid.  So a lot of
15   the stuff I do, I have an accrual that when the
16   property sells, I'll be paid.  Some of them I won't
17   be paid for another year.
18       Q.  Is there a negotiated fee on each property?
19       A.  It is.
20       Q.  When did you invest in a unit in Legacy
21   Dunes?
22       A.  I had shared income relationship.  I use it
23   very loosely.  I'm not on the deed, I'm not on the
24   title.  I have shared financial relationship with one
25   of the owners that I had before she purchased.

U.S. Legal Support
(561) 835-0220

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 210

1    Q.  And is there -- does that qualify you to be
2  on the board of directors?
3    A.  Anyone can be on the board of directors, you
4  don't need to be an owner.
5    Q.  Pull from outside expertise?
6    A.  For them I would say from the owners of
7  Legacy Dunes if there was one person running from the
8  front end -- for the Chicago based individuals -- who
9  had all the knowledge and also had been through a
10  conversion at Runaway Beach Club that's going from an
11  apartment complex to a hotel and who understood what
12  their mortgages were and all aspects -- there was
13  only one of us four of us or five of us -- there
14  wasn't anyone who had enough of those pieces to fill
15  the spot.  I would happily give it up as soon as they
16  elect a new board.
17    Q.  When does your term end?
18    A.  June.
19      I was a necessity because of OMC being in
20  there and X Man being out and all the parties being
21  out of the calculation.  The board had turned over,
22  and it was for the owners to take care of themselves.
23      MR. GORE:  Can we have two seconds?
24      (Short break.)
25

Page 211

1      MR. GORE:  I don't have any other questions
2    at this point.  I'm going to turn it over to Tony
3    and let him -- would you like to go first?
4         CROSS-EXAMINATION
5  BY MR. ARAGONA:
6    Q.  You've prepared a written declaration in this
7  mater, correct?
8    A.  Did I prepare a written declaration?
9      MR. ROTHMAN:  It was a couple of paragraphs
10  long.
11      THE WITNESS:  From Jerry?
12  BY MR. ARAGONA:
13    Q.  I mean for small things, sure, but --
14      MR. ARAGONA:  Should I just continue on the
15  exhibit list?
16      MR. ROTHMAN:  Sure.
17      MR. ARAGONA:  We'll mark this as Exhibit 12.
18      (Thereupon, Exhibit 12 was marked for
19  identification.)
20  BY MR. ARAGONA:
21    Q.  Do you recall this document?
22    A.  Yes.
23    Q.  Who did prepare this?
24    A.  I'm actually -- I don't even recall if it was
25  my counsel who handed it to me.  December 8th, I

Page 212

1  would assume my counsel.  I don't recall.  Someone
2  asked me if it was factual -- I had so many
3  conversations with Jerry and with Joel and the
4  bankruptcy counsel, I don't know who I gave the
5  statement to.
6    Q.  Were you involved in the drafting of this,
7  whether writing it or providing any input?
8    A.  I was asked if they were true and I said yes.
9    Q.  Someone presented this to you, asked if it
10  was true, and you signed it?
11      MR. ROTHMAN:  Objection to form.
12  BY MR. ARAGONA:
13    Q.  Correct?
14    A.  Yes.
15      (Thereupon, Exhibit 13 was marked for
16  identification.)
17  BY MR. ARAGONA:
18    Q.  Have you seen the affidavit of Jill Moore
19  filed in this matter?
20    A.  Let me read it now and I'll tell you.
21    Q.  Sure.
22    A.  Yes.
23    Q.  You have seen it before?
24    A.  I have.
25    Q.  When did you first see it?

Page 213

1    A.  I'd say it was around the time I talked with
2  the bankruptcy trustee.
3    Q.  And who gave it to you?
4    A.  I think I may have seen a copy from Jerry
5  Gritter, my counsel.
6    Q.  In reviewing this affidavit now is there
7  anything in here that you would take any issue with?
8    A.  Looking at mine or Jill's?
9    Q.  I'm looking at Jill's, Exhibit 13.
10    A.  Number six says:  Lastly, I have not engaged
11  in any activity whatsoever that involved inducing
12  my --
13      No, she was not part of the sales.
14    Q.  So as you sit here today, would you say
15  there's anything not true in this affidavit?
16    A.  I guess I am only mincing words in "no
17  involvement in marketing efforts."  From an
18  operational standpoint that's not case, but she never
19  did give a presentation or sat with an individual
20  client.  That is correct.
21      It depends on what you mean by marketing
22  efforts.  I don't know if having knowledge of what
23  we're doing; visiting and seeing the presentations,
24  that's not the case.  If it's actually marketing to
25  the individual and sitting with the individual, she's

