UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
CASE NO. 6:08-CV-01349-GAP-DAB


ALBERT ALUNNI, ET AL,

                Plaintiffs,

vs.

DEVELOPMENT RESOURCES GROUP LLC,
a Florida limited liability
company, LEGACY DUNES
CONDOMINIUM LLC, a Florida
limited liability company,
MICHAEL K. HALPIN, JAMES E.
WEAR, TIMOTHY S. TINSLEY, THE
REAL ESTATE INVESTMENT GROUP,
LTD., an Illinois corporation,
JOSEPH ALDEGUER, JILL MOORE,
REAL ESTATE DREAMS LLC, a
Florida limited liability
company, SEAN C. PARKES, JEREMY
HOLLY, GENEVA HOSPITALITY
MANAGEMENT LLC, a Wisconsin
limited liability company, SAL
SARDINIA, and CHANDRA WEBSTER,

                Defendants.
_____/


THE DEPOSITION OF

JAMES E. WEAR, JR.



Ullman & Ullman, P.A.

150 East Palmetto Park Road, Suite 650

Boca Raton, Florida

March 12, 2009

1:00 p.m.

35526740-b77b-46b9-b755-cc4b4efb9489

Page 2

```
 1  APPEARANCES:
 2  On behalf of the Plaintiffs:
 3  SEIDEN, ALDER, MATTHEWMAN & BLOCH, P.A.
    7795 NW Beacon Square Boulevard
 4  Suite 201
    Boca Raton, Florida 33487
 5  561.416.0170
    BY: JOEL B. ROTHMAN, ESQ.
 6
    RONALD S. NISONSON, P.A.
 7  120 East Palmetto Park Road
    Suite 100
 8  Boca Raton, Florida 33432
    561.544.8980
 9  BY: RONALD S. NISONSON, ESQ.
10  On behalf of the Defendants:
11  SHUTTS & BOWEN, LLP
    300 South Orange Avenue
12  Suite 1000
    Orlando, Florida 32802
13  407.423.3300
    BY: MICHAEL L. GORE, ESQ.
14
    Shutts & Bowen, LLP
15  201 South Biscayne Boulevard
    Suite 1500
16  Miami, Florida 33131
    305.3586300
17  BY: JONATHAN COHEN, ESQ.
18  GREENBERG TRAURIG, P.A.
    450 South Orange Avenue
19  Suite 650
    Orlando, Florida 32801
20  407.418.2360
    BY: CHRISTOPHER JOHNSEN, ESQ.
21
    On behalf of the Defendants:
22  Ullman & Ullman, P.A.
    150 E. Palmetto Park Road
23  Suite 650
    Boca Raton, Florida 33432
24  561.338.3535
    BY: ANTHONY ARAGONA, ESQ.
25
```

Page 4

```
30  12 Month Cash Flow for Legacy M-5      41
31  Long-Term Rent Guarantee Letters       53
32  Lubomski Purchase Agreement            62
33  Purchaser Intent Survey          72
34  Letter: February 16, 2007 to Ms. Zaborsky    73
35  Short-Term Rental Provision        77
36  DRG Memo January 27, 2009            84
37  DRG Complaint        88
38  DRG Letter April 14, 2008          93
39  Mr. Hart's Complaint          95
40  DBPR Records for The Wear Group Realty, Inc.  96
41  Cooperative Marketing Agreement        103
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1  Also present:
 2  Ryan Reinke
 3  Michael Halpin
 4
 5  REPORTED BY:
 6  Alexa R. Goldman, FPR
    U.S. Legal Support, Inc.
 7  Klein, Bury, Reif, Applebaum & Associates, Inc.
    444 West Railroad Avenue, Suite 300
 8  West Palm Beach, FL 33401
    561.835.0220
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1            PROCEEDINGS
 2              - - -
 3       Taken before Alexa Goldman, Florida
 4  Professional Reporter and Notary Public in and for the
 5  State of Florida at Large, in the above cause.
 6              - - -
 7  Thereupon,
 8          James E. Wear, Jr.,
 9  having been first duly sworn or affirmed, was examined
10  and testified as follows:
11      THE WITNESS:  Yes.
12          DIRECT EXAMINATION
13  BY MR. ROTHMAN:
14     Q.  Okay.  Would you state your name for the
15  record?
16     A.  James Wear.
17     Q.  Actually, give her your full name as it would
18  appear on your birth certificate because I think
19  there are some other folks that have the same name.
20     A.  James Edward Wear, Junior.
21     Q.  Okay.  Have you ever had your deposition
22  taken before?
23     A.  Yes.
24     Q.  How many times?
25     A.  Twice.
```

U.S. Legal Support
(561) 835-0220

35526740-b77b-46b9-b755-cc4b4efb9489

Page 6

1  Q.  So you probably are aware of kind of the
2  ground rules?
3    A.  Yeah.
4    Q.  Answer verbally, don't shake your head to the
5  side, up and down, because the court reporter doesn't
6  know what that means.  She needs a yes or no answer,
7  verbal answer to the question.  All right?
8    A.  Yes.
9    Q.  If there's something you don't understand,
10  let me know.  I'll be happy to repeat it, we can read
11  it back.  It's not a guessing game.
12     This is being taken down for use in this
13  case.  It's important you understand what's being
14  asked because we're going to rely upon your answers,
15  which are going to be read in context to the
16  questions, so we know what your accurate testimony
17  is.  Okay?
18    A.  Yes.
19    Q.  If you ever want to take a break, let me
20  know.
21    A.  Okay.
22    Q.  What were the other occasions you gave
23  depositions about?
24    A.  One was a suit, a contract dispute and one
25  was on behalf of -- I was called in not like a

Page 7

1  witness -- I was just called in kind of as a witness
2  I guess.
3    Q.  So one was a suit where you were a party to
4  the suit?
5    A.  Yes.
6    Q.  And the other one you were a third party
7  witness?
8    A.  Yes.
9    Q.  The one you were a party, it was a dispute
10  between you and somebody else?
11    A.  Yes.
12    Q.  What was that about?
13    A.  It was a contract dispute.  A company that I
14  own or I was a part of.
15    Q.  Were you the plaintiff or the defendant?
16    A.  The defendant.
17    Q.  And so someone was suing this company?
18    A.  Yes.
19    Q.  And what was the company?
20    A.  It was called Life Max.
21    Q.  How long ago was that lawsuit?
22     MR. GORE:  For the record, technically it was
23  an arbitration.
24  BY MR. ROTHMAN:
25    Q.  Oh, so you gave your deposition in an

Page 8

1  arbitration proceeding?
2    A.  Yes.
3    Q.  How long ago was that?
4    A.  A few months ago.
5    Q.  What does Life Max do?
6    A.  It's a network marketing company.
7    Q.  Multi-level marketing?
8    A.  Yes.
9    Q.  Dietary supplements?
10    A.  No.  Food from South and Central America to
11  seed.  It's the healthiest food in the world.
12    Q.  Excellent.  Do you have samples?
13    A.  I meant to bring you all some.  At the end of
14  the day I want everyone to be healthy.
15    Q.  We appreciate that.  Might take you up on
16  that.
17     So other than the case you were talking about
18  where you were a witness in this Life Max case, no
19  other lawsuits?
20    A.  That's correct.
21    Q.  Including anything having to do with your
22  real estate businesses?
23    A.  That's correct.
24    Q.  Tell me about your real estate businesses.  I
25  know that you're involved in a number of different

Page 9

1  real estate companies; is that right?
2    A.  No.
3    Q.  Not anymore?
4    A.  I was only involved with one.
5    Q.  Which one was that?
6    A.  DRG, Development Resources Group.
7    Q.  You were never involved with The Wear Group a
8  real estate brokerage?
9    A.  Just as a son to a father.  It's my father's
10  company.
11    Q.  It's your father's company?
12    A.  Yep.  So I, you know, consulted with him on
13  different occasions.
14    Q.  So tell me what it is your involvement is
15  with DRG?
16    A.  I was a partner.
17    Q.  You say, "was," are you still?
18    A.  Yes.
19    Q.  By partner do you mean you own membership
20  interests in a limited liability company called
21  Development Resources Group LLC?
22    A.  That sounds right.
23    Q.  Who else owns membership interest in DRG
24  besides you?
25    A.  Michael Halpin and Tim Tinsley.

U.S. Legal Support
(561) 835-0220

35526740-b77b-46b9-b755-cc4b4efb9489

Page 10

1    Q.  Does DRG keep track of membership interests
2  by number of interests or by percentage of ownership?
3    A.  I'm not sure.
4    Q.  Do you know how many membership interests you
5  own?
6    A.  I would venture to say it's a third.  How
7  ever it's broken down it's a third.
8    Q.  You understand your ownership interest is one
9  third of the membership interest in the company?
10    A.  Yes.
11    Q.  Is it the same for Mr. Tinsley and
12  Mr. Halpin, they each own a third?
13    A.  Yes.
14    Q.  Has the membership interests and ownership of
15  DRG always been that way, a third, a third, a third,
16  the three of you?
17    A.  I think so.
18    Q.  When was -- when did you first become
19  involved with DRG?
20    A.  In 2005 I believe.
21    Q.  And what did you do for a living before you
22  became involved with DRG in 2005?
23    A.  I worked for Transeastern Homes.  I was a
24  salesperson there.
25    Q.  Are they a developer?

Page 11

1    A.  Yes.
2    Q.  Was DRG started in 2005?
3    A.  I'm not sure.  I don't know if it was DRG or
4  something else in that time.
5    Q.  All right.  Did either Mr. Halpin or
6  Mr. Tinsley work with you at Transeastern Homes?
7    A.  No.
8    Q.  Where did you work before Transeastern Homes?
9    A.  Centex Homes.
10    Q.  When did you leave Centex and join
11  Transeastern?
12    A.  I think it was in 2003.
13    Q.  And was that also a sales position?
14    A.  Yes.
15    Q.  Where did you work before Centex?
16    A.  A company called Coral Reef Time Share
17  Company in Hilton Head.
18    Q.  And when did you leave Coral Reef to work for
19  Centex?
20    A.  I think 2000, maybe 2001.
21    Q.  Did you actually live in the Hilton Head
22  area?
23    A.  Yes.
24    Q.  Are you originally from that area?
25    A.  Charleston, South Carolina.

Page 12

1    Q.  Charleston, South Carolina?
2    A.  Yep.
3    Q.  And was -- is it Centex, C-E-N-T-E-X?
4    A.  Yes.
5    Q.  And was the Centex position in Florida?
6    A.  Yes.
7    Q.  So it was your first time you moved to
8  Florida?
9    A.  I had lived in Florida, I think, back in '97
10  or '98.  I was only here for about six months.
11    Q.  And --
12    A.  '96 maybe.
13    Q.  '96.  Okay.
14       Going back before the Coral Reef position,
15  where did you work before that?
16    A.  I was there off and on for about eight years.
17    Q.  Eight years?
18    A.  Yeah.
19    Q.  Okay.
20    A.  On the island doing time share, just
21  different companies.
22    Q.  Sounds like in that period of time you had
23  spent some time, about six months or so, in Florida
24  doing sales as well?
25    A.  Time share sales.

Page 13

1    Q.  Time share sales?
2    A.  Yes.
3    Q.  For what company?
4    A.  Vistana.
5    Q.  V-I?
6    A.  V-I-S-T-A-N-A.
7    Q.  What did you do before you were in the time
8  share sales business?
9    A.  I think when I graduated in college in '89 I
10  worked for my -- I believe I worked for my dad's
11  company.  He had a private investigative agency.  He
12  sold that not too long after.  And that's when I was
13  introduced to the time share business.
14    Q.  Okay.  Where did you graduate from college?
15    A.  University of South Carolina.
16    Q.  What year did you say you graduated?
17    A.  '89.
18    Q.  What was your degree in?
19    A.  Business.
20    Q.  Business?
21    A.  Yeah.
22    Q.  Any particular area?  Finance?  Just general
23  business administration?
24    A.  Just general business administration.
25    Q.  All right.  How did you come to meet

4 (Pages 10 to 13)

35526740-b77b-46b9-b755-cc4b4efb9489

Page 14

1   Mr. Halpin and Mr. Tinsley?
2       A.  I met Michael first.  I think I was
3   introduced to him through a friend -- not really a
4   friend, an acquaintance at the time, and we just hit
5   it off.
6       Q.  Okay.  Was this while you were working for
7   Transeastern or Centex?
8       A.  Transeastern.
9       Q.  Okay.  That wasn't time shares, right?
10      A.  No.
11      Q.  And do you remember what year that was?  It
12  would have been after 2003?
13      A.  I think it was 2005.
14      Q.  2005?
15      A.  (Nodding head.)
16      Q.  Okay.  Do you remember who introduced you?
17      A.  Doug something.  He got a strange last name,
18  but it was Doug.
19      Q.  How did you meet Mr. Tinsley?
20      A.  I met him later.  I think Michael knew him.
21  So I was introduced to him through Michael.
22      Q.  Did there come a time where you all had a
23  discussion about forming DRG?
24      A.  Yeah.  Michael and I were together first and
25  then Tim came aboard later.  So I don't know if we

Page 15

1   formed DRG when Tim came or if it had already been
2   formed and we added Tim.  That seems to make better
3   sense.
4       Q.  Is there an operating agreement or a limited
5   liability company agreement for DRG that sets forth
6   everyone's obligations and rights concerning
7   distribution of profits and things like that?
8       A.  I know there's something that was created.  I
9   am not sure what it entails, but I know there's a
10  document.
11      Q.  You signed the document along with
12  Mr. Tinsley and Mr. Halpin?
13      A.  Yes.
14      Q.  Does it provide for a division of the profits
15  in the company in any way other than a third, a
16  third, a third, the way you own your membership
17  interest?
18      A.  I don't know.  I haven't read it in a long,
19  long time, but I'm sure it says something about our
20  ownership.
21      Q.  Have you ever received a distribution from
22  DRG?
23      A.  Yes.
24      Q.  Okay.  And when you received it, did you
25  receive an equal distribution to Mr. Halpin and

Page 16

1   Mr. Tinsley?
2       A.  Yes.
3       Q.  Do you know how much total you have received
4   in distributions from DRG since it was formed?
5       A.  I don't.
6       Q.  Do you receive regular distributions from
7   DRG?
8       A.  What do you mean regular?
9       Q.  Every quarter do you get a distribution?
10  Every year do you get a distribution?  Or is it
11  random, just depends on whether the company has money
12  to distribute or not?
13      A.  It was random.
14      Q.  Now, are there officer positions at DRG?  Is
15  somebody -- does somebody have a title of president?
16  Does somebody have a title of vice president?
17      A.  I don't think so.
18      Q.  No.  Okay.
19          Have you ever been given a title?
20      A.  Not that I know of.
21      Q.  Did you ever have a business card from DRG?
22      A.  Yes.
23      Q.  Okay.  Did it have a title on it, do you
24  recall?
25      A.  No.

Page 17

1       Q.  It just had your name?
2       A.  Yes.
3       Q.  All right.  Is there an understanding as to
4   particular responsibilities or duties or functions
5   that each of the three members of DRG will be
6   responsible for?
7       A.  I know what mine was.
8       Q.  Okay.  What's that?
9       A.  Sales and marketing.
10      Q.  Sales and marketing?
11      A.  Yes.
12      Q.  Okay.  And what about Mr. Halpin?
13      A.  They handled everything else.
14      Q.  Who is "they"?
15      A.  Michael and Tim.
16      Q.  Michael and Tim?
17      A.  And the staff.
18      Q.  So you handled the sales and marketing side
19  and Michael and Tim handled what?  The finances, the
20  operations, everything else that the company needed
21  to do?
22      A.  Yes.
23      Q.  Okay.  Did Michael and Tim have any
24  responsibilities at all with respect to sales and
25  marketing?

5  (Pages 14 to 17)

35526740-b77b-46b9-b755-cc4b4efb9489

Page 18

1  A. We were, you know, kind of a team that did
2  whatever it took.
3  Q. Sure.
4  A. So I don't think anyone had particular
5  responsibilities assigned. We just did what it took
6  to get things done.
7  Q. DRG has been involved with several
8  condominium conversion projects, correct?
9  A. What's several.
10  Q. More than one.
11  A. More than one, yes.
12  Q. Okay. There's Legacy Dunes?
13  A. Yes.
14  Q. There's Clear Lake?
15  A. Yes.
16  Q. And then there's Downtown -- what's it
17  called?
18  A. Uptown.
19  Q. Uptown. Thank you.
20  Uptown what?
21  A. Uptown Place.
22  Q. Those three. Any others that I'm forgetting?
23  A. No. Not that I know of.
24  Q. I haven't been to the DRG website in a while.
25  I'm just going from memory.

Page 19

1  A. That's all I can remember. Maybe -- you have
2  to look to see if DRG was created around Uptown time.
3  That might have been -- Tim wasn't part of Uptown.
4  So we might have created it after.
5  Q. Okay. Do you have certain arrangements
6  within DRG about Uptown place where Tim is not
7  entitled to a share of the profits relating to that
8  because he wasn't a member at the time?
9  A. I'm pretty sure.
10  Q. Is that a yes?
11  A. I'm pretty sure of that.
12  Q. With respect to Legacy and Clear Lake, Tim is
13  entitled?
14  A. Yes.
15  Q. Now with respect to the marketing of the
16  Legacy Dunes development, would you say you were the
17  person primarily responsible for that between you,
18  Mr. Halpin, and Mr. Tinsley?
19  A. Yes.
20  Q. Did there come a time that you learned about
21  the Real Estate Investment Group, Mortgage Exchange,
22  Joe Aldeguer group of companies?
23  A. Yes.
24  Q. When was that?
25  A. I'm not sure of the date.

Page 20

1  Q. Was it sometime in 2006?
2  A. Yeah.
3  Q. Okay.
4  A. '06.
5  Q. 2006. Okay.
6  A. Yes.
7  Q. And we know you have been to Chicago, I
8  think, at least once?
9  A. Yes.
10  Q. Do you know how many times you have been to
11  Chicago to visit at The Mortgage Exchange offices?
12  A. I think it's twice.
13  Q. Twice?
14  A. Yes.
15  Q. Were you ever on Mr. Aldeguer's radio
16  program?
17  A. No.
18  Q. Never. Okay.
19  Were you ever in any -- professionally, were
20  you ever in any video that was broadcast with
21  Mr. Aldeguer in it?
22  A. Broadcast like?
23  Q. Not the video presentation that has been
24  transcribed in this case; a video where video was
25  taken and it was put on TV?

Page 21

1  A. No.
2  Q. All right. You are sure you were never on
3  the radio program?
4  A. Yes.
5  Q. Okay. All right. Since we're on the topic,
6  have you read the transcript of the video that was
7  made of the presentation on July 20th, 2006?
8  A. Yes.
9  Q. That's Exhibit 4?
10  A. Yes.
11  Q. You have read that transcript. I don't want
12  you to read it now if you have read it before today.
13  A. I'm just seeing -- yes.
14  Q. There's a number of places throughout the
15  transcript where it indicates that James "Jimbo" Wear
16  is speaking. Is your nickname Jimbo?
17  A. Yes.
18  Q. Your dad has a different nickname they call
19  him?
20  A. Big Daddy.
21  Q. Were all the statements that were transcribed
22  where it says James "Jimbo" Wear speaking, were those
23  transcribed accurately?
24  A. Saying I was speaking?
25  Q. Exactly.

6 (Pages 18 to 21)

35526740-b77b-46b9-b755-cc4b4efb9489

Page 22

1  A.  Yes.
2  Q.  The other visit that you -- this transcript
3  was made from a presentation during one of your
4  visits to Chicago, and you said there was another
5  visit you made to Chicago?
6  A.  Yes.
7  Q.  Were you also involved in a presentation on
8  that date?
9  A.  I can't remember if I was.
10  Q.  Was it before or after July 20th, 2006?
11  A.  I believe it was before.
12  Q.  Let's go back to the beginning.  Tell me, I'm
13  really just looking for you to explain to me how you
14  first came to meet anyone associated with The
15  Mortgage Exchange.
16  A.  I met a guy named Jay Jolly or Jay Holly.
17  Q.  Jay Holly?
18  A.  Jay Holly.  He was a broker or a realtor, and
19  that's how I was introduced to that group, through
20  him.
21  Q.  Jay Holly was with Real Estate Dreams?
22  A.  At the time I don't think he was.  I think he
23  was with another company.
24  Q.  Okay.  And how did you meet Jay Holly?
25  A.  I was introduced to him by my dad.

Page 23

1  Q.  Okay.  Do you know how your dad knew him?
2  A.  Maybe from the Transeastern days.  No, I
3  don't know.
4  Q.  Did your dad move down about the same time
5  you did to Florida?
6  A.  A little before I did.
7  Q.  A little before?
8  A.  (Nodding head.)
9  Q.  When he moved down what did he do?
10  A.  He worked for Transeastern.
11  Q.  You both worked for Transeastern?
12  A.  Yeah.
13  Q.  What did he do after Transeastern?
14  A.  He started The Wear Group Realty Company.
15  Q.  So he left Transeastern, started The Wear
16  Group Realty, and you left Transeastern and went to
17  work for DRG?
18  A.  Yes.  Or whatever it was called at the time.
19  Q.  Okay.  I'm sorry, I don't know if you told me
20  if you knew how your father knew Jay Holly?
21  A.  I did not.
22  Q.  Do you remember what it is your dad told you
23  about Jay?
24  A.  He worked for a real estate company and was
25  looking for properties.

Page 24

1  Q.  Okay.  For what purpose?
2  A.  To sell real estate, I guess.
3  Q.  So do you recall when it was that you first
4  met with Jay Holly?
5  A.  I'm assuming it was '06.
6  Q.  What happened at that meeting?
7  A.  I can't remember.  I'm sure we talk about
8  Legacy Dunes.
9  Q.  Okay.  Was it a face-to-face meeting?
10  A.  We met face-to-face at some point.  I think I
11  talked to him on the phone prior to meeting him
12  face-to-face.  We set up a time to meet.  I just
13  don't know where we met.
14  Q.  What happened as a result of that meeting?
15  A.  He was interested in Legacy and selling
16  Legacy, and that's -- that was the result.
17  Q.  What had you told him about Legacy that
18  piqued his interest?
19  A.  I really can't remember that conversation.
20  Q.  Okay.  Well, in the beginning of 2006 DRG
21  actually hadn't purchased the Legacy development yet,
22  had it?
23  A.  I don't think so.
24  Q.  As I understand it, at some point DRG entered
25  into a contract to purchase it and subsequently there

Page 25

1  was a closing, but there was a period of time where
2  you had this contract and the intent was to go
3  through, close, and do the condo conversion; is that
4  accurate?
5  A.  Yes.
6  Q.  So do you recall, then, anything about what
7  you were telling him the plans were for the Legacy
8  Dunes development that interested him in selling it?
9  A.  That we were converting it from apartments to
10  condos.
11  Q.  Anything else about it?
12  A.  Not that I can recall.
13  Q.  Did you discuss rental opportunities?
14  A.  No.
15  Q.  Did you discuss how it would be managed?
16  A.  Not that I recall.
17  Q.  What happened next with respect to the
18  conversation with Jay Holly?  Was there any
19  follow-up?
20  A.  I think he -- I guess what happened next is
21  he -- the only thing I can remember that was an event
22  was when he had a group from Chicago come down to
23  look at the property.
24  Q.  When was that?
25  A.  I'm not sure exactly of the time.

7 (Pages 22 to 25)

35526740-b77b-46b9-b755-cc4b4efb9489

Page 26

```
1    Q.  Who was in that group?
2    A.  I remember Jill and her husband, Jay, Mo, and
3  Joe.
4    Q.  Jill, Jay, Mo, and Joe?
5    A.  And Stacey.
6    Q.  Stacey Michelon.
7    A.  That sounds right.
8    Q.  Jill is Jill Moore, correct?
9    A.  Yes.
10   Q.  Jay we said was Jay Holly.  Mo is Maureen
11 Phillips?
12   A.  Yes.
13   Q.  And Joe is Joe Aldeguer?
14   A.  Yes.
15   Q.  So what happened during that visit?
16   A.  I remember touring around the property
17 showing them some models.  That's about it.
18   Q.  Did you provide them with any literature
19 about the property?
20   A.  Not that I recall.
21   Q.  Do you know if literature had been created
22 yet for the sales of that property?
23   A.  I don't know if it had been created yet.
24   Q.  Too early in the process?
25   A.  I don't know.
```

Page 27

```
1    Q.  Okay.  Do you remember any conversations that
2  you had with them about what it is you showed them?
3    A.  No.
4    Q.  Okay.  Did you just tour them around the
5  property or did you also drive around outside the
6  property like to see how far it was from Disney World
7  or how far it is from the main highway or downtown
8  Orlando or anything like that?
9    A.  No.  Just toured the property.
10   Q.  Did you meet them at the property?
11   A.  Yes.
12   Q.  And when they left did they leave the
13 property?
14   A.  Yes.
15   Q.  Went their own way?
16   A.  Yes.
17   Q.  Do you know where they were staying?
18   A.  No.
19   Q.  Do you know how long this meeting took total?
20   A.  No.
21   Q.  Do you know if it was during the week or on a
22 weekend?
23   A.  I don't.
24   Q.  Do you know who made the arrangements to have
25 you there at the meeting?
```

Page 28

```
1    A.  I have to assume it's Jay.
2    Q.  Do you remember any of these folks saying
3  anything to you about how it was beautiful or how
4  they thought it wasn't beautiful or they loved it or
5  they hated it, anything at all?
6    A.  No.
7    Q.  Was it just you or were your partners there
8  too?
9    A.  I think it was just me.
10   Q.  What happened next after this tour?
11   A.  I'm not sure what you're referring to.  What
12 next?  Probably went home.
13   Q.  No.  That's not what I mean.
14   A.  Okay.
15   Q.  Okay.  The next time that there was any
16 discussions with anyone from The Mortgage Exchange,
17 Real Estate Investment Group, Jay Holly, anybody
18 associated with Jay Holly about the development?
19   A.  I remember going to Chicago.
20   Q.  Okay.  Do you remember how it was you came to
21 decide to go to Chicago?  You're pointing to this
22 transcript which refers to July of '06.
23   A.  Yes.
24   Q.  Do you remember how it came about you decided
25 to go to Chicago?
```

Page 29

```
1    A.  I think they invited us down.  They had
2  developers there before, and they invited us to come
3  see their operation.
4    Q.  Okay.
5    A.  And speak at an event.
6    Q.  Okay.  And by "they," who was it that you
7  spoke to?
8    A.  Probably Mo.
9    Q.  Maureen Phillips?
10   A.  (Nodding head.)
11   Q.  Do you recall getting a phone call from
12 Maureen Phillips saying, Hey, Jimbo, come up and see
13 what we got going?
14   A.  I know I talked to Mo.  She was my point of
15 contact.
16   Q.  So some point prior to July 20th, Maureen, in
17 a telephone conversation, invites you to come to
18 Chicago to see the operation of The Mortgage Exchange
19 in action?
20   A.  Somebody invited me.  I'm assuming that's Mo.
21   Q.  Was there any discussion before you got on
22 the plane to fly up to Chicago?  I assume you took a
23 plane?
24   A.  Yes.
25   Q.  Was there any discussion about the number of
```

U.S. Legal Support
(561) 835-0220

35526740-b77b-46b9-b755-cc4b4efb9489

Page 30

1   units that they could sell or the number of units
2   they had already sold or anything in that regard?
3       A.  I don't recall a certain conversation, but I
4   know that they were interested in selling units at
5   Legacy.
6       Q.  And did you understand whether there would be
7   a broker in the transaction?
8       A.  Jay and Sean was the real estate company we
9   were dealing with.
10      Q.  So Jay and Sean, did you at some point come
11  to learn their real estate company was called Real
12  Estate Dreams?
13      A.  Yes.
14      Q.  And so the real estate -- the selling broker,
15  as you understood it in these sales, was going to be
16  Real Estate Dreams and Jay and Sean?
17      A.  Jay and Sean.
18      Q.  And in the case of the sales of the units at
19  Legacy, the seller wasn't DRG; there was a separate
20  limited liability company that had been created to
21  purchase the development and sell the units, correct?
22      A.  Yes.
23      Q.  And that was Legacy Dunes Condominium LLC?
24      A.  That sounds right.
25      Q.  Now, does DRG own Legacy Dunes Condominium

Page 31

1   LLC?
2       A.  I don't know.
3       Q.  Well, do you own any part of Legacy Dunes
4   Condominium LLC yourself personally?
5       A.  I don't know how that corporate stuff was set
6   up.
7       Q.  Okay.  Who knows how that corporate stuff was
8   set up?
9       A.  I'm sure Michael and Tim.
10      Q.  So I would need to speak to them about it?
11      A.  Yes.
12      Q.  So now with respect to the role that Jay and
13  Sean were playing as brokers, they were going to be
14  the selling brokers representing the seller, Legacy
15  Dunes Condominium LLC, correct?
16      A.  They were one of our power brokers we
17  utilized to sell property.
18      Q.  In other words they were not -- their role
19  was not to represent a buyer?  Say a buyer came in
20  and said I want to buy.  It wasn't going to be Jay
21  and Sean, Jay and Sean were there on behalf of the
22  sellers?
23      A.  No.  Jay and Sean were power brokers trying
24  to bring buyers to buy units.
25      Q.  What do you mean by power brokers?

Page 32

1       A.  Just something we call brokers we had worked
2   with in the past.
3       Q.  Well, who -- in connection with the sales Jay
4   and Sean were involved in, who paid Jay and Sean
5   commission?
6       A.  I'm not sure which entity paid it, but it
7   would have been us as developers.
8       Q.  Okay.
9       A.  We pay a commission.
10      Q.  All right.  That was my question.
11      A.  Okay.  I thought you asked if they
12  represented the seller.  You said they represented
13  the seller.
14      Q.  You're a real estate broker, a licensed real
15  estate broker, correct?
16      A.  No.
17      Q.  Licensed real estate agent?
18      A.  Yes.
19      Q.  And how many real estate transactions have
20  you been involved in with where you served as the agent
21  for one party or the other?
22      A.  One.
23      Q.  Just one?
24      A.  Yeah.  My house.
25      Q.  Your own house?

