UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
CASE NO. 6:08-CV-01349-GAP-DAB

ALBERT ALUNNI, ET AL,

        Plaintiffs,

vs.

DEVELOPMENT RESOURCES GROUP,
LLC, a Florida limited liability
company, LEGACY DUNES
CONDOMINIUM, LLC, a Florida
limited liability company,
MICHAEL K. HALPIN, JAMES E.
WEAR, TIMOTHY S. TINSLEY, THE
REAL ESTATE INVESTMENT GROUP,
LTD., an Illinois corporation,
JOSEPH ALDEGUER, JILL MOORE,
REAL ESTATE DREAMS, LLC, a
Florida limited liability
company, SEAN C. PARKES, JEREMY
HOLLY, GENEVA HOSPITALITY
MANAGEMENT, LLC, a Wisconsin
limited liability company, SAL
SARDINIA, and CHANDRA WEBSTER,

        Defendants.

_____/


THE DEPOSITION OF

JILL MOORE


Ullman & Ullman, P.A.

150 East Palmetto Park Road, Suite 650

Boca Raton, Florida

March 12, 2009

9:00 a.m.

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 5

APPEARANCES:
On behalf of the Plaintiffs:
SEIDEN, ALDER, MATTHEWMAN & BLOCH, P.A.
7795 NW Beacon Square Boulevard
Suite 201
Boca Raton, Florida 33487
561.416.0170
BY: JOEL B. ROTHMAN, ESQ.

RONALD S. NISONSON, P.A.
120 East Palmetto Park Road
Suite 100
Boca Raton, Florida 33432
561.544.8980
BY: RONALD S. NISONSON, ESQ.
On behalf of the Defendants:
SHUTTS & BOWEN, LLP
300 South Orange Avenue
Suite 1000
Orlando, Florida 32802
407.423.3300
BY: MICHAEL L. GORE, ESQ.

Shutts & Bowen, LLP
201 South Biscayne Boulevard
Suite 1500
Miami, Florida 33131
305.3586300
BY: JONATHAN COHEN, ESQ.
GREENBERG TRAURIG, P.A.
450 South Orange Avenue
Suite 650
Orlando, Florida 32801
407.418.2360
BY: CHRISTOPHER JOHNSEN, ESQ.

On behalf of the Defendants:
Ullman & Ullman, P.A.
150 E. Palmetto Park Road
Suite 650
Boca Raton, Florida 33432
561.338.3535
BY: ANTHONY ARAGONA, ESQ.

| 15 | 2006 Employee List | 36 |
| 16 | Own a Hotel Room Articles of Organization | 40 |
| 17 | X Managment Qualification | 41 |
| 18 | REIG and Real Estate Dreams Agreement | 48 |
| 19 | REIG and Real Estate Dreams Settlement Agreement | 55 |
| 20 | Personal Financial Statement of Jill Moore | 63 |
| 21 | List of Creditors | 102 |
| 22 | Statement of Affairs of TME | 104 |
| 23 | The Mortgage Exchange Schedules | 107 |
| 24 | Own a Hotel Room Website Printout | 108 |
| 25 | Own a Hotel Room Blog Printout | 110 |
| 26 | REIG Task Force Project Letter | 119 |
| 27 | Excel File Spreadsheet | 126 |
| 28 | X Management Cancellation Request Form | 127 |
| 29 | Short-Term Program Offer | 128 |

Page 5

Also present:
James Wear

REPORTED BY:
Alexa R. Goldman, FPR
U.S. Legal Support, Inc.
Klein, Bury, Reif, Applebaum & Associates, Inc.
444 West Railroad Avenue, Suite 300
West Palm Beach, FL 33401
561.835.0220

```
 1             P R O C E E D I N G S
 2                     - - -
 3        Taken before Alexa Goldman, Florida
 4   Professional Reporter and Notary Public in and for the
 5   State of Florida at Large, in the above cause.
 6                     - - -
 7   Thereupon,
 8                Jill Moore,
 9   having been first duly sworn or affirmed, was examined
10   and testified as follows:
11        THE WITNESS:  Yes.
12             DIRECT EXAMINATION
13   BY MR. ROTHMAN:
14        Q.  Could you please state your name for the
15   record?
16        A.  My name is Jill Moore Van Doren.  In business
17   everybody would know me by Jill Moore.
18        Q.  What is your business currently?
19        A.  Currently there really isn't any incoming
20   business that's been coming.
21        Q.  Are you been unemployed currently?
22        A.  I have been taking a lot of time with my
23   children.  Yes.
24        Q.  I know you've had your deposition taken
25   before so you know that you need to answer my
```

2 (Pages 2 to 5)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 6

1   questions out loud with a yes or no.  If you nod your
2   head, the reporter can't take that down.  She needs
3   to hear answers, so if you could please answer yes or
4   no to my questions, okay?
5       A.  Yes.
6       Q.  If there's any questions I ask you that you
7   don't understand, then please let me know and I will
8   happily rephrase the question.  I don't want you to
9   guess, I don't want you to be unsure.  I want to make
10  sure you understand what's being asked so that the
11  answers that you give can be relied upon in this case
12  by the judge and by the jury so that we know you
13  understood the question and you answered to the best
14  of your ability, okay?
15      A.  Yes.
16      Q.  Okay.  Great.  Give us, if you can, a brief
17  description of your employment history.  And if you
18  want to work backwards from today, that's fine.  If
19  you want to work forwards from, you know, your first
20  position, either way you want to do it is fine.
21      A.  Working backwards from when I started at The
22  Mortgage Exchange.
23      Q.  Okay.
24      A.  Is that what you're asking?
25      Q.  Sitting here today you say you're unemployed.

Page 7

1   Let's go to the last position you had, the last
2   employment that you had and, you know, we can keep
3   working back from there.
4       A.  Okay.  The Mortgage Exchange and the Real
5   Estate Investment Group and X Management and Own a
6   Hotel Room were all affiliated together.  I was the
7   CFO primarily of The Mortgage Exchange.
8       Q.  Were you also the CFO of the other entities
9   you mentioned?
10      A.  Well, I did take care of the accounting and
11  the payroll of all of the affiliates.  Yes.
12      Q.  Okay.  Any other companies that were part of
13  this group of affiliated companies?  Title Exchange,
14  was that another one?
15      A.  The Title Exchange did not have ownership
16  from The Mortgage Exchange, but it did have ownership
17  from another company that wasn't affiliated but they
18  did work together.
19      Q.  What was that other company?
20      A.  Exchange Holdings.
21      Q.  Who owned Exchange Holdings?
22      A.  Myself and Joe.
23      Q.  Was it a corporation?
24      A.  I believe so.
25      Q.  All right.  By Joe, you mean Joe Aldeguer?

Page 8

1       A.  Yes.
2       Q.  A-L-D-E-G-U-E-R?
3       A.  Correct.
4       Q.  Was The Title Exchange an entity like a
5   corporation or a limited liability company or was it
6   just doing business by that name?
7       A.  The Title Exchange, I do not remember offhand
8   if it's an LLC or incorporated.
9       Q.  Okay.  One or the other?
10      A.  I don't remember offhand.
11      Q.  Okay.  Besides The Title Exchange, what else
12  did Exchange Holdings own?
13      A.  I believe that that is it.  Exchange Holdings
14  did not have any activity.
15      Q.  Other than owning The Title Exchange?
16      A.  Exactly.
17      Q.  Are there any other entities in which you
18  have ever been an owner -- and I'm not asking about
19  shares in Citigroup or, you know, Procter and Gamble
20  or anything publicly traded on the exchange -- any
21  small corporations or small businesses like Mortgage
22  Exchange or Exchange Holdings in which you have you
23  have ever been an owner in any way?
24      A.  If there was any other incorporated companies
25  that I had my name on?  To the best my recollection

Page 9

1   there was never any actual business done in them.
2   They may have been opened with an idea of doing
3   something but none that had actually done anything
4   that I can recall my name on.
5       Q.  What, for example, what are some -- what are
6   those companies?
7       A.  Well, for instance, there's a company called
8   Platinum Holdings.  It was opened up to possibly put
9   real estate in, but then nothing went in it.
10      Q.  Okay.  Any other companies?
11      A.  RBC Ops.
12      Q.  Okay.
13      A.  Again, nothing -- it never did any business.
14  I feel that I'm forgetting some, but they're just not
15  coming to me right now.
16      Q.  In any case, these other companies whose
17  names you can't recall didn't do any business, didn't
18  earn any money?  You were an owner of these
19  companies, but they had no business?
20      A.  Correct.
21      Q.  So the companies that did have business that
22  you had been an owner in are The Mortgage Exchange,
23  Real Estate Investment Group, Own a Hotel Room, X
24  Management, Exchange Holdings, Inc., those five
25  companies, correct?

3  (Pages 6 to 9)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 10

1    A.  Exchange Holdings, Inc. actually didn't make
2  any money, but The Title Exchange did, to make that
3  clear.
4    Q.  Title Exchange was an active business that
5  was a title company, right, that closed real estate
6  transactions?
7    A.  Correct.
8    Q.  If the Exchange Holdings, Inc. owned Title
9  Exchange and you were 50 percent owner of Exchange
10 Holdings, Inc., then you were entitled to 50 percent
11 of the profits or the losses or anything associated
12 with Exchange Holdings, Inc. and the business that
13 The Title Exchange did for it, correct?  Is that
14 accurate?
15   A.  The money never floated up to Exchange
16 Holdings.  I want to make sure that's -- it stopped
17 at Title Exchange.
18   Q.  Who were the owners of The Title Exchange
19 Inc?  I thought I understood you saying Exchange
20 Holdings, Inc. was -- owned The Title Exchange, Inc.?
21   A.  I believe that is how it is set up.  It's
22 just the money never floated up.
23   Q.  Where did the money go?
24   A.  It just stayed in The Title Exchange, paid
25 the bills of The Title Exchange, and the bills of The

Page 11

1  Title Exchange.
2    Q.  Is The Title Exchange still in business?
3    A.  No.  No activity.
4    Q.  No activity?
5    A.  It is still incorporated, but there's no
6  activity.
7    Q.  Did that stop when The Mortgage Exchange
8  filed for bankruptcy?
9    A.  Yes, it did.
10   Q.  Who were the officers of The Title Exchange?
11   A.  I don't recall how it was set up.  It was
12 probably set up as myself and Joe, but I'm -- I'm not
13 positive.
14   Q.  So is Joe Aldeguer president?
15   A.  It would have made sense that he was
16 president, yes.
17   Q.  Were you a vice president?
18   A.  No.  I don't think it showed on there like --
19 you know what, I'm not sure how it shows.
20   Q.  Who ran the day-to-day business of The Title
21 Exchange?
22   A.  Well, there was a lady by the name of Joan
23 that entered through the titles in the computer and
24 it would go through Stewart Title.
25   Q.  Was Joe Aldeguer's sister Mira Aldeguer

Page 12

1  involved at all in the business The Mortgage
2  Exchange?
3    A.  Mira worked for Stewart Title.
4    Q.  Stewart Title, the huge title company that
5  issues title policies in Chicago?
6    A.  Yes.
7    Q.  So she didn't work for Title Exchange, Inc.?
8    A.  No.
9    Q.  Did she have any involvement whatsoever in
10 the business of The Title Exchange?
11   A.  No.
12   Q.  All right.  So you have given us your
13 description of your -- of the companies that you
14 worked for immediately prior to now.  And my
15 understanding is you're associated with The Mortgage
16 Exchange and its other affiliated companies -- if you
17 ever need to take a break for any reason, let me
18 know.
19   A.  Thank you.
20   Q.  Associated with Mortgage Exchange and other
21 affiliated companies for many years?
22   A.  Yes.
23   Q.  Going back to when?  When did you first start
24 working for The Mortgage Exchange?
25   A.  I believe it was 1995.

Page 13

1    Q.  You were -- were you married to Joe Aldeguer
2  at the time?
3    A.  No, I was not.
4    Q.  How did you come to meet Joe Aldeguer?
5    A.  I worked at a Chicago health club and he
6  worked out there.
7    Q.  When you began working for The Mortgage
8  Exchange, in what capacity did you work for the
9  company?
10   A.  I first came in just to learn the business.
11   Q.  Okay.  At some point did you -- at what point
12 did you become chief financial officer?
13   A.  I can't remember what year Joe gave me that
14 title, but it was later on.
15   Q.  Sometime in the 1990s?
16   A.  I feel that it was more when he signed over
17 50 percent of the shares to me.
18   Q.  Okay.  When did he sign over 50 percent of
19 the shares to you?
20   A.  I believe it was in 2002.
21   Q.  Okay.  And was that in connection with your
22 divorce?
23   A.  Yes.
24   Q.  When did you marry Mr. Aldeguer?
25   A.  In 1997.

4  (Pages 10 to 13)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 14

```
1      Q.  So before he signed over the shares to you,
2  Joe Aldeguer was a hundred percent owner of the
3  company?
4      A.  Yes.
5      Q.  In 2002 in connection with your divorce he
6  signed over 50 percent of the shares to you and you
7  became the chief financial officer?
8      A.  He started referring to me as that somewhere
9  in that time frame, yes.
10     Q.  You accepted that title, correct?
11     A.  Yes.
12     Q.  I heard you refer to yourself as the chief
13  financial officer?
14     A.  Yes.
15     Q.  Do you have any education, training or
16  experience prior to 2002 in finance or accounting?
17     A.  Just through the experience of being there
18  and taking care of the payroll and taking care of the
19  bills and keeping track of the payroll, just the
20  experience of it.
21     Q.  So it was all on-the-job training?
22     A.  Yes.
23     Q.  Do you have a college degree?
24     A.  No.
25     Q.  Do you have a high school degree?
```

Page 15

```
1      A.  Yes.
2      Q.  Did you take any courses?  Did you go to
3  college at all?
4      A.  I just took a travel class.
5      Q.  Now, did your duties as chief financial
6  officer and 50 percent owner ever change between
7  2002, when you accepted that title, when you received
8  50 percent of the business, and 2008 when the company
9  filed for bankruptcy?
10     A.  Are you asking me if my responsibilities were
11  similar between that time frame?
12     Q.  Yes.  I'm asking --
13     A.  Yes.
14     Q.  -- you that so I can understand whether you
15  were doing certain things at one point and that
16  changed and you did other things and whether you were
17  consistently in charge of the same functions
18  throughout the period from 2002 through 2008?
19     A.  Yes, I believe my functions did stay the
20  same.
21     Q.  Okay.  So as chief financial officer, if you
22  can please describe for us all of the duties and
23  functions and responsibilities that you had for The
24  Mortgage Exchange and the related entities?
25     A.  Accounting of the bills, payroll, dealing
```

Page 16

```
1  with some of the employee issues, licensing of the --
2  I should clarify that, the state licenses.  Of course
3  there was day-to-day functions of running a business
4  and answering questions.
5      Q.  Operations?
6      A.  You know, Maureen was the operations manager.
7      Q.  Maureen Phillips?
8      A.  Yes.  And she handled that for the most part.
9  There, of course, was some employee issues that would
10  come my way.  And even though I wouldn't personally
11  audit, I oversaw auditing.
12     Q.  Anything else that you can think of?
13     A.  That's all that's coming to my mind.
14     Q.  We'll go over that.
15         And Mr. Aldeguer, what were his
16  responsibilities?
17     A.  Well, he was responsible for anything that
18  had to do with sales, marketing.  He oversaw the
19  sales staff, ideas -- he was full of ideas.
20     Q.  Ideas for what?
21     A.  Well, he was really the entrepreneur.  He --
22  when the market was changing, you know, he would have
23  the ability to kind of see that and change the
24  business plan a little bit.
25     Q.  So would it be safe to say his ideas dealt
```

Page 17

```
1  with issues of sales and marketing as opposed to
2  ideas about how to better account for money that was
3  coming in or, you know, better prioritized payments
4  that were going out, do you understand what I'm
5  saying?
6         His ideas were the sales and marketing side;
7  he wasn't coming to you saying, Here's a better way
8  to manage the employees?
9      A.  He would still have his opinions about,
10  perhaps, what I should or should not pay, for
11  instance.  You know, he would -- even though I would
12  have that title he would still have opinions and I
13  would listen to them.  But his main function was
14  sales and marketing.
15     Q.  But he would give you input on some of the
16  issues that were part of your responsibilities as
17  chief financial officer?
18     A.  Yes.
19     Q.  And would you also give him your input on
20  some of the issues that were part of his
21  responsibilities, which were sales and marketing?
22     A.  I may have my two cents, but they -- I -- my
23  opinions would really not matter when it came to
24  sales and marketing.
25     Q.  But you still had the opportunities as
```

5 (Pages 14 to 17)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 18

1    50 percent owner to provide him those opinions and
2    give him your feedback whether or not he accepted
3    them?
4      A.   They were sometimes just not welcome, but.
5      Q.   They were also sometimes welcome?
6      A.   If I agreed with him.
7      Q.   All right.  Did you have any sort of
8    agreement between the two of you as to how a deadlock
9    between owners would be resolved, if there ever was
10   one?
11        In other words, it's common for companies
12   that have ownership that's split evenly, 50-50, to
13   have mechanisms to resolve disputes between the
14   owners that where one says I want to do this and the
15   other says I don't want to do that.  And sometimes
16   they send them to mediation, sometimes one owner is
17   required to purchase the other's shares, did you have
18   any sort of mechanism like that in place?
19     A.   No.
20     Q.   Did you ever have a situation from the time
21   you became 50 percent owner until the time that the
22   company filed for bankruptcy where you were both of a
23   different mind about doing a particular thing and
24   couldn't resolve the dispute between you?
25     A.   It was, you know, it was made very clear by

Page 19

1    Joe if it had to do with sales and marketing, it
2    didn't -- I was to leave that to him, and so I
3    basically did.
4      Q.   Let me ask you the question again because you
5    didn't really answer it.
6      A.   Okay.
7      Q.   Did you ever have a situation where you and
8    Joe disagreed about an issue and you could not
9    resolve it between yourselves?
10     A.   I don't remember specifically, you know,
11   times, you know, examples.  But yes, there were times
12   that we disagree.
13     Q.   I understand that everybody disagrees in any
14   sort of relationship including this sort of
15   relationship.
16     A.   Yes.
17     Q.   But my question is this:  Was there ever a
18   situation where you were -- there was an issue that
19   pertained to any aspect of managing the business and
20   either you wanted to do it one way and Joe disagreed
21   or Joe wanted to do it one way and you disagreed,
22   where you were unable to resolve that disagreement
23   between you and one of you needed to take some sort
24   of action in order to resolve the situation because
25   between the two of you, you could not resolve it?