U.S. Legal Support
(561) 835-0220

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 214

1   absolutely correct. She never sat with a single
2   owner or buyer ever.
3       Q. So there's nothing inaccurate in the
4   affidavit?
5           MR. ROTHMAN: Objection to the form. That's
6   not her testimony.
7   BY MR. ARAGONA:
8       Q. You can answer.
9       A. Depending on the definition of "involvement,"
10  no.
11      Q. Okay. So you've claimed Jill Moore attended
12  the sales presentation, you have testified?
13      A. Yes. Some.
14      Q. Do you know how many?
15      A. No. I'd have to look back to when Monet was
16  born. She was there literally up to the eve of the
17  child being born. I believe she missed a
18  presentation or two after birth.
19      Q. To your knowledge did Jill sit through the
20  entire presentation or she was in for a few minutes
21  and then walked out?
22      A. I was only physically in the presentation
23  when I was on stage with the lights on me. I
24  couldn't verify if she was in or out. But she was
25  physically present, but I couldn't tell you present

Page 215

1   in the room.
2       Q. Jill Moore never spoke at any presentations?
3       A. Never.
4       Q. And you spoke at all of them?
5       A. Correct.
6       Q. And as far as preparing for the presentation,
7   what was involved in that?
8       A. Can I go back for a second?
9       Q. Yeah.
10      A. You're only talking about Legacy Dunes?
11      Q. Right.
12      A. Can you ask the question again?
13      Q. What was involved in preparing for the
14  presentation?
15      A. My portion or everyone's?
16      Q. Start with yours then detail others.
17      A. My portion was very specifically which
18  mortgage product applied to what was being discussed,
19  if there was anything specific in the news at the
20  time that Pete Becker and I needed to coordinate
21  with, be it the market very high up or very far down,
22  any knew topic -- an Enron or Anderson or so forth --
23  those types of things being entered into that type of
24  preparation.
25          From an operational standpoint great

Page 216

1   preparation in the admin team. My assistant Katie
2   worked with Misty and Karen who worked with Jill, and
3   Caroline to set up, you know, whether it was food
4   seating, name tags, who's coming in, who's
5   registered, I.T. gathering the data, and making sure
6   we had the file folders -- purple, red, green,
7   yellow, orange file folders -- they had to be done in
8   advance and ready and so forth. That was the
9   preparation.
10      Q. What did Jill Moore do in regard to
11  preparation on these presentations, if anything?
12      A. The operational part of all of that was, you
13  know, how many are coming, what do we need, are the
14  file folders ready, do we have how many triplicates,
15  do we have check off forms, does she have people
16  making copies, who's going to be here, how many of
17  them from the developer, how many from real estate.
18  So from those perspectives who was there, how many
19  were involved, when were they coming.
20      Q. What I'm interested in next is the content of
21  the presentation, how was that put together, who was
22  involved in that?
23      A. That would be the physical two who put it
24  together being Noel Pili and usually Melanie Becker
25  putting the I.T. specific and the stuff that would go

Page 217

1   on. It would start with a template, alter it a
2   little bit and then present it to myself and Joe
3   Aldeguer to look at what was there, and Pete Becker.
4   We each had our segment that we did. We'd present
5   the segment that we do and we'd tweak it, approach
6   it, and hand it back.
7       Q. Jill Moore wasn't involved in the content or
8   review of those sections?
9       A. Not to my knowledge.
10      Q. And to your knowledge did Jill Moore ever
11  speak to any plaintiff in this matter at all?
12      A. Prior to purchase or when it comes to
13  complaints?
14      Q. Prior to purchase?
15      A. Not prior to purchase.
16      Q. And you mentioned complaints, how was she
17  involved in complaints?
18      A. Well, if a client complained and either
19  customer service or any of her staff or myself
20  couldn't -- or if I wasn't around or if I couldn't
21  answer the question and it got out of control, she
22  would have to step in, but that was a very rare
23  occurrence.
24      Q. About how rare would you say? How many
25  purchasers that you can recall?

U.S. Legal Support
(561) 835-0220

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 218

1    A.  That Jill talked to?
2    Q.  With complaints.
3    A.  Maybe three.
4    Q.  Okay.  Jill Moore's primary duty with regard
5  to The Mortgage Exchange was the financial aspect,
6  correct, as you've testified?
7       MR. ROTHMAN:  Objection to form.
8    A.  Financial aspect from a C.F.O. structure,
9  yes, but Q.C., process, the processers and
10 accounting, anything that had process related --
11 anything that could be audited was under her
12 umbrella.
13 BY MR. ARAGONA:
14   Q.  And Jill Moore did not personally assist any
15 potential buyers with real estate contracts, did she?
16      MR. ROTHMAN:  Objection to form.
17   A.  I don't want to be splitting hairs when you
18 say, "assist."  If I'm buyer A, B, C, and I sign a
19 contract and, you know, Karen picks up the contract
20 and makes a copy to Katie and Katie brings a copy to
21 Jill and Jill says you're missing this, this, this.
22 So Jill didn't go to the client directly, if that's
23 what you're asking.
24 BY MR. ARAGONA:
25   Q.  Correct.

Page 219

1    A.  Then no.
2    Q.  So she didn't assist the people who signed
3  the contract in any aspect except what you said that
4  she'd review it to make sure everything was accurate?
5    A.  Correct.
6    Q.  She didn't assist potential buyers with
7  mortgage applications either, did she?
8    A.  Never.
9    Q.  Did she order the appraisals?
10   A.  No.  The processers appraisers.
11   Q.  Did she ever advise clients on their
12 mortgages?
13   A.  Never.
14   Q.  Did she ever advise clients they should take
15 out a second mortgage?
16   A.  No.
17   Q.  Did she ever advise clients they should
18 refinance their homes to purchase these properties?
19   A.  No.
20   Q.  Did she make any sales representations to
21 potential buyers?
22      MR. ROTHMAN:  Objection to form.
23   A.  Jill personally?
24 BY MR. ARAGONA:
25   Q.  Yes.