Page 33

1       A.  Yeah.
2       Q.  Okay.  Well, you described a job history that
3   sounded to me like you'd had lots and lots of
4   experience with real estate transactions?
5       A.  Yes.  I was an employee of those companies.
6       Q.  And the -- in your history, which is
7   rather substantial, I mean, you graduate from college
8   just a year after me.  It would seem to me you have
9   been witness to at least hundreds of real estate
10  transactions?
11      A.  Yes.
12      Q.  You understand how real estate transactions
13  work is my point?
14      A.  Yes.
15      Q.  Typically there is -- well, not typically, in
16  transactions there can be real estate agents on both
17  sides.  One can represent a buyer and another can
18  represent a seller?
19      A.  Yes.
20      Q.  And in the transactions that we're talking
21  about at Legacy Dunes, the seller is Legacy Dunes
22  Condominium LLC or another entity that's involved
23  with DRG, right?
24      A.  Yes.
25      Q.  And the buyers, in the case of the folks in

9  (Pages 30 to 33)

35526740-b77b-46b9-b755-cc4b4efb9489

Page 34

1   Chicago, are individuals who learned about these
2   things and came to the presentations and signed
3   contracts, right?
4       A.   Yes.
5       Q.   So did Jay and Sean as agents, did they
6   represent the individuals that came to these
7   presentations and bought these units at Legacy?
8       A.   Yes.
9       Q.   So your position is that Jay and Sean were
10  representatives, were supposed to be looking out for
11  the interests of these purchasers?
12      A.   They were the real estate agents involved in
13  bringing those buyers to the table.
14      Q.   Okay.  Now, there are lot of different ways,
15  as I understand it, you can sell real estate.  One of
16  the ways is you can place a piece of real estate on a
17  multiple listing service so that buyers could find
18  out about it and purchase it.  Are you familiar with
19  that?
20      A.   Yes.
21      Q.   Was that what was done with respect to Legacy
22  Dunes in 2006?
23      A.   I don't know if we had it on MLS or not.
24      Q.   This was -- how many units at Legacy?
25      A.   I think 488.

Page 35

1       Q.   488?
2       A.   Yes.
3       Q.   Because of the way the conversion was
4   happening, you were selling the condominium units
5   subject to existing rental leases because there were
6   tenants in some of the units?
7       A.   There were tenants in some units.
8       Q.   And some units, I guess, were empty?
9       A.   Yes.
10      Q.   Okay.  But when the conversion happened, all
11  of a sudden you had 488 units immediately on the date
12  of the conversion when it was effective that could be
13  sold, right?
14      A.   Yes.
15      Q.   Did you, on that date, take all 488 units and
16  put them each individually on the Multiple Listing
17  Service to sell them one at a time through MLS?
18      A.   I don't really know.
19      Q.   Okay.  Do you think that's what happened?
20      A.   I really I don't know if we used MLS or not.
21      Q.   Weren't you looking to market and sell as
22  many of those units you could through programs like
23  what was going on at Real Estate Investment Group
24  where a number of buyers would come to a -- at once
25  to view and consider purchasing the property, wasn't

Page 36

1   that the most efficient way to do it?
2       A.   We tried every way we could come up with to
3   sell the units.  We had sold units previously and we
4   implemented every way we could think of.  There was
5   no one way.
6       Q.   What were some of the ways you marketed the
7   units?
8       A.   We utilized realtors.  We relied on them
9   heavily.
10      Q.   Okay.
11      A.   And we relied on our database that we had
12  generated over the years from previous buyers.  And
13  that was our two main programs that we had in place.
14      Q.   Well, the -- how about did you ever work with
15  individuals who put on real estate investment
16  seminars like Jim Smith?
17      A.   James Smith.
18      Q.   James Smith?
19      A.   Yeah.
20      Q.   I'm sorry, I figured since his name is James
21  it might be Jim.
22      A.   James.
23      Q.   He goes by James?
24      A.   Yes.
25      Q.   How did you work with James Smith?

Page 37

1       A.   James put on events and we would attend those
2   events and present our property.
3       Q.   Did you ever go to any of those events?
4       A.   Yes.
5       Q.   Where?
6       A.   I remember one in Vegas, I think one in
7   Arizona.
8       Q.   How about in Orlando, was there ever one in
9   Orlando?
10      A.   Yes.
11      Q.   And what did you do at those events?
12      A.   Just answer questions about the property.
13  And I think we took -- we had a sheet of people that
14  were interested, they could fill out a sheet.  I
15  think on the Orlando one I think they visited the
16  property on a bus tour, and I met the buses there to
17  show the people the property, but that's about it.
18      Q.   Okay.  Who paid for the bus?
19      A.   It was part of the event.  They looked at
20  several properties.
21      Q.   The folks who go to the James Smith events,
22  they pay a fee to go to these events?
23      A.   Yes.
24      Q.   Did DRG pay a fee for the opportunity to
25  present Legacy Dunes?

10  (Pages 34 to 37)

35526740-b77b-46b9-b755-cc4b4efb9489

Page 38

1   A.  Not that I know of.
2   Q.  James Smith invited you to come and talk
3   about your property at absolutely no charge?
4   A.  There were several other people there, other
5   developers.  They used different properties as
6   examples in their presentations, many different
7   speakers from all different realms of real estate
8   finance -- financing, how to manage your money, and
9   all kinds of cool stuff.
10  Q.  Examples of what?  They used them as examples
11  of what?
12  A.  For the different ways of buying real estate.
13  Q.  The James Smith seminars weren't about buying
14  real estate for the purposes of living in as a
15  principal residence, right?  They were for real
16  estate investments?
17  A.  I taught people how to buy their first homes;
18  how to get financing; how to buy foreclosure, if they
19  were renters, how to get into a home.  The whole
20  gamut of real estate and financing.
21  Q.  It also included real estate investment for
22  the purposes of earning income in investing in real
23  estate, right?
24  A.  Well, when they would talk about the
25  foreclosures and how to get a renter into a

Page 39

1   foreclosure, if that's what you are referring to as
2   buying real estate to make money, yes.
3   Q.  Well, if you're not buying real estate to
4   live in --
5   A.  Right.
6   Q.  -- you would agree with me that the only
7   other reason to buy real estate would be to make
8   money?
9   A.  You would hope to make money, yes.
10  Q.  Sure.  Okay.  That was one of the reasons why
11  people went to James Smith seminars?
12  A.  Yes.  How to buy real estate.
13  Q.  And in the other -- you're saying the other
14  real estate companies that were there talking about
15  different real estate properties, they didn't, to
16  your knowledge, have to pay James Smith anything to
17  be there to talk about what they were selling?
18  A.  Not to my knowledge.
19  Q.  Okay.  Who was the point of contact with the
20  James Smith seminars concerning DRG's attendance and
21  presentations about its properties?
22  A.  Usually Donny I think.
23  Q.  Who is Donny?
24  A.  He was James' coordinator.
25  Q.  I didn't mean at James Smith.  I meant at

Page 40

1   your company.
2   A.  Me.
3   Q.  You?
4   A.  Yes.
5   Q.  So Donny contacted you and said, Hey, would
6   you like to do a presentation at one of our seminars
7   about one of your properties like Legacy Dunes?
8   A.  Yes.
9   Q.  Was that in 2006 that you did those
10  presentations?
11  A.  I'm not exactly sure, but.
12  Q.  Is James Smith from the Orlando area?
13  A.  Yes.
14  Q.  Other than at his presentations, have you
15  ever met him?
16  A.  I think we had lunch maybe once.
17  Q.  Was that before you had done any of his
18  presentations?
19  A.  No.
20  Q.  Now, did you -- when you went to the
21  presentations, did you bring literature about the
22  properties?
23  A.  If we had it, we did.
24  Q.  Okay.  Pictures so people could see what it
25  looked like?

Page 41

1   A.  If we had it, we brought it.
2   Q.  The James Smith seminars, do you know that
3   they were called -- some of them were called M-5?
4   A.  Yes.
5   Q.  Did you ever give out any information about
6   projected cash flows for purchases at Legacy at any
7   of the James Smith M-5 seminars?
8   A.  No.
9   (Thereupon, Exhibit 30 was marked for
10  identification.)
11  BY MR. ROTHMAN:
12  Q.  Take a look at Exhibit 30, please.
13  Do you see this document is entitled 12 Month
14  Cash Flow for Legacy M-5?
15  A.  Yes.
16  Q.  Have you ever seen this document before?
17  A.  I saw it at Maureen Phillips' deposition.
18  Q.  Any time before that?
19  A.  No.
20  Q.  Do you know if information about cash flow,
21  including earnings from rentals of Legacy Dunes
22  units, were ever distributed at James Smith seminars
23  in this manner?
24  A.  No.
25  Q.  You never saw it?

11  (Pages 38 to 41)

35526740-b77b-46b9-b755-cc4b4efb9489

Page 42

1      A.  No.
2      Q.  All right.  Now the -- did your father, Big
3   Daddy, ever go to Chicago for a presentation or visit
4   Real Estate Investment Group or Mortgage Exchange?
5      A.  I think he was there once.
6      Q.  Was it before you were there or after?
7      A.  No.  We went together.
8      Q.  Together?
9      A.  Yeah.
10      Q.  So was he with you during the presentation
11   that was transcribed as Exhibit 4?
12      A.  I don't know if he was -- I don't know.  I
13   remember him being there once.  I think I was there
14   twice.
15      Q.  I think at one point in the transcript it
16   refers to him, but I can't remember exactly.  Why did
17   he go with you?
18      A.  He was -- he was a broker who introduced us
19   to Jay and Sean.
20      Q.  Okay.
21      A.  So I guess he was, at the time, representing
22   The Wear Group Realty.
23      Q.  Okay.  Was your father or The Wear Group
24   Realty entitled to a percentage of any commissions
25   that were paid in connection with sales at Legacy?

Page 43

1      A.  I'm not a hundred percent sure, but I believe
2   so.  I think it was a referral fee.
3      Q.  So would it be The Wear Group, then, that was
4   entitled to a referral fee as a result of any sales
5   that were made?
6      A.  I think that's what it was.
7      Q.  Who was responsible for paying the referral
8   fee?
9      A.  The developer, whoever -- you keep asking the
10   entity.  I don't know the entity that paid.  So would
11   you like to call it something or?
12      Q.  No.  I keep asking it because I want to make
13   sure I know where it's coming from.  Let's do it this
14   way, as I understand it, the entity that owned the
15   Legacy Dunes development and sold the condominiums is
16   Legacy Dunes Condominium LLC?
17      A.  Okay.
18      Q.  And why don't we call that the seller?
19      A.  Okay.
20      Q.  All right.  And so are you saying the seller
21   was responsible for paying the referral fee to The
22   Wear Group?
23      A.  Yes.
24      Q.  So it wasn't coming from Real Estate Dreams;
25   it was coming from the seller?

Page 44

1      A.  I believe so.
2      Q.  And how much were they paid?  Were they ever
3   paid?
4      A.  I think so.
5      Q.  How much were they paid?
6      A.  I'm not sure.
7      Q.  Do you know if it was a dollar amount or a
8   percentage or what?
9      A.  I really can't remember.
10      Q.  I'm not sure if I asked you this, do you own
11   any interest in The Wear Group Realty?
12      A.  No.
13      Q.  Okay.  So there came a point when you went to
14   Chicago -- and I'm not sure if we know if this was
15   before the presentation that's Exhibit 4 or if it was
16   that particular occasion -- tell me what you recall
17   happened during that first visit to Chicago.
18      A.  During this visit?
19      Q.  The first visit.  If you can tell me that
20   this visit is visit -- is the presentation in Exhibit
21   4, then fine, but I understood you didn't know
22   whether the presentation in Exhibit 4 was the first
23   time you went or the second time?
24      A.  Right.  I'm pretty sure this is the second
25   visit.

Page 45

1      Q.  Okay.  So what I want to focus on then is the
2   first visit.  Okay.
3      A.  Okay.
4      Q.  I don't have a transcript of the first visit.
5   Do you know if a video was taken of the presentation
6   of the first visit?
7      A.  I can't recall a presentation.
8      Q.  All right.  So if there was no presentation
9   and there's no video, I have nothing to transcribe.
10   All I have is your memory and anybody else who was
11   there.  So since I'm taking your deposition now, I'm
12   asking you what do you remember about that visit?
13   What do you remember happened?
14      A.  I think we had lunch with Mo, Joe, and
15   Stacey, and they took us to their office and showed
16   us around.
17      Q.  At the time they were in Downers Grove,
18   Illinois, not in the Sears Tower?
19      A.  Yes.
20      Q.  They're in the suburbs of Chicago?
21      A.  Yes.
22      Q.  You fly in the morning and met, went to
23   lunch, or did you stay over the night before?
24      A.  I can't remember.
25      Q.  So you go to lunch and it was Joe, Mo, and

12  (Pages 42 to 45)

35526740-b77b-46b9-b755-cc4b4efb9489

Page 46

1  Stacey?
2     A.  That sounds right, yes.
3     Q.  Okay.  And then you went to see their
4  offices?
5     A.  Yes.
6     Q.  Is there anything else you did during that
7  visit?
8     A.  That's all I can really remember.
9     Q.  And after the visit to their office, you got
10 back on the plane and went back to Florida?
11    A.  Yes.
12    Q.  So tell me what you discussed at lunch that
13 day and later on at the office.
14    A.  I can't remember.
15    Q.  Total blank?
16    A.  Yes.
17    Q.  Did you leave with the impression that it had
18 been a successful visit?
19    A.  Yeah.  I'm sure I felt good about it.  I
20 don't recall the feeling, but.
21    Q.  Okay.  Did you understand that this was a
22 group that was going to work with you to sell more
23 units at Legacy Dunes?
24    A.  Yes.
25    Q.  And was Jay with you or Sean?

Page 47

1     A.  I don't remember them being there.
2     Q.  Did you give them any materials while you
3  were there, bring any brochures, contracts, CD ROMs?
4     A.  Not that I recall.
5     Q.  You do have a very professional marketing
6  packet, including a CD ROM for the Legacy Dunes
7  property, don't you?
8     A.  Yes.
9     Q.  It's got sample contracts on it and brochures
10 about the property, and it describes all the
11 amenities and all that, right?
12    A.  I remember having a packet.  I am not exactly
13 sure what it entailed.
14    Q.  Now what happened after the first visit, if
15 anything, that led to the second visit?
16    A.  I guess that would be this visit.  And that
17 would be when, I guess, Jay and Mo said this is --
18 come up here and talk about the property.
19    Q.  At the point when they asked you to come up
20 and talk about the property, had any contracts been
21 signed for the sales of units at Legacy Dunes to
22 individuals who had learned about the property
23 through The Mortgage Exchange or the Real Estate
24 Investment Group?
25    A.  I don't know.

Page 48

1     Q.  You don't know.  All right.
2        Was there any discussion before you left
3  Florida and got on that plane about what would
4  transpire when you went to Chicago before July 20th,
5  2006?
6     A.  Just that they wanted me to speak for about
7  five minutes.  They had previous developers who came
8  and spoke about the property.
9     Q.  Okay.  You understood you would be talking to
10 a group of potential purchasers?
11    A.  Yes.
12    Q.  Okay.  And you had given presentations like
13 that before, hadn't you?
14    A.  I can only remember one time because I have
15 very bad stagefright.  So I don't like getting up in
16 front of people.
17    Q.  And was that one time before, was that at an
18 M-5?
19    A.  I think it was.
20    Q.  Did you bring any materials with you?
21    A.  I think they had everything.  They created a
22 lot of stuff.  I can't recall bringing anything.
23    Q.  Okay.  All right.  Do you remember if this
24 presentation was in the evening or during the day?
25    A.  Like mid evening, maybe late afternoon.

Page 49

1     Q.  Okay.  We got the transcript, so we know what
2  was said during the presentation.  What happened
3  afterwards?
4     A.  They take the room of people down to the next
5  floor below.  And anybody interested in purchasing
6  has a chance to talk to one of the realtors and
7  discuss purchasing a unit.
8     Q.  Did you have any conversations with anyone
9  interested in purchasing?
10    A.  In what?  Interest in purchasing in what
11 sense?  I mean, I talked to the people that were
12 there about views and sizes of the unit's location.
13    Q.  Do you remember anyone specifically by name
14 you spoke to?
15    A.  No.
16    Q.  But after the presentation when you went
17 downstairs and the other people were talking about
18 the folks who were there, potential buyers, you also
19 participated in that and gave people information, you
20 said views and what else?
21    A.  Sizes of units, just property information,
22 that most of it was readily available.  But I can
23 recall talking about different views from time to
24 time.
25    Q.  Did you talk to anyone about the

U.S. Legal Support
(561) 835-0220

35526740-b77b-46b9-b755-cc4b4efb9489

Page 50

1  opportunities that were available to rent out the
2  units?
3     A. No.
4     Q. Okay. Did you talk to anybody about any of
5  the guarantees that might be offered to people to be
6  able to rent their units out for a particular amount
7  of time?
8     A. No.
9     Q. Did you talk to anyone about any of the
10 developer incentives that were being offered that was
11 money they would receive back from common area
12 leasebacks?
13    A. Not that I recall.
14    Q. Okay. Other than Sean and Jay did any of the
15 potential buyers there have their own real estate
16 agents with them representing them?
17    A. I don't know.
18    Q. Did you meet any? Did you see any?
19    A. Not that I recall.
20    Q. We have been told there was a conference room
21 where Geneva Hospitality, Sal Sardinia, and Chandra
22 Webster gave a presentation. Did you see any part of
23 that presentation?
24    A. No.
25    Q. Have you ever seen -- other than at a prior

Page 51

1  deposition in this case -- the PowerPoint
2  presentation in Exhibit 5?
3     A. No.
4     Q. Did you ever provide anyone at The Mortgage
5  Exchange, Real Estate Investment Group, or Geneva
6  Hospitality with information about average rental
7  rates, occupancy rates in Osceola County?
8     A. No.
9     MR. ROTHMAN: Do you want to take a break for
10 a few minutes?
11    (Short break.)
12 BY MR. ROTHMAN:
13    Q. Is there anything else you can remember about
14 what happened after the presentation when you were
15 down on the floor below, other than folks coming up
16 to you and asking you questions, telling them about
17 views and other features of Legacy?
18    A. I remember them, you know, getting keys. Jay
19 and Sean would pick keys off this board.
20    Q. They had like fake keys? They weren't real
21 keys?
22    A. No. I think they were cutouts like the key
23 to the city kind of thing. I just remember a board
24 with keys on it.
25    Q. Maybe a big board with different color

Page 52

1  keychains?
2     A. No. Numbers, they were reference to the unit
3  numbers I think.
4     I remember they had good food.
5     Q. Yeah? What did they serve?
6     A. I don't know, but it was good. They had good
7  desserts.
8     Q. Did he they serve dinner or lunch?
9     A. No. Finger stuff.
10    Q. Hors d'oeuvres?
11    A. No.
12    Q. Alcohol?
13    A. No. I don't think so.
14    Q. No alcohol?
15    A. I think I was looking for some.
16    Q. Okay. Soft drinks?
17    A. I think. I know there was water. They might
18 have had soft drinks.
19    Q. And people were picking keys off the wall
20 deciding which unit they wanted to buy?
21    A. Well, they would -- Jay and Sean would select
22 the unit that they wanted off the -- and then he
23 would give the key to one of his realtors, and they
24 would go talk about, whatever, buying the property or
25 something.

Page 53

1     Q. One of his realtors, you mean somebody from
2  the Real Estate Investment Group?
3     A. No. From his group. He brought a team down.
4     Q. Who was there from -- who was his team?
5     A. I didn't know any of them. So I don't
6  remember any names.
7     Q. Okay.
8     A. He brought a handful of them.
9     Q. And then what else do you remember? What
10 happened after that?
11    A. We went back to the hotel, I guess.
12    Q. Did you go back to Florida the next day?
13    A. Yes.
14    Q. Okay. Any other visits to Chicago besides
15 those two?
16    A. Not that I can remember.
17    Q. Now, the let me show you a couple of things.
18 Maybe we can clear up a few issues.
19    (Thereupon, Exhibit 31 was marked for
20 identification.)
21 BY MR. ROTHMAN:
22    Q. I'll show you Exhibit 31.
23    Did you ever see letters that look like this
24 to Legacy Dunes homeowners that discuss long-term
25 rent guarantees?

14  (Pages 50 to 53)

35526740-b77b-46b9-b755-cc4b4efb9489

1     A.  I don't recall seeing it, but I'm sure we had
2  stuff like this.
3     Q.  In the second paragraph it refers to a
4  guarantee and Addendum C of the purchase agreement
5  regarding rent that the purchaser would be entitled
6  to receive.
7     A.  Where?
8     Q.  On the second paragraph before the little
9  print.
10    A.  Okay.
11    Q.  The sentence reads, "The guarantee is defined
12  in Addendum C of the purchase agreement."
13    A.  Okay.
14    Q.  It's referring to an addendum of the purchase
15  agreement.
16    A.  All right.
17    Q.  The folks that were at the presentation when
18  they would go down to the floor below picking out
19  keys, they would go and sign purchase agreements,
20  right?
21    A.  Yeah, I guess they would sign them then.
22    Q.  There was a form purchase agreement that DRG
23  had prepared for Legacy Dunes?
24    A.  Yes.
25    Q.  And it would be modified for each individual

1  purchase to add a unit number and/or name and other
2  details such as a purchase price and all that?
3     A.  I would assume the prices were already on the
4  contracts.  It would probably just be names and
5  signatures required.
6     Q.  Are you aware of whether the prices paid by
7  purchasers of Legacy Dunes units through The Mortgage
8  Exchange, Real Estate Investment Group, whether those
9  prices were higher for equivalent, identical units
10  than those purchased by others in different parts of
11  the country who didn't purchase through the Real
12  Estate Investment Group?
13    A.  I know I believe we had phases of how we
14  priced according to like, you know -- when you first
15  release a property and you have a price and then you
16  have a second phase and a third phase.  I know we
17  sold units at the same price to other people as what
18  they purchased for.
19    Q.  The question wasn't about phases.  There was
20  some testimony, and I just want to ask you about it,
21  that there were -- the prices that were paid by
22  Legacy Dunes purchasers who went to The Mortgage
23  Exchange were higher because the prices had been
24  through The Mortgage Exchange were higher because the
25  prices had been deliberately increased in order to

1  account for commissions that would need to be paid as
2  a result of the sales, do you remember that that was
3  the case?
4     A.  I remember the prices included the
5  commissions that we paid.
6     Q.  Those commissions were higher than
7  commissions that were paid to others who purchased
8  the same unit type size at the same time who didn't
9  buy through The Mortgage Exchange, so as a result
10  they paid a lower price?
11    A.  No.  We sold several, as I recall, several
12  units at the same price.  It depended on what phase
13  of our pricing they purchased in.
14    Q.  So take a look again at the Exhibit we were
15  talking about before, 31.  The bottom you see how
16  it's signed by Michael Halpin as managing member of
17  DRG LLC?
18        Well, I'm sorry, it's signed "Michael Halpin,
19  managing member DRG LLC."
20    A.  Yes.
21    Q.  Does that refresh your recollection at all as
22  to how the ownership worked with regard to Legacy
23  Dunes Condominium LLC; that is, that DRG LLC was the
24  owner of Legacy Dunes Condominium LLC?
25    A.  It doesn't really help me.

1     Q.  Okay.  So let's go back to the guarantee as
2  defined in Addendum C language we were talking about
3  before.  There's the small print in the middle that's
4  set off.
5        It says, "Should your unit be unoccupied on
6  the date of closing or become unoccupied after
7  closing, developer will pay to you the rent on the
8  unit at the previously occupied rental rate less any
9  applicable concession, maintenance, or unit turnover
10  cost until the unit becomes occupied by you the
11  purchaser, the unit is placed into a short-term
12  rental pool, or until June 30th, 2007, whichever
13  occurs first."
14        Do you see that?
15    A.  Yes.  Yep.
16    Q.  Do you see the paragraph just above it, this
17  paragraph is termed long-term rent guarantee?
18    A.  Right.
19    Q.  Do you recall that in the purchase agreements
20  that folks who purchased at Legacy Dunes signed that
21  there was a long-term rent guarantee that read as
22  indicated in Exhibit 31?
23    A.  I can't -- I -- there was a long-term rental
24  agreement or guarantee.
25    Q.  Do you recall anyone at the Legacy Dunes

35526740-b77b-46b9-b755-cc4b4efb9489

Page 58

1   presentations that you attended asking you any
2   questions about the guarantee?
3      A.  No.
4      Q.  None at all?
5      A.  The realtors dealt with the people.  They
6   asked, you know, property questions about views and
7   so forth.
8      Q.  What is Sovereign Residential?
9      A.  They're -- they were the management company
10  for Legacy.
11     Q.  Is there any relationship between Sovereign
12  Residential and any of the owners of DRG?
13     A.  Not that I know of.
14     Q.  Tim Tinsley has no ownership in Sovereign
15  Residential?
16     A.  Not that I know of.
17     Q.  Do you know who owns Sovereign Residential?
18     A.  I can't remember the names.  I think it was
19  two girls.
20     Q.  Do you know how Sovereign Residential was
21  chosen to be the management company at Legacy?
22     A.  We interviewed a few different management
23  companies, and I think they had a software that would
24  work for -- work good for conversion.  There was
25  something about a software.  No one else could really

Page 59

1   handle it without having a special software or
2   something like that.
3      Q.  And was there any competitive bidding process
4   that you went through?
5      A.  There was an interview process.
6      Q.  Just interview?
7      A.  I don't think it was bidding, just who was
8   qualified to manage that size property.
9      Q.  Did Sovereign manage any other properties
10  besides Legacy?
11     A.  Yes.
12     Q.  What other properties?
13     A.  Clear Lake.
14     Q.  Okay.  Another DRG Development?
15     A.  Yes.
16     Q.  Were they hired to manage that before they
17  were hired to manage Legacy?
18     A.  Yes.
19     Q.  Okay.
20     A.  They managed -- I think they had other
21  properties that they managed.
22     Q.  You don't remember the names?
23     A.  No.
24     Q.  All right.  And was there any consideration
25  given to cost; that is, what Sovereign charged for

Page 60

1   their management?
2      A.  I really didn't have much to do with that,
3   so.
4      Q.  Who did?
5      A.  Probably Michael and Tim.
6      Q.  And who were the individuals at Sovereign
7   that you were referring to, two girls?  Was it
8   Jessica Callow and Jennifer Fegebank?
9      A.  No.  I don't remember the girls' names.
10     Q.  Okay.  Did Jessica Callow and Jennifer
11  Fegebank work for DRG?
12     A.  Yes.
13     Q.  Do they still work there now?
14     A.  No.
15     Q.  How about Jonathan Ducos?
16        MR. ROTHMAN:  Is that you?
17     A.  That's Ryan.
18        MR. ROTHMAN:  I apologize, Ryan.
19  BY MR. ROTHMAN:
20     Q.  Does Jonathan Ducos still work for DRG?
21     A.  No.
22     Q.  Are you still working for DRG?
23     A.  I'm still a partner.
24     Q.  Still a partner?
25     A.  (Nodding head.)

Page 61

1      Q.  Are Mr. Halpin and Mr. Tinsley still working
2   for DRG?
3      A.  They're still partners.
4      Q.  Do you all go into the office every day and
5   do work?
6        I'm asking you.
7      A.  Not me.  I don't know what they do.
8      Q.  You don't go into the DRG offices on a
9   regular basis?
10     A.  No.
11     Q.  When was the last time you went in?
12     A.  A long time.
13     Q.  A long time?
14     A.  I don't know.
15     Q.  Over a year?
16     A.  Probably.
17     Q.  Two years?
18     A.  I don't know.  I don't know.  I don't know if
19  I have an office anymore.
20     Q.  You don't know?
21     A.  No.
22     Q.  It's been that long?
23     A.  Yeah.
24     Q.  Okay.  You've seen the standard Legacy Dunes
25  Condominium purchase forms that DRG provides, right?

16 (Pages 58 to 61)

35526740-b77b-46b9-b755-cc4b4efb9489

Page 62

1      A.   Yes.
2      (Thereupon, Exhibit 32 was marked for
3   identification.)
4   BY MR. ROTHMAN:
5      Q.   Let me show you what I have marked Exhibit
6   32. This isn't a blank form; this is a purchase
7   agreement for one of the plaintiffs in this case --
8   actually, two married plaintiffs Karen and Joseph
9   Lubomski.
10      Do me a favor and take a minute and look at
11   it, and let me know if this generally is consistent
12   with your recollection of what was contained in a
13   standard Legacy Dunes purchase contract.
14      A.   It appears to.
15      Q.   The bottom right is Bates numbers.
16      A.   Yes.
17      Q.   Do you see those? If you can flip to
18   Lubomski 00108. Do you see at the bottom there it
19   says under developer: Legacy Dunes Condominium LLC,
20   Florida limited liability company, by Development
21   Resources Group LLC, managing member, James E. Wear,
22   Junior, authorized member.
23      Is that your signature on that?
24      A.   It looks like it.
25      Q.   Was your signature on all the purchase

Page 63

1   agreements?
2      A.   I don't know.
3      Q.   Okay. Did you sign the agreements by hand or
4   was your signature scanned and placed on the
5   agreements in advance, do you know?
6      A.   I don't know.
7      Q.   Do you remember sitting there on the eighth
8   floor of The Mortgage Exchange signing each
9   agreement?
10      A.   No.
11      Q.   Do you remember ever being given a big stack
12   of agreements to sign and signing each one by hand?
13      A.   Not that I can remember.
14      Q.   Okay. All right. So it's -- would it be
15   correct, though, to -- where it indicates that you
16   were an authorized member to sign this purchase
17   agreement on behalf of Development Resources Group
18   which was the managing member of Legacy Dunes
19   Condominium LLC?
20      A.   Yes.
21      Q.   So the date of this, you see the purchasers
22   have a date of 6/29/06 and then next to your name is
23   a date of 6/30/06, which would be before the
24   presentation on July 20th of '06 that we were talking
25   about where you went and spoke.