Page 20

1      A.   I suppose not.
2      Q.   Okay.  Besides the operations which you
3    mentioned that Maureen Phillips basically handled,
4    what else did she handle?
5      A.   On The Mortgage Exchange side she was the
6    operations manager, and everything that went along
7    with that she took care of.  On the Real Estate
8    Investment Group side she still handled the
9    operations even though her title was more on The
10   Mortgage Exchange side, and she was also the project
11   manager of certain projects.
12     Q.   Now, Maureen Phillips was not an owner of any
13   of The Mortgage Exchange or any of these affiliated
14   entities?
15     A.   No.
16     Q.   And she wasn't an officer of The Mortgage
17   Exchange or any of the affiliated entities?
18     A.   No.
19     Q.   And Maureen Phillips reported to whom, you or
20   Joe on different issues, different people?
21     A.   Yes.  She was pretty split.
22     Q.   What issues did she report to you on?
23     A.   Operations of, you know, when it came to
24   employee issues, came to, you know, wanting to hire
25   another processer, or getting her assistant a raise.

Page 21

1    I mean, all in all she worked very independently, a
2    very independent lady, but when it came to The
3    Mortgage Exchange's part of operations and people,
4    you know, she would, if she had a problem, come to
5    me, or there were certain things that maybe, like I
6    said, like requesting a raise for somebody she would
7    come to me.
8      Q.   Okay.  So with respect to operations issues
9    she reported to you and with respect to sales and
10   marketing issues she reported to Joe Aldeguer?
11     A.   Correct.
12     Q.   Explain, please, the business of Real Estate
13   Investment Group?
14     A.   The Real Estate Investment Group was started
15   up to be able to promote real estate.
16     Q.   By "promote real estate," you mean sell real
17   estate?
18     A.   Yes.
19     Q.   Okay.  And as I understand it, the business
20   of The Mortgage Exchange was to broker mortgages for
21   people who were purchasing real estate or refinancing
22   real estate?
23     A.   That is correct.
24     Q.   And what was the business of X Management?
25     A.   X Management was later formed because of a --

6  (Pages 18 to 21)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 22

1  Joe felt there was a need to step in and help the
2  owners of Runaway because of their extreme
3  unhappiness of that current management company. And
4  so to do that, there was another entity created
5  called X Management.
6     Q.  But my question was:  What was the business
7  of X Management?
8     A.  Well, it subcontracted management.  So it's
9  actual business was very limited because we
10  subcontracted the work.
11    Q.  But the work that you subcontracted which was
12  the business of X Management what was that?
13    A.  It was the management of renting units.
14    Q.  Condominium units?
15    A.  Yes.  Runaway was condominium units.
16    Q.  Was there ever a time when there were
17  discussions about X Management going into the
18  business of either directly or through subcontracting
19  the management of renting condo -- condominium units
20  at Legacy Dunes?
21    A.  That happened later on.  Because at the time
22  X Management was not created yet.  So later on, yes.
23    Q.  Okay.  We'll come back to that.
24        And Own a Hotel Room, what was its business?
25    A.  That was a entity that was created also on

Page 23

1  the later side for -- to have a Florida real estate
2  company so we could have our own managing broker
3  versus how we were, you know, doing it with Legacy
4  which was Real Estate Dreams.
5     Q.  And the words and the title of the company
6  Own a Hotel Room, the business that it was going to
7  be brokering, the real estate that it was going to be
8  brokering, were condominiums to be rented as hotel
9  rooms?
10    A.  You know, it was created to be able to do all
11  and any real estate in Florida.  Just one thing
12  specifically, I don't think that was really my
13  understanding.
14    Q.  You don't think the focus of Own a Hotel Room
15  was to sell condominium units to people who would
16  then rent them out as hotel rooms?
17    A.  You know, I don't really know I wasn't part
18  of creating the name.  So I guess I never thought of
19  it like that.
20    Q.  Let's go back for a second to some of the
21  things that you described were part of your duties.
22  You referred to doing the accounting for bills.  Was
23  that bills that need to be paid, bills that your
24  company sent out that needed to be collected, both,
25  what?

Page 24

1     A.  For the majority one of my assistants would
2  pay the bills, but if there was a certain bill that
3  was out of the norm or, you know, seemed very high, I
4  would be the one to look into it.  So typically
5  speaking if it was a normal day-to-day bill, one of
6  my assistants would just stake care of that.
7     Q.  Okay.  And how many assistants did you have?
8     A.  Two.
9     Q.  What were their names?
10    A.  Actually, I had two assistants, but there is
11  an assistant underneath them, so I suppose --
12    Q.  Three assistants?
13    A.  Indirectly three assistants.
14    Q.  What were their names?
15    A.  Misty Lapage, Karen M-R-O-W -- her name is a
16  lot longer, but that was on everything -- and then
17  Carolyn Suarez.
18    Q.  Did all three of the employees you mentioned
19  assist you with the job functions that you listed
20  earlier?
21    A.  You know, Carolyn was more of somebody who
22  would help with copies and do more of the running
23  around, so not so much Carolyn.  She really was there
24  as a helping hand for Misty and Karen.
25        Misty mostly focused -- her main focus was on

Page 25

1  payroll and Karen's main focus was more on licensing.
2  Misty's also main focus was auditing and payroll, but
3  she would on occasion handle bills.  Karen was more
4  into handling the bills, but also could do some
5  payroll.  So they overlapped a lot, and Karen would
6  help out with licensing a lot.
7     Q.  Okay.  What kind of auditing are you talking
8  about?
9     A.  Well, my department was not in any way a
10  processer or underwriter, but there were certain
11  disclosures that the state required and Misty would
12  make sure that those required disclosures, if
13  audited, were there.  And if not, would tell the
14  processer, you know, that they were missing.  The
15  actual products and guts of what was in the file
16  wasn't her focus; it was more state compliance
17  issues.
18    Q.  Okay.  And who was in charge of the
19  processers and the underwriters?
20    A.  The main manager, her name was Gail Hasty.
21    Q.  Who did Gail Hasty report to?
22    A.  Well, if she had questions, she would come to
23  either myself or Misty, but she was there before I
24  even got there, and I myself never learned how to
25  process.  So it was -- she worked very, very

7 (Pages 22 to 25)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 26

1    independently, but of course could come to me if she
2    had a question.
3        Q.  Okay.  And the type of processing you're
4    talking about is processing applications for
5    mortgages?
6        A.  Right.  They didn't meet with the clients.
7    They would have some discussions about when the
8    closings were with them, but it wasn't their
9    responsibility to place them in programs.  It was
10   their responsibility to more take all of the
11   paperwork and send it to the lender and the lender
12   would then communicate what else they would need.
13       Q.  So individuals would come to The Mortgage
14   Exchange needing a mortgage, they would meet with a
15   Mortgage Exchange broker or an agent?
16       A.  Loan officer.
17       Q.  Loan officer, okay.  And those loan officers,
18   who did they report to?
19       A.  Well, all the way up the chain.  Joe was the
20   very top, but they should have been going to one of
21   their team leaders or Maureen.
22       Q.  Okay.
23       A.  A lot of them would go to Maureen or, you
24   know, there was a sales manager by the name of Dan
25   that reported to too.  They had a lot of support

Page 27

1    they could go to too.
2        Q.  I want to show you some pages from an exhibit
3    to the deposition of Maureen Phillips that was marked
4    as Exhibit 1 to that deposition.  These are all Bates
5    stamped.
6        Let me show you what's identified Phillips
7    00016.  Would you take a look at that.  It's an
8    organizational chart, correct?
9        A.  Yes.
10       Q.  For The Mortgage Exchange?
11       A.  I didn't myself make it, but that's what it
12   is.
13       Q.  Look at it and tell me if it's accurate in
14   terms of the various lines of reporting that are
15   listed there -- you know what, let me ask you this:
16   Let's focus on the lines of reporting to you, some of
17   which is handwritten, some of which is typed in.
18   Let's not focus on Joe Aldeguer at the moment.
19       A.  Okay.
20       Q.  So take a look at that and tell me if that's
21   accurate?
22       A.  It looks like, for the most part, processing
23   and then my assistants under me, so that would be
24   correct.
25       Q.  Did The Mortgage Exchange have a website?

Page 28

1        A.  Yes.
2        Q.  What was that website?
3        A.  You know, I was really not on there very
4    much.  I would think it was MTGExchange dot com, but
5    I think that there might have also been a couple
6    other websites that were advertised that I -- I want
7    to say like Funds34 dot com, but I don't know if
8    I'm -- if that could have had something to do with a
9    phone number or what.
10       Q.  1-800 funds 34 dot com?
11       A.  1-800 funds 34 was a phone number that they
12   called into, I'm pretty sure.
13       Q.  Okay.
14       A.  But that was all part of sales and marketing,
15   so I'm sorry.
16       Q.  But your department paid the bills for that
17   phone service, right?
18       A.  Well, yes.  I just, you know, I would go by
19   account numbers versus, you know, certain phone
20   numbers.  And a lot of the phone bills as long as the
21   account numbers were correct, our I.T. department, if
22   there was questions, a lot of times would look
23   through those.  They're very confusing if they look
24   wrong.
25       Q.  So if there was ever any issue with a bill,

Page 29

1    you would make sure the I.T. department looked at it
2    and confirmed if the bill was correct?
3        A.  If it was outside of me being able to
4    understand it.  Because the I.T. department and
5    marketing department worked together.  And if they
6    had new phone numbers out of marketing reasons, I
7    didn't always -- wasn't always aware of it.  So there
8    were times where yes, I would ask for their help just
9    to verify it's correct.
10       Q.  Did you have a business card?
11       A.  I think I had a couple of business cards.  I
12   just never hand them out.
13       Q.  What did the business card say on them?
14       A.  I believe one of them said administrative
15   manager and one said CFO.
16       Q.  Just for Mortgage Exchange or did you have
17   business cards to other entities too?
18       A.  If anybody ever made me business cards for
19   other ones, I don't recall that offhand, but it's not
20   impossible.
21       Q.  Do you still --
22       A.  I never dealt with clients, so I just didn't
23   hand out my cards.  They kind of just sat there.
24       Q.  Other than to clients, did you ever hand out
25   your cards to anyone else?

8  (Pages 26 to 29)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 30

1    A.  No.  I didn't hand out my cards to clients
2  because I didn't meet with clients.
3    Q.  I understand that.
4    A.  Oh, okay.
5    Q.  You said you didn't meet with clients, so you
6  didn't give them your card.  Did you have occasion to
7  give anyone your card?
8    A.  Sometimes somebody would come in and, you
9  know, that had something to do with a lender, for
10  instance, and perhaps they might ask me for my card.
11    Q.  So you had some interaction with the lenders
12  who were underwriting and funding the mortgages that
13  The Mortgage Exchange was brokering?
14    A.  Not really.  Very, very little.  But
15  sometimes they would come in and just introduce
16  themself, you know, more than an introduction, no.  I
17  mean, I can't even recall any of their names offhand.
18    Q.  Do you remember what phone numbers were on
19  your business card?
20    A.  Probably the main number.
21    Q.  The Funds 34 number?
22    A.  I believe it was the (630)261-8040 number.
23  And I don't think my direct number was on there.
24    Q.  So the number that was advertised for The
25  Mortgage Exchange 1-800 Funds 34, that wasn't on your

Page 31

1  business card?
2    A.  It could have been.  I tell you, I didn't
3  really use them.
4    Q.  Was the website address on your business
5  card?
6    A.  It would seem like it would make sense for it
7  to be, but I don't remember.
8    Q.  Do you still have any of your business cards?
9    A.  I don't think so.
10    Q.  What did you do with them?
11    A.  I tossed them.
12    Q.  The bills that came in, apart from the
13  telephones, bills for the website developing,
14  maintaining it, the domain names, all of that, all of
15  those bills would have been paid by your department,
16  right?
17    A.  That is correct.
18    Q.  You would have reviewed those bills or had
19  someone -- directed someone to review them to make
20  sure they were accurate?
21    A.  Yeah.  Chances are Karen would have been
22  reviewing those and making sure that they were
23  accurate.  And if she had questions, she would come
24  to me.
25    Q.  And that can included not just for The

Page 32

1  Mortgage Exchange's website but for other websites
2  that were related to any of your affiliated entities
3  like Own a Hotel Room?
4    A.  That is correct.
5    Q.  And you are familiar with the fact that Own a
6  Hotel Room had a website?
7    A.  I don't even remember it having a website.
8    Q.  Okay.
9    A.  It just wasn't my scope of stuff to
10  concentrate on.
11    Q.  If it had a website, then your department was
12  responsible for paying the bills?
13    A.  That is correct.
14    Q.  Same thing for X Management.  If it had a
15  website, you were the one to pay the bills for it?
16    A.  That is correct.
17    Q.  You mentioned licensing issues, what were
18  your responsibilities with respect to licensing?
19    A.  My assistant Karen would require help in that
20  area sometimes.  We were licensed in a few states,
21  and each of those states had paperwork to fill out,
22  and you had to renew that every year in order to get
23  a license.  Just sometimes it was tedious paperwork.
24    Q.  And The Mortgage Exchange was licensed in a
25  number of states?

Page 33

1    A.  That is correct.
2    Q.  And REIG, was it also licensed in a number of
3  states or was it just Illinois?
4    A.  I believe REIG was Illinois and Own a Hotel
5  Room was Florida.  Off of memory I believe that's
6  accurate but I'm not positive.
7    Q.  And X Management, did it have any licenses?
8    A.  No.  Because it subcontracted all of its
9  work.
10    Q.  All right.  So but with respect to The
11  Mortgage Exchange, REIG, and Own a Hotel Room your
12  department oversaw all the licensing?
13    A.  That is correct.
14    Q.  Okay.  You said you oversaw some operations,
15  can you describe for me what those -- what you recall
16  those operations were?
17    A.  You know, the day-to-day functions can be
18  such a large variety.  So it's a little bit difficult
19  to accurately answer that, but.
20    Q.  To the best of your ability, that's all I can
21  ask for.
22    A.  You know, if they're having problems with
23  somebody, you know, calling in sick all the time and,
24  you know, their work having a problem because of it,
25  I would get brought in and sit down, and if I didn't

U.S. Legal Support
(561) 835-0220

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 34

1  talk to them, Maureen would.
2      Q.  Can I interrupt you for a second?
3      A.  Yes.
4      Q.  Let's take the employee issues, let's put
5  them aside for a second.
6      A.  Okay.
7      Q.  So I'll ask you separately about employees.
8  As a matter of fact, I have a long list of people
9  that I'll show you.
10     A.  Okay.
11     Q.  So let's leave the employee issues separate.
12     A.  Okay.
13     Q.  Other operations you have, you're renting
14 space, as I understand it, in the Sears Tower and
15 before that in Downers Grove?
16     A.  Yes.
17     Q.  And there must be a lot of issues dealing
18 with the physical plant to come up, you've got
19 supplies and vendors and so much that goes into
20 running a business.  So other than employee issues,
21 tell me about other operational issues that were part
22 of your responsibilities?
23     A.  I was so busy every day, but for some reason
24 it's not coming.
25     Q.  What were you doing?