Page 220

1    A.  No.
2    Q.  Did she ever prepare HUDs or go through
3  closing numbers with purchasers?
4    A.  With a purchaser?
5    Q.  Yes.
6    A.  No.
7    Q.  Did she ever negotiate the terms of the
8  project with any other parties?
9       MR. ROTHMAN:  Objection to form.
10   A.  You're going to have to narrow it down
11 from -- there's a lot of parties involved in the
12 transactions.  So from contracts being negotiated --
13 the end buyer's contract, no.  Are you talking about
14 from Real Estate Dreams to REIG to the contract with
15 DRG, part of all the contracts.
16 BY MR. ARAGONA:
17   Q.  Then go through the various entities and tell
18 me what her role was.
19   A.  I guess a conduit between George Weams,
20 herself, myself, and the end parties, that was the
21 flow of information of how it was structured, that
22 everything was in it.  Just putting contracts
23 together, which would be very typical for someone who
24 -- in her position it would require her to put
25 together.

Page 221

1    Q.  More or less she would be told what the
2  materials were and make sure they were in the
3  contract or would she negotiate terms?
4    A.  Legacy Dunes specific?
5    Q.  Yes.
6    A.  The terms of commissions and what they were
7  based on changed every day until literally -- it was
8  a moving target.  The contract was negotiated a set
9  amount and then it was up by this amount of
10 commission and then this flat marketing fee and then
11 it was furniture.  It was forever.  We were all
12 knowledgeable and part of that.  No one was excluded
13 from that.  As for negotiating it, every day there
14 was a new tweak.
15   Q.  But what was her involvement with that?
16   A.  Same as the rest of us:  How do we solve the
17 problem, how do we get this in a contract, and how do
18 we go forward with it.
19   Q.  Jill didn't have any involvement in the radio
20 program, did she?
21   A.  No.
22   Q.  Did she have any involvement in the TV
23 program?
24   A.  Other than paying the bill, no.
25   Q.  Did you have involvement in the radio or TV

U.S. Legal Support
(561) 835-0220

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 222

```
1    program?
2        A.  Yes.
3        Q.  What was your involvement?
4        A.  As a guest host.
5        Q.  How many times would you say you appeared on
6    either the TV show or the radio program?
7        A.  The television they could record me one day
8    and use the same snippet over and over.  Would you
9    say episode specific or how many times did they
10   record me?
11       Q.  Both if you know.
12       A.  I think I only sat through three records, but
13   they would take from 20 minutes and put, you know, a
14   minute and a half on this one.  I only saw the few --
15   I only saw three or four episodes and then never saw
16   them again, so I have no idea.
17       Q.  Who was it that did deal with potential
18   purchasers on behalf of The Mortgage Exchange?
19       A.  At what point in the process?
20       Q.  Well, if you could walk us through?
21       A.  If Joe Smith responds to the radio show and
22   says I'm interested in coming to a workshop, he deals
23   with the inbound call center, they gather his data.
24   Knowing that he would require a mortgage, be it a
25   prequal mortgage or a refi, you'd get him to a loan
```

Page 223

```
1    officer.  The loan officer makes sure -- they look at
2    his financial status, do you need a refinance, are
3    you prepared to purchase, and they do a
4    prequalification on the mortgage.
5            If they come to the workshop, they're
6    escorted by their loan officer upstairs, the loan
7    officers go back downstairs, they listen to the
8    presentation.  If they're getting real estate, then
9    they meet with the Real Estate Dreams team, and if
10   they're talking about the purchase of Legacy Dunes,
11   they meet with the real estate team.
12           And then usually the post-contract they get
13   ready for closing, they go back at a later date to
14   the mortgage person to make sure the mortgage is in
15   place, and then they meet with the title company when
16   they closed.
17       Q.  Okay.  And did the purchasers of the Legacy
18   Dunes units have to rent the units?
19       A.  No.  They could have live there.  You mean
20   could they occupy?
21       Q.  Yes.
22       A.  They could have occupied them, yes.
23       Q.  And you were talking about the long-term
24   rentals being in place at the time of the purchase,
25   correct?
```

Page 224

```
1        A.  Correct.
2        Q.  And did any of those long-term rentals renew?
3        A.  Yes.
4        Q.  How frequently would you say that happened?
5        A.  I wish I knew.  I wish I knew.  There were
6    some long-term renters in place there that were there
7    when people purchased.
8        Q.  It was up to the owner of the unit to decide
9    whether they wanted to renew the long-term lease,
10   correct?
11       A.  Correct.
12       Q.  Subject to the term of the rental agreement?
13       A.  Correct.
14       Q.  And we talked briefly of the efforts of the
15   exclusive management company as far as renting the
16   units short-term.  And you also testified, I believe,
17   that the buyers could have rented the units
18   themselves?
19           MR. ROTHMAN:  Objection to form.
20   BY MR. ARAGONA:
21       Q.  Correct?
22       A.  No one was forced.  Everyone was told they
23   could choose their own management company.
24       Q.  They could have put and ad in the paper,
25   correct?
```