Page 64

1      So does this refresh your memory whether
2   sales of Legacy occurred prior to your going to
3   Chicago and participating in that presentation?
4      A.   I assume so.
5      Q.   Before you went to Chicago you had heard,
6   Hey, we're selling units at Legacy, guys. We're
7   selling these properties. Is that correct?
8      A.   I don't know exactly when they started
9   selling. I know Jay and Sean started selling at some
10   point. I'm assuming they were selling at this time.
11      Q.   It's a good thing for you because you're the
12   sales and marketing guy. The more you sell, the
13   better it is for the company because the more money
14   the company makes, right?
15      A.   Yeah.
16      Q.   So I would have thought that going on your
17   visit to Chicago to know that sales had already been
18   made would be a positive thing for you?
19      A.   It certainly would.
20      Q.   Let's turn to page Lubomski 000113, Legacy
21   Dunes Addendum C.
22      A.   00113.
23      Q.   Actually, the prior page. If you turn back
24   one page before. See that's part of Addendum C?
25      A.   I got it.

Page 65

1      Q.   And then you see that first paragraph
2   Long-Term Rental Management Agreement at the top of
3   the page there?
4      A.   Yes.
5      Q.   That's the paragraph that was quoted and
6   referred to in Exhibit 31 that we looked at before in
7   the small type.
8      A.   Yes.
9      Q.   Right.
10      MR. GORE: Actually, just for the record,
11   it's not.
12      MR. ROTHMAN: It's different?
13      MR. GORE: It's the management agreement
14   versus the rent guarantee.
15      MR. ROTHMAN: Well, let's figure this out for
16   a second.
17      Yeah, you're right. Let's see if it's in
18   here.
19   BY MR. ROTHMAN:
20      Q.   It's actually the rent is the next one. It's
21   the paragraph below that. Do you see underneath the
22   second paragraph on the page there, Rent?
23      A.   Yes.
24      Q.   "Should your unit be unoccupied on the date
25   of the closing," do you see that?

17  (Pages 62 to 65)

35526740-b77b-46b9-b755-cc4b4efb9489

Page 66

1    A.  Yes.
2    Q.  So it's the same.  That second paragraph is
3  the same as in this number 31.
4    A.  Yes.
5    Q.  Let's look at the paragraph above it.  See
6  that reads, "Long-term rental management agreement
7  Legacy Dunes Condominium LLC (developer) agrees to
8  provide leasing/concierge services at the expense of
9  developer until June 30, 2007 or at such time as you,
10  the purchaser, occupy the unit, or place the unit
11  into a short-term rental pool (whichever occurs
12  first)."
13    Do you see that?
14    A.  Yes.
15    Q.  Do you understand that this paragraph talks
16  about how the developer was going to bear the expense
17  of providing leasing and concierge services until a
18  particular date which would either be June 30th, 2007
19  or a date when the unit was occupied or a date when
20  the unit was placed in a short-term rental pool
21  whichever was first?
22    A.  Yes.
23    Q.  Okay.  So am I correct to understand that
24  both this paragraph here and the paragraph below it
25  refer to the opportunity for the purchaser of the

Page 67

1  unit to rent their unit on a short-term basis as part
2  of a short-term rental pool?
3    A.  It says, "placed in a short-term rental
4  pool."
5    Q.  In both places, correct?
6    A.  Yes.
7    Q.  And where it says in the paragraph above that
8  Legacy would provide all leasing/concierge services,
9  what did the leasing/concierge services refer to?
10  What would be part of those services?
11    A.  I'm assuming it's referring to Sovereign
12  managing the company.
13    Q.  Okay.
14    A.  Managing the property, handling potential
15  people wanting to come rent units.
16    Q.  So handling the process of showing tenants
17  the property, signing tenants to leases, managing the
18  tenants in the property and that are in the leases,
19  fixing anything that goes wrong with the tenants --
20  all those function of being a landlord, correct?
21    A.  I guess.
22    Q.  Okay.  I'm -- you're signing this contract on
23  behalf of DRG, so I'm asking you.
24    A.  All right.
25    Q.  Because --

Page 68

1    A.  They were managing the long-term rental
2  component of the property.  So whatever that consists
3  of, I'm not sure.  Maybe it consists of everything
4  you just said.  I know they were to maintain the
5  property, and if someone came in and wanted to rent a
6  unit, they would show them unit if there was one
7  available to rent.
8    Q.  So that's what was anticipated would occur
9  when this DRG contract was drafted?
10    A.  Yes.
11    Q.  And what about with respect to the short-term
12  rental pool?  What was anticipated by DRG would
13  happen with respect to owners who wanted to rent
14  their units on a short-term basis in this rental
15  pool?
16    A.  I don't know.  We had nothing to do with the
17  short-term component and neither did Sovereign.  So
18  I'm not sure what this is referring to.
19    Q.  Well, see in the second sentence of that top
20  paragraph it says, "Legacy Dunes Condominium owners
21  will be required to utilize and retain the leasing
22  management company selected by the board of directors
23  for all rental and leasing activity."
24    A.  Okay.
25    Q.  What did you understand would happen, then,

Page 69

1  with respect to condominium owners who you know were
2  going to rent or lease their units as a result of
3  this?
4    A.  Well, there was no short-term management on
5  the site at the time.  And so I'm assuming this is in
6  reference to having to use the on-site management
7  company for their long-term rental property.
8    Q.  So this meant that they couldn't go to
9  another management company; they had to use the
10  management company that was in place, right?
11    A.  For the long-term rental.
12    Q.  For long-term rentals, okay.
13    A.  Yes.
14    Q.  That sentence doesn't refer to specifically
15  to long-term rentals anywhere in there, though, does
16  it?
17    A.  No.
18    Q.  Because there was no short-term rentals in
19  place at the time that people were purchasing these
20  units through The Mortgage Exchange in 2006, then by
21  default it had to deal with long-term rentals because
22  short-term rentals didn't exist at that particular
23  time?
24    A.  I am not sure if it existed at the time.
25  They could use outside an short-term rental company

18  (Pages 66 to 69)

35526740-b77b-46b9-b755-cc4b4efb9489

Page 70

1  if they chose to.
2     Q.  Well, isn't it true that in fact short-term
3  rentals, because of zoning and permits, couldn't
4  legally occur at Legacy until sometime in August or
5  September of 2007?
6     A.  I'm not sure of the dates.
7     Q.  But it was approximately the middle of 2007
8  that that first occurred, right?
9     A.  That sounds right.
10    Q.  Okay.  So the let's go on.
11       The next sentence says, "No purchaser/owner
12  shall be allowed to show their unit to a prospective
13  tenant without the prior consent of the management
14  company or association manager."
15       Did you understand that to mean as an owner,
16  you couldn't -- unless you got the okay from the
17  association or the management company, you couldn't
18  just start listing your unit for rental and showing
19  it around without their approval?
20    A.  I'm not really sure what that means.
21    Q.  The third -- I'm sorry, fourth bullet point
22  down refers to a leaseback agreement.
23    A.  Okay.
24    Q.  The leaseback agreement says in that first
25  sentence, "Purchaser agrees to lease purchasers

Page 71

1  percentage interest in the common areas of the
2  condominium to Legacy Dunes Condominium LLC for six
3  months term to allow developer the ability to
4  continue property tours (for future acquisition
5  reference), marketing material access, event
6  staffing, and clubhouse use at the following lease
7  rate," there's a colon and it continues.  And then
8  there's a lease rate amount at the bottom.
9       Why is there this leaseback agreement in
10  here?
11    A.  I'm not exactly sure.
12    Q.  Wasn't this money paid to purchasers outside
13  of closing after closing by DRG?
14    A.  I don't know when it was paid or how it was
15  paid.
16    Q.  Do you know if it was paid?
17    A.  I assume so.
18    Q.  Was this ever used as an incentive for people
19  to purchase their units that they would receive this
20  payment, in this case for $4,970, after they
21  purchased their unit?
22    A.  It was part of the package we were offering
23  them.  It fell in the total package.
24    Q.  What else was part of the package?
25    A.  I can't really remember.  It's been a long

Page 72

1  time -- other than this rental thing I think that we
2  were talking about earlier.
3     Q.  Turn to Lubomski 00116.  Do you see this page
4  is entitled Legacy Dunes Purchaser Intent Survey?
5     A.  Yes.
6     Q.  Do you know if this form was -- see how here
7  the word "investment" has been checked after
8  "secondary (vacation home) residence" has been
9  crossed out?
10    A.  Yes.
11    Q.  Were you aware whether the Legacy Dunes form
12  purchase contract had the second home box prechecked?
13    A.  I wasn't aware.
14    Q.  Okay.  Exhibit 33.
15       (Thereupon, Exhibit 33 was marked for
16  identification.)
17  BY MR. ROTHMAN:
18    Q.  Do you see this is a form just like the one
19  we were looking at in Exhibit 32, and it has
20  "secondary (vacation home) residence" box rechecked?
21    A.  Yes.
22    Q.  And it's got a watermark on it where it says
23  "sample"?
24    A.  Yes.
25    Q.  Do you know if that's how this form was

Page 73

1  presented to purchasers when they were filling out
2  and completing and signing their purchase agreements?
3     A.  I don't know.
4     Q.  Okay.  Who was in charge of developing the
5  purchase agreement that we were looking at in Exhibit
6  32 at DRG?
7     A.  I guess the attorneys.
8     Q.  The attorneys?
9     A.  Yeah.
10    Q.  Who from DRG worked with the attorneys on
11  that?
12    A.  I assume Mike and Tim.
13    Q.  Not you?
14    A.  No.
15       (Thereupon, Exhibit 34 was marked for
16  identification.)
17  BY MR. ROTHMAN:
18    Q.  Let me show you Exhibit 34 the first page is
19  a letter dated February 162007 to Maryann Zaborsky.
20       Have you ever seen a letter like this from
21  the Osceola Zoning and Code and Enforcement
22  Department concerning the 488 units at Legacy Dunes?
23    A.  It doesn't lock familiar.
24    Q.  Do you see the second paragraph in the second
25  sentence -- actually let's start with the first

U.S. Legal Support
(561) 835-0220

35526740-b77b-46b9-b755-cc4b4efb9489

Page 74

1  sentence, "The existing 488 units were approved by
2  the board of county commissioners on September 14,
3  1998 under comprehensive development plan file
4  reference CDP98-81. Short-term rental is described
5  in the Osceola County Land Development Code Chapter
6  14, Section 14.26 is not authorized on this site."
7    Do you see that?
8    A. Yes.
9    Q. Does there come a time that you learn that
10  short-term rentals at Legacy Dunes were not
11  authorized?
12    A. Yes.
13    Q. And did there come a time when, as a result
14  of hearings that were held by the Osceola Planning
15  Commission, short-term rentals began to be
16  authorized?
17    A. It's my understanding that took place.
18    Q. Can you turn to the third page entitled
19  Osceola County, Florida Planning Agenda 2007?
20    A. Yes.
21    Q. You see there's a request -- on the first
22  page there's a request concerning changing 488
23  dwelling units from long-term rental to short-term
24  rental?
25    A. Yes.

Page 75

1    Q. If you turn, then, to the back page of this
2  Exhibit -- actually, it's the not the back page, turn
3  the page so it's over -- right. Okay. Do you see on
4  the top there it says "P.C. Action"?
5    A. Yes.
6    Q. "Approval subject to standard and/or special
7  conditions"?
8    A. Yes.
9    Q. Okay. Does this refresh your memory as to
10  approximately when the planning commission approved
11  the request to change the classification for Legacy
12  Dunes from 488 -- Legacy Dunes from long-term to
13  short-term?
14    A. Yes.
15    Q. And you see on the facing page, the one, two,
16  three, fourth item down?
17    A. Yes.
18    Q. It refers to Legacy Dunes Condominium
19  Association, Inc. "Applicants, various owners
20  request to amend planned development by changing 488
21  dwelling units from long-term to short-term rental."
22    A. Yes.
23    Q. On the last sentence it says, "This request
24  is scheduled to be heard by the board of county
25  commissioners at their August 13, 2007 meeting."

Page 76

1    A. Yes.
2    Q. And does this refresh your recollection as to
3  when the board of county commissioners took up what
4  had been approved at the planning commission with
5  respect to changing the classification to short-term
6  rental?
7    A. I assume so.
8    Q. So then it appears that -- while I don't have
9  it here, it appears that the earliest approval from
10  the county commissioners would have been the
11  August 13th, 2007 meeting, would that appear to be
12  accurate?
13    MR. GORE: Object to the form of the
14  question. You can answer if you know.
15    A. If that's what you say. I don't know.
16  BY MR. ROTHMAN:
17    Q. Based on what you see here?
18    A. I really don't know what any of that means,
19  so.
20    Q. All right. We do know that there was in a
21  number of documents that were presented to and signed
22  by purchasers at Legacy Dunes statements that
23  indicated that there would be, at least sometime in
24  the future, the possibility to rent their units on a
25  short-term basis?

Page 77

1    A. What you have shown me says, "short-term
2  pool -- short-term rental pool, whichever comes
3  first."
4    Q. Okay.
5    A. I'm assuming it's referring to whichever
6  comes first.
7    Q. You would agree with me that it wouldn't be
8  in the documents at all if it wasn't even a
9  possibility of it; it was something that was
10  contemplated, maybe not immediately, but sometime in
11  the future?
12    A. Sure.
13    Q. In fact, isn't it the case a number of
14  purchasers were provided with a guarantee that they
15  would be able to rent their units by means of a
16  short-term rental pool within a particular period of
17  time, and if that wasn't possible, then DRG would pay
18  them a refund of $25,000?
19    A. Yes.
20    Q. And.
21    (Thereupon, Exhibit 35 was marked for
22  identification.)
23  BY MR. ROTHMAN:
24    Q. Let me show you Exhibit 35. Take a look at
25  Short-Term Rental, that provision is there right in

20 (Pages 74 to 77)

35526740-b77b-46b9-b755-cc4b4efb9489

Page 78

1    the document Lubomski 000307, correct?
2        A. Yes.
3        Q. This has got a signature of Joe and Karen
4    Lubomski who purchased several units at Legacy Dunes.
5    The date on this is May 18th, 2006, right?
6        A. Yes.
7        Q. And on May 18th, 2006, it appears that
8    they've signed an agreement where -- that provides
9    short-term rental, "The developer acknowledges the
10   intent of purchaser to place the unit associated with
11   this purchase agreement into a short-term rental
12   pool. Should the Osceola County, Florida zoning
13   classification associated with Legacy Dunes
14   Condominium not allow for short-term rental within
15   120 days of the closing of this purchase agreement,
16   developer will refund $25,000 to purchaser."
17       So was it, then, your understanding and DRG's
18   understanding that if this purchaser of this unit
19   that this page of the contract refers to not be
20   allowed to place the unit into a short-term rental
21   pool within 120 days of their closing because the
22   zoning classification didn't allow for it, then the
23   Lubomski's would be entitled to $25,000 from the
24   developer?
25       MR. GORE: Object to the form of the

Page 79

1    question. You can answer if you know.
2        A. I don't really know.
3    BY MR. ROTHMAN:
4        Q. Do you know if DRG paid any of the purchasers
5    who had this clause in their contracts $25,000?
6        A. I don't know.
7        Q. Do you know whether the 120 day deadline
8    that's provided here was complied with?
9        MR. GORE: Object to the form of the
10   question.
11       A. I don't know.
12   BY MR. ROTHMAN:
13       Q. Okay. I asked you earlier about pricing, and
14   you said that prices varied based upon the different
15   stages that the development went through?
16       A. Phases.
17       Q. Phases?
18       A. Phase price.
19       Q. P-H-A-S-E?
20       A. Yes.
21       Q. Phase price?
22       A. Yes.
23       Q. You may want to lower your hand so I can hear
24   you better and the reporter can take it down.
25       A. Sorry.

Page 80

1        Q. It's okay.
2        So other than the changes in pricing based
3    upon different phases that the development went
4    through, is it your understanding that there were no
5    other fluctuations in price that that would be the
6    only reason a price on a particular unit would be
7    different from the price on the identical same unit?
8        A. No.
9        Q. So what other reason -- what reason would
10   account -- and let's do it this way so we can compare
11   apples to apples. There were how many different
12   models, sizes, styles -- I'm not sure what term you
13   prefer -- of units at Legacy?
14       A. I can't remember.
15       Q. Well, there were one bedroom, there were two
16   bedroom, there were three bedroom, and there were
17   four bedroom, right?
18       A. Yes.
19       Q. Not all one bedrooms were the same square
20   footage?
21       A. No. I don't think so, no.
22       Q. There were some that were more and some that
23   were less?
24       A. Yes.
25       Q. Okay. And was the same thing true of the two

Page 81

1    bedrooms and the three bedrooms and the four
2    bedrooms?
3        A. I think -- I don't know. I know there were
4    some different ones. I don't know if all had
5    different ones. I can't really remember.
6        Q. Okay.
7        A. I know there were some different ones.
8        Q. Let's say for the sake of argument that there
9    were two units available to purchase at Legacy that
10   were identical in all respects: They had the same
11   views because the buildings were side by side and
12   they looked out the same way, they were the same
13   number of bedrooms, they were the same square
14   footages, same amenities, the layout was exactly the
15   same, okay?
16       A. Okay.
17       Q. That was true for a variety of units at
18   Legacy, wasn't it?
19       A. Probably.
20       Q. Yeah. It would be possible to have two
21   units, you know, they could never be a hundred
22   percent identical, but they were so close to being
23   exactly the same that you could compare one to the
24   other and you could say it's basically the same unit?
25       A. Yes.

35526740-b77b-46b9-b755-cc4b4efb9489

Page 82

1    Q.  Okay.  Now, other than the different phases,
2    all right, is there any reason why a price for one of
3    these identical units would ever be different than
4    the other?
5    A.  Well, other than phase, we negotiated with
6    many of our brokers on different commission
7    percentages.  So that could have affected the price.
8    Q.  That's what I was asking about.
9        I was asking you earlier about is there a
10   reason why the prices paid by the purchasers of
11   Legacy Dunes units who bought through The Mortgage
12   Exchange was more than the prices paid by others for
13   identical units in -- who didn't bill through The
14   Mortgage Exchange, okay, and you just answered
15   phases.  But now you told me another possible reason.
16   And that is there was a commission negotiated with
17   respect to the sales that might have increased the
18   sales price as a result.  Did I understand you
19   correctly?
20   A.  The increase in the price could have been
21   because of commissions.  The units sold at the same
22   price as you're referring to, were sold in the final
23   phase at those pricing, same pricing.  So I don't
24   know if earlier phase pricing were fluctuating
25   because of that, but final phase pricing was across

Page 83

1    the board the same price.
2    Q.  In fact, a number -- I can't recall if it was
3    eight or ten, but a number of final phase priced
4    units were purchased by the Real Estate Dreams guys,
5    Sean and Jay, right?
6    A.  I know they bought some.
7    Q.  They bought some at those final phase prices?
8    A.  I don't know what they paid.
9    Q.  But I'm not talking about that.  What I'm
10   talking about is if I live in Seattle and I don't --
11   I'm nowhere near The Mortgage Exchange and I find out
12   about the Legacy Dunes unit through an M-5
13   presentation and I'm given a price, and the identical
14   unit is sold to a purchaser who learned about it and
15   bought through The Mortgage Exchange, at the same
16   time the price that The Mortgage Exchange purchaser
17   paid is higher.  The reason for that, as I understand
18   your testimony, is because of commissions that were
19   negotiated on the sale of that unit which raised the
20   price?
21   A.  No.
22   Q.  Then why is the price higher?
23   A.  I don't know.
24   Q.  All right.
25      (Thereupon, Exhibit 36 was marked for

Page 84

1    identification.)
2    BY MR. ROTHMAN:
3    Q.  Exhibit 36.  I'll show you 36.
4        Did you ever see this January 27th, 2009 memo
5    before?
6    A.  It doesn't look familiar.
7    Q.  All right.  Who is Susan Lesczensky,
8    L-E-S-C-Z-E-N-S-K-Y?
9    A.  She was an employee of DRG.
10   Q.  Is she any longer?
11   A.  No.
12   Q.  Regarding Legacy Dunes contract and the To is
13   Sean Parkes.  Sean was one of the gentleman with Real
14   Estate Dreams we were just talking about, right?
15   A.  Yes.
16   Q.  "Please note that this pricing is different
17   from the pricing negotiated with The Mortgage
18   Exchange."
19      Do you know why it was that this pricing,
20   which appears to be referring to pricing on a unit at
21   that time in January of '09, was different from
22   pricing negotiated with The Mortgage Exchange?
23      MR. GORE:  For purposes of the record, the
24   document bearing the date January 27, '09 is only
25   because that was the date this document was

Page 85

1    printed.  The January 27, '09 is a field --
2       MR. ROTHMAN:  It's automatic numbering
3    function?
4       MR. GORE:  Automatic numbering from the
5    field.
6    BY MR. ROTHMAN:
7    Q.  Let me ask the witness if he knows what the
8    correct date of this document would be?
9    A.  I don't recall ever seeing this document.
10   Q.  Okay.
11      MR. GORE:  For the purposes of the record, I
12   know that to be the case because we produced this
13   document.  And I recall that there were a few
14   documents that we had only in electronic format.
15   And the electronic format of the Word document
16   when it was scanned when you print it, it's a
17   prepopulated field for the date.  And also that
18   and the fact that HOA fees being waived until
19   July 1, 2007 is a condition that wouldn't make a
20   whole lot of sense.
21      MR. ROTHMAN:  I agree with that.  Will you be
22   willing to produce the original native version of
23   this document so that we can look at the --
24      MR. GORE:  To the extent it exists.
25      MR. ROTHMAN:  -- and determine -- it must

35526740-b77b-46b9-b755-cc4b4efb9489

Page 86

1    exist. You printed it.
2       MR. GORE: We'll find out when the document
3    is created and let you see that information.
4       MR. ROTHMAN: If you just e-mail me the
5    document, then I can figure it out.
6       MR. GORE: I thought that's what I did. You
7    probably have it.
8       MR. ROTHMAN: No. We just have a PDF format.
9       MR. GORE: There were some with Word and some
10   with Excel.
11      MR. NISONSON: I can check it to see.
12      MR. GORE: We can talk about it off the
13   record as well. I'm happy to provide it.
14      MR. ROTHMAN: That's fine.
15   BY MR. ROTHMAN:
16      Q. So you see the how it indicates there that --
17   a number of factors which Ms. Lesczensky appears to
18   be referring to as being reasons why pricing on a
19   unit is different from pricing through The Mortgage
20   Exchange?
21      A. Yes.
22      Q. Are any of these criteria that are listed
23   here reasons why pricing for units purchased through
24   The Mortgage Exchange would have been more than ones
25   purchased by other people in different parts of the

Page 87

1    country?
2       A. I don't know.
3       Q. Okay. You can't explain it one way or the
4    other?
5       A. No.
6       Q. Is there anybody besides yourself who had --
7    at DRG who was involved with setting the sales prices
8    of the units?
9       A. I didn't really have much to do with setting
10   the prices.
11      Q. Okay. So who did that?
12      A. Probably Michael and Tim.
13      Q. So I need to ask them?
14      A. Yes.
15      Q. Okay. Do you remember ever receiving
16   complaints through the Better Business Bureau from
17   Legacy Dunes purchasers?
18      A. I do not.
19      Q. Okay. Do you remember responding to
20   complaints?
21      A. I don't remember.
22      Q. No recollection?
23      A. No.
24      Q. Okay.
25      (Thereupon, Exhibit 37 was marked for

Page 88

1    identification.)
2    BY MR. ROTHMAN:
3       Q. I'll show you Exhibit 37. Do you recall this
4    document?
5       A. Nope.
6       Q. It's your signature on the bottom, isn't it?
7       A. Appears to be.
8       Q. Is that your actual physical signature or did
9    someone use your stamp like Ms. Moore had happen to
10   her earlier today?
11      A. That's very likely what happened.
12      Q. Do you have a stamp with your signature on it
13   that's kept around the DRG offices, wherever they
14   happen to be at the moment?
15      A. Yes.
16      Q. Did you ever get that stamp back or do they
17   still have it?
18      A. I have it.
19      Q. You have it back?
20      A. I don't personally have it. I think it
21   was -- when they cleaned out the office it was
22   disposed of.
23      Q. Okay.
24      A. That's what I was told.
25      Q. Was it kept in a safe place when it was in

Page 89

1    the office?
2       A. I assume so.
3       Q. Was anybody authorized to use it?
4       A. I think Susan was authorized to use it.
5       Q. Would she have to check with you first before
6    she stamped something?
7       A. I don't know.
8       Q. Do you have signatory authority on the DRG
9    checkbook?
10      A. Yeah, I think I did.
11      Q. Okay. Would it be important to make sure a
12   stamp with your signature on it was kept in a safe
13   place and not used without your authorization?
14      A. Yeah, it would probably be important.
15      Q. You think someone contacted you first and
16   said, Take a look at this letter. Is this okay? Can
17   we put your stamp on it?
18      A. I don't know.
19      Q. Okay. You see the first paragraph refers to
20   a complaint by Mr. Lubomski. And about the middle of
21   the paragraph it says, "DRG does serve in the
22   capacity of managing member of the Legacy Dunes
23   project."
24      Do you see that?
25      A. Yes.

23 (Pages 86 to 89)

35526740-b77b-46b9-b755-cc4b4efb9489

Page 90

1    Q.  And it says, "Secondly, Mr. Lubomski
2  identifies Ryan Reinke as sales person for these
3  units, which is not true."
4       Who is Ryan Reinke?
5    A.  Ryan Reinke is the guy over there.
6    Q.  Oh, there he is.
7       MR. ROTHMAN: I didn't know your name was
8  spelled that way.
9  BY MR. ROTHMAN:
10   Q.  So Mr. Reinke -- now I understand he's CFO of
11  DRG; is that right?
12   A.  I think that's his title.
13   Q.  And was he CFO then as well, back in March of
14  '08?
15   A.  I would say assume that's what we called him.
16   Q.  Okay.  Have you ever called him anything
17  else?
18   A.  Not for this discussion.
19   Q.  Not that you could put on the record.  Okay.
20      It says, "Mr. Lubomski entered into his
21  contracts with Legacy Dunes through Real Estate
22  Dreams LLC, his licensed Florida real estate broker."
23      Do you see that?
24   A.  Yes.
25   Q.  Is it your position that Real Estate Dreams

Page 91

1  was Mr. Lubomski's real estate broker in this
2  transaction?
3    A.  They were the real estate agents that were
4  presenting the property to him.  So I would assume
5  so.
6    Q.  They were the agents presenting the property?
7  They were there in Chicago, at least Jay was?
8    A.  Um-hmm.
9    Q.  Right?  The day when the presentation was and
10  they were down on the floor below with you picking
11  out the keys and all the rest of that?
12   A.  Yes.
13   Q.  Okay.  And they had an agreement with DRG
14  about commissions that they would be paid on those
15  sales, right?
16   A.  Yes.
17   Q.  And they were listed in the closing documents
18  for all these sales as being paid commissions,
19  marketing fees and the like in connection with the
20  sales of these units, right?
21   A.  Yes.
22   Q.  And on -- have you ever seen a HUD from a
23  sale of a Legacy Dunes unit?
24   A.  I probably have.
25   Q.  So if you have seen the HUD, you'll recall

Page 92

1  that on the second page of the HUD on the top it
2  indicated that Real Estate Dreams is the seller's
3  broker?
4    A.  I don't recall.  If you say so.  Unless you
5  can show it to me I -- I don't recall, but if you're
6  saying it is.
7    Q.  Okay.  So knowing all of that, is it still
8  your position that Real Estate Dreams was
9  Mr. Lubomski, a purchaser, Florida real estate
10  broker?
11   A.  I really don't know.
12   Q.  Okay.  The second paragraph refers to issues
13  concerning repairs that were required to be made
14  after the closing in order to make the units rent
15  ready.
16      Do you see that?
17   A.  Yes.
18   Q.  About the middle of the paragraph there's a
19  statement that says, "Mr. Lubomski's statement that
20  unit inspections were impossible at the time of the
21  closing because these units had tenants living in
22  them is not true."
23      Do you see that?
24   A.  Yes.
25   Q.  The tenants that were living in the units at

Page 93

1  the time of the closing were long-term tenants,
2  correct?
3    A.  Yes.
4    Q.  And to make those units rent-ready they -- if
5  they already have tenants living in them, wouldn't
6  those tenants need to leave, right?
7    A.  I don't know.
8    Q.  Well, if the tenants are already in the unit
9  and the unit needs to be made rent-ready, doesn't
10  that imply that the existing tenant's lease has run
11  out and they vacated the premises so a new tenant can
12  come in?
13      MR. GORE:  Object to the form of the
14  question.  You can answer if you know.
15   A.  I don't know.
16  BY MR. ROTHMAN:
17   Q.  Do you know anything about arrangements or
18  requirements to fix these units up after the existing
19  tenants vacated in order that the units could be
20  rerented?
21   A.  I really don't.
22   Q.  Who would be the person who was involved with
23  that?
24   A.  Probably Mike or Tim.
25      (Thereupon, Exhibit 38 was marked for

35526740-b77b-46b9-b755-cc4b4efb9489

Page 94

1   identification.)
2   BY MR. ROTHMAN:
3       Q.  Okay.  Exhibit 38 is a letter dated
4   April 4th, 2008 on DRG letterhead?
5       A.  April 14th.
6       Q.  April 14th, sorry, 2008?
7       A.  Yes.
8       Q.  At the bottom is there another appearance of
9   your signature stamp?
10      A.  Appears to be.
11      Q.  Do you have any specific recollections
12  regarding approving this letter to be signed and
13  stamped by you?
14      A.  I don't recollect.
15      Q.  Okay.  Do you see the fifth line down it
16  begins, "At the request of the Mr. Bartels' broker
17  Addendum W"?
18      A.  First paragraph or second?
19      Q.  Second paragraph.
20      A.  Yes.
21      Q.  "At the request of the Mr. Bartels broker
22  Addendum W was included in this contract and extended
23  the right of inspection for 30 days post-closing, as
24  the Bartels were out of state and needed additional
25  time to complete the unit inspections."