Page 35

1      A.  I don't know.  Of course there was supplies,
2  but of course that was delegated and that was given
3  to Carolyn.  There were times where I would, you k
4  now, see some of the supply bills and I felt we
5  weren't getting the best deal out there.  So I would
6  direct her to get more quotes from other companies.
7      You know, people would come in, you know,
8  asking for exceptions for files.  Most of the time I
9  said no; therefore, people didn't usually come to me
10 because I was a little bit on the strict side.
11     Q.  What do you mean exceptions for files?
12     A.  Well, you know, if they wanted to get a file
13 in but there was a few disclosures were missing.
14     Q.  Mortgage files?
15     A.  Yeah.  There might be an auditing question
16 that might come up that the client was wanting to
17 close but not everything was in the file.  But, you
18 know, I would get involved in those things because,
19 for me, the state is going to audit us, so the answer
20 is no.
21     I mean I would get involved in areas where
22 there was questions like that, but a lot of the times
23 people would try to bypass asking me something
24 because, perhaps, they might be able to get the
25 answer they want easier from somebody else because I

Page 36

1  was a bit of a stickler.
2      Q.  So they would go around you even though they
3  knew you were the last word?
4      A.  Unfortunately this is true.
5      Q.  Okay.  We were talking about individuals.
6  Here's a -- here's Exhibit 15.
7      MR. ROTHMAN:  I have three.
8  BY MR. ROTHMAN:
9      Q.  This doesn't even look like a complete list.
10 Maybe they didn't copy the second page.  You know
11 what, let me have that back.
12     A.  Sure.
13     Q.  Scratch this.  I'm scratching 15 because it
14 looks like somebody printed only the first page of a
15 spreadsheet and didn't give me a second page.  So I'm
16 going back to what I was doing before.
17     MR. ARAGONA:  Do you want this back?
18     MR. ROTHMAN:  It doesn't matter.
19     (Thereupon, Exhibit 15 was marked for
20 identification.)
21 BY MR. ROTHMAN:
22     Q.  Let me show you this one.  Ignore the fact
23 this it refers to a schedule of witnesses and -- take
24 a look at that.  I want you to look at the first two
25 and the top of the third page, just go through that.

Page 37

1      Obviously this is difficult because it's a
2  long list of individuals.  But take a look at that
3  exhibit for me, please, with the individuals who are
4  listed as either The Mortgage Exchange or on the top
5  of the third page it refers to X Management group.
6      A.  Okay.
7      Q.  Tell me if there's anyone that you can recall
8  looking at that who worked for Mortgage Exchange,
9  Real Estate Investment Group, Own a Hotel Room or X
10 Management who is not listed on this.  I'm just
11 asking you from memory.  If you go through this, does
12 anything jump out at you like, oops, you forgot
13 somebody?
14     A.  Well, the only thing that jumped out at me
15 this very moment is the fact that Eric Dukes was
16 never The Mortgage Exchange.
17     Q.  What was he?
18     A.  He eventually -- see, early on he was always
19 with Real Estate Dreams.
20     Q.  Okay.
21     A.  But eventually when Own a Hotel Room was
22 created, he was our managing broker.
23     Q.  Okay.  All right.
24     A.  Gosh, I got to tell you as far as somebody
25 being missing, if I didn't -- I mean, some of the --

10 (Pages 34 to 37)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 38

1 and on top of it this is a list from 2006 versus the
2 end of -- so it's, you know.
3 Q. Okay.
4 A. I can keep looking and seeing if there's
5 somebody that doesn't fit in there.
6 Q. Okay. That sounds good.
7 Who else besides Eric Dukes do you think
8 doesn't belong on this list?
9 A. And I will say that there was a couple of
10 sales people that I was never acquainted with very
11 well. There's a couple of names on here I'm not
12 familiar with, but that doesn't mean that they didn't
13 work there. There were sometimes a large amount of
14 people and I didn't know them all.
15 Q. That's okay. Tell me any names on this list
16 that jump out at you that don't belong and why.
17 A. Okay. There's quite a few names on this page
18 that I'm not even familiar with, so they may or may
19 not.
20 Q. Again, I'm just asking you who doesn't
21 belong.
22 MR. ROTHMAN: While you look at that, can we
23 take a quick break?
24 MR. ARAGONA: Sure.
25 (Short break.)

Page 39

1 BY MR. ROTHMAN:
2 Q. Anybody else on that list that you recognize
3 just absolutely doesn't belong?
4 A. Nobody on the list of names of the ones I
5 recognize. They look correct. There's obviously
6 some overlapping with, you know, some people that
7 worked, you know, with The Mortgage Exchange and
8 REIG, and there's only Joe under REIG, but for the
9 most part the names --
10 Q. Why don't you tell me who else besides Joe
11 would belong with REIG that's on that list.
12 A. You know, I don't know remember who all was
13 licensed, but, for instance, Stacey and Maureen.
14 Q. Stacey Michelon?
15 A. Yeah. Those are two that pop out, you know,
16 with confidence, the rest I'm not sure.
17 Q. Any others besides Eric Dukes that belong
18 with Own a Hotel Room?
19 A. No.
20 Q. The information concerning who belonged with
21 X Management is correct on the third page?
22 A. My involvement with X was very limited, and I
23 relied on Kristy and Phil to do most. So the reason
24 I'm under there, I don't know to what capacity you're
25 thinking that my name would be under there. Perhaps

Page 40

1 just because there was the overshipment, of course,
2 Phil would ask questions of me sometimes, but I
3 didn't deal with the day-to-day questions of X. So
4 just to --
5 Q. Okay.
6 A. Okay.
7 Q. And with respect to -- let's do this this
8 way. Look at Exhibit 16.
9 (Thereupon, Exhibit 16 was marked for
10 identification.)
11 BY MR. ROTHMAN:
12 Q. Do you recognize your -- is that your
13 signature on the third page under Real Estate
14 Investment Group Limited?
15 A. Yes.
16 Q. And you see it says: By Jill Moore, vice
17 president, secretary?
18 A. Yes.
19 Q. And this Exhibit 16 is the articles of
20 organization for Own a Hotel Room LLC, correct?
21 A. Yes. I believe so.
22 Q. So it appears, then, that you were vice
23 president and secretary of Own a Hotel Room,
24 according to this document, correct?
25 A. According to this document, yes.

Page 41

1 Q. It also indicates above that Eric Dukes is a
2 manager?
3 A. Yes.
4 Q. But he didn't own any equity in Own a Hotel
5 Room?
6 A. Correct.
7 Q. It was just you and Joe, 50-50?
8 A. Indirectly because it went from Own a Hotel
9 Room to REIG to The Mortgage Exchange. So the
10 ownership, you know, it was indirect.
11 Q. So REIG owned all of the equity in Own a
12 Hotel Room --
13 (Brief interruption.)
14 MR. GORE: Jim Wear.
15 BY MR. ROTHMAN:
16 Q. As I was saying, REIG owned all the equity in
17 Own a Hotel Room and Mortgage Exchange owned all the
18 equity in REIG?
19 A. That is correct.
20 Q. And X Management -- I'll show you 17.
21 (Thereupon, Exhibit 17 was marked for
22 identification.)
23 BY MR. ROTHMAN:
24 Q. Exhibit 17 is a qualification for X
25 Management, it appears, to do business in Florida.

U.S. Legal Support
(561) 835-0220

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 42

1    Take a look through the fourth page. Is that
2  your signature at the bottom as authorized agent?
3    A. Yes.
4    Q. It says on line 11 that the business of X
5  Management is real estate management services,
6  correct?
7    A. Yes.
8    Q. All right. Looks like this was filed
9  October 3rd, 2006. Is that consistent with your
10 memory of --
11   A. That is.
12   Q. Okay. And you see on line nine on that third
13 page there, the managing members are listed as you
14 and Mr. Aldeguer?
15   A. Okay. Yes.
16   Q. Okay. When was the last time you spoke to
17 Joe Aldeguer?
18   A. Within the last week.
19   Q. Okay. Do you speak to him often, say, on a
20 weekly basis?
21   A. Not necessarily on a weekly basis.
22   Q. How do you usually speak to him? Do you call
23 on a cell phone or on a land line?
24   A. On his cell phone.
25   Q. What's his cell phone number?

Page 43

1    A. (312)404-1497.
2    Q. Did you -- have you spoken to him about this
3  lawsuit?
4    A. A little.
5    Q. Okay. What did you speak to him a little
6  about this lawsuit?
7    A. He knows that I was doing a deposition.
8    Q. Okay. Anything else?
9    A. Just made it very aware to him I don't
10 understand why I'm part of it.
11   Q. And why is it you don't understand that
12 you're part of it?
13   A. I didn't have any sales contact with clients
14 at all. I don't have anything to do with sales or
15 marketing or what projects we were going to do.
16   Q. What did he say to you?
17   A. He agrees.
18   Q. He agrees you shouldn't be part of this
19 lawsuit?
20   A. Right.
21   Q. Based on your conversations with him is it
22 your understanding that he is aware that he is part
23 of this lawsuit?
24   A. He said he has not been served.
25   Q. And is -- do you understand that to be the

Page 44

1  reason why he hasn't gotten an attorney and appeared
2  in this lawsuit?
3    A. I don't really know why he hasn't done
4  anything.
5    Q. Did you -- other than him not being served,
6  have you had any other conversations about why he
7  hasn't done anything about this lawsuit?
8    A. Most of our conversations are in regards to
9  our son, when he's going to pick him up.
10   Q. I understand that. I don't ask the question
11 to pry into your personal life.
12     So all I want to know if there's anything
13 else that you've discussed where he has told you any
14 other reasons, other than that he believes he has not
15 been served, as to why he hasn't participated in this
16 lawsuit in any way?
17   A. No.
18   Q. Okay. We were discussing Real Estate
19 Investment Group before. Now -- and I believe you
20 agreed with me that Real Estate Investment Group's
21 business was to earn commissions from the sale of
22 real estate?
23   A. That is correct.
24   Q. Okay. And as CFO part of your
25 responsibilities included paying any bills of Real

Page 45

1  Estate Investment Group as well as collecting any
2  income that Real Estate Investment Group was entitled
3  to because it received a fee in connection with sales
4  of real estate?
5    A. We didn't do invoicing necessarily, but when
6  closings happened, if there was something that did
7  not come in, my department would call the title
8  company to find out why.
9    Q. So if there's a real estate closing that Real
10 Estate Investment Group is entitled to a commission
11 on, your department would make sure that Real Estate
12 Investment Group was paid that commission?
13   A. Correct. But if there was a problem, they
14 would not be the one to resolve it. That would then
15 go to, perhaps, Maureen. As long as it was a
16 question of where to direct it to, then yes.
17   Q. Are you telling me there was never a
18 situation where Real Estate Investment Group was owed
19 a commission or hadn't been paid it and either you or
20 someone in your department needed to get involved in
21 order to make sure you were paid but instead of
22 someone in your department or you getting involved,
23 it was all Maureen Phillips that did it?
24   A. No. Not necessarily.
25   Q. So there were situations where, let's say, it

12 (Pages 42 to 45)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 46

1   says on the HUD that REIG is entitled to a commission
2   and the closing occurs, for whatever reason the
3   commission check doesn't show up, there were
4   situations like that where either you or someone on
5   your staff would have to get involved to make sure
6   the commission was paid?
7       A.  Yes.  If it was just a phone call on the
8   funds not being there yet.  But if it was funds not
9   being there for some situation or problem, that's
10  when it would get directed to Maureen to get
11  involved.
12      Q.  Were there any situations or problems that
13  the funds were not received that you got involved
14  with?
15      A.  Only e-mails to Real Estate Dreams asking
16  where our funds were.
17      Q.  You did have involvement dealing with Real
18  Estate Dreams in connection with Legacy Dunes
19  development where real estate commissions that REIG
20  was entitled to were not paid and you were following
21  up to figure out where are those payments?
22      A.  That is correct.
23      Q.  What about any other developments where real
24  estate commissions were due REIG, did you do anything
25  to make sure payments were made besides with Legacy?

Page 47

1       A.  Majority of the time the funds would just
2   automatically come in at closing.
3       Q.  But when they didn't automatically come in?
4       A.  One of my assistants would usually e-mail the
5   title company and ask.
6       Q.  Okay.
7       A.  But I believe in Legacy's situation it was
8   more following up with Real Estate Dreams.
9       Q.  But putting aside Legacy, weren't there
10  situations where Real Estate Investment Group was not
11  promptly paid commissions that it was owed, where
12  your involvement was necessary in order to make sure
13  that you got your money?
14      A.  There could have been.  I just don't recall
15  them.
16      Q.  Okay.
17      A.  Okay.
18      Q.  In fact, wasn't there a situation last year
19  with Runaway Beach where a commission wasn't
20  automatically paid and you needed to get involved to
21  make sure that the payment was made?
22      A.  Yes.
23      Q.  Okay.  And you mentioned Real Estate Dreams.
24  There was, in fact, an agreement that had been
25  reached, a written agreement, between your company

Page 48

1   Real Estate Investment Group and Real Estate Dreams
2   with respect to the sharing of commissions?
3       A.  Yes.
4       Q.  Okay.  My understanding is that another of
5   your duties and responsibilities involved legal
6   issues and working with your outside counsel Coman
7   and Anderson?
8       A.  Yes.
9       Q.  So let me show you Exhibit 18.
10          (Thereupon, Exhibit 18 was marked for
11  identification.)
12  BY MR. ROTHMAN:
13      Q.  Is Exhibit 18 the agreement that we were just
14  discussing between Real Estate Investment Group and
15  Real Estate Dreams?
16      A.  Yes.
17      Q.  Were you involved in the negotiation of the
18  language of this agreement and the terms of this
19  agreement?
20      A.  You know, I never -- I don't -- I wouldn't be
21  good at it any ways, I'm not a negotiator.  So
22  negotiating certain terms and accepting what the
23  commissions would be for the Real Estate Investment
24  Group would not fall under what I would do.
25          Once everybody reached an agreement, it was

Page 49

1   of my concern.  Not so much what was agreed upon but
2   that the attorneys involved came up with a contract
3   that was legal.
4       Q.  Okay.
5       A.  And if my attorneys said if Joe and Maureen
6   and everybody agreed to the guts of the contract,
7   that was fine, you know, that's them.  They're okay
8   with that.  Then really what I care about is, okay,
9   does my attorney feel that this contract protects
10  everybody involved, you know, is proper.
11      Q.  Okay.
12      A.  And if he says yes, then I'm okay with it.
13      Q.  Okay.  Have you ever heard the phrase
14  "papering the deal"?
15      A.  No.
16      Q.  Okay.  The attorney -- did you know who
17  drafted this agreement?
18      A.  I would think the two attorneys.
19      Q.  The two attorneys?
20      A.  Between I would -- I really don't know where
21  the beginning draft came from.  I would imagine Real
22  Estate Dreams and Coman and Anderson, you know, one
23  of them started it.  I don't know which one.
24      Q.  Do you know if Real Estate Dreams had an
25  attorney?

13 (Pages 46 to 49)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 50

1    A.  I would imagine.  I don't recall offhand,
2  but.
3    Q.  Okay.  But your attorney, in connection with
4  this agreement, was an attorney at Coman and
5  Anderson?
6    A.  That's correct.
7    Q.  Was it George Weams?
8    A.  Yes.
9    Q.  Your involvement, as I understand it, after
10  the deal was worked out and the terms of the deal
11  were all negotiated, you were the one that made sure
12  that the agreement covered all the issues and
13  protected Real Estate Investment Group?
14       MR. ARAGONA:  Objection, misstates her
15    testimony.
16  BY MR. ROTHMAN:
17    Q.  Okay.  Let me ask you this:  Do I understand
18  correctly that your testimony is that your
19  involvement was to make sure that the written
20  agreement protected Real Estate Investment Group?
21    A.  I would say yeah.  If my attorneys said that
22  this was okay to sign, then I figured that the
23  arrangement that was come up with was proper.
24    Q.  Okay.  And you read the agreement before it
25  was signed, right?

Page 51

1    A.  I relied on the attorneys a lot.  I don't
2  honestly know if I would have read it with a fine
3  tooth comb.  I would have breezed over it.
4    Q.  Was it your practice to sign anything without
5  reading it?
6    A.  Well, no.  But if I -- if everybody else
7  involved was more familiar with what the terms of the
8  agreement were, you know -- Maureen was also very
9  involved in working with the attorneys.  And if
10  Maureen and the attorneys were all saying okay, we're
11  good to go, then I trusted that everybody was, you
12  know, doing their job.
13    Q.  And under those circumstances you're saying
14  you wouldn't read an agreement if everybody says,
15  It's okay, Jill.  All you have to do is sign it.  You
16  don't have to read it.  It's a binding legal
17  contract, you can go ahead and sign it.
18       You're telling me you wouldn't read it at
19  all?
20    A.  I would breeze it over.
21    Q.  What do you mean by "breeze it over"?
22    A.  I would read it over, you know.  I would look
23  it over really quick, but sometimes the way that the
24  contracts are written, they are very legal words and
25  I relied on the attorneys a lot.