Page 225

```
1        A.  They could have, yes.
2        Q.  And how instrumental were you personally as
3    far as the project of Legacy Dunes from its
4    inception?
5            MR. ROTHMAN:  Objection to form.
6        A.  Instrument in what way?
7    BY MR. ARAGONA:
8        Q.  In moving forward with the project what was
9    your role?
10       A.  To put out fires.  I was putting out fires at
11   Runaway Beach Club when they decided to do Legacy
12   Dunes.  And from the moment of introduction to today
13   as I sit here, my job has been to put out the fires
14   from yesterday.
15       Q.  Did you have any other role besides handling
16   emergencies?
17       A.  No.  It was never not an emergency.  It's
18   been putting out fires since the day they were going
19   to figure out they were going to do it.
20       Q.  Now the documents turned over to counsel for
21   the plaintiffs, those weren't your documents to take
22   from The Mortgage Exchange, were they?
23           MR. ROTHMAN:  Objection to form.
24       A.  I'm not sure of the legal answer to that.  I
25   suppose e-mails with my name at the time were mine.
```

29 (Pages 222 to 225)

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 226

```
 1    I was still -- at post-leaving Legacy Dunes -- doing
 2   everything I can. And as a good will ambassador and
 3   with their knowledge, I took documents if I had to
 4   refer back to them, because I was still intimately
 5   involved with the project.
 6   BY MR. ARAGONA:
 7    Q.  Do you recall around the time you took the
 8   documents?
 9        MR. ROTHMAN:  Objection.
10    A.  Whatever day I cleaned out my office, which
11   was not when I left. I had left long before and had
12   not taken anything out of my office. I didn't know
13   if anyone wanted to clean anything up or take what
14   they wanted.
15        I had been gone for months and needed to come
16   back and take my personal belongings. At that point
17   Misty was still with me, and I think I took three
18   boxes and left 22.
19    Q.  Twenty-two boxes of documents?
20    A.  Yes.
21    Q.  I thought you testified you took one box of
22   documents?
23    A.  I took boxes, some of them had pictures of my
24   kids and my speakers and my CDs. I still had shoes
25   in my desk drawers. I hadn't cleaned out my desk.
```

Page 227

```
 1    Q.  Did you discuss with either Joe Aldeguer or
 2   Jill Moore or anyone which documents you would be
 3   taking or that you would be taking documents at all?
 4    A.  I specifically went through page by page with
 5   Misty of what I put in my box.
 6    Q.  What was Misty's position with the company?
 7    A.  She was Jill's right hand person in payroll.
 8    Q.  Now, with regards to short-term rentals that
 9   started to take place at that time Legacy Dunes,
10   could you walk through the process by which the unit
11   owner would be end up with money from a short-term
12   rental?
13    A.  So what OMC is doing?
14    Q.  How the process worked. If I owned a unit
15   and someone rented it, how would I get money?
16    A.  If you signed a contract with the short-term
17   rental company, the short-term would rent out the
18   unit, take in the income, and then send you a check.
19    Q.  And that would be less certain expenses and
20   deductions, correct?
21    A.  Right. At Legacy Dunes, and they signed with
22   Osceola Management, Osceola doesn't typically pay the
23   expenses, they just take -- if they take in $100,
24   they send you 80. It's an 80-20 split.
25    Q.  Now, if my unit, if I was the unit owner,
```

Page 228

```
 1   wasn't rented for any particular month, I wouldn't
 2   get any money, correct?
 3    A.  For the short-term or long-term?
 4    Q.  For the short-term.
 5    A.  Correct. Well, other than the fact that --
 6   and I don't want to speak for Mr. Murphy -- they were
 7   trying to honor the rental guarantees if they could.
 8   Financially, if they could, they were trying to honor
 9   the rental guarantees even though they were not
10   obligated to do so.
11    Q.  Rental payments for short-term rentals of
12   units were not pooled together and divided amongst
13   the unit owners, were they?
14    A.  No. They were unit specific.
15    Q.  Now, how many years in the real estate
16   business have you been working?
17    A.  Real estate on the sales side or related to
18   the real estate on the mortgage side?
19    Q.  I don't want to go lengthy through your
20   history, but briefly give us your real estate
21   history.
22    A.  From a business valuation and real estate
23   evaluation it started in 1987. Large forms of real
24   estate through litigation and then started mortgages
25   in the late nineties, obviously many real estate
```

Page 229

```
 1   purchases. And then was involved investing real
 2   estate personally and then involved with this type of
 3   real estate investment from '06.
 4    Q.  So you were very familiar with the standard
 5   real estate contract, correct?
 6        MR. ROTHMAN:  Objection to form.
 7    A.  Typically I didn't sell the real estate, but
 8   I could read a contract and understand it,
 9   absolutely.
10   BY MR. ARAGONA:
11    Q.  Is there anything unique about the purchase
12   contracts with Legacy Dunes?
13    A.  In retrospect yes.
14    Q.  With what?
15    A.  They had different addendums on them, some of
16   them had unit-ready, I think it's called addendum W,
17   and some didn't.
18    Q.  Aside from the addendum -- addenda, the
19   contract was fairly standardized for all the
20   purchases and sales transactions that took place,
21   correct?
22        MR. ROTHMAN:  Objection to form.
23    A.  From my knowledge of Florida real estate at
24   that point I only saw one other property we worked
25   with. I didn't see anything tremendously different.
```