Page 95

1       Do you know who this is referring to when it
2   says, "at the request of the Mr. Bartels' broker"?
3       A.  No.
4       Q.  Okay.  Take a look at 39 for me.
5       (Thereupon, Exhibit 39 was marked for
6   identification.)
7   BY MR. ROTHMAN:
8       Q.  Do you have any specific recollection about
9   this letter?
10      A.  No.
11      Q.  Do you have any recollection of anyone asking
12  you is it okay for us to stamp your signature stamp
13  on this one?
14      A.  I don't recollect.
15      Q.  Any memory of any issues concerning
16  Mr. Hart's request to be reimbursed for a rent-ready
17  repairs almost a year and a half after he purchased
18  his unit?
19      A.  It doesn't ring a bell.
20      Q.  No.  Okay.  All right.
21      Now, when you're a licensed real estate agent
22  you have to, I guess, have your license associated
23  with a -- or not necessarily you have to, but
24  sometimes you'll associate your license with a
25  particular realty company?

Page 96

1       A.  Yes.
2       Q.  Is yours associated with The Wear Group
3   Realty, Inc.?
4       A.  I don't know.
5       Q.  Okay.  Admittedly it's not the most current,
6   but take a look at 40 for me.
7       (Thereupon, Exhibit 40 was marked for
8   identification.)
9   BY MR. ROTHMAN:
10      Q.  Is The Wear Group Realty, Inc. your father's
11  business you referred to earlier?
12      A.  Yes.
13      Q.  On the next page you see there's a number of
14  licenses and one of them, the second from the bottom,
15  is 634966, James Edward Wear, Junior; is that you?
16      A.  Yes.
17      Q.  Who is Sherry Wear, is that your wife?
18      A.  Yes.
19      Q.  James Edward Wear, is that your father?
20      A.  Yes.
21      Q.  And do you have a brother named Kevin Wear?
22      A.  Yes.
23      Q.  Is he a real estate agent too?
24      A.  I don't know.
25      Q.  Okay.  And is this still where you're license

Page 97

1   is associated with, The Wear Group Realty?
2       A.  I don't know.
3       Q.  You don't know?
4       Do you have any reason to believe it's
5   changed since the date of this printout, which is
6   September of '08?
7       A.  I thought it was inactive.
8       Q.  You're not selling real estate anymore, just
9   doing the food sales?
10      A.  Yes.
11      Q.  Any reason why other than the real estate
12  market?  Sorry to be obvious.
13      A.  I think it was up for renewal or something
14  and no reason to keep it active.
15      Q.  Up for renewal and you let it lapse?
16      A.  Something like that.
17      Q.  Now, do you know if The Wear Group maintained
18  a website?
19      A.  I believe that -- yes.
20      Q.  Do you know if you were ever listed on the
21  website?
22      A.  I think they put me up there at one point and
23  I had it taken down.
24      Q.  Do you know if they put you up there and
25  listed you as a principal?

25  (Pages 94 to 97)

35526740-b77b-46b9-b755-cc4b4efb9489

Page 98

1    A.  I can't remember what it said.  Whatever it
2  said I had them take it down.
3    Q.  Why did you have them take it down?
4    A.  Because I wasn't part of the company.
5    Q.  Okay.  Were you ever part of the company?
6    A.  No.
7    Q.  Did you ever sell any real estate on behalf
8  of The Wear Group?
9    A.  Not that I can recall.
10    Q.  Did you ever sell any units in Vista Cay?
11    A.  No.
12    Q.  Do you know if your dad ever sold units in
13  Vista Cay?
14    A.  I think he did.
15    Q.  So just to be clear with respect to Vista
16  Cay, you had absolutely no involvement?  James Wear,
17  if any, associated with any sales of Vista Cay is
18  your father and not you?
19    A.  That's correct.
20    MR. ROTHMAN:  Why don't we take a quick
21  break.
22    (Short break.)
23  BY MR. ROTHMAN:
24    Q.  After the presentation in Chicago downstairs
25  on the eighth floor you had a few brief conversations

Page 99

1  with some of the purchasers.  Did you ever have
2  occasion to speak to those individuals who
3  purchased units in Legacy Dunes through The Mortgage
4  Exchange or the Real Estate Investment Group again?
5    A.  Not that I remember.
6    Q.  Did you ever get any phone calls, e-mails,
7  correspondence of any kind from any of the purchasers
8  of units at Legacy Dunes indicating, suggesting, or
9  claiming in any way that the securities laws may have
10  been violated in connection with the sales prior to
11  your receipt of the complaint in this case?
12    A.  No.
13    Q.  Did you ever hear anyone say to you at any
14  point from the time that you first heard the words
15  Legacy Dunes until the time that you saw the
16  complaints in this case that there may be an issue
17  with the securities laws in connection with the sales
18  of units at Legacy Dunes that you need to be careful
19  about?
20    A.  No.
21    Q.  So at no point during that time did anybody
22  say to you that the securities laws may be a
23  potential issue, be careful not to say certain things
24  in connection with your sales or marketing of the
25  units?

Page 100

1    A.  No.
2    Q.  Had you ever heard at any time prior to
3  receiving the complaint in this case that the
4  securities laws could apply to the sales of real
5  estate under certain circumstances?
6    A.  No.
7    Q.  So this was completely new to you when you
8  saw the complaint in this case?
9    A.  Yes.
10    Q.  Were you ever privy to any communications,
11  telephone, e-mail, whatsoever, any communications at
12  all with anyone who had purchased or anyone who was
13  acting on behalf, as you understood it, a purchaser
14  trying to resolve issues dealing with problems at
15  Legacy Dunes that had developed?
16    A.  No.
17    Q.  Okay.  Let me give you a for example so we
18  can be sure that we're not missing anything.  You
19  were at Maureen Phillips's deposition?
20    A.  Yes.
21    Q.  Did you ever have conversations with Maureen
22  Phillips at any time after the closings of the units
23  at Legacy Dunes in which you discussed problems that
24  were being encountered by purchasers, such as the
25  inability to rent the units, the inability to obtain

Page 101

1  income from the units, anything like that?
2    A.  No.
3    Q.  Do you know if anybody else at DRG had
4  conversations such as that?
5    A.  No.
6    Q.  Okay.  But you were not involved in any
7  communications of that nature at all?
8    A.  No.
9    Q.  Was that because -- well, withdrawn.
10    Did anyone ever bring to your attention that
11  complaints were being made by purchasers at Legacy
12  Dunes about things like the short-term rental program
13  not working, not being able to obtain enough income
14  from short-term rentals, representations being made
15  that had been made to them were not coming to
16  fruition, anything of those sorts?
17    A.  No.
18    Q.  Did there come a time that you kind of pulled
19  out and were no longer involved in the sales and
20  marketing of Legacy Dunes units?
21    A.  No.
22    Q.  You have always been involved since day one
23  when DRG started working on the conversion through
24  today?
25    A.  We have some units still for sale.  So I

26 (Pages 98 to 101)

35526740-b77b-46b9-b755-cc4b4efb9489

Page 102

1    would love to sell them.
2       Q. So you would still get involved with selling
3    them if there were somebody willing to buy them?
4       A. Sure.
5       Q. Do you recall by what date it was the last
6    significant group of sales of Legacy Dunes units
7    closed?
8       A. I don't.
9       Q. You don't?
10      Would it have been sometime in 2007 or was it
11   in 2008 that short-term rentals happened?
12      A. I'm not sure.
13      Q. You're not sure.
14      Were the majority of units sold in 2006?
15      A. I'm not sure.
16      Q. You don't know. Okay.
17      All right. Who would have the statistics
18   about that?
19      A. Mike and Tim.
20      Q. Okay.
21      A. Or Tim. One of them.
22      Q. One of the two, okay.
23      Did you have a marketing budget for Legacy?
24      A. Not that I remember.
25      Q. Okay. Anybody ever tell you, Jim, you have

Page 103

1    this much money to spend on the sales and marketing
2    of Legacy units, you know, go out there and do it
3    however you want to do it, print, e-mail, web,
4    whatever?
5       A. Not that I recall.
6       Q. Okay. Did The Mortgage Exchange ever ask DRG
7    to contribute any money to a fund to support the
8    marketing of Legacy Dunes units?
9       A. Not to my knowledge.
10      Q. Okay. Other than what it cost you to get on
11   the plane, stay in a hotel room, and go up to Chicago
12   those two times that you described, did DRG spend any
13   other funds in connection with the marketing of
14   Legacy Dunes units to the individuals who purchased
15   those units through The Mortgage Exchange?
16      A. Not that I know of.
17      (Thereupon, Exhibit 41 was marked for
18   identification.)
19   BY MR. ROTHMAN:
20      Q. Take a look at Exhibit 41. I'll represent to
21   you we were given the pages in 41 -- there's a number
22   of different items -- by your counsel as part of the
23   discovery in this case.
24      It looks like the first page DRG 00192 and
25   193 are a Cooperative Marketing Agreement, do you see

Page 104

1    that?
2       A. Yes.
3       Q. What's a cooperative marketing agreement?
4       A. I don't know.
5       Q. The second page has a line for your signature
6    as authorized agent?
7       A. Yes.
8       Q. You've never seen document called Cooperative
9    Marking Agreement like Exhibit 41 before?
10      A. No.
11      Q. Do you know who Skyline Properties Limited
12   is?
13      A. I have heard the name David Lamm. I don't
14   know if that's the name of his company.
15      Q. Who is David Lamm?
16      A. I think he's a real estate guy.
17      Q. A real estate agent?
18      A. I'm not sure what his status is. I know he's
19   in the real estate industry.
20      Q. Do you know what he does in the real estate
21   industry?
22      A. He sells -- he tries to sell real estate. I
23   don't know what he's licensed. I know he's a guy
24   that talks about real estate. I think I talked to
25   him a couple of times.

Page 105

1       Q. If he sells real estate, he has to be a real
2    estate agent or a real estate broker, right?
3       A. I don't know.
4       Q. In order to legally sell real estate, you
5    need to have a license?
6       A. He may own a company and have realtors that
7    works for him.
8       Q. One of those things? He's in the business --
9       A. He's in the real estate business. That's all
10   I know.
11      Q. Okay. Do you know if Legacy Dunes
12   Condominium LLC ever entered into an agreement with
13   David Lamm for David Lamm to market Legacy Dunes
14   Condominium units and in exchange, in connection with
15   any sales, Legacy Dunes would pay David Lamm and his
16   company a fee?
17      A. I don't know if there was an agreement. I
18   know I talked to him a couple of times and he was
19   interested in selling some units and buying some
20   units himself.
21      Q. If you look the third page DRG00194, do you
22   see on the bottom there there's your signature?
23      A. Yes.
24      Q. Is that your written signature or is that
25   your stamp again?

27 (Pages 102 to 105)

35526740-b77b-46b9-b755-cc4b4efb9489

1    A. Appears to be a stamp.
2    Q. Do you see that this is a signed lease --
3  from David Lamm's perspective -- a signed version of
4  the same contract we were looking at?
5    A. Yes.
6    Q. Does this refresh your memory as to whether
7  there was an agreement entered into for David Lamm to
8  market Legacy Dunes units?
9    A. I assume he was.
10   Q. Do you know if he sold Legacy Dunes units?
11   A. I don't know.
12   Q. You don't know.
13      The next page, 196. This appears to be an
14  agreement with Jacqueline Wear. Is that your mom?
15   A. Yes.
16   Q. And do you know if your mom, on behalf of
17  Wear Group Realty, entered into an agreement with DRG
18  or Legacy Dunes Condominium LLC to market units and
19  be paid a commission in connection with any sales?
20   A. I assume so.
21   Q. Okay. Do you know if she sold any units?
22   A. Well, my dad was a realtor for her brokerage.
23   Q. Did your dad sell units?
24   A. I think he.
25   Q. Other than that -- the finders fee?

1    A. The referral fee?
2    Q. Yeah. Referral fee.
3    A. I don't know.
4    Q. Do you see two pages later, DRG 182?
5    A. Yes.
6    Q. We've got number of other individuals
7  involved here. Ever hear of Andres Zamudio and
8  Fernando Zapata?
9    A. I know I have heard of A to Z Realty.
10   Q. Okay.
11   A. I think that guy had a nickname or something.
12   Q. Do you remember what it was?
13   A. Nope.
14   Q. Do you know if A to Z Creative Realty sold
15  any Legacy Dunes units?
16   A. I think they did.
17   Q. And according to this document they were
18  entitled to a percentage commission on the said
19  sales?
20   A. If that's what it says.
21   Q. If you skip down to DRG 00186, this appears
22  to be a marketing agreement between Legacy Dunes
23  Condominium LLC and Global Equity Management
24  Solutions LLC, do you know who they are?
25   A. It doesn't ring a bell.

1    Q. Do you see like three pages later it referred
2  to as the Marketer, and it says, "Global Equity
3  Management Solutions LLC by Parks and Holly LLC,
4  manager Sean C. Parkes"?
5    A. Yes.
6    Q. Is that one of Sean Parkes' companies?
7    A. I don't know.
8    Q. We know he was involved with Real Estate
9  Dreams, right?
10   A. I believe so.
11   Q. Okay. Do you know if apart from Real Estate
12  Dreams if other companies owned by Mr. Parkes and
13  Holly, Global Management Solutions ever earned a
14  commission on the sales of Legacy Dunes units?
15   A. I don't know.
16   Q. Okay. Do you see on the second to last page
17  there's a cooperative marketing agreement with Maria
18  Henry of Vend LLC. Have you ever heard of her?
19   A. Yes.
20   Q. Did she ever sell any Legacy Dunes units?
21   A. I don't know.
22   Q. What is it you know about her? How did you
23  hear her name?
24   A. Michael said her name once.
25   Q. Okay. Do you know if the agreement was

1  ever -- this is an unsigned agreement. Do you know
2  if there was ever a version of this that was signed?
3    A. I don't know.
4    Q. Okay. Would you agree with me that it
5  appears a number of other companies and individuals,
6  apart from The Mortgage Exchange and Real Estate
7  Investment Group, appear to have worked with Legacy
8  Dunes Condominium LLC, and by extension DRG, in
9  connection with sales of units at Legacy Dunes?
10   A. Yes. We worked with other groups.
11   Q. And so then and this was -- you were the --
12  in charge of the sales and marketing, you knew that
13  you would need to depend on these other groups to do
14  what they could in order to make sales of these units
15  because ultimately that's what you were trying to
16  accomplish?
17   A. We worked with several different brokers and
18  realtors to try to sell out Legacy.
19   Q. You came close to selling it out?
20   A. Yes.
21   Q. How much units left? Just a few?
22   A. Not that many.
23   Q. Fewer than ten, I think, right?
24   A. I don't know.
25   Q. Out of 488, there's ten units left. That's

35526740-b77b-46b9-b755-cc4b4efb9489

Page 110

1  pretty good in this environment?
2     A.  I would say that's pretty good, but it wasn't
3  this environment.
4     Q.  Right.  It was a different environment?
5     A.  Yes.
6     Q.  Okay.  Do you know how much revenue -- I'm
7  not asking -- understand what my question is here.
8  I'm not going to ask for profit, but there were costs
9  involved, certainly, to DRG in terms of acquiring the
10  property, right?
11     A.  Yes.
12     Q.  And debt service on financing on the
13  property?
14     A.  Yes.
15     Q.  When the cost of acquisition and the
16  financing and the debt service on the property are
17  deducted from the amount of money that was revenue
18  that was received by DRG for sales of units at Legacy
19  and also the amount you had to pay out in
20  commissions, do you know how much was left?
21     A.  I don't.
22     Q.  Okay.  Do you know if DRG made a profit?
23     A.  Yes.
24     Q.  On Legacy?
25     A.  I think we did.

Page 111

1     Q.  Do you know how much?
2     A.  I don't.
3     Q.  I think I asked you earlier about what
4  distributions you had received, and I think you said
5  you didn't recall?
6     A.  I don't remember.
7     Q.  Do you know if Legacy was more profitable or
8  less profitable than Clear Lake?
9     A.  I don't know.
10     Q.  How about Uptown Place?
11     A.  DRG didn't have anything to do with Uptown.
12  I think I corrected that.  That was, I think, before
13  we formed DRG.
14     Q.  Oh, I thought it was that Tim Tinsley didn't
15  have anything to do with it?
16     A.  No.  I think it was formed after when Tim
17  came on board.  I remember it being Uptown something,
18  but I don't know.
19     Q.  All right.  I have seen it on your website.
20        So I guess when you had said Tim didn't have
21  anything to do with it, I thought what you meant by
22  that was that there was some agreement between you
23  and Mr. Halpin about how the profits concerning
24  Uptown Place were going to be divided, and that
25  because Mr. Tinsley wasn't involved in it, that he

Page 112

1  wasn't entitled to any share of the profits.  Did I
2  misunderstand you?
3     A.  That was correct, but I don't know if DRG was
4  formed at that point.  It's easy to find out.
5     Q.  Okay.  So I think you said -- did you tell me
6  whether Legacy was more or less profitable than Clear
7  Lake?
8     A.  I said I don't know.
9     Q.  Who would have all the information about how
10  much -- how profitable Legacy was and what was paid
11  to the owners of DRG in terms of distributions and
12  profits from its business?
13     A.  I guess our accountant.
14     Q.  Your accountant?
15     A.  Um-hmm (nodding head).
16     Q.  Is that also information that's kept by
17  Mr. Halpin or Mr. Tinsley?
18     A.  I don't know.
19     Q.  How about your CFO, does he have that?
20     A.  I don't know.
21        (Short break.)
22  BY MR. ROTHMAN:
23     Q.  Did you do any research on Joe or Mortgage
24  Exchange before you went up to meet with them that
25  first time?

Page 113

1     A.  I can't remember.
2     Q.  Okay.  Did anybody do any background checking
3  on him?
4     A.  I can't remember.
5     Q.  Did you know if he had ever been the subject
6  of an investigation for securities violations in
7  Canada?
8     A.  I did not know that.
9     Q.  Take a look at Phillips -- it's part of
10  Exhibit 1, Phillips 00117.  And the page following
11  that is -- it just said Sal on it.
12     A.  Okay.
13     Q.  Do you see at the top of 00117 one of the
14  e-mail addresses listed is JimWear at yahoo dot com?
15     A.  Yes.
16     Q.  Is that your e-mail?
17     A.  Yes.
18     Q.  Do you recall receiving an e-mail on June 21,
19  '06 from Maureen Phillips regarding Legacy with an
20  attachment called association dot doc, the e-mail
21  said, "Talking Points for Today"?
22     A.  I do not.
23     Q.  If you turn the page, do you recall ever
24  seeing this document, which appears to be the
25  association dot doc document that was attached to the

U.S. Legal Support
(561) 835-0220

35526740-b77b-46b9-b755-cc4b4efb9489

Page 114

1  e-mail?
2    A.  I do not.
3    Q.  Okay.  Do you recall ever having a
4  conversation with Sal Sardinia of Geneva regarding
5  issues like laundry facilities at Legacy, storage
6  space at Legacy, reconfiguring areas of the clubhouse
7  at Legacy, anything like that?
8    A.  No.
9    Q.  Do you recall ever speaking with Sal
10 Sardinia?
11   A.  I think I shook his hand when I was in
12 Chicago once and that's it.
13   Q.  So that was the beginning and end of your
14 conversations with him?
15   A.  Yes.
16   MR. ROTHMAN:  Okay.  All right.  I don't
17 think I have any further questions.
18   MR. GORE:  I don't have any questions.
19   MR. ROTHMAN:  Subject, obviously, to the
20 order in place in this case that restricts our
21 discovery in its initial stages to issues relating
22 to whether or not the plaintiffs were sold
23 securities and any further depositions that might
24 need to take place after that's determined.  Thank
25 you very much.

Page 115

1    MR. GORE:  He'll read.
2    (The deposition concluded at 5:19 p.m.)

Page 116

1            CERTIFICATE
2               - - -
3
   THE STATE OF FLORIDA)
4
   COUNTY OF PALM BEACH)
5
6    I hereby certify that I have read the
7  foregoing deposition by me given, and that the
8  statements contained herein are true and correct to
9  the best of my knowledge and belief, with the
10 exception of any corrections or notations made on
11 the errata sheet, if one was executed.
12
13   Signature of deponent:_____
14   Dated this _____ day of_____, 2009.
15
16
17   The foregoing was acknowledged before me by
18   _____ who is personally known
19 to me or has produced _____ as
20 identification and who did/did not take an oath,
21 this _____ day of_____, 2009.
22
23   _____
     Notary Public
24   My Commission Expires:
25

Page 117

1         CERTIFICATE OF OATH
2              - - -
3
4  THE STATE OF FLORIDA)
5  COUNTY OF PALM BEACH)
6
7    I, Alexa R. Goldman, Notary Public, State of
8  Florida, certify that James Wear, Jr. personally
9  appeared before me on the 12th of March, 2009, and was
10 duly sworn.
11   WITNESS my hand and official seal this 17th day of
12 March, 2009.
13
14
15
16
           _____
17         ALEXA R. GOLDMAN, FPR
           Notary Public, State of Florida
18         My Commission No: DD515295
           Expires: 2/6/10
19
20
21
22
23
24
25

U.S. Legal Support
(561) 835-0220

35526740-b77b-46b9-b755-cc4b4efb9489

Page 118

```
 1        C E R T I F I C A T E
 2            - - -
 3
     THE STATE OF FLORIDA)
 4   COUNTY OF PALM BEACH)
 5
        I, Alexa R. Goldman, Notary Public in and for
 6   the State of Florida at Large, do hereby certify
     that the aforementioned witness was by me first
 7   duly sworn to testify the whole truth; that I was
     authorized to and did report said deposition in
 8   stenotype; and that the foregoing pages are a true
     and correct transcription of my shorthand notes of
 9   said deposition.
10      I further certify that said deposition
     was taken at the time and place hereinabove set
11   forth and that the taking of said deposition was
     commenced and completed as hereinabove set out.
12
        I further certify that I am not attorney
13   or counsel of any of the parties, nor am I a
     relative or employee of any attorney or counsel of
14   party connected with the action, nor am I
     financially interested in the action.
15
        The foregoing certification of this
16   transcript does not apply to any reproduction of
     the same by any means unless under the direct
17   control and/or direction of the certifying
     reporter.
18
        Dated this 17th day of March, 2009.
19
20
21
          _____
22        Alexa R. Goldman, FPR
23
24
25
```

Page 119

```
 1        U.S. Legal Support, Inc.
        Klein, Bury, Reif, Applebaum & Associates, Inc.
 2          444 West Railroad Avenue, Suite 300
              West Palm Beach, FL 33401
 3              561.835.0220
 4   March 17, 2009
     James E. Wear, Jr.
 5   c/o Michael Gore, Esq.
     Shutts & Bowen, LLP
 6   300 South Orange Avenue
     Suite 1000
 7   Orlando, Florida 32802
     RE:  Alunni v. Development Resources Group
 8
     Dear Sir:
 9
        This letter is to inform you that your deposition
10   transcript taken on March 12, 2009 in the
     above-captioned matter is ready for your review.
11
        The transcript will be furnished to you through
12   counsel.  The transcript is 113 pages long, and you
     should allow yourself sufficient time to read the
13   transcript in its entirety
14      Once you have read the transcript and noted any
     changes or corrections on the errata sheet, be sure to
15   sign and date the errata sheet and sign the transcript
     and return these pages.  If you do not read, sign, and
16   return the transcript within 30 days, the original,
     which has already been forwarded to the attorney who
17   ordered your deposition, may be filed with the Clerk of
     the Court.
18
        If you wish to waive your signature, sign your
19   name at the bottom of this letter and return it to us.
     Your prompt attention to this matter is appreciated.
20
21   Cordially yours,
22   Alexa R. Goldman, FPR
23
     cc via transcript: Joel Rothman, Esq.
24        Michael Gore, Esq.
          Anthony Aragone, Esq.
25        Christopher Johnsen, Esq.
```

Page 120

```
 1           ERRATA SHEET
 2   IN RE: Alunni et al v. DRG et al
     DEPOSITION OF: James E. Wear, Jr.
 3   TAKEN: March 12, 2009
 4      DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 5   PAGE # LINE #  CHANGE        REASON
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   Please forward the original signed errata sheet to
     this office so that changes may be distributed to
19   all parties.
20   Under penalty of perjury, I declare that I have
     read my deposition and that it is true and correct
21   subject to any changes in form or substance entered
     here.
22
23   DATE:_____
     SIGNATURE OF DEPONENT:_____
24
25
```

U.S. Legal Support
(561) 835-0220

35526740-b77b-46b9-b755-cc4b4efb9489


PLAINTIFF'S EXHIBIT 70 3-12-09

## 12 Month Cash Flow for Legacy M5

| | AVERAGE PRICE | MINIMUM PAYMENT OPTION* | HELOC* | TOTAL MONTHLY MORTGAGE | EST. HOA | EST. MONTHLY TAXES | DEVELOPER REBATE | REBATE OVER 12 MONTHS | AVG. MARKET RENT | CASH FLOW WITH 10% DOWN | CASH FLOW WITH 20% DOWN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| A2 | $189,500 | $505 | $189 | $694 | $0 | $197 | $17,000 | $1,417 | $805 | $1,330 | $1,519 |

*Payment based on 1.25% Pay-Option arm and 80% LTV.
*Payment based on 10% HELOC. This is a line of credit tied to the Prime Rate. The actual monthly payment can change based on the Prime Rate.

Total monthly mortgage payment = 80% Option-Arm + 10% HELOC. Minimum 10% down payment required.

All figures listed are approximate based on information we have at this time. These figures are subject to change.

# LEGACY DUNES

November 28, 2006

PLAINTIFF'S
EXHIBIT
21
3-12-09  as

Maryann Zaborsky
2626 N. Lakeview #2309
Chicago, IL 60614

Dear Legacy Dunes Homeowner:

Congratulations on your Legacy Dunes Condominium purchase. We hope you are enjoying your new home.

We would like to take this opportunity to outline your options for the Long-Term Rent Guarantee (the "Guarantee") that you received when you purchased at Legacy Dunes. The Guarantee as defined in Addendum C of the Purchase Agreement reads as follows:

> Should your unit be unoccupied at the date of closing or become unoccupied after Closing, Developer will pay to you the rent on the unit at the previously occupied rental rate, less any applicable concession, maintenance or unit turnover costs, until the unit becomes occupied by you the Purchaser, the unit is placed into a short term rental pool, or until June 30, 2007, whichever occurs first.

The intent of the Guarantee is to ensure that if you choose to lease your home for a period of time before you can personally occupy it, the Developer will supplement the lost rent amount not received by you due to a vacancy of your home (subject to the terms of the previous lease agreement on your Legacy Dunes home). If you choose to instruct Sovereign Residential Services LLC ("Sovereign"), as leasing manager, to lease your unit under terms which make it more difficult to enter into a lease, the Guarantee will not be valid. For example: If you authorize or instruct Sovereign to only enter into a 7-month lease (or anything less than a full 12-month term) on your home in order to have it available for short term tenancy in the near future, even though it is allowed by the Declaration of Condominium, the Guarantee will be canceled by the Developer, as 7-month lease terms are not common long term leases in the general market.

Sovereign is required to make every effort possible to secure a tenant for your home. If you choose to make your home available for a short-term leasing scenario or plan to occupy your home and do not wish to have your home bound by a long-term lease, you must notify Sovereign so they can market/lease other homes to prospective tenants. Upon notification from you to Sovereign of your decision to pursue a short term tenant or to personally occupy your new home, Sovereign will notify the Developer of your decision, thereby canceling the Guarantee. **Please note that once the Guarantee has been canceled it will never be reinstated.**

Enclosed you will find a Occupancy/Leasing Intent Election form to be returned to Sovereign indicating your decision relative to your new home. Please return this document in the enclosed self-addressed stamped envelope to Sovereign. If you have any questions regarding this communication feel free to call us at (407) 841-1343. Thank you again for your business.

Sincerely,

Legacy Dunes Condominium LLC

Michael Halpin
Managing Member
DRG, LLC

*[handwritten notes: Only call Re tenant move / Heather Andrea Callier 407-787-0133 / 407-447-5698 / fax 407-447-5829]*



PLAINTIFF'S
EXHIBIT
22
3-12-09 as

LEGACY DUNES CONDOMINIUM PURCHASE AGREEMENT

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE
REPRESENTATIONS OF DEVELOPER. FOR CORRECT REPRESENTATIONS, REFERENCE
SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY SECTION
718.503 FLORIDA STATUTES TO BE FURNISHED BY DEVELOPER TO A PURCHASER OR
LESSEE.