Page 52

1    Q.  Okay.  I'm not questioning whether or not you
2  relied on your attorneys.  All I'm asking, and I
3  think you answered it, is would you read over the
4  agreement to make sure that it was consistent with
5  what you understood the deal was about and that Real
6  Estate Investment Group was protected because you
7  owned 50 percent of Real Estate Investment Group?
8    A.  Again, I would breeze over it.  I wouldn't
9  necessarily understand it all, but if Maureen and the
10  attorney both did, then I trusted that.
11    Q.  Okay.  If there was something that you didn't
12  understand, would you ask someone to explain it to
13  you?
14    A.  Not always.
15    Q.  You were a critical person for The Mortgage
16  Exchange and Real Estate Investment Group's success,
17  were you not?
18    A.  I tried to keep the paperwork in good order.
19  I think I did keep the paperwork in good order.  I
20  believe that I did bring a lot to the companies.  You
21  know, some have a different opinion on, you know,
22  success of a company.  You know, I was not the one
23  that knew how to bring the money in.  But yes, I
24  think that I did a good job.
25    Q.  Okay.  Let me ask you if you've heard this

Page 53

1  other phrase, have you ever heard the phrase "the
2  devil is in the details"?
3    A.  No.  But I can understand what it means.
4    Q.  Sounds to me like one of your roles was to
5  manage the details to make sure the details were all
6  handled correctly.  You were the detail person.
7  Where Joe Aldeguer may be the creative person in
8  front of the camera, you were behind the scenes
9  making sure the details were all handled and managed,
10  would that be accurate?
11    A.  It depends on what detail we're speaking of.
12  If it's one within my skill, yes.  If it's one that's
13  outside my skill, I have no problem paying that extra
14  money for somebody who will protect me.
15    Q.  I'm not asking about your skill; I'm asking
16  about the responsibilities.  The responsibilities
17  that you described to me as being yours at The
18  Mortgage Exchange and Real Estate Investment Group
19  are all responsibilities that require making sure the
20  I's are dotted, the T's crossed, the details are all
21  handled, the documents are done and correct and
22  everything is in order.  That's what I'm hearing from
23  you, and if I'm wrong, tell me I'm wrong.  But if I'm
24  right, then, you know, let me know.
25    A.  I mean the things that I've said that I do

14 (Pages 50 to 53)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 54

1   are what I do.  But that doesn't mean necessarily --
2   I understand the language that attorneys use in
3   contracts, so there are times where I'd breeze it
4   over and I'd rely on the attorneys and the people
5   that knew the details of the negotiations to tell me
6   that it's correct and okay.
7       Q.  Okay.  And I can certainly understand that
8   there are situations where you had to rely on your
9   attorneys, but isn't it true that if there was a
10  situation where you didn't understand something, that
11  you would get assistance from someone to help
12  understand the situation better because that was
13  outside your skill set?
14      A.  If something was alarming to me, if something
15  popped up that was alarming that I felt was wrong,
16  then yes, I would ask.  But some items, you know,
17  just didn't really pop out as much of anything and I
18  would trust everybody else that's doing their job
19  that's doing it well.
20      Q.  Was there anything about Exhibit 18 and the
21  transaction that's referred to in 18 that popped out
22  at you to cause you to have any alarm?
23      A.  I mean, back in 2006 I don't remember if I
24  would have an alarm about this.  I don't even
25  remember it so much.

Page 55

1       Q.  Okay.  If there was something in there that
2   was alarming to you, you would have told someone and
3   made sure it was changed or explained to you so that
4   you were no longer alarmed, correct?
5       A.  You know, at the time George Weams and
6   Maureen said -- it was one of those, it's good, stamp
7   of approval.  And that -- that's all I remember.  I
8   don't remember looking through it and asking certain
9   questions.  I just don't remember.
10      Q.  Do you remember that relationship and the
11  agreement that's reflected in 18 turned out not to be
12  so good?
13      A.  Yes.
14      Q.  And that eventually you had to engage in
15  further negotiations and enter into a settlement
16  agreement?
17          (Thereupon, Exhibit 19 was marked for
18  identification.)
19      A.  Yes, I do remember that.
20  BY MR. ROTHMAN:
21      Q.  And that's what Exhibit 19 is that I just
22  handed you, correct?  Is that correct?
23      A.  What was your question.
24      Q.  This settlement and mutual release is an
25  agreement that resolved disputes that arose out of

Page 56

1   the relationship and the contract that's -- that we
2   were looking at as Exhibit 18?
3       A.  That is correct.
4       Q.  And is that your signature on the page Moore
5   0006?
6       A.  I mean, in all honesty someone used my
7   signature stamp.  Did I know about this agreement?  I
8   think Maureen went to Florida and they were trying to
9   work it out, you know, together in a conference room,
10  if memory serves me right.  I'm not positive, but I
11  believe that's how it worked.  And whatever they --
12  whatever they came up with was the best everybody
13  could agree to.  And I believe -- I don't know if it
14  was their attorney or Coman and Anderson that wrote
15  this.
16      Q.  What do you mean someone used your signature
17  stamp?
18      A.  I must not have been in that day, and I'm
19  sure they would have called me on the phone to talk
20  to me, but that's technically my signature stamp.
21  But it's not that I wasn't aware of the settlement.
22  I'm not saying that.
23      Q.  Okay.  What is it you're saying?  Let's just
24  deal with your signature on page six.
25      A.  Um-hmm.

Page 57

1       Q.  You have a rubber stamp that has your
2   signature on it?
3       A.  Um-hmm (nodding head).
4       Q.  Why do you have a rubber stamp that has your
5   signature on it?
6       A.  Well, when I wasn't in, a lot of times people
7   would use my signature stamp to write checks, my two
8   assistants would.
9       Q.  Was it kept in a safe place?
10      A.  Yes.
11      Q.  Was it locked up so people couldn't sign
12  stamped checks for large amounts of money and walk
13  off with them?
14      A.  Well, yes.  If it wasn't, somebody wasn't
15  doing something properly, so.
16      Q.  And at the time this agreements was executed
17  was that the case, your signature stamp was in a safe
18  place?
19      A.  Yeah.  I am not saying I didn't agree.  I'm
20  saying it was probably done on a day that I just
21  wasn't in.
22      Q.  Was there a requirement that before someone
23  use your signature stamp that you first be contacted
24  so that you could make sure that their use of your
25  signature was authorized?

15  (Pages 54 to 57)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 58

1    A.  I remember this whole thing.  So I'm sure I
2  authorized it.
3    Q.  You do?
4    A.  I don't know how much -- obviously, I didn't
5  necessarily get a chance to read it over maybe
6  properly, but if George Weams said this agreement was
7  as good as we were going to get and Maureen agreed to
8  it, I would have approved them to use my stamp.
9    Q.  So there's no confusion, the agreement that's
10  marked as Exhibit 19, which has your signature stamp
11  on it, was in fact authorized by you to be signed on
12  behalf of The Mortgage Exchange and Real Estate
13  Investment Group, correct?
14    A.  Yeah.  I don't remember the situation, but I
15  know that this agreement had to be signed in order to
16  get the funds.  So it was --
17    Q.  How much -- I'm sorry.  Go ahead.
18    A.  So I'm just saying nobody like snuck my stamp
19  in there, but I'm just letting you know that it's my
20  signature stamp, that's all.
21    Q.  You've told us that already.
22      The funds that were at stake here, this is a
23  lot of money that's discussed on the first page,
24  isn't it?
25    A.  Yes.

Page 59

1    Q.  The first page talks about close to
2  $3 million?
3    A.  Yes.  I believe that first amount was what
4  went into escrow to cover everyone's furniture
5  expenses.
6    Q.  Do you remember the total amount of money
7  that was in dispute in connection with this
8  agreement?
9    A.  Well, I know that this settlement was quite a
10  bit less than what should have been technically due
11  to REIG.
12    Q.  How much should have technically been due?
13    A.  I'm sorry, I don't know offhand, but I know
14  it was a big deal.  But I wasn't part of the
15  negotiations of this.  When Maureen said that this
16  was the absolute best we can do and George Weams said
17  this is the absolute best that they would do, we
18  agreed.
19    Q.  The money that you were disputing that REIG
20  believed it was owed was money the company needed to
21  operate, correct?
22    A.  Correct.
23    Q.  And so as chief financial officer it was
24  important for you to make sure that REIG got the
25  share of the funds that it was entitled to, correct?

Page 60

1    A.  Even if that meant taking a hit, that's what
2  we did.
3    Q.  Okay.  And so based on the advice of others
4  who reported to you and Joe Aldeguer, and despite the
5  fact you were receiving less than you thought you
6  were entitled to, you accepted and authorized your
7  signature stamp be used on this agreement, correct?
8    A.  That is correct.
9    Q.  Now Real Estate Investment Group was entitled
10  to the money that is discussed in that Exhibit 19
11  because of its role in the sales of units at Legacy
12  Dunes, true?
13    A.  Yes.
14    Q.  Okay.  And --
15    A.  Or can I just say?
16    Q.  Sure.
17    A.  The sale that was referred to Real Estate
18  Dreams.
19    Q.  Okay.
20    A.  I just want no confusion there.
21    Q.  Now, Real Estate Dreams was a Florida
22  brokerage, not an Illinois brokerage?
23    A.  You said Real Estate Dreams, right?
24    Q.  Yes.
25    A.  Okay.  Right.

Page 61

1    Q.  And Real Estate Investment Group was an
2  Illinois real estate brokerage and not a Florida
3  brokerage?
4    A.  That is correct.
5    Q.  So in order for Real Estate Investment Group
6  to get a share of the commission, Real Estate
7  Investment Group affiliated itself with Real Estate
8  Dreams, entered into the referral agreement that we
9  marked as Exhibit 18, and therefore any sales that
10  were made were -- gave rise to a right on behalf of
11  Real Estate Investment Group to receive a percentage
12  of the commissions?
13    A.  That was a lot of information, but I believe
14  it was correct.
15    Q.  Okay.  And the sales of the units at Legacy
16  Dunes were to individuals who learned about Legacy
17  and potential for purchasing units at Legacy through
18  The Mortgage Exchange, correct?
19    A.  Through the radio shows that -- I don't know
20  if you want to say The Mortgage Exchange or the Real
21  Estate Investment Group.  I know there's --
22    Q.  There's overlap?
23    A.  You know, people refer to the Real Estate
24  Investment Group as The Mortgage Exchange when really
25  it's the Real Estate Investment Group, so.

U.S. Legal Support
(561) 835-0220

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 62

```
1      Q.  It's a separate entity but it was wholly
2   owned by The Mortgage Exchange?
3      A.  That is correct.
4      Q.  Which you were a 50 percent owner in?
5      A.  That is correct.  On paper, you know, yes,
6   that is correct.
7      Q.  Okay.  Are you disputing that you are not
8   50 percent owner of The Mortgage Exchange?
9      A.  Well, no.  I'm 50 percent owner on paper,
10  but, you know, a lot of questions that you ask, you
11  know, make it geared towards decisions, you know, and
12  a lot of the decisions I really didn't have
13  50 percent say in.
14     Q.  Okay.
15     A.  So, you know, when you're saying 50 percent
16  owner, it just kind of -- I just wanted to clarify
17  it.
18     Q.  When I said 50 percent owner that time, I was
19  thinking about your entitlement to receive 50 percent
20  of the profits and your entitlement to receive
21  50 percent of the value of the entity, not the
22  decisions.
23     A.  Okay.
24     Q.  You agree with me that as 50 percent owner
25  you were entitled to receive 50 percent of the
```

Page 63

```
1   profits and you were entitled to receive 50 percent
2   of the value of the company?
3      A.  I guess I am entitled, yes.
4      Q.  Okay.  In fact, there were situations where
5   you indicated to others that your income was derived
6   from The Mortgage Exchange and one of your assets was
7   from The Mortgage Exchange, right?
8      A.  My income did come from The Mortgage
9   Exchange, yes.
10     Q.  Also one of your assets was 50 percent of The
11  Mortgage Exchange and all of the companies that it
12  owned?
13     A.  Well, I -- I guess that's true.
14     Q.  Okay.  Did you ever tell other people that?
15     A.  That I was 50 percent owner?
16     Q.  Yeah.
17     A.  I mean, sometimes it would have to be known.
18  I wasn't one to really talk about it, but it wasn't
19  like people weren't -- didn't know it.
20     Q.  Let me show you what is marked as Exhibit 20.
21         (Thereupon, Exhibit 20 was marked for
22  identification.)
23  BY MR ROTHMAN:
24     Q.  Do you recognize Exhibit 20?
25     A.  It's a personal financial statement.  I don't
```

Page 64

```
1   remember exactly what it was -- maybe it was for one
2   of the banks.  I'm not sure what it would have been
3   for.
4      Q.  It's your financial statement as of May 1st,
5   2007, correct?  Applicant name at the top is Jill
6   Moore?
7      A.  Yeah.  I'm just not positive -- a lot of the
8   numbers aren't things I have in my head, so I'm not
9   positive if everything within here is -- was
10  something that was a final that ever went to
11  somebody.  I'm just not sure if all the details are
12  correct.  Because I don't recall it off the top of my
13  head.
14     Q.  Well, let's go over some of the details,
15  then.  Do you recall filling out personal financial
16  statements over the course of your lifetime?
17     A.  I believe they would have been for Harris
18  Bank, but I don't remember.
19     Q.  Do you recall completing this personal
20  financial statement from May of '07?
21     A.  I mean, I remember completing financial
22  statements, but I don't necessarily remember
23  completing this one.
24     Q.  Okay.
25     A.  They all kind of look similar.
```

Page 65

```
1      Q.  Okay.  Looking at the middle of the page
2   where it says annual income salary, was it accurate
3   that your annual salary was $703,360 when you worked
4   for The Mortgage Exchange in 2007?
5      A.  I don't know where that income would have
6   come from because that wasn't my salary.
7      Q.  What was your salary?
8         MR. ARAGONA:  I'm going to object here.  I
9   don't see how this is relevant to the limited
10  scope of this deposition of whether these are
11  securities or not.
12        MR. ROTHMAN:  She's a control person, and you
13  have raised the issue of whether she's liable for
14  a violation of the securities laws and
15  specifically the failure of registering the
16  securities.
17        MR. ARAGONA:  Her salary is irrelevant.
18        MR. ROTHMAN:  Her salary -- fine.  Let's move
19  on from salary.
20  BY MR. ROTHMAN:
21     Q.  Do you see where it says:  Partnership income
22  $767,600?
23     A.  Yes.
24     Q.  Do you remember receiving $767,600 of
25  partnership income because of the distributions you
```

17 (Pages 62 to 65)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 66

1  received from the companies that you were associated
2  with including The Mortgage Exchange and Real Estate
3  Investment Group and others?
4      A.  I don't.  And I don't recall at all what the
5  distributions were.  I don't remember.
6      Q.  There were distributions, correct?
7      A.  If there were any distributions, I would have
8  reported that to the accountant.  The accountant
9  would have done whatever tax, you know, implications,
10  you know, making me pay whatever.  Whatever was
11  necessary.  But I don't know.
12      Q.  But you wrote the checks.
13      A.  But I don't remember.
14      Q.  Okay.  That's fine.
15      A.  I don't.
16      Q.  That's fine.  You may not remember the exact
17  amounts, but you agree with me you were the one that
18  kept the checkbook and you were the one who would
19  have written the distribution checks?
20      A.  Yes.
21      Q.  By the way, do you recall filling out a
22  personal financial statement such as this on The
23  Mortgage Exchange computer that you used at The
24  Mortgage Exchange which was then surrendered to the
25  trustee after the bankruptcy was filed?

Page 67

1      A.  Say that one more time.
2      Q.  Do you remember filling out a financial
3  statement like this one or this exact one on the
4  computer that you used at The Mortgage Exchange that
5  was Mortgage Exchange property that you then
6  surrendered to the trustee in bankruptcy?
7      A.  I could have.  I don't remember if I did.
8      Q.  Do you remember at the creditors meeting that
9  you testified that you had deleted information off of
10  The Mortgage Exchange computer that you used before
11  you turned it into the trustee?
12      A.  Yes.
13      Q.  Would you be surprised to learn that this
14  financial statement was among a number of other
15  documents that you failed to delete on that machine
16  when you turned it in to the trustee?
17      A.  Could have.
18      Q.  Would that help you in any way in remembering
19  whether or not you used a Mortgage Exchange computer
20  to complete this personal financial statement?
21      A.  I could have.  I just don't remember.
22      Q.  I'm trying to understand whether I can rely
23  on the information that's here because it comes from
24  a computer that you used at The Mortgage Exchange.
25  So can you tell me whether or not I can rely on the

Page 68

1  information in this financial statement?
2      A.  Well, I don't know if these numbers are
3  accurate.  I don't remember at all.  So I would --
4      Q.  What would you need in order to determine
5  whether or not these numbers were accurate?
6      A.  Probably a conversation with my accountant
7  and to look over my tax returns and --
8      Q.  Is that David Gilfand?
9      A.  Yes.
10      Q.  So we would need to take David Gilfand's
11  deposition in order to determine whether this
12  information was correct?
13      A.  David Gilfand knows my financial information
14  because he does all my taxes.
15      Q.  Is the answer yes?
16      A.  Yes.
17      Q.  On the right side where it says mortgage
18  payments investment, see where it says:  $404,112
19  company covers?
20      A.  Um-hmm.
21      Q.  Do I understand correctly that The Mortgage
22  Exchange paid your mortgage payments on your
23  properties?
24      A.  Any mortgage payments it would have paid
25  would have been considered a distribution.