U.S. Legal Support
(561) 835-0220

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 230

1  BY MR. ARAGONA:
2      Q.  And the contracts themselves were fairly --
3  were standard contracts, they were the same for all
4  purchasers, correct?
5          MR. ROTHMAN:  Objection to form.
6  BY MR. ARAGONA:
7      Q.  The terms?
8          MR. ROTHMAN:  Objection to form.
9      A.  The form the purchase contract utilized was
10 the one filed in the P.O.S. with the dec for the
11 property and to my knowledge it was the same for
12 everyone.
13 BY MR. ARAGONA:
14     Q.  Did you ever take part in advising potential
15 buyers and buyers of their mortgages?
16     A.  For Legacy Dunes?
17     Q.  Yes.
18     A.  I think three.
19     Q.  That's all?
20     A.  Yeah.  I did three that were personal clients
21 or had asked me retirement specific or specifically
22 asked to talk too me.  Yes, I did.
23     Q.  Okay.  When was the last time you spoke with
24 Gina Heller?
25     A.  Let me think about this, probably just before

Page 231

1  her son's first birthday.  I'll say September or
2  October '08.
3      Q.  What did you talk about?
4      A.  Her son's first birthday.
5      Q.  When was the last time you spoke about
6  business with Gina Heller?
7      A.  A Runaway Beach Club owners meeting May 10th,
8
9      Q.  Very good recollection.
10     A.  Yeah.
11     Q.  What did you specifically discuss and did you
12 discuss anything about Legacy Dunes?
13     A.  It was mostly related to Runaway Beach Club.
14 In fact, I am not sure Legacy came up.  Runaway was
15 most of the content.
16     Q.  What did you speak with her about Runaway
17 Beach?
18         MR. ROTHMAN:  Objection.
19     Can we try to confine this to Legacy Dunes,
20 particularly to the issue we're dealing with at
21 this deposition, but certainly with respect to
22 Legacy Dunes so we don't waste time.
23         MR. ARAGONA:  I'm almost done.
24     A.  Runaway Beach Club?
25

Page 232

1  BY MR. ARAGONA:
2      Q.  Yeah.  Briefly.
3      A.  Where the association stood, how we were
4  going to manage this budget, and did we have to put a
5  mandatory reserve in place.  Those were the big
6  topics.
7      Q.  Do you know the last time you spoke with Gina
8  Heller with regard to Legacy Dunes and what was
9  discussed?
10     A.  Probably February or March of '08.  When are
11 these people going to stop calling me to complain --
12 would be from Gina -- and am I ever going to get my
13 money.
14     Q.  What about Nathan Schwartzberg, do you recall
15 the last time you spoke about Legacy Dunes with him?
16     A.  I suppose maybe September of '07 or earlier
17 than that.  I haven't talked to Nathan post leaving
18 Mortgage Exchange and I probably talked to him months
19 before I left, maybe summer of '07.
20     Q.  In the last four to six months, conversations
21 with any of the defendants in this case?
22     A.  Do you have a list?
23         Yes.  Sal and Chandra, they manage Runaway
24 Beach where I own and Jay Holly and Sean Parkes.
25 That's it.

Page 233

1      Q.  Okay.  What did you discuss specifically
2  regarding Legacy Dunes with them?
3      A.  With Sean and Jay?
4      Q.  Yeah.
5      A.  Call the attorneys for yourself on your
6  sword, tell them anything you know, and tell them you
7  don't have money for lawyers come look at your
8  bankruptcy and move on.
9          Sal and Chandra not specifically about Legacy
10 Dunes, very specifically Runaway management, nothing
11 to do with Legacy Dunes.  I don't think we ever
12 discussed Legacy Dunes other than I saw you were
13 named, you too.  Basically very minimal -- oh, and
14 also what counselor are you using and did you take
15 Greenspoon or Greenberg Traurig -- who do you have so
16 we don't use the same one.
17         MR. ARAGONA:  That's all I have.
18         CROSS-EXAMINATION
19 BY MR. DEATHERAGE:
20     Q.  Ms. Phillips, my name is Clay Deatherage.  I
21 represent Geneva Hospitality and Sal Sardinia and
22 Chandra Webster.  I just have a few quick questions.
23     I want to go back to your initial testimony
24 just to clarify.  Have you been told when it would be
25 determined that you've been truthful; in other words,

31 (Pages 230 to 233)

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 234

1    when would that determination be made?
2        MR. ROTHMAN: Objection to form.
3        A.  I don't know, but my presumption, my personal
4    presumption, would be prior to going to trial they'll
5    vet all the information I gave through depositions,
6    facts, and documents and I guess go from there.  I
7    never -- I know when I answer truthfully and the
8    documents are what they are.
9    BY MR. DEATHERAGE:
10       Q.  But you haven't been told that?
11       A.  No.
12       Q.  That's your presumption.
13           Now were you told that even if whatever you
14   say here, your truthful statements, somehow would
15   lead to liability, you would still be released?
16       A.  It has not been discussed, no.  I honestly
17   reached a point with this whole thing -- I'm sitting
18   here without counsel.  I want it to end.  Here's what
19   I know, here's what it is, let's move on.
20       Q.  Sure.  I understand.
21           Now you stated earlier that Chandra Webster
22   was uncomfortable being up on the ninth floor during
23   the presentations?
24       A.  Correct.
25       Q.  Do you know why?