PARTIES:

Legacy Dunes Condominium LLC ("Developer") of 115 E. Marks Street, Orlando, Florida 32803
(Phone) 407-841-1343;

Purchaser:  Karen M. Lubomski

Co-Purchaser:  Joseph L. Lubomski

Effective Date:

Mailing Address:  6418 N. Newark

City:  Chicago  State:  IL  Zip Code:  60631

Home Phone:  (773) 763-2571  Cellular:

Fax Number:  (773) 763-2571  E-Mail:

PURCHASE PRICE:

| | |
|---|---|
| Unit Price 5-105 : | $ 235,882.00 |
| Garage Unit # | $ 0.00 |
| Carport Unit # | $ 0.00 |
| Upgrade Misc. | $ 0.00 |
| Total Purchase Price: | $ 235,882.00 |
| Deposit made this date to be held in escrow by the Escrow Agent: Make payable to: *The Title Place* | $ 11,794.00 |
| Balance to close by US cash, LOCALLY DRAWN certified or cashier's check or third-party loan, subject to adjustments and prorations: | $ 224,088.00 |

Buyer's Initials:

*Legacy Dunes Condominium Purchase Agreement 1 of 20*

WITNESSETH

In consideration of the purchase price specified below, the mutual covenants and benefits provided for herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, the parties hereto do hereby agree as follows:

1.    GENERAL.   Developer agrees to sell, and Purchaser agrees to purchase, in accordance with the terms and conditions of this Agreement, Unit 5-105 ("Unit"), of Legacy Dunes Condominium, a condominium development in Osceola County, Florida, (Condominium) with the property description of the Condominium attached hereto and incorporated herein as Exhibit "A" and the floor plan for such Unit attached hereto and incorporated herein as Exhibit "B."  The Condominium was or shall be created pursuant to the Declaration of Condominium for Legacy Dunes Condominium ("Declaration"), which was or shall be recorded in the public records of Osceola County, Florida, prior to the closing of the purchase and sale contemplated by this Agreement.   Purchaser acknowledges receipt of the Condominium Documents and all documents required by Section 718.503, Florida Statutes, to be furnished by a developer to purchasers, on or before the date of this Agreement.   The foregoing statement shall not, however be in lieu of the execution of a Receipt for Condominium Documents.  The Unit, together with its percentage of undivided interest in the Common Elements of Legacy Dunes Condominium, and its interest in the Limited Common Elements assigned to such Unit, is more particularly described in the Declaration, and is shown and delineated on the survey/plot plan and building plans for Legacy Dunes Condominium.

The Unit has been previously occupied.

2.    USE OF DEPOSITS.

(a) All sums paid prior to Closing as stated above ("Deposits") shall be held in escrow by The Title Place whose address is 151 SW 27 Avenue   Miami, FL  33135 ("Escrow Agent") and disbursed in accordance with the terms of this Agreement.  The Deposits shall be held in an interest bearing account.  Interest earned is for the benefit of Developer.  Purchaser will receive a receipt for the Deposits from Escrow Agent upon request.

(b) Developer agrees to give Purchaser a credit at Closing (if, but only if, the transaction contemplated by this Agreement is properly closed in accordance with the Agreement terms) in an amount equal to the amount of the Deposits, which shall be disbursed to Developer at Closing.  In the event Purchaser properly terminates the Agreement pursuant to its terms, or pursuant to the provisions of the Florida Condominium Act, Purchaser shall be entitled to receive the Deposits from Escrow Agent.

(c) Buyer's rights and deposits under this Agreement will be subordinate to all mortgages (and all modifications made to those mortgages) affecting the Unit or the Condominium (or the real property upon which the Condominium is located) even if those mortgages (or modifications) are made or recorded after the date of this Agreement.

Buyer's Initials:

*Legacy Dunes Condominium Purchase Agreement 2 of 20*

Lubomski_ 00094

3.    FINANCING. [Initial One] The Section not initialed shall not be part of this Agreement.

_____ (a) No Financing Required.  Purchaser represents to Developer that no mortgage financing is necessary or desirable for Purchaser to complete this transaction and that Purchaser does not desire for this Agreement to be contingent upon his ability to obtain financing. **Purchaser agrees to provide Developer with a letter from a bank or financial institution on or before fifteen (15) business days from the date of Purchaser's execution of this Agreement verifying that Purchaser has sufficient funds to close the sale of the Unit and agreeing to notify the Developer if there is a reduction of funds to Purchasers account below 110% of purchasers net funds needed to close this transaction.** In the event Purchaser elects to obtain mortgage financing for the purchase of the Unit, this Agreement shall not be contingent on financing and the financing shall not delay the Closing of the sale of the Unit.

(b) Financing Required. This Agreement is made conditioned upon Purchaser's ability to obtain a loan of up to 90% Loan to Value, at the prevailing rates for a term of thirty (30) years. Such loan is to be secured by the Unit.  Purchaser agrees to apply for such loan on or before five (5) days from the date Purchaser signs this Agreement to notify Developer and/or Developer's agent of such application, and to pursue such application diligently. In the event Purchaser fails to apply for such loan within such period, or does not diligently furnish requested loan information within Purchaser's control within two (2) days of the request therefore, Purchaser shall be in default hereunder and Developer, at its option, may terminate this Agreement and retain the Deposits, as liquidated damages. Purchaser agrees to cooperate fully with Developer and the lender in processing the loan application. Developer or its designated agent is authorized to contact such lender from time to time regarding the status of said loan and to acquire necessary loan qualification information from Purchase's lender without specific consent. "Ability to obtain" as used herein means that Purchaser is qualified to receive the loan described herein based upon lender's customary and standard underwriting criteria.  If Purchaser has the ability to obtain the loan referenced herein, Purchaser warrants that, at Closing, Purchaser will have sufficient cash to complete the purchase and agrees to maintain current loan qualifications necessary to obtain loan approval deemed necessary by Purchasers lender, of the Unit. Purchaser further warrants that, unless otherwise specified herein, Purchaser does not need to sell or lease other real property in order to complete the purchase of the Unit.

**Purchaser shall provide Developer with written evidence of approval for a loan for purchase of the Unit under the terms and conditions set forth in this Agreement on or before fifteen (15) days from the date Purchaser signs this Agreement. Upon receipt of evidence of loan approval by Developer, this contingency shall no longer apply.**  In the event the loan is disapproved and evidence of such disapproval is provided to Developer within said fifteen (15) day period, then Purchaser may terminate the Agreement, Escrow Agent shall return the Deposits to Purchaser, and all further rights, obligations and liabilities created hereunder shall be deemed terminated and of no further force and effect. Purchaser agrees to incur no debt or create a change in its financial status subsequent to the date hereof which might jeopardize approval of Purchaser's loan.   Should Purchaser not provide evidence of approval or

Buyer's Initials:

*Legacy Dunes Condominium Purchase Agreement 3 of 20*

Lubomski_ 00095

disapproval of loan within said ten (15) day period, this contingency shall not apply, and this transaction shall be considered an all cash transaction. Developer shall not pay any closing costs, and Purchaser shall provide Developer with a letter from a bank or financial institution on or before seven (7) business days from the expiration of the finance contingency verifying that Purchaser has sufficient funds to close the sale of the Unit. Should Purchaser not provide said written evidence within the aforementioned seven (7) day period the Deposit shall be immediately disbursed by Escrow Agent to Developer.

Developer may suggest possible sources of funds for permanent financing, including funds made available to qualified purchasers through permanent loan commitments from a lending institution identified by Developer.  Purchaser hereby acknowledges and agrees that by identifying or suggesting such possible sources of funds, Developer does not accept any responsibility for lenders actions or obtaining such financing on Purchaser's behalf, nor does Developer make any representations as to the availability of funds to purchaser or as to Purchaser's ability to qualify for such financing.

Purchaser acknowledges the use of 1031 Exchanges will not be a permitted form of unit purchase financing, unless approved by Developer, in Developer's absolute and sole discretion.

4.   CLOSING DATE, CONVEYANCE AND ENCUMBRANCES.

(a)   Subject to the provisions of Paragraph 26, the estimated closing of the transaction contemplated by this Agreement shall occur on or before <u>October 12,</u> 2006 (the "Closing" or "Closing Date"). The Closing shall take place at such specific time, date, and place as shall be designated by Developer at least seven (7) days prior hereto. In the event Purchaser shall fail to close on the Closing Date, then Purchaser shall be deemed in default as provided in Paragraph 13 hereof. Should Developer agree to extend the Closing Date at the request of Purchaser, such request from Purchaser must be in writing, Purchaser agrees to pay a late funding charge equal to interest on Purchaser's total Purchase Price at the then applicable highest lawful rate (currently 18% annually) for the time period between the Effective Date and the extended closing date (computed using a simple interest calculation based on a 365 day per year calendar or 0.0493% daily). Any extension of Purchaser's Closing Date shall be at the absolute and sole discretion of Developer.   Notwithstanding anything to the contrary herein, Developer shall have the right from time to time by notice to Purchaser to extend the Closing for up to two (2) extension periods of up to thirty (30) days for each extension period without penalty.

(b)   Developer shall convey at Closing by special warranty deed, insurable title to the Unit subject only to current taxes, applicable zoning restrictions, conditions, limitations, utility service agreements, reservations, terms and conditions of the Declaration and Exhibits thereto, covenants and restrictions and easements of record at the time of Closing. Developer agrees to deliver to Purchaser at or before Closing a title insurance commitment issued by a title agent licensed to do business in Florida which agrees to insure title subject only to the exceptions set forth above and the standard printed exceptions contained in an owner's title insurance policy, shall be conclusive evidence that title to the Unit meets the requirements of this Agreement.

(c)   Developer shall deliver possession of the Unit to Purchaser at the time of Closing. The Closing shall take place at a location be designated by Developer.  If Developer is unable

Buyer's Initials: [signature]

Lubomski_ 00096

to deliver title as aforesaid, Developer shall be afforded a period of not more than sixty (60) days from receipt by Developer of written notice of such title defects within which to cure any objections or defects in title and, if Developer does not cure such objections and defects, Purchaser may accept title in its then existing condition and close the transaction, but without any diminution of the Total Purchase Price, or Purchaser may terminate this Agreement and be entitled to the return of all Deposits, and upon such return, the parties shall be released of any and all liabilities to each other and this Agreement shall thereafter be null and void.

(d) The acceptance of a deed by Purchaser and the Closing of the transaction shall be acknowledged by Purchaser of the full performance by Developer of all of its agreements, obligations and responsibilities under this Agreement, and no performance of any agreement, obligation or representation of the Developer shall survive the Closing except the warranties contained in the deed.

(e) RESPA Disclosure. As required by the Real Estate Settlement Procedures Act of 1974, as amended ("RESPA"), Purchaser acknowledges that Developer has not directly or indirectly required Purchaser, as a condition of sale, to purchase either an owner's or mortgagee's title insurance policy from any particular title company. If the transactions contemplated in this Agreement are governed by RESPA and to the extent RESPA applies, Purchaser may elect to obtain such insurance from a company of Purchaser's choice and Purchaser shall pay, at Closing, the title insurance premium for such policy. Purchaser understands that Developer's cost for the issuance of Purchaser's title insurance policy may be less than the cost that Purchaser will be charged if Purchaser has a different company issues Purchaser's title insurance policy, and that Purchaser's electing to have a different company issue this policy may result in additional costs to Purchaser.

5.   CLOSING COSTS. Purchaser understands and agrees that, in addition to the Purchase Price for the Unit, Purchaser will pay for the costs associated with obtaining an owner's title insurance policy, title exam, search and closing fee's. Purchaser shall also pay all additional costs and fees incident to the securing of financing and the closing of the purchase and sale contemplated hereunder, not specifically assigned to the Developer including, but not limited to, recording fees, State documentary stamp tax on the deed and the mortgage, intangible tax on the mortgage, any flood certifications necessary, courier fees and express mail fees, recording of the deed, lender's title insurance fees, mortgage insurance premiums, escrow deposits, prepaid interest, including, but not limited to, all discount points required by any lender, any fees associated with financing regarding the purchase of the unit, and purchaser's attorney's fees. In addition Purchaser agrees to pay a development fee equal to two percent (2%) of the Purchaser Price. This development fee shall be retained by Developer as additional revenue and to offset certain of its conversion expenses, including without limitation, certain utility deposits and expenses, pre-paid insurance premiums, certain of Developer's administration expenses and Developer's attorneys' fees in connection with conversion of the Condominium. Accordingly, Purchaser understands and agrees that the development fee is not for payment of closing costs. or settlement services, but rather represents additional funds to Developer which are principally intended to provide additional revenue and to cover various out-of-pocket and internal costs and expenses of Developer associated with conversion of the Condominium.

6.   BROKERAGE AND AGENCY. In no event shall Developer have any obligation to pay any real estate commission except in the event of the closing of this transaction in accordance with the terms of this Agreement. If Purchaser worked with or was represented by a cooperating broker, a disclosure of such brokerage relationship set forth in Exhibit "D" shall be a part of this

Buyer's Initials:

*Legacy Dunes Condominium Purchase Agreement 5 of 20*

Agreement. If no such brokerage relationship exists, there shall be no Exhibit "D" to this Agreement.

Except as set forth in this Paragraph, Purchaser and Developer represent and warrant to the other that each party has not dealt with another broker, agent, or finder in connection with this transaction and Purchaser and Developer covenant and agree, each to the other, to indemnify and hold each other harmless from any and all losses, damages, costs and expenses including, but not limited to, attorney's fees and court costs that may be incurred or suffered as a result of any claim for any fee, commission, or similar compensation with respect to this transaction made by any person or entity and arising through the actions of the indemnifying party, whether or not such claim for any fee, commission, or similar compensation with respect to this transaction made by any person or entity is meritorious.

7.   DISCLAIMER.

(a)  Purchaser and Developer acknowledge that they have not relied upon any advice, representations or statements of Brokers and shall not assert any claims against Developer involving the same.  The term "Broker" as used herein, shall mean those parties executing this Agreement as the Listing Broker and Selling Broker, if applicable. Purchaser and Developer agree that Brokers shall not be responsible to advise Purchaser and Developer on any matter, including but not limited to the following: any matter which could have been revealed through a survey, title search or inspection of the Unit; the condition of the Unit, any portion thereof, or any item therein; the necessity or cost of any repairs to the Unit; hazardous or toxic materials; the tax or legal consequences of this transaction; the availability and cost of utilities or community amenities; the appraised or future value of the Unit; any condition(s) existing off the Condominium which may affect the Condominium; the terms, conditions and availability of financing; and the uses and zoning of the Condominium whether permitted or proposed.   Purchaser and Developer acknowledge that Brokers are not experts with respect to the above matters and that, if any of these matters or any other matters are of concern to them, they shall seek independent expert advice relative thereto.

(b)  Purchaser agrees and acknowledges the Developer is not a licensed real estate agent or broker.   The developer does not represent Purchaser in this (or any) transaction. Developer advises Purchaser to seek the guidance or assistance of an attorney before Purchaser executes any real estate (or related) document.

(c)  Developer currently does not have title to (own) the subject property but is under contract to purchase with an expected outside closing date of May 18, 2006. This Agreement is contingent upon Developer acquiring (closing) on the property in advance of the Purchaser's designated closing date.  In the unlikely event that the property is not purchased by the Developer, the Purchaser's deposit will be returned to the Purchaser and this contract will be canceled.

(d)  Should Purchaser's unit be purchased by the current Resident (per Florida Statute chapter 718) and by which, not made available for sale to Purchaser, Purchaser's deposit will be refunded and/or Purchaser will be offered a similar unit (if available).

Buyer's Initials: [signature/initials]

*Legacy Dunes Condominium Purchase Agreement 6 of 20*

Lubomski_ 00098

8.  PRORATIONS.

    (a)  <u>Ad Valorem Taxes</u>. Purchaser acknowledges that, as of the year in which Closing takes place, the Unit may not have been a separately described and assessed parcel of real estate and that, in that event, ad valorem taxes for the Unit for the year in which Closing takes place will be assessed under a tax bill in the name of Developer which covers additional property. Should the Unit not be separately described and assessed parcel of real estate, Purchaser agrees to pay Developer at Closing that portion of the tax for the year in which Closing takes place (based on the prior year if the tax bill for the year in which Closing takes place is not yet available) which shall be determined by multiplying the total tax bill by the percentage interest in the Common Elements assigned to the Unit in the Declaration and then prorating the product of such multiplication as of the Closing Date. **Both parties agree that no further tax adjustments or rebates will be allowed or considered after Closing Date.**

    (b)  <u>General Assessments</u>. Purchaser shall pay at Closing his or her pro rata share of the general assessment levied against the Unit, as provided in the Declaration and By-laws, for the month in which the Closing shall take place, which pro rata share of the general assessment shall be adjusted at the Closing according to the number of days remaining in the calendar month in which the Closing occurs. In addition, Purchaser shall pay at closing the general assessment owed by the Unit for the month immediately following the month in which the closing takes place. Thereafter, commencing on the first day of the second calendar month following the Closing Date, Purchaser shall pay general assessments for his or her Unit monthly or quarterly as determined by the Board of Directors, and such assessments shall be due on the day first day of each month in advance unless otherwise ordered by the Board of Directors. Said general assessment shall be payable to Legacy Dunes Condominium Association, Inc. (Association").

    (c)  <u>Contribution to Working Capital Fund of Association</u>. In addition to all other sums due hereunder, Purchaser agrees at Closing to make a nonrefundable contribution to the working capital fund of the Association in the amount of $500.00.

    (d)  <u>Insurance Premiums</u>. Purchaser acknowledges that, prior to Closing, Developer will have pre-paid directly the Unit's pro rata portion of the annual premium on the hazard and liability insurance policies maintained by the Association or Developer, or the Association will have pre-paid such premium with funds previously contributed by Developer to the Association's account. At Closing, Purchaser shall pay an amount equal to the Unit's pro rata portion of said annual premium, and from said amount, Purchaser shall reimburse the appropriate party for the Unit's pro rata portion of said annual premium from the date of Closing through the expiration date of the policies.

9.  POSSESSION. Permanent possession of the Unit shall be delivered to Purchaser at the Closing.

10.  LEGACY DUNES CONDOMINIUM ASSOCIATION, INC.

    (a)  <u>Governing Documents</u>. Purchaser acknowledges that the Unit being purchased is a portion of the real property and improvements that have been or will be made subject to the Declaration referred to in Paragraph 1. The nature and extent of the rights and obligations of the Purchaser in acquiring and owning the Unit will be controlled by and subject to the Declaration, as well as the Articles of Incorporation, the Bylaws, and the rules and regulations of the Association. Purchaser agrees to comply with all of the terms,

Buyer's Initials: _____

*Legacy Dunes Condominium Purchase Agreement 7 of 20*

Lubomski_ 00099

conditions and obligations set forth therein.

(b) <u>Membership in Association</u>. Upon conveyance of the Unit's title to Purchaser, Purchaser shall automatically become a member of the Association and shall be subject to the assessment obligations and other provisions set forth in the Declaration, including the obligation of the Purchaser to pay a contribution to the working capital of the Association referred to in Paragraph 9(c) above.

(c) <u>Amendments to Documents</u>. Purchaser hereby acknowledges and agrees that prior to the Closing, Developer shall have the right to modify, change, revise and amend, without Purchaser's approval, any or all of the documents required to be provided to Purchaser under Section 718.503, Florida Statutes. Pursuant to section 718.110(2), F.S., an amendment, other than amendments made by the developer pursuant to sections 718.104, 718.403 and 718.504(6), (7) and (9), F.S., without a vote of the unit owners and any rights the developer may have in the declaration to amend without consent of the unit owners shall be limited to matters other than those under sections 718.110(4) and (8), F.S.

In the event the Developer shall make any amendment, modification, change, or revision to the documents or materials which materially alters or modifies the offering, then a copy of such shall be delivered to the Purchaser and, if such change, amendment, revision or modification materially alters or modifies the offering in a manner that is adverse to the Purchaser, then, the Purchaser shall have the option to (1) consent to such, or (2) within fifteen (15) days after receiving a copy of such, terminate, in writing, this Agreement, in which event Purchaser's entire Deposits shall be refunded and the parties hereto shall have no rights or liabilities hereunder. In the event Purchaser does not terminate this Agreement within said fifteen (15) days, Purchaser shall be conclusively deemed to have consented to the proposed change, amendment, modification or revision.

11. <u>NON-ASSIGNABILITY BY PURCHASER</u>, Purchaser's interest in this Agreement may not be transferred or assigned, in whole or in part, without the prior written consent of Developer, which may be granted or withheld at Developer's sole and absolute discretion. Developer shall also have the right to require the payment of an assignment fee as a condition to any assignment. Developer reserves the right to assign this Agreement without the prior consent of Purchaser.

12, <u>DEFAULT</u>.

(a) In the event Developer fails to comply with or perform any of the conditions to be complied with or any of the covenants, agreements or obligations to be performed by Developer under the terms and conditions of this Agreement and Developer does not cure such failure within seven (7) calendar days of receiving written notice of such failure from Purchaser, then Purchaser shall be entitled to terminate this Agreement by giving written notice to Developer and Escrow Agent, whereupon the Deposits shall be immediately delivered to Purchaser.

(b) In the event Purchaser fails to comply with or perform any of the covenants, agreements or other obligations to be performed by Purchaser under the terms and provisions of this Agreement, Developer shall be entitled to terminate this Agreement (within seven (7) calendar days) upon written notice to Purchaser whereupon Developer shall be paid the Deposits as set forth on page 1 hereof, as fixed and full liquidated damages, it being acknowledged that is impossible to more precisely estimate the specific damages to be

Buyer's Initials

*Legacy Dunes Condominium Purchase Agreement 8 of 20*

Lubomski_ 00100

suffered by Developer, but that the sum herein stipulated is a reasonable estimate of such damages and the parties hereto expressly acknowledged and intend that this provision shall be a provision for the retention of the Deposits as liquidated damages and not as penalty, whereupon all rights, liabilities and obligations created under the terms and provisions of this Agreement shall be deemed null and void of no further force and effect.

13.   ATTORNEY FEES. In connection with any litigation, including appellate proceeding, arising out of this Agreement the prevailing party shall be entitled to recover reasonable attorney fees and costs. .

14.   NOTICES. Each notice, except for oral notice of the date and time of Closing, required or permitted to be given hereunder must comply with the requirements of this Paragraph. Each such notice shall be in writing and shall be delivered either by personally delivering it by hand or Federal Express or similar courier service to the person to whom notice is directed, or by facsimile transmission, or by depositing it with the United States Postal Service, certified mail, return receipt requested, with adequate postage prepaid, addressed to the appropriate party (and marked to a particular individual's attention). Such notice shall be deemed delivered at the time of personal delivery or, if mailed, when it is deposited as provided above, but the time period in which a response to any such notice must be given or any action taken with respect thereto shall commence to run from the date it is personally delivered or, if mailed, the date of receipt of the notice by the addressee thereof, as evidenced by th return receipt. Notwithstanding the above, notice by facsimile transmission shall be deemed to have been given as of the date and time it is transmitted if the sending facsimile machine produces a written confirmation with a date, time and telephone number to which the notice was sent. Rejection or other refusal by the addressee to accept the notice shall be deemed to be receipt of the notice. In addition, the inability to deliver the notice because of a change of address of the party of which no notice was given to the other party as provided on page 1 of this Agreement and below shall be deemed to be the receipt of the notice sent. The addresses of the parties to which notice is to be sent shall be those set forth on page #1 of this agreement.  Such addresses may be changed by either party by designating the change of address to the other party in writing.

15.   FLOOR PLANS AND MODELS. Purchaser hereby acknowledges and agrees that any floor plans, renderings, drawings, and the like, furnished by Developer to Purchaser which purport to depict the Unit, or any portion thereof, or the building containing the same, are merely approximations, and do not necessarily reflect the actual as-built conditions of the same. The Purchaser further acknowledges and agrees that the decorations, furniture, furnishings, wallpaper, appliances, fixtures, floor covering and the like, contained in any model unit of Legacy Dunes Condominium, are for demonstrative purposes only, and are not included in the property which is the subject of this Agreement.

16.   UNIT COMPLETION AND INSPECTION.

(a)   Unit Completion. The Unit is constructed substantially in conformance with the Floor Plan attached hereto and incorporated herein as Exhibits "B" . Purchaser understands and agrees that materials used in construction and completion may vary somewhat from any samples provided; such variations are inherent in manufacturing and shall not be grounds for any refusal by Purchaser to accept the Unit. Actual as-built conditions may also vary.

(b)   "AS IS" and "WHERE IS". Developer shall not, by the execution and delivery of any document or instrument executed and delivered in connection with the Closing, make any warranty, express or implied, of any kind or any nature whatsoever, with respect to the

Buyer's Initials: 

*Legacy Dunes Condominium Purchase Agreement 9 of 20*

Lubomski_ 00101

Property other than warranties of title pursuant to the deed of conveyance in Paragraph 5, and all such warranties are hereby disclaimed. Without limiting the generality of the foregoing, DEVELOPER HEREBY DISCLAIMS ANY AND ALL EXPRESS OR IMPLIED WARRANTIES AS TO DESIGN, CONSTRUCTION, FURNISHING AND EQUIPPING OF THE CONDOMINIUM PROPERTY, AND IN ACCORDANCE WITH SECTION 718.618(6), *FLORIDA STATUTES*, DEVELOPER HEREBY MAKES NO IMPLIED WARRANTIES, HAVING ELECTED INSTEAD TO ESTABLISH CONVERTER RESERVE ACCOUNTS IN ACCORDANCE WITH SECTION 718.618(6), *FLORIDA STATUTES* IN LIEU OF IMPLIED WARRANTIES OR POSTING OF A SURETY BOND; PROVIDED THAT IN ACCORDANCE WITH SECTION 718.618(6), *FLORIDA STATUTES*, IN THE EVENT THAT DEVELOPER FAILS TO ESTABLISH SUCH CONVERTER RESERVE ACCOUNTS, THE DEVELOPER SHALL BE DEEMED TO HAVE GRANTED TO PURCHASER AN IMPLIED WARRANTY OF FITNESS AND MERCHANTABILITY AS SET FORTH IN SECTION 718.618(6), *FLORIDA STATUTES*. AS TO SUCH WARRANTIES WHICH CANNOT BE DISCLAIMED, AND TO OTHER CLAIMS, IF ANY, WHICH CAN BE MADE AS TO THE AFORESAID MATTERS, ALL INCIDENTAL AND CONSEQUENTIAL DAMAGES ARISING THEREFROM ARE HEREBY DISCLAIMED. ALL UNIT OWNERS, BY VIRTUE OF THEIR ACCEPTANCE OF TITLE TO THEIR RESPECTIVE UNITS (WHETHER FROM THE DEVELOPER OR ANOTHER PARTY), SHALL AUTOMATICALLY WAIVE ALL OF THE AFORESAID DISCLAIMED WARRANTIES AND INCIDENTAL AND CONSEQUENTIAL DAMAGES TO THE EXTEND ALLOWED BY LAW. CHAPTER 558, FLORIDA STATUTES CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME. SIXTY DAYS BEFORE YOU BRING ANY LEGAL ACTION, YOU MUST DELIVER TO THE OTHER PARTY TO THIS CONTRACT A WRITTEN NOTICE REFERRING TO CHAPTER 558 OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER WHICH MAY BE MADE. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER THIS FLORIDA LAW WHICH MUST BE MET AND FOLLOWED TO PROTECT YOUR INTERESTS.

The sale of the Unit by Developer to Purchaser shall be "AS IS" and "WHERE IS". Developer shall transfer to Purchaser any manufacturing warranties pertaining to the Unit which by their terms are transferable.

(c) Unit Inspection. Purchaser will be given an opportunity prior to closing, on the date and at the time scheduled by Developer, to inspect the Unit with Developer's representative. If Purchaser fails to take advantage of the right to a pre-closing inspection on the date and time scheduled, Developer will not be obligated to reschedule an inspection prior to closing and Purchaser shall be deemed to have accepted the Unit in its AS-IS condition.

(d) Third Party Upgrades. Purchaser acknowledges that in the event he or she engages a contractor to perform upgrades or other work on the Unit that: (1) such work shall be performed in accordance with the Declaration, and any rules and regulations of the Association; (2) the Developer shall have no responsibility for the work performed or materials supplied by such contractor; (3) the contractor shall have adequate insurance

Buyer's Initials: [initials]

*Legacy Dunes Condominium Purchase Agreement 10 of 20*

Lubomski_ 00102

coverage for any damage caused to any person or property on the Condominium as a result of the contractor's work on the Unit; (4) the Developer is not responsible for any problems or disputes related to the workmanship of the contractor or materials installed by such person; and (5) any such upgrades shall not be commenced until after Closing.

17.   FLORIDA LAW.   This Agreement concerns the sale of real property located in the State of Florida. This Agreement, and all of the relationships between the parties hereto, shall be construed and interpreted in accordance with the laws of the State of Florida.

18.   JURY WAIVER:   PURCHASER AND DEVELOPER DO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THEIR RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, OR UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE DOCUMENTS DELIVERED BY PURCHASER AT CLOSING OR DEVELOPER AT CLOSING, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ANY ACTIONS OF EITHER PARTY ARISING OUT OF OR RELATED IN ANY MANNER WITH THIS AGREEMENT OR THE PROPERTY (INCLUDING WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND ANY CLAIMS OR DEFENSES ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER IS A MATERIAL INDUCEMENT FOR DEVELOPER TO ENTER INTO AND ACCEPT THIS AGREEMENT AND THE DOCUMENTS DELIVERED BY PURCHASER AT CLOSING AND SHALL SURVIVE THE CLOSING OF TERMINATION OF THIS AGREEMENT.

19.   TIME OF ESSENCE.   Time is of the essence of this Agreement.

20.   FORCE MAJEURE.   Either party hereto shall be excused for the period of any delay in the performance of any obligations hereunder when such delay is occasioned by cause or causes beyond the control of the party whose performance is so delayed and the time for performance shall be automatically extended for a like period. Such causes shall include, without limitation, all labor disputes, civil commotion, war, warlike operations, invasion, rebellion, hostilities, military or usurped power, sabotage, government regulations or controls, fire or other casualty, inability to obtain any necessary materials or services, or acts of God.

21.   SEVERABILITY.   The provisions of this Agreement are intended to be independent, and in the event any provision hereof should be declared by a court of competent jurisdiction to be invalid, illegal or unenforceable for any reason whatsoever, such illegality, unenforceability, or invalidity shall not affect the remainder of this Agreement.

22.   CONSTRUCTION OF AGREEMENT.   Purchaser and Developer acknowledge that they have read, understand, and have had the opportunity to be advised by legal counsel as to each and every one of the terms, conditions, restrictions, and effect of all of the provisions of this Agreement and every document provided to Purchaser pursuant to Section 718.503, Florida Statutes, all of which are incorporated herein by reference and made a part hereof, and the Purchaser agrees to the enforcement of any and all of these provisions and affixes his hand and seal hereto with full knowledge of same. Should any provision of this Agreement require judicial interpretation, it is agreed that the court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against one party by reason of the rule of constructing that a document is to be construed more strictly against the party who itself or through its agent prepared the same. It is further agreed that words of any

Buyer's Initials:

*Legacy Dunes Condominium Purchase Agreement 11 of 20*

Lubomski_ 00103

gender used in this Agreement shall be held to include any other gender, any words in the singular number shall be held to include the plural wherever applicable, and that captions and paragraphs numbers appearing in this Agreement are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of such paragraph or in any way affect this Agreement.