Page 69

1      Q.  Okay.  But that wasn't my question.
2      A.  Okay.
3      Q.  Am I understanding you correctly that The
4  Mortgage Exchange paid all of the mortgage payments
5  on real properties that you owned?
6      A.  It did pay some of the payments of the
7  properties that were owned by Joe and myself.
8      Q.  And did The Mortgage Exchange include the
9  amounts that it paid on your mortgages in a K-1 that
10  was issued to you or another document reporting it as
11  income?
12      A.  It would have been -- I would assume it would
13  have been a distribution, but that -- but I'm not an
14  accountant, so I don't know how he categorized that.
15      Q.  All right.  Well, the real properties that
16  you owned in your name, those weren't property of The
17  Mortgage Exchange, were they?
18      A.  No.
19      Q.  They were your properties, right?
20      A.  Yes.
21      Q.  So if The Mortgage Exchange is paying your
22  mortgage, then it's going to need to account for it
23  somehow as either as income to you, right?
24      A.  I think that's where the distributions come
25  into play.

18  (Pages 66 to 69)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 70

1    Q.  Okay.  So The Mortgage Exchange never
2  accounted for the payments of your mortgages as an
3  expense of The Mortgage Exchange?
4    A.  I wouldn't think so.  It should have been
5  considered a distribution.  And I'm pretty positive
6  that my accountant would have done it accordingly.
7    Q.  On the next page see Schedule B Insurance
8  Life Insurance?
9    A.  Yes.
10    Q.  You see two Phoenix life insurance policies
11  that -- not the middle one, there's three policies
12  there, but the first one says Phoenix Life, it's a
13  $5 million policy and it says the beneficiary is the
14  business.
15    A.  Okay.
16    Q.  The business that's referred to as the
17  beneficiary is that The Mortgage Exchange?
18    A.  Yes, I believe so.
19    Q.  Okay.  Then there's another policy, the third
20  one down, Phoenix life another $5 million term
21  policy, beneficiary Keyman.
22    A.  Yes.
23    Q.  Who was the beneficiary of the Keyman policy?
24    A.  It was either Joe or the company.  I'm not
25  sure which.

Page 71

1    Q.  Would you agree with me that if a 50 percent
2  owner and CFO of a company has $10 million of life
3  insurance that is to benefit either the company or
4  that person's other partner, the person who has
5  that much coverage on their life would be an
6  important person to the success of the company?
7    A.  Yes.
8    Q.  Thanks.
9      Below that there are a number of real
10  property investments listed under Schedule C, four
11  real properties?
12    A.  Yes.
13    Q.  The first three just has you as the owner and
14  the fourth one has you and Joe Aldeguer as the
15  owners.
16    A.  Yes.
17    Q.  Were the mortgages on all these properties
18  paid by The Mortgage Exchange?
19    A.  I believe so, yes.
20    Q.  If you look at the fourth page of that
21  exhibit, on the left hand side under Assets, you see
22  it lists The Mortgage Exchange which it values at
23  $5 million?
24    A.  Okay.
25    Q.  Is that -- that $5 million is your 50 percent

Page 72

1  of The Mortgage Exchange, correct?
2    A.  I don't really remember putting that.  I
3  don't really remember even putting that in there.
4  I'm not saying, you know, that maybe somebody told me
5  it should belong in there.  I don't know.
6    Q.  What about the $3 million that's indicated as
7  the Real Estate Investment Group?
8    A.  That would be the same thing.  I --
9    Q.  Do you have any reason to doubt that those
10  two together at the time your share of them would
11  have been worth $8 million for a total of $16 million
12  total net worth?
13    A.  I don't believe it was ever appraised out,
14  but, you know, perhaps on the optimistic side maybe.
15    Q.  My only question was if you have any reason
16  to doubt whether that's accurate?
17    A.  I don't know where those numbers came from.
18  I can't remember, so I'm not really sure what the
19  companies were ever worth.
20    Q.  I don't know where the numbers came from
21  either, but they're on your personal financial
22  statement.
23      So my question is, again:  Do you have any
24  reason to doubt, any reason at all, please let me
25  know, that those numbers are accurate?

Page 73

1      MR. ARAGONA:  Objection.  She's already
2    answered the question.
3  BY MR. ROTHMAN:
4    Q.  You can answer.
5    A.  Again, it wasn't appraised, so I'm not really
6  sure where the numbers came from.  I don't know if it
7  was on the optimistic side.  You know, when you have
8  ownership of a company you maybe think good thoughts,
9  and I just don't know if it was worth that or not.
10  I'm not sure.
11    Q.  Okay.
12    A.  I might have at the time had more reason to
13  believe that, but I don't know.
14    Q.  Okay.  There was a radio program and that
15  radio program is Making Money with Joe Aldeguer?
16    A.  I believe it was Make Money in Real Estate
17  with Joe Aldeguer.
18    Q.  Were you ever on the radio program?
19    A.  No.  Never.
20    Q.  But, actually, the radio program, was it
21  something where they paid Joe or the company to be on
22  it or did you pay the radio station?
23    A.  We were invoiced for to be on the shows.
24    Q.  Okay.  There's commercials that ran during
25  the radio program, did you receive any of the income

U.S. Legal Support
(561) 835-0220

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 74

1    from the commercials? Not you personally, the
2    company or Joe Aldeguer?
3        A.  No. No. No. I -- no income was ever given
4    to Joe for the -- that I'm aware of for being on the
5    radio shows.
6        Q.  You have listened to his radio program in the
7    past, haven't you?
8        A.  Not really.
9        Q.  You made a face that suggests that you don't
10   like to listen to Joe on the radio. What did that
11   face mean?
12       A.  Well, it wasn't that. It was that his radio
13   shows were on the weekends when I was with my family.
14       Q.  Okay.
15       A.  There had to be some separation.
16       Q.  Okay.
17       A.  You know, so.
18       Q.  That's fine. But my question was: Have you
19   listened to his radio program ever?
20       A.  I know it sounds crazy, but I maybe had like
21   five or six minutes of listening, and I really don't
22   listen -- didn't listen to his radio program.
23       Q.  You listened to the beginning of the program
24   where they introduce him?
25       A.  I maybe heard a few minutes of one of his

Page 75

1    shows. I really -- I didn't listen. I don't listen
2    to him.
3        Q.  Do you know they referred to him on the show
4    as "The Master of the Deal"?
5        A.  I believe that could be, but I can't say that
6    I've heard that part.
7        Q.  Okay. So you're saying The Mortgage Exchange
8    paid for those radio shows to be broadcast and The
9    Mortgage Exchange received no income from any
10   commercials run during the broadcasts?
11       A.  No. Not that I am aware of. I think I would
12   know that.
13       Q.  Let me -- that was a compound question, I
14   apologize.
15          The Mortgage Exchange paid for the programs
16   to be run on WLS in Chicago, correct?
17       A.  That is correct.
18       Q.  The Mortgage Exchange received no income from
19   any commercials that run during the program, correct?
20       A.  That is correct.
21       Q.  In fact, when The Mortgage Exchange filed for
22   bankruptcy, there was significant accounts payable
23   due to a variety of entities that were associated
24   with producing or presenting this radio program?
25       A.  That is correct.

Page 76

1        Q.  And Joe Aldeguer is still on the air, isn't
2    he?
3        A.  He still does radio, but I don't know which
4    channel or anything.
5        Q.  Well, my understanding is he still does it on
6    WLS. Do you know how he pays for it?
7        A.  I have no idea.
8        Q.  So as you understand it, potential buyers of
9    Legacy Dunes units would learn about the opportunity
10   to purchase a unit in Legacy Dunes on Mr. Aldeguer's
11   radio programs, but you never heard any of those
12   programs?
13       A.  That is correct.
14       Q.  Then they would be invited to a presentation
15   at your offices to hear more about the Legacy Dunes
16   units that they could purchase?
17       A.  That's correct.
18       Q.  Did you ever attend any presentation about
19   Legacy Dunes at The Mortgage Exchange or anywhere
20   else?
21       A.  I usually would have been in the building. I
22   would go in and out of the presentations. I would
23   catch bits and pieces. But for the most part I was
24   making sure that, you know, that I was working and,
25   you know -- I wasn't part of the presentation, so.

Page 77

1        Q.  I'm sorry, wouldn't the presentations be at
2    night? Weren't they in the evening?
3        A.  Yes. I think some of them might have been in
4    the afternoon.
5        Q.  If they were in the afternoon, wouldn't they
6    be on the weekends?
7        A.  Some I think were on the weekends. I don't
8    remember for sure, but I think some of them were.
9        Q.  So these presentations that were in the
10   evenings or on the weekends in the afternoons when
11   you were working, what was the work that you were
12   doing when you weren't in the presentation room or
13   even when you were in the presentation room?
14          You said you were working, what was that
15   work? What would you be doing?
16       A.  Sometimes I would be doing my e-mails or
17   doing paperwork or going through mail or overlooking
18   work that I didn't get done during the day. Like I
19   said, I will go in and out, but for the most part I
20   was making sure that the people who were going to be
21   making copies were, you know, ready and in place.
22       Q.  Okay. Anything else?
23       A.  Making sure the elevators, you know, were on.
24   Sometimes, you know, after hours there would be
25   confusion.

U.S. Legal Support
(561) 835-0220

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 78

1   Q.   Okay.
2   A.   I mean, that -- I was really just kind of
3   waiting.
4   Q.   Waiting for what?
5   A.   Well, when the presentations were over and
6   the people would come down to the eighth floor, I
7   would wait for the people to come down.
8   Q.   What would happen when they would come down
9   that you were waiting for?
10  A.   Well, they would have the option of meeting
11  with one of the Florida brokers.  The Florida broker
12  would go over everything and all of their questions.
13  If they chose to sign the real estate contract, once
14  that was signed that would then be given to an
15  individual who would bring it to one of our auditors
16  that just made sure that the signature spaces were
17  filled, a copy of the driver's license was there.
18       I mean, you know, I just really wanted to
19  make sure the Real Estate Investment Group received a
20  copy.
21  Q.   Okay.
22  A.   And that was the -- my main function why I
23  was there.
24  Q.   Why was it important for the Real Estate
25  Investment Group to receive a copy?

Page 79

1   A.   Well, it seemed important.
2   Q.   I agree with you.
3   A.   It seemed like something that we would have a
4   right to have a copy of.
5   Q.   Sure.
6   A.   If there was, you know -- I don't know why we
7   would have needed to have a copy of it other than
8   making sure that we did eventually get our
9   commissions if there was a problem.
10  Q.   Right.  That sounds like a pretty good reason
11  right there.
12  A.   Yeah.  So to me that was my main reason for
13  being there.
14  Q.   I mean, just the issue of making sure the
15  Real Estate Investment Group got its commission
16  sounds to me like a very good reason for you to be
17  there.
18  A.   I mean, we wouldn't get our commission that
19  evening, but it was the copy of the contracts that
20  just seemed like something that was important for us
21  to have.
22  Q.   Right.  And the commission that was paid on
23  the sales of Legacy Dunes for each unit was fairly
24  substantial?
25  A.   (Nodding head.)

Page 80

1   Q.   Is that a yes?
2   A.   Yes.
3   Q.   I mean, you have been in the real estate
4   business a long time, what's the average real estate
5   commission on a sale, just the normal sale of a
6   single family home not part of a development or
7   anything like that?
8        What's the average commission in your area in
9   Chicago?
10  A.   Well, if it's just -- first of all I'm -- I
11  don't really -- I have not sold real estate ever.  So
12  kind of --
13  Q.   You purchased real estate.
14  A.   Right.
15  Q.   So what's the commission, normal commission?
16  A.   Six percent.
17  Q.   What was the commission paid on the sales at
18  Legacy?
19  A.   Well, it got kind of confusing.  And so what
20  did it actually end up being, you know, I'm not sure.
21  At the closings I believe Legacy's lender allowed it,
22  you know, a portion of it to be paid, and that I
23  know -- that I clearly understand was ten percent.
24  Q.   Okay.
25  A.   The settlement part gets a little confusing

Page 81

1   because it was settlement.
2   Q.   I'm actually not asking about what it -- what
3   you ended up settling for.  What I'm asking is, and
4   I'm not asking for an exact figure, but approximately
5   what was the percentage paid by each purchaser of
6   Legacy in commission, marketing fee?  What was the
7   total amount, approximately, as a percentage of the
8   sale end price?
9   A.   I never really actually -- I don't recall
10  ever, you know, with everything included having like
11  a certain percentage in my head.  So, like I said, I
12  know at closing I believe we were getting -- the
13  approved part was ten percent.  Beyond that I can't
14  -- I just can't remember.
15  Q.   Would it refresh your recollection if I told
16  you that the percentage paid in real estate
17  commission and marketing fees for each unit at Legacy
18  Dunes were approximately 25 percent or more, does
19  that refresh your memory on that?
20  A.   I mean, it really doesn't.
21  Q.   Okay.
22  A.   Like I said, I clearly remember when the HUDs
23  were coming in the ten percent, the other part got so
24  scrambled that -- I'm sorry.
25  Q.   Okay.  So you're downstairs, I guess the

U.S. Legal Support
(561) 835-0220

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 82

1  floor below where presentations are occurring -- just
2  going back to your testimony about what happened at
3  the presentations -- and people would come down and
4  you would make sure that Real Estate Investment Group
5  got a copy of the contract, that each of the
6  purchasers signed so that you had a record of that
7  sale so you could make sure you got your commission
8  paid, correct?
9      A.  I mean, getting a copy of the real estate
10  contract was, you know, just important.  It was
11  something that the, you know -- George had said early
12  on that was important.  You know, all of the reasons
13  why, I didn't necessarily know.  Yes, it was very
14  important for me to get a copy of the real estate
15  contract.
16      Q.  Okay.  Can you remember any other reason
17  besides making sure that Real Estate Investment Group
18  got paid its commission that it was important that
19  you got a copy of the real estate contract?
20      A.  Say that again.
21      Q.  Can you remember any other reason why it was
22  important for Real Estate Investment Group to get a
23  copy of the real estate contract besides making sure
24  you would later on be able to receive your
25  commission?

Page 83

1      A.  Are you asking me other than commission?
2      Q.  Right.
3      A.  The reasons for commissions, what other
4  reasons maybe why I want that real estate contract?
5      Q.  Exactly.  The reasons for you being there to
6  make sure the stuff was being done properly.
7      A.  You know, it just seemed like something very
8  important that we should have a copy of.  I didn't
9  know if it would be something later that somebody
10  could come in and request those copies on, you know,
11  some kind of state licensing reason.  I just felt
12  that it was important for us to have a copy of it.
13      Q.  What about for the loan processing part of
14  this transaction, wasn't a copy of the real estate
15  contract critical in order to get loans, mortgages
16  funded for these purchases?
17      A.  Yeah.  But the client also got a copy of the
18  real estate contract.  And so the copies that I had,
19  I was not thinking of them as for the mortgage.  I
20  was thinking of them as important for the real estate
21  end.
22      Q.  But --
23      A.  I'm sure somebody might have come to me and
24  asked me for a copy of one, but that wasn't my mind
25  frame at the time for needing the copy.

Page 84

1      Q.  I understand that, but the vast majority of
2  the purchasers who purchased units at Legacy also
3  financed the purchases through The Mortgage Exchange
4  didn't they?
5      A.  I believe so, yes.
6      Q.  If you're going to submit a loan package to
7  underwriting in connection with a purchase of a piece
8  of real estate like the Legacy Dunes units, you need
9  to submit the contract, don't you?
10      A.  I would think so.  You know what, I'm not a
11  processer, but I would imagine that makes full sense.
12  But, again, that wasn't the reason I was getting the
13  copies.
14      Q.  Okay.
15      A.  I was getting them for the purpose of having
16  them on file for the Real Estate Investment Group.
17      Q.  Okay.  All right.  So I think I understand
18  what you're saying.  You're saying you personally got
19  copies of the contracts but that The Mortgage
20  Exchange might also have been getting its own copies
21  of the contracts for other reasons?
22      A.  Yeah.  Well, the -- my assistants that were
23  the auditors were the ones going through the papers.
24  And once they said the signatures were there, the
25  guts of it, just the signature lines that were

Page 85

1  supposed to be signed are signed, just to make sure,
2  that they would then make a copy.  Not necessarily
3  them, the person sitting at the copier.
4      It would then get a copy given to the client,
5  a copy given to the Real Estate Investment Group, and
6  I believe the original went for the developer.  And I
7  believe another copy was made for Real Estate Dreams.
8      What happened in the meetings between the
9  Florida broker at the time of them signing the real
10  estate contract, I don't know what conversations
11  happened right there.  But then separate
12  conversations happened that, I mean, that I also
13  wasn't a part of, but separate conversations happened
14  with The Mortgage Exchange loan officers.  That was
15  separate.  They qualified them and did their thing.
16      So that was very separate from the purpose
17  and reason why I was at the seminars.  I was there to
18  get Real Estate Investment Group a copy and just to
19  make sure that that little system had some
20  organization.
21      Q.  Okay.  Let's go back to the loan officers for
22  a second.
23      A.  Okay.
24      Q.  Loan officers you said they're qualifying
25  these individuals for loans on these properties as

22 (Pages 82 to 85)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 86

1  part of what they're doing?
2     A.  They were supposed to prequalify them.  That
3  was my understanding.
4     Q.  They would also need to fill out loan
5  applications?
6     A.  That's correct.
7     Q.  Now, when all of that loan paperwork was
8  completed where would it go?
9     A.  For that evening?
10    Q.  I'm not necessarily asking for that evening.
11    A.  Okay.
12    Q.  Forget you're at the presentation part.
13    A.  Okay.
14    Q.  I'm talking about as a business wide issue
15 after those loan applications were done, where would
16 that paperwork go?
17    A.  The next business day the loan officers would
18 put it in a bin, that bin -- then one of my
19 assistants would log the loan; meaning, the contents
20 of the information is irrelevant to her, she's just
21 putting in name, address, phone number so that we
22 have record of a new client.  It then goes into the
23 processing department.
24    Q.  Okay.  And the processing department was a
25 department that was underneath your chain of command?