Page 235

1        A.  Chandra -- for two reasons:  One, Chandra
2    hates being on stage, being the center of attention,
3    other than board room and, two, counsel didn't want
4    her to.
5        Q.  She told you this?
6        A.  Yes.
7        MR. DEATHERAGE:  I have no further questions.
8        MR. GORE:  I have one quick follow up on that
9    last answer.
10       MR. ROTHMAN:  Okay.
11           CROSS-EXAMINATION
12   BY MR. GORE:
13       Q.  Who was Chandra's counsel, if you know?
14       A.  First name is Scott and -- I don't know.  I
15   can look it up.  I can't recall.
16       MR. GORE:  That's it.  Thank you.
17       MR. ROTHMAN:  I have some redirect.
18           REDIRECT EXAMINATION
19   BY MR. ROTHMAN:
20       Q.  Did Chandra ever tell you why it was her
21   counsel didn't want her there?
22       A.  No.  I didn't ask.
23       Q.  Okay.
24       A.  It was the day of, it was ten minutes before
25   the presentation.  So it was --

Page 236

1        Q.  Okay.
2        A.  Okay.  Done.
3        Q.  Gotcha.  On cross you were asked some
4    questions about the contracts that were signed and
5    that there were different addenda on certain
6    contracts.  You were also asked questions about
7    promises that -- withdrawn -- different addenda on
8    different contracts.
9            (Thereupon, Exhibit 14 was marked for
10   identification.)
11   BY MR. ROTHMAN:
12       Q.  You have seen Legacy Dunes contracts before,
13   right?
14       A.  Yes.
15       Q.  Okay.  Take a look at the clause entitled
16   Short-Term Rental.  Do you recognize this as being
17   part of the addendum of the Legacy Dunes purchase
18   contract?
19       A.  Yes.
20       Q.  This is one of the contracts for purchase by
21   Karen and Joseph Lubomski?
22       A.  Yes.
23       Q.  Correct?
24       A.  Yes.
25       Q.  Looks like Karen signed May 18th, '06 and Joe

Page 237

1    signed May 20th '06?
2        A.  Probably a good chance they were sitting
3    together and Joe put the wrong date, but yeah.
4        Q.  In any case, the short-term rental provision
5    says, "The developer acknowledges the intent of
6    purchaser to place the unit associated with this
7    purchase agreement into a short-term rental pool.
8    Should the Osceola County, Florida zoning
9    classification associated with the Legacy Dunes
10   Condominium not allow for short-term rental within
11   days of the closing of this purchase agreement,
12   the developer will refund $25,000 (twenty-five
13   thousand dollars) to purchaser."
14           Do you see that?
15       A.  I do.
16       Q.  There were many Legacy Dunes purchasers who
17   had provisions like this in their contracts?
18       A.  To my knowledge, yes.
19       Q.  And there were others who didn't?
20       A.  Yes.  I have learned in retrospect, yes,
21   that's the case.
22       Q.  Now, you were asked on cross about whether or
23   not any guarantees were made that the units at Legacy
24   Dunes could be rented on a short-term basis?
25       A.  I was asked that, yes.

32 (Pages 234 to 237)

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 238

1    Q.  I think your answer was you never use the "G"
2  word?
3    A.  Right.
4    Q.  As of May of 2006, do I understand correctly
5  that the inclusion of this short-term rental
6  provision where the developer is acknowledging that
7  the purchaser wants to rent short-term, the inclusion
8  of this because the developer understood that
9  this was something that was contemplated, that is
10  short-term rental was something that was contemplated
11  at the time, for at the very least the particular
12  unit that is the subject of Exhibit 14?
13    MR. GORE:  Object to the form of the
14  question.
15    A.  It is my -- yes, they knew of the intent, and
16  to my knowledge it was just the application to
17  Osceola County that we needed to go forward with
18  knowing at the time, and I shouldn't put the caveat
19  in there but I'm going to because I don't want to
20  come back, is that we knew that DRG did not yet own
21  the property.  They had to put a period of time in
22  there because they hadn't closed yet in May.
23  BY MR. ROTHMAN:
24    Q.  And period they close was within a 120 days?
25    A.  Yes.