23.  NON-RECORDATION OF AGREEMENT. Neither this Agreement nor any of the terms hereof, nor any other memorandum, affidavit or other document relating to or referring to this Agreement or the transactions contemplated hereby, whether directly or indirectly, shall ever be filed or record by or on behalf of Purchaser. If there occurs a violation of the preceding sentence, Seller may avail itself of any remedies available to it for breach of this Agreement at law or in equity. There may be recorded, however, at Developer's option, a memorandum of agreement or similar document referencing this Agreement in the Osceola County, Florida Land Records.

24.  ENTIRE AGREEMENT. This Agreement contains the entire agreement between the parties hereto. No agent, representative, salesman or officer of the parties hereto has authority to make, or has made, any statements, agreements, or representations, either oral or in writing, in connection herewith, modifying, adding to , or changing the terms and conditions hereof and neither party has relied upon any representation or warranty not set forth in this Agreement. No delaying between the parties or customs shall be permitted to contradict, vary, add to, or modify the terms hereof.

25.  SURVIVAL. All terms, conditions, representations, and provisions contained herein shall extinguish upon Closing and delivery of the deed, except for Paragraphs 7 (Brokerage and Agency), 9 (Prorations), 11(a) (Governing Documents), 14 (Attorney Fees), 17 (Unit Completion and Inspection), 22 (Construction of Agreement), 24 (Entire Agreement), 27 (Disclosures), and 31 (Subordination) hereof, which shall survive indefinitely.

26.  DISCLOSURES. Purchaser acknowledges and agrees with the following:

(a)  The Condominium Association budget provided to Purchaser is based on estimated expenses only and may increase or decrease when the actual expenses of the Condominium Association become known.

(b)  The Condominium is a conversion of a previously existing rental apartment complex which was not constructed by Developer and accordingly that the Condominium is not new construction.

(c)  The views from Purchaser's Unit can change over time due to, among other things, additional development and the removal or addition of landscaping.

(d)  No representations are made regarding the zoning of adjacent property, or that the category to which adjacent property is zoned may not change in the future.

(e)  No representations are made regarding the use of adjacent property, or that the use of adjacent property may not change in the future.

(f)  No representations are being made regarding which schools may now or in the future serve the Unit.

Buyer's Initials: _____

*Legacy Dunes Condominium Purchase Agreement 12 of 20*

Lubomski_ 00104

(g) Since in every neighborhood, there are conditions which different purchasers may find objectionable, Purchaser acknowledges that there may be conditions outside of the Condominium which Purchaser finds objectionable and that it shall be the sole responsibility of Purchaser to become acquainted with neighborhood conditions which could affect the Unit.

(h) No representations are made that the Unit is or will be soundproof or that sound may not be transmitted from one Unit to another.

(i) The condominium floor plans and the dimensions are square footage calculations shown thereon are only approximations.    Any Purchaser who is concerned about any representations regarding the floor plans should do his/her own investigation as to the dimensions, measurements and square footage of his/her Unit.

(j) The Unit may trap humidity created by everyday living (cooking, bathing, laundering, etc.). As a result, condensation may appear on the interior portion of windows and glass surfaces and fogging of windows and glass surfaces may occur due to temperature disparities between the interior and exterior portions of the windows and glass.  If left unattended and not properly maintained by Purchaser, the condensation may increase resulting in staining, damage to surrounding seals, caulk, paint, wood work and sheetrock, and potentially mildew or mold. Further, given the climate and humid conditions in Florida, molds, mildew, toxins and fungi may exist and/or develop within the Unit and/or the Condominium Property.  Purchaser is hereby advised that certain molds, mildew, toxins and/or fungi may be, or if allowed to remain for a sufficient period may become, toxic and potentially pose a health risk.  By acquiring title to the Unit, Purchaser shall be deemed to have assumed the risks associated with molds, mildew, toxins and/or fungi and to have released the Developer and Association from any and all liability resulting from same.

(k) Mold and/or mildew can grow in any portion of the Condominium that is exposed to elevated levels of moisture. The Association and each Unit Owner agree to:

    (i) Regularly inspect the parts of the Condominium that they respectively maintain, and which are visible and accessible without having to first conduct invasive testing, for the existence of mold, mildew, and/or water intrusion (except when the water intrusion is part of the normal functioning of improvements and appliances such as showers, sinks, dishwashers, and other similar appliances and improvements) and/or damage;

    (ii) Upon discovery, immediately repair in a good and workmanlike condition the source of any water intrusion in the parts of the Condominium that they respectively maintain;

    (iii) Remediate or replace any building material located in the parts of the Condominium that they respectively maintain that has absorbed water or moisture as a result of water intrusion; and (iv) promptly and regularly remediate all mold and/or mildew discovered in the parts of the Condominium that they respectively maintain in accordance with current industry-accepted methods.  In addition, the Association agrees to notify the Units Owners, and each Unit Owner agrees to notify the Association within twenty-four (24) hours of the discovery of mold, mildew, and/or water intrusion and/or damage in the parts of the Condominium

Buyer's Initials: [signature]

*Legacy Dunes Condominium Purchase Agreement 13 of 20*

Lubomski_ 00105

that they respectively maintain.

(l) Exposed concrete surfaces in portions of the Condominium which are not heated and cooled are subject to cracking due to (A) water penetration, (B) expansion and contraction of the concrete with temperature changes, and (C) building settlement.

(m) Concrete surfaces in heated and cooled portions of the Condominium are subject to cracking due to building settlement.

(n) Purchaser acknowledges and understands that the Developer may be renovating portions of the Condominium and engaging in other construction activities related to the Common Elements. Such renovation and construction activities may, from time to time, produce certain conditions on the Condominium, including, without limitations: (A) noise or sound that is objectionable because of its volume, duration, frequency or shrillness; (B) smoke; (C) noxious, toxic, or corrosive fumes or gases; (D) obnoxious odors; (E) dust, dirt or flying ash; (F) unusual fire or explosion hazards; (G) temporary interruption of utilities, and/or (H) other conditions that may threaten the security or safety of Persons on the Condominium. Notwithstanding the foregoing, Purchaser agrees that such conditions on the Condominium resulting from renovation and construction activities shall not be deemed a nuisance and shall not cause Developer and its agents to be deemed in violation of any provisions of the Declaration.

(o) Purchaser acknowledges and understands that there may currently be a tenant residing in the Unit to be purchased. Under Florida Statutes, Chapter 718 (the "Act"), the tenant has certain rights to extend his or her lease, and the tenant has the right to purchase the Unit for a period of forty-five (45) days after receipt of the items required to be delivered pursuant to Section 718.612 of the Act or as otherwise provided under the Act. Because of the tenant's right set forth above, Purchaser acknowledges that this Purchase Agreement will be effective only if the tenant does not exercise tenant's right to purchase the Unit as set forth above. If tenant exercises the right to purchase the Unit, this Purchase Agreement shall be null and void and of no further force and effect, all Deposits shall be returned to Purchaser and all parties shall be relieved of their respective obligations. If tenant does not exercise the right to purchase, then this Purchase Agreement shall remain in full force and effect, and Purchaser shall purchase the Unit subject to tenant's right of purchase. Purchaser shall assume all of landlord's rights and obligations under tenant's lease and Florida statutes. Notwithstanding the foregoing, Purchaser acknowledges that Developer does not guarantee the tenancy of the Unit by tenant, tenant status, lease status or rents due for the entire period of tenant's lease.

(p) Developer will designate and/or contract the management for Legacy Dunes Condominium Association, Inc for a term not to exceed 360 days and may be canceled by the Condominium Board of Directors with 30 days written notice to the Management Company. The Developer reserves the right to change management at any time without notice to the buyers/owners until the Developer turns over the association to its Board of Directors.

27. RADON GAS DISCLOSURE. The following disclosure is required by Section 404.056(8), Florida Statutes, for all Contracts for Sale and Purchase of any building in Florida: "Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional

Buyer's Initials: ⟦signature⟧

*Legacy Dunes Condominium Purchase Agreement 14 of 20*

Lubomski_ 00106

information regarding radon and radon testing may be obtained from your county public health unit."

28.   ENERGY-EFFICIENCY INFORMATION BROCHURE. As required by Section 553.996, Florida Statutes, Developer has provided Purchaser at the time of or prior to the execution of this Agreement with a copy of an information brochure notifying Purchaser of the option for an energy efficiency rating.

29.   RISK OF LOSS PRIOR TO CLOSING. Any loss and/or damage to the Condominium and/or the Unit between the date of this Agreement and the Closing Date will be at Developer's sole risk and expense. If Developer decides to repair the damage, Developer will have a reasonable time to complete repairs. The work will be judged by the same standards used to evaluate new contraction. Purchaser will have no right to any reduction in the Total Purchase Price, nor any claim against Developer by reason of the loss and/or damage, and agrees to accept title on the date scheduled for closing. Developer reserves the right, in its sole and absolute discretion, to decide not to repair the loss and/or damage. If Developer makes this decision, this Agreement will be canceled and Developer will refund all of Purchaser's Deposits and any interest actually accrued thereon. This cancellation will terminate any rights or responsibilities the parties have to each other under this Agreement.

30.   SUBORDINATION. This Agreement, and all rights of Purchaser to purchase the Unit and all other rights of Purchaser hereunder, are and shall be subject and subordinate to the lien, terms, and provisions of any and all mortgages and related security agreements and loan documents encumbering the Unit, whether currently of record or recorded any time hereafter, and to all renewals, extensions thereof, an any future advances thereunder. This Paragraph shall be self-operative and no further instrument shall be required to effect such subordination.

31.   SPECIAL STIPULATIONS. The following stipulations, if in conflict with any preceding provision, shall control:

   (a)  Exhibits. The following Exhibits are attached hereto and by reference made a part hereof: Exhibit "A" - Condominium Legal Description; Exhibit "B" - Unit Floor Plan; Exhibit "C" - Condominium Documents; Exhibit "D" – Brokerage Designation.

   (b)  Advertising. Prior to Closing, Purchaser is prohibited from listing or advertising the Unit for sale in any real estate listing service and/or publication, on any online electronic medium and on any radio, television or any other medium for advertising.

32.   CANCELLATION RIGHTS. THIS AGREEMENT IS VOIDABLE BY PURCHASER BY DELIVERING WRITTEN NOTICE OF PURCHASER'S INTENTION TO CANCEL WITH FIFTEEN (15) DAYS AFTER THE DATE OF EXECUTION OF THIS AGREEMENT BY PURCHASER AND RECEIPT BY PURCHASER OF ALL OF THE ITEMS REQUIRED TO BE DELIVERED TO HIM OR HER BY DEVELOPER UNDER SECTION 718.503, *FLORIDA STATUTES*. THIS AGREEMENT IS ALSO VOIDABLE BY PURCHASER BY DELIVERING WRITTEN NOTICE OF PURCHASER'S INTENTION TO CANCEL WITHIN FIFTEEN (15) DAYS AFTER THE DATE OF RECEIPT FROM DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO PURCHASER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. PURCHASER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN FIFTEEN (15) DAYS AFTER

Buyer's Initials: 

*Legacy Dunes Condominium Purchase Agreement 15 of 20*

Lubomski_ 00107

PURCHASER HAS RECEIVED ALL OF THE ITEMS REQUIRED. PURCHASER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.

33.  PROPERTY TAX DISCLOSURE SUMMARY. PURCHASER SHOULD NOT RELY ON THE DEVELOPER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE PURCHASER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

34.  OFFER. This Agreement, as executed by Purchaser, shall constitute an offer for purchase to Developer. Developer may accept the same, if at all, by delivering to Purchaser at least one executed original or copy of this Agreement prior to the time that Purchaser shall notify Developer, in writing, of Purchaser's revocation of this offer. The effective date of this Agreement shall be the date executed by Purchaser ("Effective Date"). Purchaser shall have fifteen (15) days after the Effective Date to cancel this Agreement as Provided in Paragraph 32 hereof.

PURCHASER(S):

_____          6-29-06
(Buyer)                                      (Date)

Karen M. Lubomski
Print Name

_____          6-29-06
(Co-Buyer)                                   (Date)

Joseph L. Lubomski
Print Name

DEVELOPER:

Legacy Dunes Condominium LLC,
A Florida Limited Liability Company

By: Development Resources Group, LLC
    Managing Member

_____          6/30/06
(Authorized Member)                          (Date)

James E. Wear, Jr.
Print Name

Buyer's Initials: _____

*Legacy Dunes Condominium Purchase Agreement 16 of 20*

Lubomski_ 00108

EXHIBIT "A"

LEGAL DESCRIPTION

LOT 3, TRACT B AND TRACT C, DEVON PARK UNIT ONE, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 10, PAGES 198 AND 199, OF THE PUBLIC RECORDS OF OSCEOLA COUNTY, FLORIDA.

TOGETHER WITH THE RIGHT OF VEHICULAR AND PEDESTRIAN ACCESS OVER THAT CERTAIN PRIVATE ROAD IDENTIFIED AS TRACT R1 ON THE PLAT OF DEVON PARK UNIT ONE AND AS SET FORTH IN AND GRANTED BY MASTER DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR DEVON PARK, RECORDED APRIL 5, 1999 IN OFFICIAL RECORDS BOOK 1601, PAGE 395 AS AFFECTED BY ASSIGNMENT OF RIGHTS OF DEVELOPERS RECORDED APRIL 5, 1999 IN OFFICIAL RECORDS BOOK 1601, PAGE 430, PUBLIC RECORDS OF OSCEOLA COUNTY, FLORIDA.

TOGETHER WITH EASEMENTS OVER THE COMMON AREAS FOR UTILITES AND DRAINAGE AS SET FORTH IN AND GRANTED BY MASTER DECLARATION OF COVENANTS, CONDITIONS, AND RESTRICITONS FOR DEVON PARK, RECORDED APRIL 5, 1999 IN OFFICIAL RECORDS BOOK 1601, PAGE 395; AS AFFECTED BY ASSIGNMENT OF RIGHTS OF DEVELOPERS RECORDED APRIL 5, 1999 IN OFFICIAL RECORDS BOOK 1601, PAGE 430, PUBLIC RECORDS OF OSCEOLA COUNTY, FLORIDA.

Buyer's Initials

*Legacy Dunes Condominium Purchase Agreement 17 of 20*

Lubomski_ 00109

EXHIBIT "C"

CONDOMINIUM DOCUMENTS

PLEASE REVIEW LEGACY DUNES CONDOMINIUM DOCUMENTS ON ENCLOSED DISK.

Buyer's Initials:

*Legacy Dunes Condominium Purchase Agreement 19 of 20*

Lubornski_ 00110

EXHIBIT "B"

FLOOR PLAN

UNIT # ___5-105___

A-2

# 1BR/1BA
## 712 sq. ft.



Buyer's Initials:

*Legacy Dunes Condominium Purchase Agreement 18 of 20*

Lubomski_ 00111

# Legacy Dunes Addendum "C"

Please be sure to **initial** and **sign** this documents where indicated and return the documents to us along with your earnest money deposit by the date below or your unit will be returned to inventory.

**Important Dates:**

|  |  |
|---|---|
| Offer Date: | Thursday, June 29, 2006 |
| Contract and Deposit Must Be Received By: | Tuesday, July 4, 2006 |
| Estimated Mortgage Loan Commitment Deadline: | Wednesday, July 19, 2006 |
| Current Scheduled Closing Date: | Thursday, October 12, 2006 |

**Please note that the important dates above are critical!** You have a fifteen (15) day right of rescission period from the date you received this package, in which to review documents and obtain your financing. During this time period you may cancel for any reason, however after the 15 day period all monies are forfeited should you fail to meet all terms and conditions of the Purchase Agreement.

The following items are added to the Purchase Agreement between Legacy Dunes Condominium LLC ("Developer") and the Purchaser (identified below).  By initialing each item and endorsing (below) this document, the Purchaser agrees to accept and abide by all items of this addendum.

- **Water Billing and Trash Pick-up:**                                    _(Initial)_

Purchaser understands that each unit is serviced by an individual water meter and door-to-door valet trash pick-up. that direct-bills each consumer/owner without involving the Legacy Dunes Condominium Association, Inc.

- **Insurance**                                    _(Initial)_

Purchaser shall be required by the Legacy Dunes Condominium Association, Inc. to obtain and maintain at all times an HO6 condominium insurance policy.

- **Access to Property**                                    _(Initial)_

As disclosed in the Purchase Agreement, Purchaser understands the Unit being purchased is in the process of being converted from a rental apartment community to a condominium community.  Purchaser understands the property and grounds are private and the privacy of the current residents must be maintained.  Purchaser agrees to never approach, contact, discuss or communicate in any way with any resident of the community or employee of its current owner or property management company. Purchaser should contact their sales associate to facilitate any on-site tours. **If Purchaser fails to abide by this procedure, Purchaser understands that the Purchase Agreement will be terminated and the Purchaser's deposit immediately forfeited to the Developer.**

- **Long Term Rental Management Agreement:** _(Initial)_

Legacy Dunes Condominium LLC (Developer) agrees to provide all leasing/concierge services at the expense of Developer until June 30, 2007 or at such time as you, the Purchaser, occupy the unit, or place the unit into a short term rental pool (whichever occurs first). Legacy Dunes Condominium Owners will be required to utilize and retain the leasing management company selected by the Board of Directors for all rental and leasing activity. No Purchaser/Owner shall be allowed to show their unit to a prospective tenant without the prior consent of the Management Company or Association Manager.

- **Rent:** _(Initial)_

Should your unit be unoccupied at the date of closing or become unoccupied after Closing, Developer will pay to you the rent on the unit at the previously occupied rental rate, less any applicable concession, maintenance or unit turnover costs, until the unit becomes occupied by you the Purchaser, the unit is placed into a short term rental pool, or until June 30, 2007, whichever occurs first.

- **Title:** _(Initial)_

Developer agrees to allow Buyer to use ___STEWART TITLE___ located at _____, as Closing Agent. All earnest money deposits must be held by the escrow agent, The Title Place.

- **Lease-Back Agreement:** _(Initial)_

Purchaser agrees to lease Purchaser's percentage interest in the common areas of the Condominium to Legacy Dunes Condominium LLC (Developer), for a six (6) month term to allow Developer the ability to continue property tours (for future acquisition reference), marketing material access, event staffing and clubhouse use at the following lease rate:  Purchaser still maintains the right to use all common area facilities during this time and will continue to be responsible for all prorated expenses of the association dues per condominium documents.

Unit Number:    5-105                          Lease Rate:    $ 4,970.00

The applicable lease start date will be the turnover date of the Condominium from the Developer to Legacy Dunes Condominium Association, Inc.  The lump sum lease payment will be paid to Purchaser the later of thirty (30) days from Unit Closing/funding or August 31, 2006.

PURCHASER(S):

_(signature)_                          6-29-06
(Buyer)                                (Date)

Karen M. Lubomski
Print Name

_(signature)_                          6-29-06
(Co-Buyer)                             (Date)

Joseph L. Lubomski
Print Name

_Legacy Dunes Addendum C_

Lubomski_ 00113

# Legacy Dunes Addendum "D"

The following items are added to the Purchase Agreement between Legacy Dunes Condominium LLC ("Developer") and the Purchaser (identified below). By initialing each item and endorsing (below) this document, the Purchaser agrees to accept and abide by all items of this addendum.

- **Development Fee**                                    (Initial)

Developer agrees to waive the two percent (2%) developer fee as defined in the Purchase Agreement.

PURCHASER(S):

_Karen M. Lubomski_                                  6-29-06
(Buyer)                                                     (Date)

Karen M. Lubomski
Print Name

_Joseph L. Lubomski_                                 6-29-06
(Buyer)                                                     (Date)

Joseph L. Lubomski
Print Name

*Legacy Dunes Addendum D*

Lubomski_ 00114

# Legacy Dunes Addendum "F"

The following items are added to the Purchase Agreement between Legacy Dunes Condominium LLC ("Developer") and the Purchaser (identified below). By initialing each item and endorsing (below) this document, the Purchaser agrees to accept and abide by all items of this addendum.

- **Furniture**                              _(Initial)_

Per the original Purchase Agreement, referencing unit number ___5-105___ , we hereby understand said unit will be furnished by the Developer, within the full discretion of Developer, within forty five (45) days of the termination of any long term lease pertaining to said property in order to prepare said unit for entry into a short term rental pool. We understand said unit will be furnished by the Developer regardless of whether or not we elect to enter unit into a short term rental pool.

PURCHASER(S):

_____               __6-29-06__
(Buyer)                                        (Date)

Karen M. Lubomski
_____
Print Name

_____               __6-29-06__
(Buyer)                                        (Date)

Joseph L. Lubomski
_____
Print Name

*Legacy Dunes Addendum F*

Lubomski_ 00115

# Legacy Dunes Purchaser Intent Survey

I    Karen M. Lubomski           (Purchaser) identify below my intended use of the Legacy Dunes Condominium I am purchasing from Legacy Dunes Condominium LLC. I acknowledge this letter may be shared with my lender (if applicable) and will be used by the Seller to calculate the Investor/Occupant ratios necessary by buyer mortgage lenders.

I intend to use my Legacy Dunes Condominium as a:

(Please select one)

☐      Primary Residence

☑      Secondary (Vacation Home) Residence

☑      Investment

PURCHASER(S):

_Karen M. Lubomski_           _6-29-06_
(Buyer)                                       (Date)

Karen M. Lubomski
Print Name

_Joseph L. Lubomski_           _6-29-06_
(Buyer)                                       (Date)

Joseph L. Lubomski
Print Name

Unit #:   5-105

Lubomski_ 00116

### THE TITLE PLACE

#### Privacy Policy Notice

#### PURPOSE OF THIS NOTICE

Title V of the Gramm-Leach-Bliley Act (GLBA) generally prohibits any financial institution, directly or through its affiliates, from sharing nonpublic personal information about you with a nonaffiliated third party unless the institution provides you with a notice of its privacy policies and practices, such as the type of information that it collects about you and the categories of persons or entities to whom it may be disclosed. In compliance with the GLBA, we are providing you with this document, which notifies you of the privacy policies of The Title Place, and its affiliates, Development Resources Group LLC and Legacy Dunes Condominium LLC.

We may collect nonpublic personal information about you from the following sources:

1. Information we receive from you, such as on applications or other forms.
2. Information about your transactions we secure from our files, or from our affiliates or others.
3. Information we receive from a consumer reporting agency.
4. Information that we receive from others involved in your transaction, such as the real estate agent or lender.

Unless it is specifically stated otherwise in an amended Privacy Policy Notice, no additional nonpublic personal information will be collected about you.

We may disclose any of the above information that we collect about our customers or former customers to our affiliates or to nonaffiliated third parties as permitted by law.

We also may disclose this information about our customers or former customers to nonaffiliated companies that perform services on our behalf.

WE DO NOT DISCLOSE ANY NONPUBLIC PERSONAL INFORMATION ABOUT YOU WITH ANYONE FOR ANY PURPOSE THAT IS NOT SPECIFICALLY PERMITTED BY LAW.

We restrict access to nonpublic personal information about you to those employees who need to know that information in order to provide products or services to you. We maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

Some states give you the right to access and correct nonpublic personal information. You may contact us in writing at 151 SW 27 Avenue, Miami, FL 33135, if your state law gives you this right.

Revised May 2006

Buyer's Initials

Lubomski_  00117

<u>Affiliated Business Arrangement Disclosure Statement</u>

To:   Karen M. Lubomski      Property:  Legacy Dunes Unit # 5-105

From:  Legacy Dunes Condominium LLC    Date:  6-29-06

The purpose of this Disclosure Statement is to give you notice that Legacy Dunes Condominium LLC has a business relationship with The Title Place.  Development Resources Group LLC (DRG) owns a 90% membership interest in Legacy Dunes Condominium LLC.  The 100% owners of DRG hold a 90% membership interest in The Title Place. Due to this relationship, this referral may provide the owners of DRG a financial or other benefit.

Set forth below is the estimated charge or range of charges for the settlement services listed.  You are NOT required to use the listed provider(s) as a condition for settlement of your loan or purchase of the subject property.  THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES.  YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE.

The Title Place—Title Insurance Premiums and Endorsements

- Title Insurance           $5.75 per $1,000 of Liability Written up to $100,000 and $5.00 per $1,000 of Liability Written over $100,000 up to $1,000,000
- Endorsements except Form 9    $25.00 per Endorsement
- Form 9 Endorsement        10% of Total Title Charge excluding other Endorsements

A rebate of 5% of the total policy premium will be credited at closing.

Following is a list of settlement service fees charged by unaffiliated providers in addition to title insurance:

National Title Company- Primary Closing
- Abstract/Title Fee      $50.00
- Title Examination      $50.00

National Title Company—Simultaneous Second Mortgage Loan Closing
- Abstract/Title Fee      $25.00
- Title Examination      $25.00

ACKNOWLEDGEMENT

I/we have read this disclosure form, and understand that Legacy Dunes Condominium LLC is referring me/us to purchase the above-described settlement service(s) and that the owners of DRG may receive a financial or other benefit as the result of this referral.

Buyer _Karen M. Lubomski_____ Date _6-29-06_____

Buyer _Joseph J. Ferland_____ Date _6-29-06_____

Lubomski_ 00118

DBPR Form CO 6000-6
Effective: 12/23/02

## RECEIPT FOR CONDOMINIUM DOCUMENTS

The undersigned acknowledges that the documents checked below have been received or, as to plans and specifications, made available for inspection.

Name of Condominium:     Legacy Dunes Condominium
Address of Condominium:     3200 Legacy Boulevard, Kissimmee, FL 34747

Place a check in the column by each document received or, for the plans and specifications, made available for inspection.  If an item does not apply, place "N/A" in the column.

| DOCUMENT | Received | By Alternative Media |
|---|---|---|
| Declaration of Condominium | X | |
| Prospectus Text | X | |
| Bylaws | X | |
| Articles of Incorporation | X | |
| Lease of Recreational and Other Facilities to be Used Exclusively by Unit Owners of Subject Condominiums (See s. 718.503(1)(b)7, F.S. and s. 718.504, F.S.) | N/A | |
| Management and Maintenance Contracts for More than One Year | N/A | |
| Estimated Operating Budget | X | |
| Ground Lease | N/A | |
| Declaration of Servitude | N/A | |
| Frequently Asked Questions and Answers Sheet | X | |
| Developer's Evidence of Ownership | X | |
| Form of Agreement for Sale or Lease | X | |
| Description of Management for Single Management of Multiple Condominiums | N/A | |
| Conversion Inspection Report | X | |
| Conversion Termite Inspection Report | X | |
| Plot Plan | X | |
| Floor Plan | X | |

*Receipt-1*

Lubomski_ 00119

| | | | |
|---|---|---|---|
| Survey of Land and Graphic Description of Improvements | X | | |
| Covenants and restrictions | N/A | | |
| Rules and Regulations | N/A | | |
| Sales Brochures | N/A | | |
| Phase Development Description (See s. 718.503(1)(b)11, F. S. and s. 718.504, F.S.) | N/A | | |
| Description of Management for Single Management of Multiple Condominiums (See s. 718.503(1)(b)8, F.S., and s. 718.504, F.S.) | N/A | | |
| Executed Escrow Agreement | X | | |
| Renewable Management Contracts | N/A | | |
| Form of Unit Lease if a Leasehold | N/A | | |
| Lease of Recreational and Other Facilities to be Used by Unit Owners with other Condominiums (See s. 718.503(1)(b)8, F.S. and s. 718.504, F.S.) | N/A | | |
| Alternative Media Disclosure Statement (See Rule 61B-17.011, F.A.C.) | X | | |

| DOCUMENT | RECEIVED OR | MADE AVAILABLE | BY ALTERNATIVE MEDIA |
|---|---|---|---|
| Plans and Specifications | | X | |

THE PURCHASE AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF THE EXECUTION OF THE PURCHASE AGREEMENT BY THE BUYER AND RECEIPT BY THE BUYER OF ALL OF THE DOCUMENTS REQUIRED TO BE DELIVERED TO HIM BY THE DEVELOPER. THE AGREEMENT IS ALSO VOIDABLE BY THE BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAT 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE DOCUMENTS REQUIRED. BUYER'S RIGHT TO VOID THE PURCHASE AGREEMENT SHALL TERMINATE AT CLOSING.

Executed this 29 day of JUN , 2006

_Joseph L. Lubomski~ Karen M. Lubomski_
Purchaser

*Receipt-3*

Lubomski_ 00120



# Legacy Dunes Purchaser Intent Survey

I _____ (Purchaser) identify below my intended

use of the Legacy Dunes Condominium I am purchasing from Legacy Dunes Condominium

LLC. I acknowledge this letter may be shared with my lender (if applicable) and will be used

by the Seller to calculate the Investor/Occupant ratios necessary by buyer mortgage lenders.

I intend to use my Legacy Dunes Condominium as a:

(Please select one)

☐   Primary Residence

☑   Secondary (Vacation Home) Residence

☐   Investment

PURCHASER(S):

_____          _____
(Buyer)                                              (Date)

_____
Print Name

_____          _____
(Co-Buyer)                                          (Date)

_____
Print Name

Unit #: _____





## Zoning & Code Enforcement Department

1 Courthouse Square
Suite 1400
Kissimmee, FL
34741

Office: (407) 343-3400
Fax: (407) 343-3436
email: atem@osceola.org

February 16, 2007

Maryann Zaborsky
2626 N. Lakeview #2309
Chicago, IL 60614-1914

Re: **8830 Dunes Court**
   *Property described as: 06 25 27 2951 0001-COMM*
   *Also Described as: The Alexan at Legacy Dunes*

Dear Miss Zaborsky:

The above referenced property is in a Planned Development (PD) zoning district and is located in a Commercial (COMM) land use classification on the Future Land Use Map 2010 (FLUM) of Osceola County.