Page 87

1     A.  Yes.  But just to refresh our conversation
2  about a little bit earlier, they were always able to
3  ask me questions.  But the manager was there was
4  actually there even before I joined The Mortgage
5  Exchange, and it was always the same manager.
6     Q.  Okay.
7     A.  So it was very independent group of people
8  because of that.
9     Q.  I understand that.
10    A.  Okay.
11    Q.  But we did look at the organizational chart
12 before and you did agree with me everything in the
13 loan processing department came underneath your
14 managerial control ultimately, whether they were
15 asking you questions about every single loan or not,
16 it all came under your managerial control, correct?
17    A.  You know, I do not know how to process, but
18 if there was questions in regards to the auditing of
19 a file is according to what the state requires, yes.
20    Q.  Okay.
21    A.  Otherwise they really were very independent,
22 because you couldn't ask me a question about
23 processing specifically.
24    Q.  Okay.  What else besides -- and going back to
25 the presentations -- by the way, how many

Page 88

1  presentations were there for Legacy Dunes?
2     A.  I don't remember.
3     Q.  Okay.
4     A.  I don't remember.  I mean, let's say more
5  than two, less than five.
6     Q.  Okay.
7     A.  I don't even know if I was necessarily at all
8  of them.
9     Q.  Somewhere between two and five?
10    A.  I think that would be accurate, but I am
11 guessing.
12    Q.  Do you recognize the handsome gentleman in
13 the corner with the baseball cap with the American
14 flag on it?
15    A.  Yes, I do.
16    Q.  That's Jim?
17    A.  Jim Wear.
18    Q.  Do you remember him being at any
19 presentations that you were at?
20    A.  Yeah.  I remember him being there.
21    Q.  Do you remember how many?
22    A.  I don't remember how many.
23    Q.  At least one?
24    A.  Well, yes.
25    Q.  Okay.

Page 89

1     A.  Because I remember it.  But they all in my
2  head they're all -- they kind of become one.  So I
3  cannot remember how many he was at.
4     Q.  And was he downstairs where you were during
5  those presentations or was he upstairs doing the
6  presentations with Mr. Aldeguer?
7     A.  I think he would have been upstairs.
8     Q.  You pretty much stayed downstairs when the
9  people would come down after the presentations so you
10 could make sure that you had the contracts that were
11 signed and everything was in order?
12    A.  Right.  I would go in and out.  I'm not
13 saying I never went in and out.
14    Q.  Okay.
15    A.  But most of the time was making sure that
16 everybody was ready for them to come down, yes.
17    Q.  Okay.  Do you remember anything that you
18 heard when you went in these presentations?
19    A.  I'm sure back in 2006 I would have been able
20 to tell you what I, you know, bits and pieces, but I
21 can't even recall.  I don't know anymore.
22    Q.  You have no recollection whatsoever?
23    A.  I mean, you know, I remember I would go in
24 and there would be different people on stage, but I
25 really -- it's very, very, very vague to me right

23 (Pages 86 to 89)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 90

1   now. I really don't remember very many specifics.
2       And perhaps that was because I really didn't
3   have anything to do with sales and marketing. I
4   wasn't part of the presentation. So I don't remember
5   so much anymore.
6   Q. I understand. Have you reviewed -- showing
7   you Exhibit 4 -- have you ever reviewed Exhibit 4?
8   A. I peeked at it.
9   Q. Breezed through it?
10   A. I less than breezed through it, but yes, I
11  did see it.
12   Q. When you peeked at it, did it refresh your
13  recollection about anything you might have heard at
14  these presentations when you went in and out?
15   A. You know, I didn't really take the time to
16  read through this. So I guess it didn't really help
17  too much. If I would have taken time to read through
18  the whole thing, it may have refreshed part. But
19  like I said, going in and out and having my focus
20  being someplace totally separate than sales and
21  marketing, you know, only -- I really only listened
22  to a very little degree.
23   Q. Have you seen the video that the transcript,
24  Exhibit 4, was made from?
25   A. No.

Page 91

1   Q. Do you know who videotaped the presentation
2  that's transcribed in Exhibit 4?
3   A. No.
4   Q. Do you know if other videotapes besides the
5  one that was transcribed in Exhibit 4 were made of
6  presentations at The Mortgage Exchange?
7   A. I'm really not sure when things were being
8  taped and when things weren't being taped. So I
9  don't know.
10   Q. Do you have any idea who might have been
11  operating the video camera?
12   A. I can make some guesses. Maybe the I.T.
13  department, but -- or maybe there was somebody there
14  professionally, you know, I don't know.
15   Q. Do you recall ever paying a professional
16  videographer to videotape presentations at The
17  Mortgage Exchange?
18   A. I do remember there was one fancy camera
19  there one time, but I don't -- I don't recall why or
20  if it maybe had to do with CLTV. I just don't
21  remember.
22   Q. What was CLTV?
23   A. CLTV was a TV show that, you know -- again,
24  I'm sorry m,I didn't have anything to do with that
25  either except for paying the bills. It was a TV show

Page 92

1   that I would assume promoted the same thing as the
2  radio.
3   Q. Okay. Do you recall that on the floor below
4  where the presentation was, where you were for some
5  of the time, that there was also presentation that
6  was being given by Geneva Hospitality?
7   A. You know, I do remember Geneva coming into
8  the picture. I remember them being there, but I
9  don't remember who invited them and how it happened.
10   Q. Okay. Where was their presentation being --
11  well, I'm not sure quite how to ask this.
12      You were on the eighth floor or seventh
13  floor?
14   A. We were on eight and nine.
15   Q. Okay. So the people come down after the
16  presentation and you're on the eighth floor and
17  Geneva is there, where are Sal and Chandra or one or
18  the other?
19      Where are they located on the eighth floor?
20  Are they out in the open? Are they in a conference
21  room?
22   A. I can't visually picture and remember them
23  much at all. So they must have been in one of the
24  conference rooms.
25   Q. Do you remember ever seeing a PowerPoint

Page 93

1   presentation that one or both owners of Geneva gave?
2   A. No, I don't think I saw it.
3   Q. Okay.
4   A. I can't imagine because I can't even remember
5  them there.
6   Q. Take a look at Exhibit 5. Tell me if you
7  recall ever seeing that PowerPoint presentation up on
8  a screen.
9   A. I'm sure I was never in a conference room
10  with them that I can recall. There's no way that I
11  could see something that I would have been in there
12  in the first place.
13   Q. I just asked if you recognized that.
14   A. Okay. I don't know. If I have seen it, I
15  don't recall it.
16   Q. Did The Mortgage Exchange have an employee
17  handbook?
18   A. No.
19   Q. Did REIG have an employee handbook?
20   A. No, I don't think we really had a handbook.
21   Q. Did The Mortgage Exchange have a policy
22  concerning the use of e-mail that was written down
23  anywhere or maybe electronically distributed to
24  people who worked there?
25   A. I mean, if there was something inappropriate

24 (Pages 90 to 93)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 94

1    that went out that, you know, didn't have to do with
2    work --
3        Q.  I'm asking if they had a written policy
4    either on paper or electronic that was distributed to
5    people who worked there about what was proper use of
6    e-mail, what was improper, what you can do and
7    couldn't do with e-mail?
8        A.  Maybe Maureen had something that she gave
9    out, but I don't recall one.
10       Q.  Okay.
11       A.  Could have been.  I just can't recall one.
12       Q.  Okay.  Do you recall -- strike that.
13           Do you ever recall hearing anyone make any
14   statements either in a presentation or elsewhere
15   about income that can be earned from the rentals of
16   condominiums at Legacy Dunes?
17       A.  You know, there was a -- there was options of
18   being able to rent out Legacy.
19       Q.  So you heard --
20       A.  I'm aware they had long-term leases and I'm
21   aware that the clients were told that, but I don't
22   really -- I wasn't part of the conversations with the
23   clients.  So I'm not really sure specifically what
24   went on, you know, they were told.
25       Q.  And you all -- so you had an awareness of it

Page 95

1    with respect to long-term leases, were you also aware
2    of conversations with clients about the opportunities
3    for short-term rentals?
4        A.  Yes.  I mean, that was all part of the option
5    was the possibility of having short-term.
6        Q.  Did you ever hear Mr. Aldeguer make
7    statements about that being a possibility?
8        A.  Yes.  I mean, he was -- that was one of the
9    options of buying real estate, that was part of
10   Legacy.
11       Q.  Right.  And do you recall also statements
12   made about how much could be earned from renting
13   units at Legacy either on a long-term or a short-term
14   basis where the numbers or projections were given?
15       A.  See, all that's getting more specific, and I
16   don't remember specifically what would have been
17   said.
18       Q.  Okay.  If you don't have a specific
19   recollection, I'm not asking you to guess.
20       A.  I don't.
21       Q.  Do you recall that part of the attraction for
22   individuals to purchase at Legacy was that there was
23   going to be centralized management of the units for
24   short-term or long-term rentals?
25       A.  I think as an option they were supposed to

Page 96

1    have certain choices, but I don't think there was --
2    I don't think they had to use a particular management
3    company.
4        Q.  I understand that.  But that was something
5    they could take advantage of.  And, in fact, you had
6    testified earlier that there were discussions about X
7    Management being management later on?
8        A.  Later, later.
9        Q.  Okay.
10       A.  Later on.  I don't believe that X Management
11   was part of or mentioned or even created at this
12   point yet at all.
13       Q.  In fact, the management that was being
14   discussed at the presentations was going to be
15   something handled by Geneva?
16       A.  You know, I don't recall -- I don't really
17   remember why Geneva was even there.  If it was there
18   just as an example, I don't even remember.
19       Q.  You know that Geneva's business is managing,
20   among other things, managing rental properties on a
21   short-term basis for condominium owners?
22       A.  I know that -- at the time I didn't know who
23   Geneva was at all.
24       Q.  But --
25       A.  But now I know that.

Page 97

1        Q.  You know that's what they do?
2        A.  Now I know that's what they do.  At the time
3    I didn't even know who Geneva was.
4        Q.  And there wasn't anyone else there besides
5    Geneva who was in the business of managing short-term
6    rentals and condominium units, was there?
7        A.  Not that I'm aware of.
8        Q.  So you just either didn't make the connection
9    that's the reason Geneva was there to provide the
10   management on either a short-term or long-term basis
11   for these rentals or you didn't put two and two
12   together or you didn't think about it?
13       A.  I really didn't think about it.
14       Q.  Well, I think you had mentioned earlier -- or
15   maybe it was in your declaration -- that you had very
16   minimal interaction with clients of Mortgage Exchange
17   or purchasers of real estate at Legacy; is that
18   right?
19       A.  That is correct.
20       Q.  Is it your testimony that you never, during
21   2006, that you never spoke directly with any
22   purchaser at Legacy Dunes?
23       A.  If somebody came up to me and said Hi or
24   Where is the bathroom ---
25       Q.  I'm not asking about Hi and Where is the

25 (Pages 94 to 97)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

1    bathroom. I think you know that.
2        A.   Well, just in case.
3        Q.   Well -- please.
4             I'm asking this: Is it your testimony that
5    you never had a substantive conversation about real
6    estate, about Legacy, about mortgages, about anything
7    substantive, not Where's the bathroom, with any of
8    the purchasers of units at Legacy Dunes during 2006?
9        A.   I absolutely do not remember having any
10   conversation that could have had anything to do with
11   buying a unit at Legacy, and I would not have been
12   the one to sit with them. I would not have been the
13   one to help them with the mortgage or paperwork. If
14   I had any conversation with any of them at all, I
15   don't even remember a conversation.
16       Q.   Okay.
17       A.   Now, there were a couple of people that
18   called me and asked me for a copy of their appraisal,
19   and they did get to me and I did send a copy of the
20   appraisal. So that is talking --
21       Q.   Sure.
22       A.   And that's more than just the bathroom.
23       Q.   Okay.
24       A.   But it's not, you know -- I hope that
25   explained it.

1        Q.   You do recall some conversations with Legacy
2    purchasers getting copies of their appraisals, but
3    other than that you have no recollection of any
4    specific conversations?
5        A.   I do not.
6        Q.   So if any of the plaintiffs in this case do
7    have specific recollections of those conversations,
8    sitting here today, you just don't have a memory of
9    it one way or another?
10       A.   I don't think that I ever had -- I mean, if
11   somebody told me a full-blown conversation I had with
12   them, it would surprise the heck out of me because I
13   do not remember having, like I said, you know, could
14   somebody have stopped me and just chit-chatted for a
15   little bit, I would have been polite and
16   chit-chatted, but I would not have had anything to do
17   with selling them a Legacy unit or helping them with
18   their mortgage.
19       Q.   Okay. If someone had asked you, for example,
20   do you think that Legacy is a good investment, would
21   you have had a conversation about it?
22       A.   Nobody ever asked me that question.
23       Q.   Did anyone ever ask if you are you purchasing
24   at Legacy?
25       A.   No. I don't believe anybody ever asked me

1    that.
2        Q.   Did you ever hear that it was told to
3    purchasers at Legacy that everyone at The Mortgage
4    Exchange was also buying units because that's how
5    much they believed in it?
6        A.   I think quite a few people signed contracts
7    and I do believe that there were a couple that did
8    buy. I do believe there was a lot that couldn't
9    qualify too, so.
10       Q.   The let me go back to Mortgage Exchange for a
11   second. If a client of The Mortgage Exchange has --
12   comes in and is seeking your assistance, The Mortgage
13   Exchange's assistance, in finding mortgage financing,
14   a loan, to purchase a piece of property, my
15   understanding was that in order for The Mortgage
16   Exchange to begin work on that file that they needed
17   to, in advance, pay for the cost of a credit report
18   and the appraisal that would be necessary on that
19   piece of property; is that right?
20       A.   That's correct.
21       Q.   Was that typically $300?
22       A.   That's correct.
23       Q.   And is it your understanding that that was
24   the situation with respect to the individuals who
25   purchased units at Legacy, that for each unit they

1    would have to have written a check and paid $300 for
2    a credit report and for the appraisal?
3        A.   I would imagine that is the case. There
4    might have been an exception to the rule for some
5    reason, but that was typical to come in with a
6    mortgage application was the check to pay for the
7    appraisal and credit report.
8        Q.   You're not aware of any exception that was
9    made for the purposes of Legacy Dunes purchases,
10   there was still the same requirement that everybody
11   pay the $300?
12       A.   That's correct. But just every now and then
13   there would be an exception made, and I don't know if
14   maybe somebody had an exception. It's possible.
15       Q.   Do you know who the appraiser was who did the
16   appraisals on the Legacy Dunes units?
17       A.   I don't know who the appraiser was. If it
18   was two or three, I don't remember.
19       Q.   Would it refresh your recollection that the
20   appraiser that did the majority of the appraisals on
21   the units purchased by individuals who bought their
22   units through The Mortgage Exchange and Real Estate
23   Investment Group was Expert Appraisals?
24       A.   I do remember that bill, yes.
25       Q.   The bill you're referring to was never paid

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 102

```
1    bill The Mortgage Exchange, correct?
2       A.  I don't remember that part.
3       Q.  Okay.  Let me show you what's been marked as
4    Exhibit 21.
5          (Thereupon, Exhibit 21 was marked for
6    identification.)
7    BY MR. ROTHMAN:
8       Q.  I will represent to you that this is a
9    spreadsheet of Mortgage Exchange, Real Estate
10   Investment Group, and other related company creditors
11   that was on The Mortgage Exchange computer that you
12   used while you were at The Mortgage Exchange, which
13   was then turned over to the trustee in bankruptcy, do
14   you recognize this spreadsheet?
15      A.  This looks like a spreadsheet that my
16   assistant Karen created.  I wouldn't remember if, you
17   know, each detail is correct, but it looks correct,
18   yes.
19      Q.  Okay.  Do you see on the second page on line
20   57 there's an entry for Expert Appraisals of Central
21   Florida?
22      A.  Yes.
23      Q.  The invoice date is April 11th, 2006 and the
24   amount is $32,550?
25      A.  I see that.
```

Page 103

```
1       Q.  The bill you're referring to, is that from
2    Expert Appraisals for $32,550?
3       A.  I believe so.
4       Q.  Do you remember when you received that bill?
5       A.  I don't know if they were coming in -- I
6    don't recall if they were coming in on separate
7    invoices every couple of weeks or 30 days or if it
8    just came in all at one time in the end, I don't
9    remember.  But I remember the name Expert Appraisals.
10      Q.  So do you know why the date is listed as
11   April 11th, 2006?
12      A.  I don't.
13      Q.  Okay.
14      A.  It could have been a typo.  It seems early
15   on.
16      Q.  It seems early because the sales of Legacy
17   didn't start to happen until the end of April,
18   beginning of May of '06?
19      A.  Yeah.  So I don't know.  Karen could have
20   just made a typo.  That's the only thing I can come
21   up with that makes sense.
22      Q.  Do you know if maybe some sort of a deal was
23   done with Expert Appraisals where a flat fee was
24   going to be paid for a certain number of appraisals
25   and that flat fee would be discounted because of the
```