Page 239

1    Q.  Do you know whether DRG honored these
2  short-term rental provisions by paying purchasers
3  $25,000 in the event they failed to obtain approval
4  for short-term rentals?
5    A.  None that I know of.
6    Q.  Okay.  And just for clarity's sake, the date
7  indicated on 14 that this was signed by the
8  purchasers is a date prior to the dates reflected on
9  the top of Exhibit 8, which is the questionnaire that
10  was filled out and signed by someone at DRG
11  concerning this development and sent to a mortgage
12  lender which apparently was Bank United?
13    A.  Yes.  Bank United clearly because it says
14  B.U.  This isn't for an individual, it's for the
15  property.
16    Q.  Understood.
17    A.  As an association president, the P.O.S. and
18  the docs that are filed and the docs were filed, this
19  is correct.  I guess I'm not sure what you're asking
20  me.
21    Q.  There's no question that the answer given
22  with respect to whether or not the project documents
23  allow short-term rentals, as of this date it's your
24  position that that was technically accurate?
25    A.  It is, yes.

Page 240

1    Q.  But at the same time you would have to agree
2  with me it was understood by the developer, based on
3  Exhibit 14 and others like it, that short-term
4  rentals were contemplated and would be coming to this
5  development?
6    A.  Correct.
7    Q.  How many clients were there of The Financial
8  Exchange?
9    A.  I have -- I mean ongoing repetitive clients,
10  ten.
11    Q.  This was --
12    A.  Fifteen.
13    Q.  -- as compared to the number of mortgage
14  clients at The Mortgage Exchange, how many were there
15  of those?
16    A.  25,000.
17    Q.  25,000?
18    A.  You're talking about some of them have long
19  since expired or moved, but they had probably the
20  largest client list.
21    Q.  The Financial Exchange wasn't there to
22  counsel every single purchaser as to their particular
23  finances and create financial plans for them?
24    A.  But that was the intent.
25    Q.  It was available if they wanted it?

Page 241

1    A.  Right.
2    Q.  But in the end maybe ten people took
3  advantage of it out of thousands who were clients of
4  The Mortgage Exchange?
5    A.  Probably sat with hundreds of them.
6    Q.  Sounds to me, based upon your testimony
7  today, that it would have been a good thing for many,
8  many more of those Mortgage Exchange clients to take
9  advantage of The Financial Exchange?
10    A.  Correct.
11    Q.  But they didn't?
12    A.  Correct.
13    Q.  You made a comment on cross-examination about
14  how -- and I think you were referring to the
15  plaintiffs in this case look at the money on the
16  HUDs.  And what do you mean when you said people were
17  looking at the money on the HUDs, what money on the
18  HUDs were you talking about?
19    A.  Real estate commissions.
20    Q.  And why is it significant?
21    A.  Why is what significant?
22    Q.  Let's assume for a second I have never seen a
23  single HUD with respect to the sale of a unit in
24  Legacy Dunes.  Tell me, explain to me, why is it
25  significant that there is real estate commissions on

U.S. Legal Support
(561) 835-0220

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 242

```
 1    the HUDs concerning these sales, what is it about
 2    those commissions?
 3        A.   Well, the commissions were at the high end
 4    for the peak market and there was a marketing fee,
 5    that was significant.
 6        Q.   What percentage of the purchase price was the
 7    commissions marketing fees and other payments?
 8        A.   Here's where it gets confusing, commissions
 9    are based on original purchase price not contract
10    purchase price because of the changes.  So I would
11    say it ranged.  I would have to give you range from
12    20 to 25 percent.
13        Q.   So on a $400,000 sale accounting for the
14    additional $10,000 that was added to the price of
15    these that you testified at the beginning about,
16    which was -- you said that the commission wasn't paid
17    on the full price?
18        A.   But it was paid on less than just the $10,000
19    because the prices had already increased prior to
20    that.  If we had a $150,000 property with the
21    incentives and so forth we had agreed to 170.  By the
22    time we landed before that first showing, he added
23    another ten and that 170 became 180, but the
24    commission paid on the 150.
25        Q.   Help me out because I'm very bad at math,
```

Page 243

```
 1    which is why I went to law school.  Let's use the
 2    $400,000 figure, okay, because there are some units
 3    that sold for $400,000 or thereabouts.
 4            So what would approximately have been the
 5    commission, including marketing fees and everything
 6    else, paid on a sale of a $400,000 unit?
 7        A.   Give me a minute.  I can walk you through it,
 8    17 percent of probably 350 to 360,000 plus $25,000
 9    flat.  So I would say based on the full 400, it would
10    probably fall closer to 18 to 20 percent.  Again, the
11    commissions were based on a lower amount and the flat
12    marketing fee wasn't applicable based on a
13    percentage.
14            Can I use a calculator?
15        Q.   It's not necessary.  I just wanted an
16    estimate.  The documents will bare it out, but it
17    could be as much as $80,000?
18        A.   Correct.
19        Q.   Okay.  And so when you said that you look at
20    the money on the HUDs, that's the money you were
21    talking about?
22        A.   Correct.
23            MR. ROTHMAN:  I have nothing else.
24            MR. GORE:  Any follow up?
25            MR. NISSONSON:  Nothing here.
```

Page 244

```
 1            MR. DEATHERAGE:  Nothing.
 2            MR. GORE:  We will take a copy.
 3            MR. ROTHMAN:  You have the opportunity to
 4    read the transcript to determine if the reporter
 5    has taken everything down correctly to review your
 6    testimony or you can waive that right and you
 7    won't have to do that.  If you --
 8            THE WITNESS:  Honestly, I'll waive it.
 9            (The deposition concluded at 5:26 p.m.)
```