The existing 488 units were approved by the Board of County Commissioners on September 14, 1998 under Comprehensive Development Plan file reference number CDP98-81. Short term rental as described in the Osceola County Land Development Code, Chapter 14, Section 14.26 is not authorized on this site. (I have enclosed a copy of Section 14.26 for your records.)

If we can be of any further help to you, please feel free to contact us.

Sincerely,

Amy T. Templeton
Senior Zoning Technician

## Osceola County

00-32; 03-16; 06-37 BCC Adopted 11/20/06

## 14.26   SHORT TERM RENTAL OVERLAY

**A.   OBJECTIVES**

An objective of this Article is to permit the location and construction of short term rental units, given the County's role as a tourist destination. This Article recognizes that short term rental housing is a unique land use that is to be regulated apart from traditional residential and commercial development. An objective of this Article is to provide for the proper location of short term rental housing, in a specifically designated area, restricting this use from traditional neighborhoods.

**B.   PERMITTED USES**

Short term rental housing is permitted in the planned development zoning district within the following described geographic areas and as further illustrated in Exhibit A:

1.   Beginning where Shingle Creek enters Osceola County, following Shingle Creek South to the south section line of Section 30, Township 25 south, Range 29 East, thence westerly along said section line and the south section line of Sections 25, 26, 27, 28, 29 and 30 of Township 25 South, Range 28 East, continuing west along the south section line of Sections 25 and 26, Township 25 South, Range 27 East to the right of way for County Road 545, thence south along the right of way line of County Road 545 to the southern boundary of Township 25 South, Range 27 East, thence westerly along said southern boundary to the west boundary of Township 25 South, Range 27 East, thence north along the west boundary of Township 25 South, Range 27 East, thence east along the northern boundary of Township 25 south to Shingle Creek, further provided, all local and state licenses are obtained, as required. As such, short term rental housing may be designated as a short term rental planned development (STRPD), subject to the standard considerations and criteria required in STRPD review. Short term rental housing shall be allowed only within those parts of the STRPD which are specifically designated as such.

2.   Begin at the intersection of the Boggy Creek Road as re-aligned and US Hwy 192 (SR 530); Thence southeasterly along the centerline of US Hwy 192 (SR 530) to the intersection with the east line of the west 1/2 of Section 24, Township 25 South, Range 29 East, said point being a point north of the northwest corner of Tract A of Magic Landings as recorded in Plat Book 11 Pages 184-187 of the public records of Osceola County, Florida; Thence south to the northwest corner of Tract A; Thence south along the westerly boundary of Tract A and Tract L to the northwest corner of Magic Landings Phase 2 as recorded in Plat Book 17 Pages 12-13 of the public records of Osceola County, Florida; Thence continue south along westerly boundary to the southwest corner of said subdivision; Thence easterly along the south line of said subdivision, to the northwesterly corner of Heritage Key Villas Phases 1 & 2 as recorded in Plat Book 18 Pages 121-126 of the public records of Osceola County, Florida; Thence southerly, along the westerly boundary of said subdivision, to the southwesterly corner of Tract W3, also being the southern boundary line of said subdivision; Thence southeasterly, along said southerly boundary of said subdivision, to the intersection of the northwesterly boundary line of Neptune Pointe as recorded in Plat Book 16 Pages 15-16 of the public records of Osceola County, Florida; Thence in a northeasterly direction, along said northern boundary of said subdivision, to the intersection of the west line of Section 30, Township 25 South, Range 30 East, Thence south along said west line to the most westerly corner of the Kingsland Property as recorded in Official Records Book 886, Page 100 of the public records of Osceola County, Florida; Thence southeasterly along the southwesterly line of said lands and a projection thereof, to the centerline of Shady Lane; Thence southwesterly along centerline of Shady Lane to the intersection of the centerline of Partin Settlement Road; Thence easterly along the centerline of Partin Settlement Road to the

-87-

intersection of the centerline of Florida's Turnpike; Thence northwesterly along the centerline of Florida's Turnpike to the intersection of the centerline of Boggy Creek Road; Thence westerly along the centerline of Boggy Creek Road to the centerline of Boggy Creek Road as re-aligned; Thence southwesterly, along centerline of said road, to the point of beginning.

As referenced in the planned development zoning district, short term rental housing may be allowed in the STRPD district, in accordance with other regulations of that district and other provisions of this Ordinance. Preliminary concept plan and final development plan shall clearly designate areas to be developed as short term rental housing, including net acreage and the number of housing units.

## C.   DEFINITIONS

1.   Dwelling is defined as a building or portion thereof, designed or used exclusively for residential occupancy, but not including hotels, lodging houses, time-share units or motels.

2.   Short term rental is defined as a land use, exhibiting characteristics common to both commercial and residential uses, in which a dwelling is leased or rented for a period of less than twenty-eight (28) days by a non-owner not making the dwelling his/her sole residency.

## D.   PROHIBITED USES

Short term rental housing shall be a prohibited use in all other zoning districts.

## E.   APPROVED SHORT TERM RENTAL DEVELOPMENTS

Short term rental developments approved as a conditional use or planned unit development by Osceola County prior to the adoption of the regulations contained herein, and developed in conjunction with all conditions of approval, may continue to operate as short term rental housing. A non-conforming STRPD shall be administered in accordance with Chapter 2 of this Ordinance.

-88-



**OSCEOLA COUNTY, FLORIDA**
**PLANNING COMMISSION AGENDA**
**JULY 19, 2007**

---

**• ▲ 8**

| | |
|---|---|
| **PD07-00015** | **LEGACY DUNES CONDOMINIUM ASSOCIATION, INCORPORATED (APPLICANT) VARIOUS OWNERS** |

---

**COMMISSION DISTRICT:**  1

**REQUEST:**  Request to amend Planned Development (PUD98-0026) by changing 488 dwelling units from long term rental to short term rental. (This action does not alter site improvements previously approved in PUD98-0026). The subject property consists of approximately 94 acres of land.

**LOCATION:**  South side of U.S. Highway 192, west of Lindfields Boulevard, and east of Osceola/Polk County line.

**ENGINEERING:**  Defer to Zoning.

**ZONING:**  Approval.

**PLANNING:**  Approval.  (PG)

Note:  Site is located in the Short Term Rental Overlay.

**TRANSPORTATION:** Approval.

Note:  This Planned Development application is proposing to amend PUD98-0026, which was approved by the BCC on August 31st, 1998, prior to the implementation of the Osceola County Concurrency Management System. The CDP for this development was subsequently approved on September 14th, 1998 and 488 long-term rental units have been constructed. The amendment to the PUD is proposing to revise the language of the development order to state that short-term rental units would be a permitted use. Short-term rental units on average have a lower trip generation rate than long-term rental units and therefore this Planned Development application is exempt from concurrency review.  (AM)

**GIS:**  Approval.  (SCW)

**ENVIRONMENTAL:**  Approval.  (JRH)

**PUBLIC SAFETY:**  Approval, subject to Standard Condition: PS2.

**SFWMD:**  Approval, subject to Standard Condition: SF1.

51

08/13/2007

**PC Action:**   Approval, subject to Standard and/or Special Conditions.

## Public Hearings

**Department of Community Development**
**Growth Management Division**

### APPROVED, SUBJECT TO STANDARD AND/OR SPECIAL CONDITIONS
22. PD07-00015   LEGACY DUNES CONDOMINIUM ASSOCIATION INCORPORATED
    (APPLICANT) VARIOUS OWNERS

**Commission District:**      1
**Request:**      Request to amend Planned Development (PUD98-0026) by changing 488 dwelling units from long term rental to short term rental. This action does not alter site improvements previously approved in PUD98-0026. The subject property consists of approximately 94 acres of land and is located on the south side of US 192, west of Lindfields Boulevard, and east of the Osceola/Polk County line.
**Staff Recommendation:**      Approval, subject to Standard and/or Special Conditions.
**PC Action:**   Approval, subject to Standard and/or Special Conditions.

### APPROVED, SUBJECT TO STANDARD AND/OR SPECIAL CONDITIONS
23. PD07-00016   MAESBURY HOMES INCORPORATED (APPLICANT AND OWNER)

**Commission District:**      1
**Request:**      Request to amend the previously approved Westside (PD07-00005) to allow for modifications on Parcel J (school site) and Parcel K (Village Center) consisting of approximately 75 acres of land within the Planned Mixed Use (PMUD) Zoning District. The inclusion of a middle school gymnasium necessitates the increase in Parcel J from 3-story or 30' to 3-story or a maximum of 50' to accommodate the proposed gym. The design for the Village Center has been refined to increase the building height from 5-story or 50' to 7-story or 100' including architectural features on building facades. The subject property is located on the south side of US 192, and east of the Osceola/Polk County line.
**Staff Recommendation:**      Approval, subject to Standard and/or Special Conditions.
**PC Action:**   Approval, subject to Standard and/or Special Conditions.

### APPROVED, SUBJECT TO STANDARD AND/OR SPECIAL CONDITIONS
24. PD07-00018   CANIN ASSOCIATES (APPLICANT) SIERRA LAND GROUP INCORPORATED
    (OWNER)

**Request:**      Request to approve a Planned Commercial Development (PCD) to allow for the development of a 300 room, 11-story hotel with an ancillary 30,000 square feet convention center, on approximately 8 acres of land within a Planned Development (PD) Zoning District. The applicant also requests the Planning Commission establishment of parking standards for this development that result in 377 on-site parking spaces. The subject property is located on the north side of Kyng's Heath Road, on the east side of Sadina Street, and on the west side of SR 535 (Vineland Road).
**Staff Recommendation:**      Approval, subject to Standard and/or Special Conditions.
**PC Action:**   Approval, subject to Standard and/or Special Conditions.

# OSCEOLA COUNTY, FLORIDA
## PLANNING COMMISSION AGENDA
### JULY 19, 2007

**5.**  **ZMA07-0033**  **OSCEOLA COUNTY SCHOOL DISTRICT (APPLICANT) BOGGY CREEK LANDINGS, LLC (OWNER)** Request to amend the Zoning Map by changing approximately 16 acres of land from Planned Residential (PRD) Zoning District and Agricultural Development and Conservation (AC; 5 acre minimum lot size) Zoning District to Public Institution (IN) Zoning District located east of Waters Edge Drive and south of Coco Bay Circle. Staff recommends approval.
This request is scheduled to be heard by the Board of County Commissioners at their **August 27**, 2007 meeting.

**6.**  **CU07-00008**  **OSCEOLA COUNTY SCHOOL DISTRICT (APPLICANT) BOGGY CREEK LANDINGS, LLC (OWNER)** Request to acknowledge the construction of a 27,000 sq. ft. two story classroom addition to the existing Ventura Elementary School site as a Conditional Use on approximately 16 acres of land within an Institutional (IN) Zoning District. (Pending ZMA07-0033 approval). The subject property is located east of Waters Edge Drive and south of Coco Bay Circle. Staff recommends approval, subject to Standard and Special Conditions.
This request is scheduled to be heard by the Board of County Commissioners at their **August 27**, 2007 meeting.

**7.**  **CDP07-0018**  **THE SCHOOL DISTRICT OF OSCEOLA COUNTY, FLORIDA (APPLICANT AND OWNER)** Request to approve the Comprehensive Development Plan to allow for construction of a two-story prototype elementary school which also includes parking, bus loop drop-off, covered play area, uncovered play courts, playground areas and open ball field area consisting of approximately 10 acres of land within the Harmony Planned Development (PD) Zoning District located on the east side of School House Road and south side of Cupseed Lane. Staff recommends approval, subject to Standard and Special Conditions.
This request is scheduled to be heard by the Board of County Commissioners at their **July 23**, 2007 meeting.

**8.**  **PD07-00015**  **LEGACY DUNES CONDOMINIUM ASSOCIATION, INCORPORATED (APPLICANT) VARIOUS OWNERS** Request to amend Planned Development (PUD98-0026) by changing 488 dwelling units from long term rental to short term rental. (This action does not alter site improvements previously approved in PUD98-0026). The subject property consists of approximately 94 acres of land located on the south side of U.S. Highway 192, west of Lindfields Boulevard, and east of Osceola/Polk County line. Staff recommends approval.
This request is scheduled to be heard by the Board of County Commissioners at their **August 13**, 2007 meeting.

**9.**  **PD07-00016**  **MAESBURY HOMES, INCORPORATED (APPLICANT AND OWNER)** Request to amend the previously approved Westside (PD07-00005) to allow for modifications on Parcel J (School site) and Parcel K (Village Center) consisting of approximately 75 acres of land within the PMUD. The inclusion of a middle school gymnasium necessitates the increase in Parcel J from 3-story or 30 feet to 3-story or a maximum of

**OSCEOLA COUNTY, FLORIDA**
**PLANNING COMMISSION AGENDA**
**JULY 19, 2007**

Gaylord Palms parking engineer in March 1999. The differences are inconsequential to the analysis.

However, there are claimed philosophical and operational differences. In addition to the convention facility, the Gaylord Palms routinely hosts attractions that are planned to generate excess traffic and parking requirements. For example: the China Ice; an outside helium balloon display & rides; a restaurant/night club that offers leading entertainers, soliciting non-hotel dinners.

The applicant claims to not offer such hosting for events slanted for non hotel guests. He recognizes that there may be unavoidable, occasional outside visitors to conventions staged by hotel residents, and he has provided 77 parking spaces above the hotel room count for their accommodation. This will provide a parking space to hotel room ratio of 1.26, which is consistent with similar hotel/convention facilities as reported in the narrative.

**PLANNING:**    Approval of request, subject to Standard Conditions: PL2 and PL4
Special Condition:
1. The applicant has elected to reserve capacity for 300 Hotel units and 30,000 square feet of ancillary Convention Center use. A Concurrency review has determined there to be sufficient capacity available to support this project and its proposed density/intensity. Therefore, the applicant shall make payment in accordance with Chapter 5 of the Osceola County Land Development Code. (AM, SR)

Support of the variance/waiver as stated. (CMC)

**PUBLIC SAFETY:**  Approval, subject to Standard Conditions: PS2, PS5, PS11, PS12 and PS14.

**SFWMD:**    Approval, subject to Standard Condition: SF1.

**PARKS &**
**RECREATION:**    Approved. (RM)

**NOTE:**    This request was continued at the June 7, 2007 Planning Commission meeting to the July 19, 2007 Planning Commission meeting. The applicant asked for additional time to address staff's concerns regarding the parking issue.

This request is scheduled to be heard by the Board of County Commissioners at their August 13, 2007 meeting.



PLAINTIFF'S
EXHIBIT
25
3-12-09   09

The applicable lease start date will be the turnover date of the Condominium from the Developer to Legacy Dunes Condominium Association, Inc. The lump sum lease payment will be paid to Purchaser the later of thirty (30) days from Unit Closing/funding or August 31, 2006.

**Assignment:**                                          (Initial)

This Purchase Agreement includes a one time assignment by Purchaser (Assignor) to a third party, (Assignee). Assignor may not assign this Purchase Agreement within thirty (30) days of the scheduled closing date as defined in the Purchase Agreement. The Assignee agrees to be bound by all the terms and conditions as stated in this Purchase Agreement as though Assignee were the original Purchaser. No changes to the Purchase Agreement may be made by either Assignor or Assignee. Upon assignment of this Purchase Agreement to Assignee the deposit associated with the unit remains non-refundable except for a Developer default as defined in the Purchase Agreement.

**Short Term Rental**                                      (Initial)

The Developer acknowledges the intent of Purchaser to place the unit associated with this Purchase Agreement into a short term rental pool. Should the Osceola County, Florida zoning classification associated with Legacy Dunes Condominium not allow for short-term rental within 120 days of the closing of this Purchase Agreement, Developer will refund Twenty Five Thousand Dollars ($25,000.00) to Purchaser.

PURCHASER(S):

_Karen M. Lubomski_                    _5-18-06_
(Buyer)                                (Date)

_KAREN M. LUBOMSKI_
Print Name

_Joseph L. Lubomski_                   _5-20-06_
(Co-Buyer)                             (Date)

_Joseph L. Lubomski_
Print Name

Lubomski_ 00307

115 E. Marks Street
Orlando, FL 32803
(407) 841-1343
(407) 841-1543 fax



DEVELOPMENT RESOURCES GROUP, LLC

# Memo



| | |
|---|---|
| **To:** | Sean Parkes |
| **From:** | Susan Lesczynski |
| **Date:** | January 27, 2009 |
| **Re:** | Legacy Dunes Contract |

Please note that this pricing is different from the pricing negotiated through the Mortgage Exchange.

You are getting the lowest price with the following:

- Commission is 4% on the <u>base</u> purchase price which is <u>$273,060.00</u>.

- HOA is waived until July 1, 2007

- Per your request the price was increased to allow you to have a higher lease-back amount of $35,000.00.

- *You cannot use The Mortgage Exchange for financing.* Please refer to the FAQ's for our preferred lenders. I already emailed you info for American Dream Financial.

- Closings will take place through The Title Place.



DEVELOPMENT RESOURCES GROUP, LLC



March 12, 2008

Better Business Bureau of Central Florida, Inc.
Attn: Beatrice Ford
1600 S. Grant Street
Longwood, FL 32750

Re:   Mr. Joseph Lubomski, case #92E6-F5E%

Dear Ms. Ford:

This correspondence is in response to your letter dated March 5, 2008 in reference to a complaint by
Mr. Joseph Lubomski regarding two condominium units that he and his wife purchased in the Legacy
Dunes Condominium (1-201 & 5-105). Firstly, the contracts referenced in this complaint are with
Legacy Dunes Condominium, LLC ("Legacy Dunes"), the developer of the Legacy Dunes
Condominium, not Development Resources Group, LLC ("DRG"). DRG does serve in the capacity
of managing member of the Legacy Dunes project. Secondly, Mr. Lubomski identifies Ryan Reinke
as salesperson for these units which is not true. Mr. Lubomski entered into his contracts with Legacy
Dunes through Real Estate Dreams, his licensed Florida real estate broker. Mr. Reinke had no
involvement with the sales of these units to the Lubomskis.

The Lubomskis, working through individuals associated with or agents of Real Estate Dreams, LLC,
purchased three units from Legacy Dunes. The two units for which Mr. Lubomski seeks additional
reimbursement were placed under contract in late June 2006 and had closing settlement dates of
October 2, 2006. The standard contacts for these two units were "as is" and "where is" and allowed
for property inspection prior to the date of closing. At the request of the Lubomskis' broker,
Addendum W as referenced by Mr. Lubomski was included in the contracts for these two units and
extended the right of inspection for 30 days post closing as these buyers were out of state and needed
additional time to complete the unit inspections. Mr. Lubomski's statement that unit inspections were
impossible at the time of closing because these units had tenants living in them is not true. This
scenario was not uncommon during the sale and conversion of the Legacy Dunes property and a
number of purchasers exercised their rights of inspection on units that were occupied by third parties
at the time of closing. Legacy Dunes has fully honored its contracts with the Lubomskis and declines
to provide additional reimbursement for "rent ready" repairs almost a year and a half after
conveyance of the units.

Please contact me directly at 407-841-1020 if you have any questions.

Sincerely,

James E. Wear Jr.

James E. Wear, Jr.
Authorized Member

115 E. Marks Street, Orlando, FL 32803   ◆   (407) 841-1020   ◆   Fax (407) 841-7050



DEVELOPMENT RESOURCES GROUP, LLC



April 14, 2008

Better Business Bureau of Central Florida, Inc.
Attn: Beatrice Ford
1600 S. Grant Street
Longwood, FL 32750

Re:     Mr Wayne Bartels, case #E871-A9E%

Dear Ms. Ford:

This correspondence is in response to your letter dated April 2, 2008 in reference to a complaint by Mr. Wayne Bartels regarding a condominium unit that he purchased in the Legacy Dunes Condominium. The contract referenced in this complaint is with Legacy Dunes Condominium, LLC ("Legacy Dunes"), the developer of the Legacy Dunes Condominium, not Development Resources Group, LLC ("DRG"). DRG does serve in the capacity of managing member of the Legacy Dunes project.

Mr. Bartels, working through individuals associated with or agents of Real Estate Dreams, LLC purchased unit 13-303 from Legacy Dunes. The unit for which Mr. Bartels seeks additional reimbursement was placed under contract on June 15, 2006 and had a closing settlement date of September 08, 2006. The contact for this unit was "as is" and "where is" and allowed for property inspection prior to the date of closing. At the request of the Mr. Bartels broker, Addendum W was included in this contract and extended the right of inspection for 30 days post closing as the Bartels were out of state and needed additional time to complete the unit inspections. Any items identified during the inspection period as needing repair or replacement would have been completed. Mr. Bartels assertion that he could not have seen his unit to respect the tenant's privacy is not true as all occupied units were available for inspection with proper planning and advanced notification of the tenant living in the units. Additionally, Mr. Bartels enlisted the assistance of independent counsel to review the aforementioned contract prior to closing and based on that review provided us with copy of his attorney's correspondence/questions. In that correspondence, Mr. Bartels' attorney states that "you have an opportunity to inspect the property prior to closing and which should specifically be made at the very last moment, so you can see its final condition before closing." Based on this fact, Mr. Bartels was aware of the time frames for inspection of the property. Legacy Dunes has fully honored its contract with Mr. Bartels and declines to provide additional reimbursement for "rent ready" repairs more than a year and a half after conveyance of the unit.

Please contact me directly at 407-841-1020 if you have any questions.

Sincerely,

James E. Wear Jr.
Authorized Member

Bartels_00007
04/15/2008 TUE  9:21   [JOB NO. 7315]   ☑001





March 18, 2008

Better Business Bureau of Central Florida, Inc.
Attn: Beatrice Ford
1600 S. Grant Street
Longwood, FL 32750

Re:     Mr Doug Hart, case #6487-0F4%

Dear Ms. Ford:

This correspondence is in response to your letter dated March 13, 2008 in reference to a complaint by Mr. Doug Hart regarding two condominium units that he purchased in the Legacy Dunes Condominium. The contract referenced in this complaint is with Legacy Dunes Condominium, LLC ("Legacy Dunes"), the developer of the Legacy Dunes Condominium, not Development Resources Group, LLC ("DRG"). DRG does serve in the capacity of managing member of the Legacy Dunes project.

Mr. Hart, working through individuals associated with or agents of Real Estate Dreams, LLC purchased units 4-203 & 19-201 from Legacy Dunes. The units for which Mr. Hart seeks additional reimbursement were placed under contract on May 25, 2006 (4-203) and June 23, 2006 (19-201) and both had a closing settlement date of September 29, 2006. The contract for unit 4-203 was "as is" and "where is" and allowed for property inspection prior to the date of closing. Any items identified during the pre-closing inspection as needing repair or replacement would have been completed prior to closing. The contract for unit 19-201 was also "as is" and "where is" and allowed for property inspection prior to the date of closing, however, it also contained Addendum W which extended the right of inspection for this unit to 30 days post closing. Legacy Dunes has fully honored its contract with Mr. Hart and declines to provide additional reimbursement for "rent ready" repairs almost a year and a half after conveyance of the units.

Please contact me directly at 407-841-1020 if you have any questions.

Sincerely,

James E. Wear Jr.

James E. Wear, Jr.
Authorized Member

DRG00176





PLAINTIFF'S EXHIBIT
40
3-12-09 GG

**Florida Department of**
# Business/
## Professional
## Regulation

🔲 **Log On**

**DBPR ONLINE SERVICES**

Home | Help | Site Map

11:11:10 AM 9/11/2008

🔲 **Public Services**
Search for a Licensee
Apply for a License
View Application Status
Apply to Retake Exam
Find Exam Information
File a Complaint
AB&T Delinquent
 Invoice & Activity
 List Search
🔲 **User Services**
Renew a License
Change License Status
Maintain Account
Change My Address
View Messages
Change My PIN
View Continuing Ed

🔲 Term Glossary
ⓘ Online Help (FAQs)

**Licensee Details**

**Licensee Information**

| | |
|---|---|
| Name: | **WEAR GROUP REALTY INC** (Primary Name) |
| | **(DBA Name)** |
| Main Address: | **7575 DR PHILLIPS BLVD #365** |
| | **ORLANDO Florida 32819** |
| County: | **ORANGE** |
| License Mailing: | |
| LicenseLocation: | **7575 DR PHILLIPS BLVD #365** |
| | **ORLANDO FL 32819** |
| County: | **ORANGE** |

**License Information**

| | |
|---|---|
| License Type: | **Real Estate Corporation** |
| Rank: | **RE Corp.** |
| License Number: | **CQ1023064** |
| Status: | **Current,Active** |
| Licensure Date: | **06/21/2005** |
| Expires: | **09/30/2009** |
| **Special Qualifications** | **Qualification Effective** |

View Related License Information

View License Complaint

| Terms of Use | | Privacy Statement |

Print

## Licensee

| | | | |
|---|---|---|---|
| Name: | **WEAR GROUP REALTY INC** | License Number: | **1023064** |
| Rank: | **Real Estate Corporation** | License Expiration Date: | **09/30/2009** |
| Primary Status: | **Current** | Original License Date: | **06/21/2005** |
| Secondary Status: | **Active** | | |

## Related License Information

| License Number | Status | Related Party | Relationship Type | Relation Effective Date | Rank | Expiration Date |
|---|---|---|---|---|---|---|
| 3026095 | Current, Active | DUNLAP, STONEY RAY | Employed By | 02/21/2007 | Real Estate Sales Associate | 03/31/2010 |
| 3184343 | Current, Active | LOADER, MICHAEL TIMOTHY | Employed By | 03/07/2008 | Real Estate Sales Associate | 09/30/2008 |
| 3194558 | Current, Active | MARSHALL, JENNIFER MARIE | Employed By | 05/30/2007 | Real Estate Sales Associate | 09/30/2008 |
| 3208705 | Current, Active | RAMPINO, JOHN WILLIAM | Qualifying Broker | 12/14/2007 | Real Estate Broker | 03/31/2009 |
| 633470 | Current, Active | WEAR, JAMES EDWARD | Employed By | 11/30/2005 | Real Estate Sales Associate | 09/30/2009 |
| 634966 | Current, Active | WEAR, JAMES EDWARD JR | Employed By | 11/30/2005 | Real Estate Sales Associate | 09/30/2009 |
| 680106 | Current, Active | WEAR, SHERRI D | Employed By | 12/29/2005 | Real Estate Sales Associate | 03/31/2009 |



**Legacy Dunes Condominium, LLC**
**Cooperating Marketing Agreement**

The following agreement ("Agreement") is entered into this 7th day of November, 2007 by and among David Lam, President, Skylines Properties Limited, at 9335 W. Sample Road, Coral Springs, FL 33065 ("Agent") and Timothy S. Tinsley ("Developer"), an Authorized Agent from Legacy Dunes Condominium, LLC.

The above referenced Agent and the Developer of Kissimmee's Legacy Dunes Condominium, at 3200 Legacy Boulevard, Kissimmee FL 34747, hereby acknowledge and agree to the following terms and conditions:

1.  In the event a prospective Purchaser enters into a Purchase Agreement and thereafter consummates the closing contemplated in the Purchase Agreement, the Developer agrees to pay Skylines Properties Limited a marketing fee as set forth on Schedule A for real property listed therein. Agent acknowledges that any adjustment to the sales prices as shown on Schedule A will result in a corresponding adjustment to the marketing fee and will be incorporated herein by subsequent Agreement addendum(s).

2.  Agent hereby acknowledges that in the event the transaction fails to close for any reason whatsoever or in the event of termination of the Purchase Agreement for any reason whatsoever, then, in such event, no marketing fee shall be deemed to have been earned by Agent and no sum of money shall be due and owing to Agent from Developer.

3.  Agent agrees to indemnify and hold harmless Legacy Dunes Condominium, LLC from and against any and all losses, claims, demands, costs relating to or arising out of any claim against Legacy Dunes Condominium, LLC or any of its agent or its employees as a result of representation or other conduct by Agent without the express written consent of Legacy Dunes Condominium, LLC.

4.  The execution of this Agreement by Agent shall be deemed to bind authorized Agent designated above and they shall be bound by the terms hereof.

5.  Agent agrees that all marketing material including electronic media and web-based marketing must be approved by the Developer prior to release to the public.

Accepted Ratified and Approved By:

By: _____        Date: _____
David Lam, President
Skylines Properties Limited

By: _____        Date: _____
James Wear, Jr., Authorized Agent
Legacy Dunes Condominium LLC

**Legacy Dunes Condominium, LLC**
**Cooperating Marketing Agreement**

### SCHEDULE A

| Unit | Unit Type | Address | City, State, Zip | Sales Price | Marketing Fee |
|------|-----------|---------|------------------|-------------|---------------|
| 15-107 | A2 | 8911 Legacy Court #15-107 | Kissimmee, FL 34747 | $244,382.00 | $70,870.78 |
| 13-103 | C1 | 8834 Dunes Court #13-103 | Kissimmee, FL 34747 | $384,703.00 | $111,747.00 |
| 16-305 | C1 | 8910 Legacy Court #16-305 | Kissimmee, FL 34747 | $384,703.00 | $111,747.00 |
| 6-202 | D1 | 8809 Dunes Court #6-202 | Kissimmee, FL 34747 | $408,000.00 | $114,616.00 |
| 12-101 | D1 | 8828 Dunes Court #12-101 | Kissimmee, FL 34747 | $408,000.00 | $114,616.00 |
| 13-301 | D1 | 8834 Dunes Court #13-301 | Kissimmee, FL 34747 | $408,000.00 | $114,616.00 |
| 16-101 | D1 | 8908 Legacy Court #16-101 | Kissimmee, FL 34747 | $408,000.00 | $114,616.00 |
| 16-102 | D1 | 8908 Legacy Court #16-102 | Kissimmee, FL 34747 | $408,000.00 | $114,616.00 |
| 16-307 | D1 | 8910 Legacy Court #16-307 | Kissimmee, FL 34747 | $408,000.00 | $114,616.00 |

Accepted Ratified and Approved By:

By: _____          Date: _____
David Lam, President
Skylines Properties Limited.