Page 104

```
1    volume?
2       A.  I don't think so.  No.  I don't know, but I
3    don't think so.
4       Q.  This bill from Expert Appraisals was never
5    paid?
6       A.  Looks like it wasn't.
7       Q.  Why?
8       A.  Bills piling up and amount of income coming
9    in, there was some bills that got put to the side.
10         (Thereupon, Exhibit 22 was marked for
11   identification.)
12   BY MR. ROTHMAN:
13      Q.  Do you recognize 22 to be the Statement of
14   Financial Affairs that The Mortgage Exchange filed
15   when it filed for Chapter 7 bankruptcy in July of
16   2008?
17      A.  Yes.
18      Q.  Do you see that at the bottom of the first
19   page it indicates that The Mortgage Exchange had
20   income from employment or operation of its business
21   in the year 2006 in excess of $13.5 million?
22      A.  Yes.
23      Q.  Do you have any explanation as to why Expert
24   Appraisals was not paid the bill we were just talking
25   about when Mortgage Exchange had income of
```

Page 105

```
1    $13.5 million in that same year when the bill was
2    indicated as being sent to you?
3       A.  Its expenses must have been more than that
4    and there were some things that got pushed on the
5    wayside.
6       Q.  Okay.
7       A.  I don't really recall why.
8       Q.  Are you saying that the expenses of The
9    Mortgage Exchange were greater than $13.5 million?
10      A.  I'm saying that there must have been a lot of
11   other bills.  I can't imagine why it would have just
12   sat there unpaid.  I don't recall why it was not
13   paid.
14      Q.  Sitting here today do you know that The
15   Mortgage Exchange had expenses in excess of the
16   income that is stated for the year 2006?
17      A.  I don't remember.
18      Q.  You don't remember?
19      A.  I don't remember.
20      Q.  Okay.
21      A.  I just don't remember why it wasn't paid or.
22      Q.  You were profitable in 2006, were you not?
23      A.  We had a lot of catching up to do in 2006 at
24   times, so.
25      Q.  Your financial statements showed that you
```

27 (Pages 102 to 105)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 106

1   received distributions of income in 2006, do you
2   remember?
3       A.  Could have.  I don't remember.  I didn't --
4   I'd never create the financial statements --
5       Q.  Didn't QuickBooks run on that computer that
6   was owned by The Mortgage Exchange that you turned in
7   to the trustee?
8       A.  Yes.  But we didn't run financial statements
9   off of QuickBooks.
10      Q.  What did you run financial statements off of?
11      A.  We turned everything over every quarter to
12  the accountant and the accountant made actual
13  financial statements.
14      Q.  Okay.  So I need to ask the accountant these
15  questions about whether or not you were profitable
16  and why you didn't pay this bill to Expert
17  Appraisals, then; is that what you're saying?
18      A.  He wouldn't know why I didn't pay the bill,
19  and I wish I could remember what the circumstance was
20  why I didn't pay it.  I just don't remember.
21          MR. ROTHMAN:  Can we take a couple of
22      minutes?  Five minutes.
23          (Short break.)
24  BY MR. ROTHMAN:
25      Q.  Does Joe Aldeguer also have an e-mail address

Page 107

1   that you can communicate with him these days or do
2   you just call him on his cell phone?
3       A.  You know what, he does, but it's
4   automatically memorized in my computer, and I'm not
5   positive I'd have it right.
6       Q.  Do you know what domain he uses?
7       A.  What does that mean?
8       Q.  The part after the at, the this dot com or
9   something?
10      A.  I can't remember.  I'm sorry.
11      Q.  That's okay.  Let me show you Exhibit 23.
12          (Thereupon, Exhibit 23 was marked for
13      identification.)
14  BY MR. ROTHMAN:
15      Q.  Do you recognize that this is the list of
16  schedules that The Mortgage Exchange filed in
17  connection with its bankruptcy in the bankruptcy
18  case?
19      A.  Yes.
20      Q.  Do you see on the first page, Schedule A,
21  real property it indicates "None"?
22      A.  Yes.
23      Q.  I seem to recall that you provided the
24  trustee with all the tax returns for The Mortgage
25  Exchange in the past, right?

Page 108

1       A.  Yes.
2       Q.  So I can go back and look at those tax
3   returns and I'll be able to see how the payments of
4   the mortgages for your properties were treated on
5   those tax returns?
6       A.  I would imagine it would show on there.
7   Yeah.
8       Q.  We talked about some websites and I think I
9   asked you whether one of the websites that the
10  affiliate companies owned was Own a Hotel Room dot
11  com, do you remember if that was one of the websites?
12      A.  I don't remember.
13      Q.  Look at Exhibit 24.
14          (Thereupon, Exhibit 24 was marked for
15      identification.)
16  BY MR. ROTHMAN:
17      Q.  Do you recall that this, Exhibit 24, is the
18  website for Own a Hotel Room dot com?
19      A.  I don't think I ever actually saw this, so.
20      Q.  Do you see at the bottom it says Real Estate
21  Investment Group, Limited?
22      A.  Yeah.
23      Q.  That was the address that's given in Downers
24  Grove, Illinois as the address that REIG was located
25  at in 2006, correct?

Page 109

1       A.  Yes, that is correct.
2       Q.  You're saying you don't recall ever seeing
3   this website?
4       A.  I don't recall ever seeing it.
5       Q.  Okay.  Do you recall ever paying any bills
6   for the development or the hosting of this website?
7       A.  I don't remember if this is -- this was a
8   website then I'm sure one was paid, but I don't
9   recall one.
10      Q.  Okay.  You know a company called the Four
11  Eyes Squad?
12      A.  I believe that is a company that one of our
13  I.T. guys has.
14      Q.  Cedric Castillo?
15      A.  Yes.
16      Q.  The Four Eyes Squad is a website design
17  hosting Cedric Castillo has?
18      A.  Yes.
19      Q.  Did he do website for The Mortgage Exchange
20  Real Estate Investment Group, and other companies
21  that were affiliated with it?
22      A.  Yes.  But I think it was under Net Corp at
23  the time.  I think the Four Eyes thing might be new.
24      Q.  His prior company was Net Corp?
25      A.  Yeah.

28 (Pages 106 to 109)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 110

1    Q.  So Net Concept, Inc., might that have been
2  the name of it?  In Naperville?
3    A.  Possibly.
4    Q.  Okay.  Do you remember that there was also a
5  website called Own a Hotel Room dot org that was a
6  blog, that Joe Aldeguer had a blog at Own a Hotel
7  Room dot org?
8    A.  I don't remember that.
9    Q.  Let me show you Exhibit 25.
10       (Thereupon, Exhibit 25 was marked for
11  identification.)
12  BY MR. ROTHMAN:
13    Q.  Do you remember ever using a slogan "Own a
14  Hotel Room one room at a time," like it says on top
15  there?
16    A.  I don't.  No.
17    Q.  Do you remember seeing this blog?
18    A.  I do not.
19    Q.  If you flip to the end of this exhibit, you
20  look at the third to the last page --
21    A.  Yep.
22    Q.  It says underneath where it says "Google" who
23  is record for Own a Hotel Room dot org?
24    A.  Yes.
25    Q.  And then if you flip the page again you see

Page 111

1  at the top the second line says:  Domain name, Own a
2  Hotel Room dot org.  And then below that: Registrant
3  name, Cedric Castillo?
4    A.  Yes.
5    Q.  Does that refresh your recollection whether
6  Cedric Castillo entered an Internet domain of Own a
7  Hotel Room dot org for Mortgage Exchange or Own a
8  Hotel Room or one of the other affiliated companies?
9    A.  I see that it says it, but it doesn't make me
10  remember anything.  I don't remember knowing about
11  it.
12    Q.  Now, did there come a time in between 2006
13  when the presentations were given between then and
14  now when you began to hear about complaints that were
15  made by purchasers of units at Legacy Dunes?
16    A.  You know, I don't remember when, but there
17  was at one point a time that -- I don't think clients
18  were calling me.  I don't recall that at all.  So I
19  think these were more hearsay of things that Maureen
20  would talk about.
21    Q.  Okay.
22    A.  But I don't remember, you know, specifically
23  the conversations on what she was saying.  A lot of
24  times it was my understanding that she was taking
25  care of that particular complaint and not worry about

Page 112

1  it, and later on when the complaints -- I mean much
2  later on -- now we're talking when OMC was going to
3  take over.  You know, then I'm aware, again, based on
4  more hearsay, not on actual conversations that I'm
5  having that clients are concerned.
6    Q.  Okay.  Well, let's clear something up.
7    A.  Okay.
8    Q.  You use the term "hearsay."  As a lawyer I
9  understand hearsay to mean someone is telling me
10  something that somebody else said, okay; is that how
11  you're understanding it?
12    A.  It was like Maureen had discussions with
13  clients and then --
14    Q.  Okay.
15    A.  -- she, on some of them, would come to me and
16  talk about them.  Most of the time I don't think that
17  she was coming in discussing them with me.  It was
18  just part of her role was to take care of questions
19  and concerns and answer them.  It wasn't till much
20  later that I realized that so many people had
21  concerns.
22    Q.  Okay.
23    A.  Okay.
24    Q.  Let's start with the time that Maureen
25  Phillips is having these conversations with owners

Page 113

1  and then coming to you and discussing them with you.
2       That would be before she left the company at
3  the end of 2007, correct?
4    A.  Correct.
5    Q.  And you mentioned that there were some of
6  them you could pinpoint to a period before or around
7  the time when OMC took over; is that right?
8    A.  That was when really Maureen started speaking
9  out and saying that, you know, X, was the right thing
10  to do is to let it go and let OMC take over.
11    Q.  Okay.
12    A.  And she said that people were becoming
13  unhappy and it was -- she was looking out for them.
14  She wasn't -- it was the right thing to do, so.
15    Q.  Okay.  And so the right thing to do, you're
16  referring to allowing OMC to come in and be the
17  short-term management company for Legacy Dunes?
18    A.  Well, I believe they were already there
19  dealing -- you know, I'm not positive, but I feel
20  like they had already taken over the long-term there.
21    Q.  Okay.
22    A.  And long-term was one of their options and
23  the clients were also wanting an option of
24  short-term, and that's what OMC -- that's what
25  Maureen felt OMC should do.

29 (Pages 110 to 113)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 114

1    Q.  Okay.  And the time period that we're talking
2  about is the -- in or around the summer of 2007?
3    A.  It was definitely in '07, and I want to say
4  on the later side '07.
5    Q.  Okay.  When you say the right thing to do,
6  that seems to imply that there was an alternative,
7  did that alternative involve X Management and Geneva
8  doing the management of the rentals?
9    A.  Yes.  But there was some reason -- I don't
10  remember what it was -- but there was some particular
11  reason that Maureen really felt that OMC already was
12  working well with DRG in what they were doing and
13  they should be the ones to handle that.
14    Q.  Okay.  But just for clarification, it was a
15  question should OMC manage the rentals or should X
16  Management and Geneva together manage the rentals,
17  that was the issue?
18    A.  I mean, those were, yeah, all options.
19    Q.  Those were options.  Are there options I
20  haven't mentioned, any other options you can recall?
21    A.  Do you mean options as far as what the
22  clients could do?
23    Q.  No.
24    A.  The clients could use or do whatever they
25  wanted.

Page 115

1    Q.  No.  I'm talking about the management of the
2  rentals, and you were specifically talking about how
3  OMC was going to come in --
4    A.  Yes.
5    Q.  -- and that there was the possibility that
6  instead of OMC, it could be X Management and Geneva.
7  What I'm asking you is:  Were there any other options
8  in terms of a different company managing the rentals
9  besides OMC or X Management and Geneva or was it just
10  a choice between the two?
11    A.  I believe there was also a company by the
12  name of Sovereign, but I don't know if they still had
13  an active role there or not.  I don't know what all
14  options they really had.
15    Q.  Sovereign was the existing management company
16  that was there at the time that this discussion was
17  going on about whether it should be OMC or X
18  Management and Geneva, right?
19    A.  I don't know for sure.  I just know that
20  Sovereign at one point was there.
21    Q.  What were the complaints that you heard from
22  Maureen Phillips in 2007 when there was this
23  discussion about which choice to make?  What were the
24  complaints Maureen was telling you she was hearing
25  from owners?

Page 116

1    A.  I'm trying to remember.  I don't know if she
2  was telling -- if she was getting really specific
3  about one owner at a time or it was just a lot of
4  them as a whole were excited of the possibility of
5  using somebody like OMC.
6    Q.  Okay.
7    A.  You know, I don't specifically know if it was
8  particular names.  I don't know, it was more of a
9  group and her wanting to do a conference call with
10  all of them and Jim Murphy, which was the gentleman
11  from OMC.
12    Q.  Did you understand that the concern on the
13  part of the owners was to make sure they could obtain
14  income from rentals, as much income as they could
15  possibly obtain?
16    A.  They definite -- she definitely implied they
17  wanted the options, all of their options available to
18  them.
19    Q.  So that they could make as much money as they
20  could from renting these units?
21    A.  She didn't specifically say that, but I'm,
22  you know, everybody would have wanted to make as much
23  money as possible.
24    Q.  So that's what you understood?
25    A.  That is what I understood in regards to the

Page 117

1  fact that they wanted to use OMC.
2    Q.  And were there any other conversations that
3  you had with Maureen Phillips before she left at the
4  end of 2007 where she was telling you about
5  complaints that were being made by Legacy owners,
6  other than conversations where she talked about the
7  choice between OMC and X Management and Geneva?
8    A.  You know, everybody -- it was my
9  understanding that everybody was so excited when OMC
10  took over and there was still some questions and what
11  have you, but those were really directed to Ms. Green
12  maybe, Judy Green at OMC.  And I thought that
13  everybody was -- I'm sure that there was still people
14  that were upset, but I don't remember specifically it
15  being more -- I thought people were excited overall
16  about OMC.  And if there were still some complaints,
17  which there might have been, I just don't remember
18  what they were.
19    Q.  Okay.  So after Maureen Phillips leaves in
20  December of 2007 through today, have you ever
21  received communications from any purchasers at Legacy
22  Dunes complaining about any issue whatsoever, any
23  issue at all?
24    A.  I don't think I have.
25    Q.  No one's ever called you, spoken with you,

30 (Pages 114 to 117)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 118

1 and said to you, I'm not making the amount of income
2 that I was promised I would make on the rentals of
3 this units and I'm upset?
4 A. I don't think anybody called me to -- there
5 were a couple of phone calls that came in requesting
6 appraisals. For the most part the processing
7 department took care of those, but a few people did
8 get to my extension and, of course, I'm going to, you
9 know -- request they get a copy of their appraisal if
10 they need it.
11 I don't remember anybody calling me
12 specifically and complaining. If there was one or
13 two, I'm not recalling it. If there was, like I
14 said, it wouldn't have been anything I can remember
15 and it would have been minimal.
16 And if any -- and lots of times complaints
17 still would have been handled by my assistant. If
18 there was something she could have answered. For the
19 most part, I would have imagined if something came in
20 to her, she would also have directed them, at this
21 point, to OMC.
22 Q. Do you remember anyone telling you that they
23 had received a call from any Legacy Dunes purchaser
24 making any complaints in this time period?
25 A. There could have been somebody else calling

Page 119

1 and complaining to somebody other than myself.
2 Q. Right.
3 A. I just really don't remember a specific
4 conversation, though, of that. It's not impossible,
5 but I just don't remember any.
6 Q. Okay. Let me show you Exhibit 26.
7 (Thereupon, Exhibit 26 was marked for
8 identification.)
9 BY MR. ROTHMAN:
10 Q. The fourth line down it refers to commissions
11 relating to "commissions relating to units sold as
12 part of an REIG task force project."
13 What is an REIG task force project?
14 A. You know, I was, again, we're talking
15 third-hand information here. I was not part of any
16 meetings with any of these agents or anything.
17 My understanding and what I was told was that
18 there was talk about creating a task force in which
19 people would have individual functions, but that it
20 never actually came into fruition. It was something
21 that was talked about, but it's nothing that ever
22 played out.
23 And, again, I wasn't part of any meeting
24 where the ideas were even being bounced around. So
25 all I can really say is my understanding of it.

Page 120

1 Q. Which is what?
2 A. Is that there was talk about creating a task
3 force but that it never actually happened.
4 Q. What was that task force going to do?
5 A. I'm not really sure. I wasn't part of the
6 meetings. I don't know. Nobody was given any tasks,
7 so it just never really happened.
8 Q. Okay. But you're the one who was the --
9 dealing with the lawyers was part of your
10 responsibilities?
11 A. Yes.
12 Q. It was -- and this came from your attorneys
13 -- and the attorney says that units were sold as part
14 of an REIG task force project. So it suggests that a
15 task force actually existed, not what you had said
16 that it never came to be.
17 A. I think that was his claim. His claim was
18 that it was sold, that he should have earned a
19 certain amount of money because of a task force he
20 was part of. But that's his claim. I think my
21 attorney is just reiterating his claim, what he's
22 saying, not really what it was.
23 Q. Okay. So eventually did REIG take the
24 position that there was never a task force?
25 A. Yes.