Page 245

```
            C E R T I F I C A T E
                  - - -

THE STATE OF FLORIDA:

COUNTY OF PALM BEACH:

    I hereby certify that I have read the

foregoing deposition by me given, and that the

statements contained herein are true and correct to

the best of my knowledge and belief, with the

exception of any corrections or notations made on

the errata sheet, if one was executed.

    Signature of deponent:_____
    Dated this _____ day of_____, 2009.


    The foregoing was acknowledged before me by
_____ who is personally known
to me or has produced _____ as
identification and who did/did not take an oath,
this _____ day of _____, 2009.


            _____
            Notary Public
            My Commission Expires:
```

U.S. Legal Support
(561) 835-0220

7f632f8f-fce3-4069-9ca3-fd067624bba2

Page 246

```
 1          CERTIFICATE OF OATH
 2                - - -
 3
 4   THE STATE OF FLORIDA)
 5   COUNTY OF PALM BEACH)
 6
 7      I, Alexa R. Goldman, Notary Public, State of
 8   Florida, certify that Maureen Hayes Phillips personally
 9   appeared before me on the 26th of February, 2009, and
10   was duly sworn.
11      WITNESS my hand and official seal this 8th day of
12   March, 2009.
13
14
15
16   _____
17      ALEXA R. GOLDMAN, FPR
     Notary Public, State of Florida
     My Commission No: DD515295
18   Expires: 2/6/10
19
20
21
22
23
24
25
```

Page 248

```
 1   U.S. Legal Support, Inc.
     Klein, Bury, Reif, Applebaum & Associates, Inc.
 2      444 West Railroad Avenue, Suite 300
        West Palm Beach, FL 33401
 3         561.835.0220
 4
     March 8, 2009
 5   Maureen Hayes Phillips
     c/o Joel Rothman, Esq.
 6   SEIDEN, ALDER, MATTHEWMAN & BLOCH, P.A.
     7795 NW Beacon Square Boulevard
 7   Boca Raton, Florida 33487
     RE:   Alunni, et al v. DRG, et al
 8
     Dear Madam:
 9
        This letter is to inform you that your deposition
10   transcript taken on February 26, 2009 in the
     above-captioned matter is ready for your review.
11
        The transcript will be furnished to you through
12   counsel.  The transcript is 250 pages long, and you
     should allow yourself sufficient time to read the
13   transcript in its entirety.
14      Once you have read the transcript and noted any
15   changes or corrections on the errata sheet, be sure to
     sign and date the errata sheet and sign the transcript
16   and return these pages. If you do not read, sign, and
     return the transcript within 30 days, the original,
17   which has already been forwarded to the attorney who
     ordered your deposition, may be filed with the Clerk of
     the Court.
18
        If you wish to waive your signature, sign your
19   name at the bottom of this letter and return it to us.
     Your prompt attention to this matter is appreciated.
20
21   Cordially yours,
22   Alexa R. Goldman, FPR
23
     cc via transcript: Joel Rothman, Esq.
24         Michael Gore, Esq.
           Clay Deatherage, Esq.
25         Tony Aragona, Esq.
```

Page 247

```
 1    C E R T I F I C A T E
 2          - - -
 3
     THE STATE OF FLORIDA)
 4   COUNTY OF PALM BEACH)
 5
        I, Alexa R. Goldman, Notary Public in and for
 6   the State of Florida at Large, do hereby certify
     that the aforementioned witness was by me first
 7   duly sworn to testify the whole truth; that I was
     authorized to and did report said deposition in
 8   stenotype; and that the foregoing pages are a true
     and correct transcription of my shorthand notes of
 9   said deposition.
10      I further certify that said deposition
     was taken at the time and place hereinabove set
11   forth and that the taking of said deposition was
     commenced and completed as hereinabove set out.
12
        I further certify that I am not attorney
13   or counsel of any of the parties, nor am I a
     relative or employee of any attorney or counsel of
14   party connected with the action, nor am I
     financially interested in the action.
15
        The foregoing certification of this
16   transcript does not apply to any reproduction of
     the same by any means unless under the direct
17   control and/or direction of the certifying
     reporter.
18
        Dated this 8th day of March, 2009.
19
20
21
22   _____
        Alexa R. Goldman, FPR
23
24
25
```

Page 249

```
 1          ERRATA SHEET
 2   IN RE: Alunni, et al v. DRG, et al
     DEPOSITION OF: Maureen Hayes Phillips
 3   TAKEN: February 26,
 4      DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 5   PAGE # LINE #  CHANGE          REASON
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   Please forward the original signed errata sheet to
     this office so that copies may be distributed to
19   all parties.
20   Under penalty of perjury, I declare that I have
     read my deposition and that it is true and correct
21   subject to any changes in form or substance entered
     here.
22
23   DATE:_____
     SIGNATURE OF DEPONENT:_____
24
25
```

35 (Pages 246 to 249)

7f632f8f-fce3-4069-9ca3-fd067624bba2