By: _____          Date: _____
James Wear, Jr., Authorized Agent
Legacy Dunes Condominium LLC

DRG00193

**Legacy Dunes Condominium, LLC**
**Cooperating Marketing Agreement**

The following agreement ("Agreement") is entered into this 7th day of November, 2007 by and among David Lam, President, Skylines Properties Limited, at 9335 W. Sample Road, Coral Springs, FL 33065 ("Agent") and Timothy S. Tinsley ("Developer"), an Authorized Agent from Legacy Dunes Condominium, LLC.

The above referenced Agent and the Developer of Kissimmee's Legacy Dunes Condominium, at 3200 Legacy Boulevard, Kissimmee FL 34747, hereby acknowledge and agree to the following terms and conditions:

1. In the event a prospective Purchaser enters into a Purchase Agreement and thereafter consummates the closing contemplated in the Purchase Agreement, the Developer agrees to pay Skylines Properties Limited a marketing fee as set forth on Schedule A for real property listed therein. Agent acknowledges that any adjustment to the sales prices as shown on Schedule A will result in a corresponding adjustment to the marketing fee and will be incorporated herein by subsequent Agreement addendum(s).

2. Agent hereby acknowledges that in the event the transaction fails to close for any reason whatsoever or in the event of termination of the Purchase Agreement for any reason whatsoever, then, in such event, no marketing fee shall be deemed to have been earned by Agent and no sum of money shall be due and owing to Agent from Developer.

3. Agent agrees to indemnify and hold harmless Legacy Dunes Condominium, LLC from and against any and all losses, claims, demands, costs relating to or arising out of any claim against Legacy Dunes Condominium, LLC or any of its agent or its employees as a result of representation or other conduct by Agent without the express written consent of Legacy Dunes Condominium, LLC.

4. The execution of this Agreement by Agent shall be deemed to bind authorized Agent designated above and they shall be bound by the terms hereof.

5. Agent agrees that all marketing material including electronic media and web-based marketing must be approved by the Developer prior to release to the public.

Accepted Ratified and Approved By:

By: _____     Date: 11/14/07
David Lam, President
Skylines Properties Limited

By: _____     Date: 11/14/07
James Wear, Jr., Authorized Agent
Legacy Dunes Condominium LLC

DRG00194

Legacy Dunes Condominium, LLC
Cooperating Marketing Agreement

SCHEDULE A

| Unit | Unit Type | Address | City State Zip | Sales Price | Marketing Fee |
|------|-----------|---------|----------------|-------------|---------------|
| 15-107 | A2 | 8911 Legacy Court #15-107 | Kissimmee, FL 34747 | $244,382.00 | $70,870.78 |
| 13-103 | C1 | 8834 Dunes Court #13-103 | Kissimmee, FL 34747 | $384,703.00 | $111,747.00 |
| 16-305 | C1 | 8910 Legacy Court #16-305 | Kissimmee, FL 34747 | $384,703.00 | $111,747.00 |
| 6-202 | D1 | 8809 Dunes Court #6-202 | Kissimmee, FL 34747 | $408,000.00 | $114,616.00 |
| 12-101 | D1 | 8828 Dunes Court #12-101 | Kissimmee, FL 34747 | $408,000.00 | $114,616.00 |
| 13-301 | D1 | 8834 Dunes Court #13-301 | Kissimmee, FL 34747 | $408,000.00 | $114,616.00 |
| 16-101 | D1 | 8908 Legacy Court #16-101 | Kissimmee, FL 34747 | $408,000.00 | $114,616.00 |
| 16-102 | D1 | 8908 Legacy Court #16-102 | Kissimmee, FL 34747 | $408,000.00 | $114,616.00 |
| 16-307 | D1 | 8910 Legacy Court #16-307 | Kissimmee, FL 34747 | $408,000.00 | $114,616.00 |

Accepted Ratified and Approved By:

By: _____     Date: 11/14/07
David Lam, President
Skylines Properties Limited.

By: _____     Date: 11/14/07
James Wear, Jr., Authorized Agent
Legacy Dunes Condominium LLC

DRG00195

Legacy Dunes Condominium, LLC
Cooperating Marketing Agreement

The following agreement ("Agreement"), is entered into this 1st day of June, 2007 by and among Jacqueline T. Wear, President, Wear Group Realty, Inc. of 7575 Dr. Phillips Blvd., Suite 365, Orlando, FL 32819 ("Agent") and Timothy S. Tinsley ("Developer"), an Authorized Agent from Legacy Dunes Condominium, LLC.

The above referenced Agent and the Developer of Kissimmee's Legacy Dunes Condominium, at 3200 Legacy Boulevard, Kissimmee FL 34747, hereby acknowledge and agree to the following terms and conditions:

1. In the event a prospective Purchaser from REINCLUB enters into a Purchase Agreement and thereafter consummates the closing contemplated in the Purchase Agreement, the Developer agrees to pay The Wear Group a commission of four percent (4%) of the original base purchase price (excluding premiums and/or add-ons-See Schedule A) for real property listed therein. An additional $2,000.00 will also be paid on all contracts brokered on behalf of REINCLUB.

2. Agent hereby acknowledges that in the event the transaction fails to close for any reason whatsoever or in the event of termination of the Purchase Agreement for any reason whatsoever, then, in such event, no commission shall be deemed to have been earned by Agent and no sum of money shall be due and owing to Agent from Developer.

3. Agent agrees to indemnify and hold harmless Legacy Dunes Condominium, LLC from and against any and all losses, claims, demands, costs relating to or arising out of any claim against Legacy Dunes Condominium, LLC or any of its agent or its employees as a result of representation or other conduct by Agent without the express written consent of Legacy Dunes Condominium, LLC.

4. The execution of this Agreement by Agent shall be deemed to bind authorized Agent designated above and they shall be bound by the terms hereof.

5. Agent agrees that all marketing material including electronic media and web-based marketing must be approved by the Developer prior to release to the public.

Accepted Ratified and Approved By:

By: _____
Jacqueline T. Wear, President
The Wear Group

Date: _6/1/07_

By: _____
Timothy S. Tinsley, Authorized Agent
Legacy Dunes Condominium LLC

Date: _6/1/07_

DRG00196

Legacy Dunes Condominium, LLC
Cooperating Brokerage Agreement
Schedule A

1. Original <u>base</u> purchase price (excluding premiums and/or add-ons) is as follows:

| | |
|---|---|
| A-1 | $165,360.00 |
| A-2 | $184,408.00 |
| A-3 | $191,232.00 |
| B-2 | $262,000.00 |
| B-3 | $273,060.00 |
| C-1 | $307,254.00 |
| D-1 | $330,480.00 |

2. Your Client Incentives are as follows:

   a) Developer will waive the 2% Developer Fee.
   b) COA dues waived through December 31, 2007.
   c) 30-day limited unit warranty
   d) A seller credit of $3,000.00 will be paid at closing if buyers close within 30 days as stipulated in Addendum S of the Purchase Agreement.

3. Developer leasebacks will be reduced by $5,000.00 and paid within 30 days of closing and funding of the purchase.

4. All incentives are subject to the terms and conditions of the Developer.

5. All earnest money deposits will be held by The Title Place and all closings conducted by The Title Place.

Accepted Ratified and Approved By:

By: _____            Date: 6\1\07
Jacqueline T. Wear, President
The Wear Group

By: _____            Date: 6/4/07
Timothy S. Tinsley, Authorized Agent
Legacy Dunes Condominium LLC

DRG00197

Nov. 9. 2006  5:26PM                                                No. 3843   P. 2

Legacy Dunes Condominium, LLC
Cooperating Brokerage Agreement

The following agreement ("Agreement"), is entered into this 25th day of October, 2006 by and among Andres Zamudio, Broker, A to Z Creative Realty of 3785 NW 82 Avenue, Suite 112, Doral, FL 33166, Fernando Zapata, Broker, American Homes and Loans Network of 3785 NW 82 Ave, Suite 112, Doral, FL 33166, Jacqueline T. Wear, President, Wear Group Realty, Inc. of 8512 Giovana Ct., Orlando, FL 32836 (collectively the "Agents") and Timothy S Tinsley ("Developer"), an Authorized Agent from Legacy Dunes Condominium, LLC.

The above referenced Agents and the Developer of Kissimmee's Legacy Dunes Condominium, at 3200 Legacy Boulevard, Kissimmee FL 34747, hereby acknowledge and agree to the following terms and conditions:

1. In the event a prospective Purchaser enters into a Purchase Agreement and thereafter consummates the closing contemplated in the Purchase Agreement, the Developer agrees to pay A to Z Creative Realty the commission noted on Schedule B (attached) for real property listed therein. A commission equal to two (2%) percent of the original base purchase price (excluding premiums and/or add-ons-see Schedule A) will be paid to Wear Group Realty, Inc., a Florida Licensed Real Estate Broker, for each real property sold under this agreement. A marketing fee as presented on Schedule A will be paid to American Homes and Loans Network.

2. Agents hereby acknowledge that in the event the transaction fails to close for any reason whatsoever or in the event of termination of the Purchase Agreement for any reason whatsoever, then, in such event, no commission or marketing fee shall be deemed to have been earned by Agents and no sum of money shall be due and owing to Agents from Developer.

3. Agents agree to indemnify and hold harmless Legacy Dunes Condominium, LLC from and against any and all losses, claims, demands, costs relating to or arising out of any claim against Legacy Dunes Condominium, LLC or any of its agents or its employees as a result of representation or other conduct by Agents without the express written consent of Legacy Dunes Condominium, LLC.

4. The execution of this Agreement by Agents shall be deemed to bind authorized Agents designated above and they shall be bound by the terms hereof.

5. Agents agree that all marketing material including electronic media and web-based marketing must be approved by the Developer prior to release to the public.

Accepted Ratified and Approved By:

By: _____          Date: 11/9/06
Andres Zamudio, Broker
A to Z Creative Realty

By: _____          Date: 11/9/06
Fernando Zapata, Broker
American Homes and Loans Network

By: _____          Date: 11/10/06
Jacqueline T. Wear, President
Wear Group Realty, Inc.

By: _____          Date: 11/30/06
Timothy S. Tinsley, Authorized Agent
Legacy Dunes Condominium LLC

DRG00182

Legacy Dunes Condominium, LLC
Cooperating Brokerage Agreement
Schedule A

1. Original base purchase price (excluding premiums and/or add-ons) is as follows:

| | |
|---|---|
| A-1 | $165,360.00 |
| A-2 | $184,408.00 |
| A-3 | $191,232.00 |
| B-2 | $262,000.00 |
| B-3 | $273,060.00 |
| C-1 | $307,254.00 |
| D-1 | $330,480.00 |

2. Your Client Incentives are as follows:

    a) Developer will waive the 2% Developer Fee.
    b) Long-term property management waived through June 30, 2007.
    c) COA dues waived through June 30, 2007
    d) 30-day limited unit warranty
    e) Guaranteed rent through June 30, 2007 (long-term tenancy only)

3. All Incentives are subject to the terms and conditions of the Developer.

4. Developer will pay a marketing fee to American Homes and Loans Network, Broker Fernando Zapata, 3785 NW 82 Ave. Suite 112, Doral, FL 33166 at closing as outlined

| | |
|---|---|
| A-1 | $53,197.00 |
| A-2 | $55,854.00 |
| A-3 | $56,567.00 |
| B-2 | $64,933.00 |
| B-3 | $66,010.00 |
| C-1 | $69,420.00 |
| D-1 | $73,907.00 |

5. All purchase agreements must be accompanied by $5,000.00 earnest money deposit.

6. All earnest money deposits will be held by The Title Place and all closings conducted by The Title Place.

7. Developer agrees to allow all purchasers to use the following lender:

Integrity Mortgage of America
Janeth Varges
3900 NW 79 Ave Suite # 209
Miami, FL 33166
Phone: 305-436-0050
Fax: 305-599-8284
Cell: 786-312-5822
E-Mail: jvargas@Provisionfc.Com

Schedule A - A to Z Realty

Andres Zamudio

Jacqueline T. Wear

Fernando Zapata

TST

DRG00183

Nov. 9. 2006  5:16PM                                              No.3540   P. 4

# LEGACY▸DUNES

## Schedule B

| Unit | | No. | Type | | Amount | Amount | | | | | | | Total |
|------|---|-----|------|---|--------|--------|---|---|---|---|---|---|-------|
| 10-103 | A1 | 636 | Conservation | | $146.32 | $220,287 | $53,197 | $165,380 | $11,575 | $3,616 | $3,307 | $18,498 |
| 10-202 | A1 | 636 | Conservation | End Unit | $146.32 | $221,287 | $53,197 | $165,380 | $11,575 | $3,616 | $3,307 | $18,498 |
| 10-204 | A1 | 636 | Conservation | | $146.32 | $216,287 | $53,197 | $165,380 | $11,575 | $3,616 | $3,307 | $18,498 |
| 20-102 | A1 | 635 | Nature | End Unit | $146.32 | $217,787 | $53,197 | $165,380 | $11,575 | $3,616 | $3,307 | $18,498 |
| 20-103 | A1 | 635 | | | $146.32 | $216,287 | $53,197 | $165,380 | $11,575 | $3,616 | $3,307 | $18,498 |
| 20-104 | A1 | 636 | Nature | | $146.32 | $215,287 | $53,197 | $165,380 | $11,575 | $3,616 | $3,307 | $18,498 |
| 20-106 | A1 | 636 | Nature | | $146.32 | $215,287 | $53,197 | $165,380 | $11,575 | $3,616 | $3,307 | $18,498 |
| 20-108 | A1 | 636 | Nature | End Unit | $146.32 | $217,787 | $53,197 | $165,380 | $11,575 | $3,616 | $3,307 | $18,498 |
| 26-203 | A1 | 636 | Nature | | $146.32 | $219,787 | $53,197 | $165,380 | $11,575 | $3,616 | $3,307 | $18,498 |
| 26-204 | A1 | 635 | Nature | | $146.32 | $251,787 | $53,197 | $165,380 | $11,575 | $3,616 | $3,307 | $18,498 |
| 20-205 | A1 | 635 | Nature | | $146.32 | $213,787 | $53,197 | $165,380 | $11,575 | $3,616 | $3,307 | $18,498 |
| 20-206 | A1 | 636 | Nature | | $146.32 | $213,787 | $53,197 | $165,380 | $11,575 | $3,616 | $3,307 | $18,498 |
| 20-207 | A1 | 636 | Nature | End Unit | $146.32 | $216,287 | $53,197 | $165,380 | $11,575 | $3,616 | $3,307 | $18,498 |
| 20-208 | A1 | 636 | Nature | End Unit | $146.32 | $216,287 | $53,197 | $165,380 | $11,575 | $3,616 | $3,307 | $18,498 |
| 20-302 | A1 | 636 | Nature | End Unit | $146.32 | $217,787 | $53,197 | $165,380 | $11,575 | $3,616 | $3,307 | $18,498 |
| 20-304 | A1 | 636 | Nature | | $146.32 | $215,287 | $53,197 | $165,380 | $11,575 | $3,616 | $3,307 | $18,498 |
| 20-306 | A1 | 636 | Nature | | $146.32 | $215,287 | $53,197 | $165,380 | $11,575 | $3,616 | $3,307 | $18,498 |
| 20-308 | A1 | 636 | Nature | End Unit | $146.32 | $217,787 | $53,197 | $165,380 | $11,575 | $3,616 | $3,307 | $18,498 |
| 1-207 | A2 | 712 | | | $163.77 | $234,382 | $55,854 | $184,403 | $12,909 | $3,744 | $3,688 | $20,341 |
| 1-209 | A2 | 712 | | | $163.77 | $234,382 | $55,854 | $184,403 | $12,909 | $3,744 | $3,688 | $20,341 |
| 16-106 | A2 | 712 | | | $163.77 | $235,882 | $55,854 | $184,403 | $12,909 | $3,744 | $3,688 | $20,341 |
| 15-206 | A2 | 712 | Nature | | $163.77 | $234,382 | $55,854 | $184,403 | $12,909 | $3,744 | $3,688 | $20,341 |
| 15-206 | A2 | 712 | Nature | | $163.77 | $234,382 | $55,854 | $184,403 | $12,909 | $3,744 | $3,688 | $20,341 |
| 15-207 | A2 | 712 | Partial Nature | | $163.77 | $234,382 | $55,854 | $184,403 | $12,909 | $3,744 | $3,688 | $20,341 |
| 15-305 | A2 | 712 | Nature | | $163.77 | $236,882 | $55,854 | $184,403 | $12,909 | $3,744 | $3,688 | $20,341 |
| 15-307 | A2 | 712 | Partial Nature | | $163.77 | $236,882 | $55,854 | $184,403 | $12,909 | $3,744 | $3,688 | $20,341 |

Schedule B-A to Z Creative Realty
1 of 2

Andres Zamudio

Jacqueline T. Woal

Fernando Zapata

Nov. 9. 2006  5:26PM                    No.3840   P. 5

# LEGACY·DUNES

Schedule B



| Unit | Bldg | Br/Ba | Sq Ft | Nature | End Unit | Sales Price (A to Z Share) | Total Sales Price | Maximum Sales Price (A to Z Maximum) | Original Purchase Price (Preliminary) | Commission to A to Z Sales (Balance) | Commission to A to Z Creative Sales (Balance) | Creative Sales Price (Balance) | Total Commission |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13-201 |  | 3/1 | 747 |  |  | $171.78 |  | $4,530 | $191,233 | $13,303 | $4,312 | $5,825 | $31,553 |
| 13-205 |  | 3/2 | 1249 |  |  | $267.02 | $368,703 | $89,420 | $307,284 | $21,508 | $6,230 | $6,145 | $33,882 |
| 13-206 |  | 3/2 | 1249 |  |  | $267.02 | $368,703 | $86,420 | $307,284 | $21,508 | $6,230 | $6,745 | $33,882 |
| 5-201 |  | 4/2 | 1377 | Water |  | $318.40 | $402,315 | $73,907 | $330,480 | $23,134 | $6,708 | $5,610 | $35,453 |
| 5-205 |  | 4/2 | 1377 | Water |  | $318.40 | $404,815 | $73,907 | $330,480 | $23,134 | $6,708 | $5,610 | $35,453 |
| 12-207 |  | 4/2 | 1377 | Nature |  | $318.40 | $405,315 | $73,907 | $330,480 | $23,134 | $6,708 | $5,610 | $35,453 |
| 13-301 |  | 4/2 | 1377 |  |  | $318.40 | $394,315 | $73,907 | $330,480 | $23,134 | $6,708 | $5,610 | $35,453 |
| 16-101 |  | 4/2 | 1377 |  |  | $318.40 | $394,315 | $73,907 | $330,480 | $23,134 | $6,708 | $5,610 | $35,453 |
| 16-102 |  | 4/2 | 1377 |  |  | $318.40 | $399,315 | $73,907 | $330,480 | $23,134 | $6,708 | $5,610 | $35,453 |
| 16-107 |  | 4/2 | 1377 |  |  | $318.40 | $399,315 | $73,907 | $330,480 | $23,134 | $6,708 | $5,610 | $35,453 |
| 16-108 |  | 4/2 | 1377 |  |  | $318.40 | $399,315 | $73,907 | $330,480 | $23,134 | $6,708 | $5,610 | $35,453 |
| 19-207 |  | 4/2 | 1377 |  |  | $318.40 | $384,815 | $73,907 | $330,480 | $23,134 | $6,708 | $5,610 | $35,453 |
| 19-208 |  | 4/2 | 1377 |  |  | $318.40 | $394,815 | $73,907 | $330,480 | $23,134 | $6,708 | $5,610 | $35,453 |
| 16-304 |  | 4/2 | 1377 |  |  | $318.40 | $386,315 | $73,907 | $330,480 | $23,134 | $6,708 | $5,610 | $35,453 |
| 16-307 |  | 4/2 | 1377 |  |  | $318.40 | $395,315 | $73,907 | $330,480 | $23,134 | $6,708 | $5,610 | $35,453 |
| 16-308 |  | 4/2 | 1377 |  |  | $318.40 | $395,315 | $73,907 | $330,480 | $23,134 | $6,708 | $5,610 | $35,453 |



Angel Zamudio

Jacqueline T. Wear

Fernando Zapata

TST

<u>MARKETING AGREEMENT</u>

THIS MARKETING AGREEMENT is made and entered into as of the 7th day of February, 2007 by and between LEGACY DUNES CONDOMINIUM LLC, a Florida limited liability company ("**Owner**"), whose address is 115 E. Marks Street, Orlando, Florida 32803 and GLOBAL EQUITY MANAGEMENT SOLUTIONS, LLC, a Florida limited liability company ("**Marketer**"), whose address is 100 East Pine Street, Suite 208, Orlando, Florida 32801.

<u>RECITALS</u>

A.     Owner is the owner of that certain real property located at 3200 Legacy Dunes Boulevard, Kissimmee, Florida 34747 located in Osceola County, Florida commonly known as "Legacy Dunes Condominium" (the "**Property**").

B.     Owner desires to obtain Marketer's services in connection with the marketing of those certain condominium units on the Property as listed on **Exhibit A** attached hereto and made a part hereof (the "**Units**").

C.     Marketer desires to render services on behalf of Owner in connection with the marketing of the Units.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, Owner and Marketer hereby agree as follows:

1.     <u>Appointment of Marketer</u>. Owner gives and grants unto Marketer the right and authority to market the Units in accordance with the terms and conditions set forth herein.

2.     <u>Term of Agreement</u>. The term of this Agreement will commence upon the date as listed above and will end sixty (60) days from such commencement date, unless sooner terminated pursuant to the provisions hereof. **There are no default provisions listed hereof or below.**

3.     <u>Marketing Fees</u>.

(a)     Upon the closing of the sale of all Units listed on Exhibit A to prospective purchasers procured by the Marketer , Marketer shall have earned a marketing fee (the "**Marketing Fee**") equal to Nine Hundred Fifty Thousand Dollars ($950,000.00). Notwithstanding the foregoing, in the event that less than 100% of all of the Units sell within the term of this Agreement, then Marketer shall earn the Marketing Fee minus Seventy Thousand Dollars ($70,000.00) per Unit that fails to close during the term hereof.

4.     <u>Miscellaneous Provisions</u>

1

O0339125v1 03/23/2007



DRG00186

(a)     Notices.  Any notices or other communications which may be required or desired to be given under the terms of this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered or mailed by United States Certified Mail, Return Receipt Requested, postage prepaid, addressed to the respective party at the address or addresses set forth hereinabove.  Any notice so given, delivered or made by mail shall be deemed to have been duly given, delivered or made on the date the same as received by the intended recipient.  Either party may change the address to which notices are to be sent by such party by written notice to the other party specifying such change of address.

(b)     Attorneys' Fees.  In connection with any litigation, including appellate, bankruptcy or administrative proceedings, arising out of or under this Agreement, the prevailing party in such litigation shall be entitled to recover such party's out-of-pocket costs and reasonable attorneys' fees.

(c)     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

(d)     Successors and Assigns.  The terms and provisions of this Agreement shall bind, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns.  The rights of Marketer under this Agreement may not be assigned without the prior written consent of Owner, which consent may be withheld in Owner's sole and complete discretion.

(e)     Entire Agreement.  This Agreement (and all exhibits hereto) constitutes the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and supersedes any and all prior or contemporaneous agreements, whether written or oral.  No covenants, agreements, terms, provisions, undertakings, statements, representations or warranties, whether written or oral, made or executed by any party hereto or any employee or agent thereof, shall be binding upon any party hereto unless specifically set forth in this Agreement.

(f)     Modification and Waiver.  This Agreement may not be changed, amended or modified in any respect whatsoever, nor may any covenant, agreement, condition, requirement, provision, warranty or obligation contained herein be waived, except in writing signed by both parties.

2

O0339125v1 03/23/2007



DRG00187

(g)     Governing Law; Venue.  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.  In the event of any legal or equitable action arising under this Agreement, the venue for such action shall lie exclusively within either the state courts of Florida located in Orange County, Florida, or the United States District Court for the Middle District of Florida, Orlando Division, as the case may be, and the parties hereto do hereby specifically waive any other jurisdiction and venue

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on the date shown above the signature of each.

WITNESSES:

"OWNER"

LEGACY DUNES CONDOMINIUM LLC, a Florida limited liability company

By: _____
Name: _____ Ryan Parke _____
Print Name: _M.qq6- Bornfrevnd_     Title: _Authorized Member, Legacy Dune Condominium LLC_

"MARKETER"

GLOBAL EQUITY MANAGEMENT SOLUTIONS, LLC, a Florida limited liability company

By: PARKES & HOLLY, LLC,
      MANAGER

By: _____
Print Name: _Matthew Bornfreund_     Name:  Sean C. Parkes
                                                             Title:   Manager

3

O0339125v1 03/23/2007

DRG00188

| Global Equity Management Solutions / Legacy Dunes Condominiums Unit List | | |
|---|---|---|
| | | |
| 06-207 | 13-104 | 16-301 |
| 07-207 | 13-201 | 16-308 |
| 12-207 | 13-207 | 17-207 |
| 12-208 | 16-108 | 18-203 |
| 13-101 | 16-208 | -- |

**EXHIBIT A**       INITIALS GEMS _____       INITIALS LEGACY _____

DRG00189

Legacy Dunes Condominium, LLC
Cooperating Marketing Agreement

The following agreement ("Agreement") is entered into this 23rd day of September, 2008 by and among Maria Henry, authorized person, Vend LLC, at 8306 Mills Dr 504, Miami, FL 33183 ("Agent") and Michael K. Halpin, managing member, Development Resources Group, LLC, managing member, Legacy Dunes Condominium LLC ("Developer").

The above referenced Agent and the Developer of Kissimmee's Legacy Dunes Condominium, at 3200 Legacy Boulevard, Kissimmee FL 34747, hereby acknowledge and agree to the following terms and conditions:

1. In the event a prospective Purchaser enters into a Purchase Agreement and thereafter consummates the closing contemplated in the Purchase Agreement, the Developer agrees to pay Vend LLC a marketing fee as set forth on Schedule A for real property listed therein

2. Agent hereby acknowledges that in the event the transaction fails to close for any reason whatsoever or in the event of termination of the Purchase Agreement for any reason whatsoever, then, in such event, no marketing fee shall be deemed to have been earned by Agent and no sum of money shall be due and owing to Agent from Developer.

3. Agent agrees to indemnify and hold harmless Legacy Dunes Condominium, LLC from and against any and all losses, claims, demands, costs relating to or arising out of any claim against Legacy Dunes Condominium, LLC or any of its agent or its employees as a result of representation or other conduct by Agent without the express written consent of Legacy Dunes Condominium, LLC.

4. The execution of this Agreement by Agent shall be deemed to bind authorized Agent designated above and they shall be bound by the terms hereof.

5. Agent agrees that all marketing material including electronic media and web-based marketing must be approved by the Developer prior to release to the public.

Accepted Ratified and Approved By:

By: _____          Date: _____
Maria Henry, Authorized Person
Vend LLC


By: _____          Date: _____
Michael K. Halpin, Managing Member, Development
Resources Group, LLC, Managing Member of
Legacy Dunes Condominium, LLC

DRG00190

Legacy Dunes Condominium, LLC
Cooperating Marketing Agreement

### SCHEDULE A

| Unit | Unit Type | Address | City, State, Zip | Sales Price | Marketing Fee |
|------|-----------|---------|------------------|-------------|---------------|
| 15-107 | A2 | 8911 Legacy Court #15-107 | Kissimmee, FL 34747 | $65,000.00 | $6,500.00 |
| 18-103 | B1 | 8919 Legacy Court #18-103 | Kissimmee, FL 34747 | $99,000.00 | $9,900.00 |
| 19-207 | B3 | 8925 Legacy Court #19-207 | Kissimmee, FL 34747 | $105,000.00 | $10,500.00 |
| 13-103 | C1 | 8834 Dunes Court #13-103 | Kissimmee, FL 34747 | $110,000.00 | $11,000.00 |
| 16-305 | C1 | 8910 Legacy Court #16-305 | Kissimmee, FL 34747 | $110,000.00 | $11,000.00 |
| 6-202 | D1 | 8809 Dunes Court #6-202 | Kissimmee, FL 34747 | $135,000.00 | $13,500.00 |
| 12-101 | D1 | 8828 Dunes Court #12-101 | Kissimmee, FL 34747 | $135,000.00 | $13,500.00 |
| 13-301 | D1 | 8834 Dunes Court #13-301 | Kissimmee, FL 34747 | $135,000.00 | $13,500.00 |
| 13-308 | D1 | 8836 Dunes Court #13-308 | Kissimmee, FL 34747 | $145,000.00 | $14,500.00 |
| 16-101 | D1 | 8908 Legacy Court #16-101 | Kissimmee, FL 34747 | $145,000.00 | $14,500.00 |
| 16-102 | D1 | 8908 Legacy Court #16-102 | Kissimmee, FL 34747 | $135,000.00 | $13,500.00 |
| 16-307 | D1 | 8910 Legacy Court #16-307 | Kissimmee, FL 34747 | $135,000.00 | $13,500.00 |

| Garage Number | Sales Price | Marketing Fee |
|---------------|-------------|---------------|
| G12 | $12,000.00 | $1,200.00 |
| G21 | $12,000.00 | $1,200.00 |
| G28 | $12,000.00 | $1,200.00 |
| G29 | $12,000.00 | $1,200.00 |
| G37 | $12,000.00 | $1,200.00 |
| G44 | $12,000.00 | $1,200.00 |
| G46 | $12,000.00 | $1,200.00 |

Accepted Ratified and Approved By:

By: _____          Date: _____
Maria Henry, Authorized Person
Vend LLC


By: _____          Date: _____
Michael K. Halpin, Managing Member, Development
Resources Group, LLC, Managing Member of
Legacy Dunes Condominium, LLC

DRG00191