Page 121

1 Q. Do you recall anyone ever mentioning at any
2 point before this lawsuit was filed whether or not
3 the sales of units at Legacy Dunes combined with
4 management futures and ability to earn income from
5 rentals would be considered a security under the
6 securities laws?
7 A. Some time a little bit later into the project
8 there was talk about how securities had gotten
9 broughten [sic] up, but everybody was really under
10 the assumption that we were selling real estate here,
11 you know. I thought, you know, you hear securities,
12 I think stocks and bonds. I don't even understand
13 how that could relate. However, Joe and Maureen,
14 during their presentations, decided to be careful
15 about what they say and to be on the safe side.
16 Q. Okay.
17 MR. ROTHMAN: Can you read back the beginning
18 of that answer.
19 (Thereupon, the requested portion was read
20 back by the reporter as above recorded.)
21 BY MR. ROTHMAN:
22 Q. So when are we talking a little bit later in
23 the project? What time frame are you talking about?
24 A. I don't remember exactly, but it wasn't right
25 away.

31 (Pages 118 to 121)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 122

1    Q.  Is this during the time that presentations
2  were being made and sales were taking place or was
3  this after?
4    A.  I'm sorry, say that again.
5    Q.  Are you talking about during the time
6  presentations were being made and sales were taking
7  place or are you talking about some time after?
8    A.  I'm saying that there were presentations that
9  had already taken place.
10    Q.  Okay.
11    A.  You know, I believe.
12    Q.  Right.
13    A.  And then to be on the safe side, you know,
14  that's when both Joe and Maureen and anybody doing a
15  presentation was just being careful.
16    Q.  Okay.  So you're saying some presentations
17  had already taken place, some were still to come in
18  the future, and there was a discussion about
19  securities and Joe and Maureen decided to be careful,
20  did I understand that right?
21    A.  Yeah.  I mean, I don't know at what point --
22  I don't remember when specifically.
23    Q.  Okay.  And so addressing these concerns
24  you're talking about, there was some discussion that
25  took place between Joe and Maureen and other people

Page 123

1  involved in the presentations about what to say and
2  what not to say?
3    A.  Yeah.  I don't know about that.  I just know
4  that I'm pretty sure that there was a conversation
5  that happened between Joe and Maureen and George
6  Weams just alerting to the fact of that they should
7  be careful of what they say.
8    Q.  You were --
9    A.  I don't believe I was on that conversation,
10  so that's why it's very difficult for me to pinpoint,
11  you know, what all was said.
12    Q.  But you said you were pretty sure it
13  happened.  How is it you're pretty sure if you
14  weren't part of the conversation?
15    A.  I'm almost positive I wasn't part of the
16  conversation, but I don't really recall exactly when
17  it took place, but I do believe there was a phone
18  call that happened between George and Joe and
19  Maureen.
20    Q.  Okay.  And George Weams being with the Coman
21  and Anderson law firm?
22    A.  Um-hmm.
23    Q.  Okay.  Do you remember anyone from Coman and
24  Anderson ever coming to your offices to advise The
25  Mortgage Exchange, Real Estate Investment Group,

Page 124

1  anyone there about what to say or what not to say to
2  avoid getting into trouble with the securities laws?
3    A.  I don't remember them coming in.  I do
4  remember, you know, Coman and Anderson coming in one
5  time, but I don't -- it didn't --
6    Q.  It didn't have to do with that?
7    A.  I don't think it had to do with that.
8    Q.  Did you ever have a conversation with anyone
9  at Coman and Anderson about the potential for Legacy
10  Dunes, Runaway Beach, or any other condo-hotel
11  investments being considered securities?
12    A.  Not that they were specifically securities
13  and not that anybody had said that Legacy was a
14  security, you know, but that alerting Joe and Maureen
15  to be careful was important.
16        Everybody was selling real estate.  And so
17  the words, you know, of securities was -- no one
18  understood to be relating to normal real estate,
19  which was what was being sold.
20    Q.  You thought that the units that were being
21  sold in Legacy Dunes was normal real estate?
22    A.  Well, yeah.  They were just simple real
23  estate contracts just as far as I could tell.
24    Q.  Even though you've already testified that you
25  knew that part of the arrangement was the ability to

Page 125

1  rent the units out, to get income from the rentals,
2  that they would managed by a company that would
3  manage the rentals of the units, but your
4  understanding this was just a simple sale of real
5  estate?
6        MR. GORE:  Object to the form of the
7    question, misstates the witness' prior testimony.
8        MR. ROTHMAN:  I don't want to misstate
9    testimony.
10        MR. GORE:  Well, you just did.  If you don't
11    want to, you may want to start over.
12        MR. ROTHMAN:  Let's go back.  Read me her
13    answer.
14        (Thereupon, the requested portion was read
15  back by the reporter as above recorded.)
16  BY MR. ROTHMAN:
17    Q.  So when you say they were simple real estate
18  contracts, are you referring to the actual contract
19  on paper?
20    A.  Yes.
21    Q.  So you're not referring to all the aspects of
22  the investment; you were just concerning yourself
23  with the actual paper contract?
24    A.  Well, yes.
25    Q.  All right.

32 (Pages 122 to 125)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 126

1    A.  I really -- it was a real estate contract,
2  so.
3    Q.  Okay.  Did you ever hear from any purchasers
4  at Legacy Dunes at any time before this lawsuit was
5  filed that they believed that the securities laws may
6  have been violated in connection with the sale of
7  units to them in Legacy?
8    A.  Nobody ever called me and discussed the
9  thinking of that.  Again, that I can recall.
10    Q.  So the first time you ever heard the notion
11  that from a purchaser of these units that the
12  securities laws may be involved was when you received
13  the lawsuit in this case?
14    A.  As far as I can remember yes.
15    Q.  Okay.  All right.  Let me show you what I'm
16  marking as Exhibit 27.
17      (Thereupon, Exhibit 27 was marked for
18  identification.)
19  BY MR. ROTHMAN:
20    Q.  The handwritten notation on the top on this
21  is the name of the Excel file that this printed
22  document came from.  And I'll represent to you that
23  this was on the hard drive of The Mortgage Exchange
24  computer that you turned in to the trustee.
25      Do you recognize this spreadsheet?

Page 127

1    A.  I don't.  I never -- I don't think I ever
2  really made any of these spreadsheets.
3    Q.  Who did?
4    A.  Is this one spreadsheet or is this like --
5    Q.  It may be two, actually.
6    A.  I'm just a little bit confused about where
7  maybe one starts and stops, just so I can get a
8  better idea.
9    Q.  I think it's actually two.  I think the
10  second one begins at JM00026.
11    A.  I don't know.  This was maybe something that
12  had been -- this doesn't, honestly, look familiar to
13  me, but --
14    Q.  Okay.
15    A.  -- but I don't know what -- I have no idea
16  who created it.
17    Q.  Okay.  That's fine.
18      (Thereupon, Exhibit 28 was marked for
19  identification.)
20  BY MR. ROTHMAN:
21    Q.  Do you recognize Exhibit 28?
22    A.  For some reason I thought that this form was
23  more from OMC, but I guess this could have been it, I
24  don't know.
25    Q.  Okay.

Page 128

1    A.  I don't know for -- it just kind of -- I just
2  feel like something very similar to this but it was
3  from OMC, but perhaps I'm mistaken.  But the
4  information within does sound -- I do remember.
5    Q.  Okay.  And this was a form that an owner at
6  Legacy could sign if they wanted to not contract with
7  X Management group for short-term rental of their
8  unit and get their refund from X Management, right?
9    A.  Correct.  I believe that Geneva was holding
10  those funds, not X, but nevertheless.
11    Q.  So this was when we talked about before
12  whether OMC was going to be the short-term manager or
13  X Management was going to be the short-term manager.
14  But when X Management, it turned out, was not going
15  to be short-term manager, this form was created in
16  order to disseminate to the owners so they could
17  cancel and get their money back?
18    A.  At the end of the day this was so they could
19  use OMC or would use OMC or had the option to use
20  OMC.  I don't know how specifically.
21    Q.  Okay.  Exhibit 29.
22      (Thereupon, Exhibit 29 was marked for
23  identification.)
24  BY MR. ROTHMAN:
25    Q.  Do you recognize this?

Page 129

1    A.  I do recognize this.
2    Q.  Okay.  What is that?
3    A.  I don't know how it came about or if it was
4  an incentive or what have you, but I don't think that
5  it ever was actually sent out.
6    Q.  Okay.  The second paragraph talks about how
7  Real Estate Investment Group is offering an incentive
8  to individuals who purchased their units through
9  REIG, submitted their units to the program, which is
10  defined earlier as a short-term management company
11  program, and continue to offer their unit for rent
12  through the program for a period of 24 consecutive
13  months, do you see that?
14    A.  Um-hmm.
15    Q.  Would it have been correct that the date on
16  this, September 2006, would have been the time in and
17  around when discussions had been going on about
18  short-term rentals and rental guarantees for
19  purchasers at Legacy Dunes?
20    A.  I didn't really -- I'm sorry, could you
21  repeat that again?
22    Q.  Is the date accurate about when there were
23  discussions about short-term rentals and incentives
24  at Legacy?
25    A.  These monthly guarantees being -- looks like

33 (Pages 126 to 129)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

Page 130

1    incentives. I don't think that this ever actually
2    went out. I think this might have been something
3    that was created and -- just created. I'm not aware
4    of this being something that was sent out to
5    everybody. I believe there was discussions about the
6    monthly guarantee, but I don't know. I really don't
7    know.
8        Q.  Were you part of those discussions?
9        A.  I remember seeing this and I remember the
10   attorney even looking at it. I believe he worked
11   with Maureen on it.
12       Q.  Okay.
13       A.  I don't remember if it was Dan or if it was
14   George. But, again, I don't believe it was ever sent
15   out.
16       Q.  Have you ever been to Legacy Dunes?
17       A.  I have been to Legacy Dunes.
18       Q.  How many times?
19       A.  Once.
20       Q.  Did you stay overnight?
21       A.  No.
22       Q.  When did you go?
23       A.  I don't remember.
24       Q.  Was it in 2006?
25       A.  Yes, it was in 2006, but I don't remember

Page 131

1    exactly when I went there.
2        Q.  Was it in the spring, in the fall, in the
3    summer, do you remember it being hot?
4        A.  I remember it being hot.
5        Q.  Okay.
6        A.  I do remember it being hot.
7        Q.  The only time you had been was 2006 before
8    all the closings began to take place?
9        A.  I would imagine so, but I really don't
10   remember.
11       Q.  What did you do there?
12       A.  My husband took a bunch of pictures.
13       Q.  Why?
14       A.  Joe had asked him to.
15       Q.  Okay.
16       A.  I think that was the only reason we went.
17       Q.  Do you know if he still has those pictures?
18       A.  Well, he gave them -- he handed them over in
19   2006. Would they still be something that he has, I
20   don't know. I would have to ask him.
21       Q.  Do you know why he was asked to take
22   pictures?
23       A.  I believe that it was just part of a big
24   portfolio book that Joe wanted.
25       Q.  It was for marketing?

Page 132

1        A.  I don't know what the pictures were all used
2    for, but I know they ended up being just in a big
3    portfolio book. I don't know what else they were
4    used for.
5        Q.  Okay. Look at Exhibit 7 for me, please.
6    These are -- do you recognize -- I'll represent to
7    you they're substantially identical, all the pages in
8    Exhibit 7, just different purchasers and signatures.
9    It's Geneva 1 through 71.
10           Do you recognize the document?
11       A.  See, remember when I was saying on Exhibit 28
12   that I felt that this cancellation was really on --
13       Q.  Right.
14       A.  -- from Judy at OMC?
15       Q.  Right.
16       A.  I'm not so sure. I don't think that -- I
17   don't remember.
18       Q.  You think that maybe --
19       A.  I think it's really Exhibit 7.
20       Q.  Okay.
21       A.  I don't know if 28 was ever used, maybe it
22   was, but this is the one I remember.
23       Q.  So Exhibit 7 is the document that you were
24   talking about before when there was the decision made
25   to go with OMC and so they had all the owners sign a

Page 133

1    document so that they could get their deposits back
2    and decide that they're going to go with OMC,
3    correct?
4        A.  Correct.
5           MR. ROTHMAN: Okay. Subject to later
6    depositions after we get past the issue of whether
7    or not these are securities, I have no further
8    questions for you, Ms. Moore.
9           Thank you for your attention and thank you for
10   coming to Florida.
11          THE WITNESS: You're welcome.
12          MR. GORE: I don't have any questions.
13          MR. JOHNSON: No.
14          MR. ARAGONA: I don't have any questions.
15   We'll read.
16          MR. ROTHMAN: Thanks.
17          · (The deposition concluded at 1:11 p.m.)
18
19
20
21
22
23
24
25

34 (Pages 130 to 133)

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

C E R T I F I C A T E
- - -

THE STATE OF FLORIDA)

COUNTY OF PALM BEACH)

I hereby certify that I have read the

foregoing deposition by me given, and that the

statements contained herein are true and correct to

the best of my knowledge and belief, with the

exception of any corrections or notations made on

the errata sheet, if one was executed.

  Signature of deponent:_____
  Dated this _____ day of_____, 2009.

  The foregoing was acknowledged before me by
_____ who is personally known
to me or has produced _____ as
identification and who did/did not take an oath,
this _____ day of _____, 2009.

    _____
    Notary Public
    My Commission Expires:

CERTIFICATE OF OATH
- - -

THE STATE OF FLORIDA)
COUNTY OF PALM BEACH)

  I, Alexa R. Goldman, Notary Public, State of
Florida, certify that Jill Moore personally appeared
before me on the 12th of March, 2009, and was duly
sworn.
  WITNESS my hand and official seal this 17th day of
March, 2009.

    _____
    ALEXA R. GOLDMAN, FPR
    Notary Public, State of Florida
    My Commission No: DD515295
    Expires: 2/6/10

C E R T I F I C A T E
- - -

THE STATE OF FLORIDA)
COUNTY OF PALM BEACH)

  I, Alexa R. Goldman, Notary Public in and for
the State of Florida at Large, do hereby certify
that the aforementioned witness was by me first
duly sworn to testify the whole truth; that I was
authorized to and did report said deposition in
stenotype; and that the foregoing pages are a true
and correct transcription of my shorthand notes of
said deposition.
  I further certify that said deposition
was taken at the time and place hereinabove set
forth and that the taking of said deposition was
commenced and completed as hereinabove set out.

  I further certify that I am not attorney
or counsel of any of the parties, nor am I a
relative or employee of any attorney or counsel of
party connected with the action, nor am I
financially interested in the action.

  The foregoing certification of this
transcript does not apply to any reproduction of
the same by any means unless under the direct
control and/or direction of the certifying
reporter.

  Dated this 17th day of March, 2009.

    _____
    Alexa R. Goldman, FPR

    U.S. Legal Support, Inc.
  Klein, Bury, Reif, Applebaum & Associates, Inc.
    444 West Railroad Avenue, Suite 300
      West Palm Beach, FL 33401
        561.835.0220
March 17, 2009
Jill Moore
c/o Anthony Aragona, Esq.
ULLMAN & ULLMAN, P.A.
150 E. Palmetto Park Road, Ste. 650
Boca Raton, Florida 33432
RE:  Boca Raton, Florida 33432
Dear Madam:
  This letter is to inform you that your deposition
transcript taken on March 12, 2009 in the
above-captioned matter is ready for your review.
  The transcript will be furnished to you through
counsel.  The transcript is 134 pages long, and you
should allow yourself sufficient time to read the
transcript in its entirety.

  Once you have read the transcript and noted any
changes or corrections on the errata sheet, be sure to
sign and date the errata sheet and sign the transcript
and return these pages.  If you do not read, sign, and
return the transcript within 30 days, the original,
which has already been forwarded to the attorney who
ordered your deposition, may be filed with the Clerk of
the Court.
  If you wish to waive your signature, sign your
name at the bottom of this letter and return it to us.
Your prompt attention to this matter is appreciated.

Cordially yours,

Alexa R. Goldman, FPR

cc via transcript: Joel Rothman, Esq.
        Michael Gore, Esq.
        Anthony Aragona, Esq.
        Christopher Johnsen, Esq.

U.S. Legal Support
(561) 835-0220

c7c4e7b4-168c-44d7-9cd9-70f8498b681c

ERRATA SHEET
IN RE:  Alunni et al v. DRG et al
DEPOSITION OF:  Jill Moore
TAKEN:  March 12, 2009
    DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
PAGE # LINE #  CHANGE          REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Please forward the original signed errata sheet to
this office so that copies may be distributed to
all parties.
Under penalty of perjury, I declare that I have
read my deposition and that it is true and correct
subject to any changes in form or substance entered
here.

DATE:_____
SIGNATURE OF DEPONENT:_____

U.S. Legal Support
(561) 835-0220

c7c4e7b4-168c-44d7-9cd9-70f8498b681c