**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**ALBERT ALUNNI, et al.,**
                 **Plaintiffs,**

**-vs-**                                                          **Case No. 6:08-cv-1349-Orl-31DAB**

**DEVELOPMENT RESOURCES GROUP, LLC, LEGACY DUNES CONDOMINIUM, LLC, MICHAEL K. HALPIN, JAMES E. WEAR, TIMOTHY S. TINSLEY, THE REAL ESTATE INVESTMENT GROUP, LTD., JOSEPH ALDEGUER, JILL MOORE, REAL ESTATE DREAMS, LLC, SEAN C. PARKES, JEREMY HOLLY, GENEVA HOSPITALITY MANAGEMENT, LLC, SAL SARDINA, CHANDRA WEBSTER,**
                 **Defendants.**
_____/

## ORDER

This matter came before the Court upon consideration of Defendants', Jill More, Development Resources Group, LLC, Legacy Dunes Condominium, LLC, Michael K. Halpin, James E. Wear, Timothy S. Tinsley, Geneva Hospitality Management, LLC, Sal Sardina, and Chandra Webster (collectively, "Defendants"), Motions for Partial Summary Judgment (the "Motions") (Docs. 94, 96 and 99), Plaintiffs' response in opposition thereto (the "Response") (Docs. 118 and 119),[1] and Defendant Jill Moore's Reply to Plaintiffs' Response (Doc. 131). The Court heard oral argument on June 30, 2009 (Doc. 132).

---

[1] Plaintiffs originally filed a cross-motion for partial summary judgement. The Court construed Plaintiffs' motion as their response in opposition to Defendants' Motions (*see* Order at Doc. 122).

**I. Overview**

**A. General Allegations**

In their 119-page Second Amended Complaint, Plaintiffs allege, *inter alia*, that Defendants violated federal and state securities laws in connection with the sale of certain condominiums in a Kissimmee, Florida development known as Legacy Dunes (Doc. 74, ¶ 1). Specifically, Count I alleges that Defendants violated Sections 5(a) and 5(c) of the Securities Act of 1933 and 15 U.S.C. §§ 77e(a) and (b) (Sale of Unregistered Securities) (Doc. 74, ¶¶ 578-582). Count II alleges that Defendants violated Section 15 of the Securities Act of 1934 and 15 U.S.C. § 78o (Sale of Securities by Unlicensed Persons) (Doc. 74, ¶¶ 583-587). Count III alleges that Defendants violated Section 10b of the Securities Exchange Act of 1934 and Rule 10b-5[2] (Securities Fraud) (Doc. 74, ¶¶ 588-607). Count IV purports to state a claim for relief under FLA. STAT. § 517.211 for the sale of unregistered securities (Doc. 74, ¶¶ 608-613). Count V purports to state a claim for relief under FLA. STAT. § 517.211 for the sale of securities by unregistered persons (Doc. 74, ¶¶ 614-618). Count VI alleges that Defendants violated FLA. STAT. § 517.301 by committing securities fraud (Doc. 74, ¶¶ 619-637). Count VII purports to state a claim for relief under ILL. COMP. STAT., ch. 815, § 5/13 for the sale of unregistered securities (Doc. 74, ¶¶ 638-643). Count VIII purports to state a claim for relief under ILL. COMP. STAT., ch. 815, § 5/13 for the sale of securities by unlicensed persons (Doc. 73, ¶¶ 644-648). Count IX purports to state a claim for relief under ILL. COMP. STAT., ch. 815, § 5/13 for securities fraud (Doc. 73, ¶¶ 649-669). Count X alleges that Defendants committed common law fraud in connection with Plaintiffs' purchase of –

---

[2] *See* 15 U.S.C. § 78j and 17 C.F.R. § 240.10b-5, respectively.

and in inducing Plaintiffs to purchase – the condominiums in Legacy Dunes (Doc. 74, ¶¶ 668-681). Count XI alleges that Defendants negligently represented certain material facts regarding the sale of condominiums in Legacy Dunes (Doc. 74, ¶¶ 682-693). Finally, Count XII alleges that Defendant Legacy Dunes Condominium, LLC breached its purchase agreements with certain Plaintiffs by failing to make a $25,000.00 refund in the event the development failed to secure new zoning after certain Plaintiffs purchased their condominiums (Doc. 74, ¶¶ 694-698).

### B. Procedural History and Subject Matter Jurisdiction

To effectively manage this case, the Court entered a Modified Limited Special Case Management Order on January 1, 2009 (Doc. 78). This Order directed Defendants to file appropriate motions as to whether the contracts at issue in this case are securities within the meaning of the securities laws being sued upon. In accordance with that Order, Defendants filed their Motions on April 15, 2009, contending that the contracts in this case involved fee simple real estate transactions – not a sale of securities. Plaintiffs' filed their Response on May 29, 2009.

Accordingly, the question before the Court is whether the contracts at issue in this case are securities within the meaning of the securities laws. If the contracts are not securities, Counts I through III of the Second Amended Complaint (and most likely Counts IV through X) necessarily fail as a matter of law. The Court addresses this question, *infra*.

The Court has subject matter jurisdiction over Counts I through III pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367.

**C. Parties**

The 99 named Plaintiffs in this case are individuals, trusts, and various business entities that entered into contracts for the purchase of one or more condominiums in the Legacy Dunes development in Kissimmee, Florida. Most of the Plaintiffs live in or near Chicago, Illinois and all but two of the named Plaintiffs appear to be Illinois residents.

Defendant Development Resources Group, LLC ("DRG") is a Florida limited liability company managed by Defendant Michael K. Halpin. Defendants James E. Wear and Timothy S. Tinsley were officers of DRG.

DRG formed Defendant Legacy Dunes Condominium, LLC ("LDC") to purchase the Legacy Dunes development, convert the development's apartments into condominiums, and then market the condominiums. Plaintiffs purchased their condominiums from LDC.

As a part of its plan to market Legacy Dunes, LDC entered into a brokerage agreement with Defendant Real Estate Dreams, LLC ("RED"), a Florida-licensed real estate brokerage company. Defendants Sean C. Parkes and Jeremy Holly are Florida licensed real estate agents that worked for RED.[3]

RED, in turn, entered into a relationship with Defendant The Real Estate Investment Group, Ltd. ("REIG"), an Illinois-based real estate brokerage company, and its principal, Defendant Joseph Aldeguer ("Aldeguer"), to market Legacy Dunes to potential buyers in Chicago, Illinois.

---

[3] A Clerk's Default has been entered against Defendants RED, Parkes, and Holly (Docs. 109, 110, and 115).

-4-

In addition to his role at REIG, Defendant Aldeguer is also the president, chief operating officer, manager, and principal owner of The Mortgage Exchange ("TME"), a licensed mortgage broker in the State of Illinois.[4] Defendant Jill Moore is the chief financial officer, a manger, and an owner of TME (as well as an owner of REIG).

Together, Defendants Aldeguer, REIG and TME promoted Legacy Dunes in the Chicago area by advertising on local radio and conducting real estate workshops that were tailored specifically to the Legacy Dunes development.

Defendant Geneva Hospitality Management, LLC ("Geneva") is a Wisconsin-based property management company. Defendants Sal Sardina and Chandra Webster are managing members of Geneva. Working with Aldeguer, TME and REIG at the real estate workshops, Geneva made certain presentations to Plaintiffs regarding the income they could earn by renting their condominiums as hotel rooms.

## II. Factual Background

### A. Legacy Dunes and Its Promotion in Chicago, Illinois

Legacy Dunes is a 50-acre residential development located near the intersection of U.S. Route 192 and State Road 429 in Kissimmee, Florida, within ten miles of Walt Disney World. The development is comprised of 488 one, two, three, and four bedroom apartments and, *inter alia*, a clubhouse, fitness center, swimming pools, lounge, and tennis and basketball courts.

Defendant LDC purchased Legacy Dunes on June 27, 2006 and shortly thereafter converted the development into condominiums. At the time it purchased the development,

---

[4] TME filed for bankruptcy in the Northern District of Illinois on July 7, 2008.

approximately 94% of the units were occupied by tenants with long-term leases. To market the property, LDC entered into a brokerage agreement with Defendant RED, which, in turn, entered into a relationship with Defendants REIG, TME and Aldeguer to promote the condominiums in Chicago, Illinois.

Aldeguer began promoting Legacy Dunes on Chicago radio station WLS-AM 890 in the spring of 2006.[5] After listening to Aldeguer's radio program, Plaintiffs began attending real estate workshops at TME's Chicago office. According to Plaintiffs, these "workshops" were nothing more than high-pressure sales pitches designed to induce attendees into purchasing condominium units in Legacy Dunes.

### B. Pre-Contract Representations Regarding Legacy Dunes

According to Plaintiffs, Aldeguer and other presenters at TME's workshops made a number of oral and written representations that Plaintiffs relied upon in purchasing their units at Legacy Dunes. Plaintiffs were told, for instance, that they would receive immediate income from long-term tenants who already occupied 94% of the units at Legacy Dunes and that the development had been granted new zoning that would permit Plaintiffs to earn significant income by renting their units out as hotel rooms.[6] Plaintiffs were further told that they did not have to manage their units (either on a short-term or long-term basis), that the entire development would

---

[5] Although LDC did not purchase Legacy Dunes until June 27, 2006, LDC (and Aldeguer) had already begun promoting the development.

[6] In a Microsoft PowerPoint presentation prepared and given by Defendant Geneva at TME's offices, Plaintiffs were told that they could conservatively earn monthly net income of approximately $1,244.13 on a basic two bedroom, two bath unit by simply letting Geneva manage and rent the unit on a short-term (nightly) basis (Doc. 118-3 at 2).

be converted into a resort and that Defendant Geneva would actively manage all of the units as hotel rooms and market the resort as being in close proximity to Walt Disney World.

The sworn statement of Plaintiff Robert Devereaux, as cited in Plaintiffs' Response, is fairly representative of the more than eighty such statements made by the other Plaintiffs in this case regarding the sort of information that Plaintiffs received at the "workshops" on Legacy Dunes:

> I was told that Legacy Dunes was a 488 unit resort being converted to short term resort rental (condo hotel units). The property would be managed with 80% of the rental going to the owner of the unit and 20% going to the management company. I was told that this would be a totally passive investment with no active participation required of the owners. I was told that I could expect an occupancy rate of 75% to 80% at an average rate of $318 per night. I was told the units would be ready for short term rental at closing.

(Doc. 121-27 at 6).

Similarly, Plaintiff Sandra Griggs, who attended the oral argument in this case, swore in her information sheet that:

> . . . [T]he TME people, plus everyone associated with and/or presenting at the TME Workshop/sales presentation, plus the people discussing this FL condo-hotel project on Aldeguer's WLS AM 890 talk show, all talked about how great an investment this one [sic] because i) there would be excellent ongoing positive cash flow/rental income, ii) there would be superior appreciation so this property would increase in value, and iii) I wouldn't need to do anything because the management and rental of the property was "all set up"; [sic] and c) the TME people told me that "all the TME people were buying units at Legacy Dunes, including Joe Aldeguer" so I therefore thought this was a "great" investment.

(Doc. 121-38 at 12).

Apparently lured by the projections of significant profits with little or no effort on their parts, on-the-spot financing arranged by REIG, and assured by Geneva's prior hotel/condominium

management experience,[7] Plaintiffs purchased approximately 125 of the 488 units at Legacy Dunes.

### C. The Purchase Agreements

Notwithstanding the foregoing representations, the actual purchase agreements between LDC (the seller/developer) and the Plaintiffs/buyers in this case tell a somewhat different story. As a threshold matter, the very first sentence of the purchase agreements clearly provided that:

> ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF DEVELOPER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY SECTION 718.503 FLORIDA STATUTES TO BE FURNISHED BY DEVELOPER TO A PURCHASER OR LESSEE.

(Doc. 94-2 at 1).

The purchase agreements also contain an express merger clause:

> ENTIRE AGREEMENT. This Agreement contains the entire agreement between the parties hereto. No agent, representative, salesman or officer of the parties hereto has authority to make, or has made, any statements, agreements, or representations, either oral or in writing, in connection herewith, modifying, adding to , [sic] or changing the terms and conditions hereof and neither party has relied upon any representation or warranty not set forth in this Agreement.

(Doc. 94-2 at 13).

Furthermore, the purchase agreements disclaim: "**Developer advises Purchaser to seek the guidance or assistance of an attorney before Purchaser executes any real estate (or related) document**." (Doc. 94-2 at 7).

---

[7] Geneva manages a similar (but apparently successful) condominium resort in Lake Geneva, Wisconsin, The Cove of Lake Geneva. Ultimately, Geneva was not selected to be the management company for Legacy Dunes.

-8-

Every Plaintiff initialed each page of, and then signed, his or her approximately thirty-page purchase agreement.

The purchase agreements make no reference to Defendant Geneva, do not make any projections as to what a purchaser might earn by renting his unit (either on a short or long-term basis), and do not suggest that purchasers would passively earn income from their units. While LDC did agree to provide all "leasing/concierge services" at its expense, it only agreed to do so until (1) June 30, 2007; (2) the purchaser occupied the unit; *or* (3) the purchaser decided to place his unit into a short term rental pool – whichever came first (Doc. 94-2 at 22).[8]

However, the purchase agreements clearly contemplated that Plaintiffs were buying their units with an intent to rent them on a short-term basis. In addition to the reference to a "short term rental pool," *supra*, the purchase agreements also included the following provision:

**Short Term Rental**

The Developer acknowledges the intent of Purchaser to place the unit associated with this Purchase Agreement into a short term rental pool. Should the Osceola County, Florida zoning classification associated with Legacy Dunes Condominiums not allow for short-term rental within 120 days of the closing of this Purchase Agreement, Developer will refund Twenty-Five Thousand Dollars ($25,000.00) to Purchaser.

(Doc. 94-2 at 23).[9]

---

[8]Similarly, LDC agreed to pay rent on the unit, if it had been previously occupied by a tenant, at the prior long-term rental rate until June 30, 2007, the purchaser occupied the unit, or the purchaser decided to place the unit into a short term rental pool – whichever came first (Doc. 94-2 at 22).

[9]"Legacy Dunes Addendum 'F'" also provided: "Per the original Purchase Agreement, referencing unit number _____, we hereby understand said unit will be furnished by the Developer, within the full discretion of Developer, within forty-five (45) days of the termination of any long term lease pertaining to said property in order to prepare said unit for entry into a short term rental pool. We understand said unit will be furnished by the Developer regardless of whether or not we elect to

Other than the short-term rental provisions (which both parties understood to be contingent upon a change in zoning), the purchase agreements appear to be standard Florida condominium purchase agreements. Indeed, Plaintiffs took immediate fee simple possession of their units at closing (subject in some instances, of course, to any pre-existing leases) (Doc. 94-2 at 8, Section 9). They were entitled to all incidents of property ownership and could immediately occupy their units, lease their units, re-sell their units, use their units as secondary/vacation homes,[10] etc. Although Plaintiffs and LDC contemplated the existence of a short-term rental pool, nothing in the purchase agreements either obligated LDC to create the pool or obligated Plaintiffs to place their units into the pool.

---

enter unit [sic] into a short term rental pool" (Doc. 94-2 at 30).

[10]Plaintiffs do not appear to dispute that every Plaintiff in this case indicated on the "Legacy Dunes Purchaser Intent Survey" that they intended to use their ". . . Legacy Dunes Condominium as a . . . Secondary (Vacation Home) Residence" (Doc. 94-2 at 26). The "Legacy Dunes Purchaser Intent Survey" was attached to each purchase agreement and each Plaintiff acknowledged that the information they provided therein could be "shared with [each Plaintiffs'] lender (if applicable) and will be used by the Seller to calculate the Investor/Occupant ratios necessary by buyer mortgage lenders" (Doc. 94-2 at 26). At oral argument, Plaintiffs' counsel indicated that the box indicating that Plaintiffs' intended to use their unit as a secondary residence had already been checked by LDC – not Plaintiffs. Nevertheless, Plaintiffs signed the document and had they instead indicated that they intended to purchase their unit as an "investment," it likely would have been more difficult for them to secure financing.

## III. Standard of Review

### A. Summary Judgment

Summary judgment has a special place in civil litigation. The device "has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991). In operation, the role of summary judgment is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required. *See id.*; *see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990).

A party is entitled to summary judgment when it can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25;

*Watson*, 252 F.Supp.2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).

### B. Federal Securities Law

Securities include not only traditional investments such as stocks or bonds but "investment contracts." 15 U.S.C. § 77b(1). Congress' use of the term "investment contracts" was designed "to afford the investing public a full measure of protection" from a broad range of transactions. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946) [hereinafter *Howey*]. While not defined by Congress, an "investment contract" is

> a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

*Id*. at 298-99.

Given this broad construction, courts must look to the substance and "economic realities" of the underlying transaction rather than to the labels or forms the parties may attach to the transaction. *Id*. at 298-99. Indeed, the term "investment contracts" embodies "a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id*. It reaches "[n]ovel, uncommon, or irregular devices, whatever they appear to be," *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943), and may even exist "where the tangible interest which is sold has intrinsic value independent of the success of the enterprise as a whole." *Howey*, 328 U.S. at 301.

Real estate transactions are generally not investment contracts. *SEC v. Kirkland*, 521 F. Supp. 2d 1281, 1289 (M.D. Fla. 2007). This is particularly true where the purchaser is "interested in acquiring housing rather than making an investment for profit." *Id.* (quoting *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 860 (1975)). However, certain real estate transactions may constitute the sale of securities if the purchaser expects to participate in a profit-sharing or rental pooling arrangement upon completing the transaction, or when the transaction includes restrictions limiting the owner's control over the property. *Id.* (citing *Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development, Securities Act*, 1973 WL 158443, Release No. 33-5347, 1 Fed. Sec. L. Rep. (CCH) ¶ 1049 (Jan. 4 1973) [hereinafter "*SEC Guidelines*"]). Specifically, the SEC has advised that the offering of condominiums with any one of the following constitutes an investment contract:

> 1. The condominiums, with any rental arrangement or other similar service, are offered and sold with emphasis on the economic benefits to the purchaser to be derived from the managerial efforts of the promoter, or a third party designated or arranged for by the promoter, from rental of the units;
>
> 2. The offering of participation in a rental pool arrangement; and
>
> 3. The offering of a rental or similar arrangement whereby the purchaser must hold his unit available for rental for any part of the year, must use an exclusive rental agent or is otherwise materially restricted in his occupancy or rental of his unit.

*Id.*

As in *Kirkland*, the Court analyzes the offering in this case under the preceding guidelines and the familiar three-part test articulated by the Supreme Court in *Howey*. *Id.* at 1289-90. Under the *Howey* test, an offering is an investment contract if: (1) there is an investment of money; (2)

into a common enterprise; and (3) an expectation of profits to be derived solely from the efforts of others. *Id.* (citing *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999)).

## IV. Analysis

### A. An Investment of Money

Pursuant to *Howey*, an investment of money requires a "commitment of assets in such a manner as to subject oneself to financial loss." *Id.* (citing *SEC v. Comcoa Ltd.*, 855 F.Supp. 1258, 1260 (S.D. Fla. 1994). Defendants appear to concede that this element has been met (*see* Docs. 94 at 11, 96 at 8-10, and 99 at 7).

### B. Existence of A Common Enterprise

In the Eleventh Circuit, a common enterprise may be established through either vertical or horizontal commonality. *Id.* at 1292 (citing *Unique Fin. Concepts*, 196 F.3d at 1200 n. 4). Because Plaintiffs focus only on vertical commonality in their Response (Doc. 119 at 14-19), the Court does not address whether horizontal commonality is present in this case.[11]

Vertical commonality exists whenever the "fortunes of the investor are interwoven with and dependent on the efforts and success of [the promoter] or of third parties." *Villeneuve v. Advanced Bus. Concepts Corp.*, 698 F.2d 1121, 1124 (11th Cir. 1983); *see also SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 732 (11th Cir. 2005); *Unique Fin. Concepts*, 196 F.3d at 1199-1200; *Eberhardt v. Waters*, 901 F.2d 1578, 1580-81 (11th Cir. 1990)*; SEC v. Koscot*, 497 F.2d 473, 479 (5th Cir. 1974). In determining whether there is vertical commonality, "the crucial

---

[11]Horizontal commonality is more stringent and difficult to establish than vertical commonality. *See Unique Fin. Concepts*, 196 F.3d at 1200 n. 4 ("Unlike the more stringent concept of horizontal commonality . . . this flexible standard does not require investor funds to be pooled nor does it require profits to be shared on a pro rata basis.").

inquiry is the amount of control that the investors retain under their . . . agreements." *Albanese v. Fla. Nat'l Bank*, 823 F.2d 408, 410 (11th Cir. 1987) (citing *Williamson v. Tucker*, 645 F.2d 404, 423-24 (5th Cir. 1981)).

Relying almost exclusively on the representations made at the TME workshops and other representations not made in their purchase agreements, Plaintiffs contend that the transactions at issue in this case involved more than just the sale of real estate. Instead,

> [t]he sales were a package deal that included not just a unit, but also included assurances of substantial passive income from short and long term rentals, active and exclusive management of the property, a hotel rental program, remodeling, zoning changes, construction of restaurant and club amenities, and promises of significant appreciation in value.

(Doc. 119 at 16). Thus, Plaintiffs argue that the Court must look beyond their investment contracts and conclude that, based on the "package deal" that Plaintiffs were sold, Plaintiffs purchased securities.

Plaintiffs' approach belies the economic reality of the transactions at issue in this case. Even assuming, *arguendo*, that Defendants' pre-contract representations comprise part of the transaction at issue in this case,[12] Plaintiffs cannot simply ignore the fact they retained complete control over their condominiums. While Plaintiffs (in most instances) purchased income

---

[12] Plaintiffs contend that merger clauses have no effect in securities cases and that such clauses are limited to claims for breach of contract or fraud (Doc. 119 at 18). On the record before it, the Court need not decide this question. In passing, however, it seems incredible that anyone purchasing a $300,000.00 piece of property would blithely initial each page of, and then sign, an approximately 30 page purchase agreement without some scrutiny and that, as a matter of law, not one, but two conspicuous merger clauses in that agreement would be of no moment. Despite the presumption of unequal bargaining power inherent in the federal securities laws, such a rule could grossly distort a factfinder's assessment of an investor's reasonable expectations and the economic realities at work in a given case, as well as turn the law of contract on its head.

producing properties that were subject to long-term lessees and were guaranteed that income by LDC through June 30, 2007, Plaintiffs did not surrender any control of their units to LDC or to any other party. On the contrary, Plaintiffs retained the right to do whatever they legally pleased with their units. They could occupy their units, rent the units out themselves, hire a third party to rent the units on their behalf, or use their units for any other lawful purpose. In contrast to both *Howey* and *Kirkland*, these rights were by no means illusory.

Plaintiffs also rely on *Kirkland* (Doc. 119 at 15). That reliance is misplaced. Unlike the sham transactions in *Kirkland*, the deposits in this case were properly placed in escrow with an independent escrow agent (as in typical real estate transactions) and not squandered by the developer; Plaintiffs actually closed on the units for which they contracted and LDC never sold the same unit to multiple purchasers; and, most importantly, Plaintiffs retained control of their units. 521 F. Supp. 2d at 1291-93. In contrast, the investors in *Kirkland*

> [H]ad little to no control over the success of the endeavor or the future of their investments. That control rested in the hands of [the developer] and the management company that he chose and controlled. Together, they advertised for tenants, chose and approved tenants, collected rent, and maintained the premises. Investors could neither assume control of the rental process nor chose the rate at which their units were rented.

*Id*. at 1292-93 (internal citations omitted). Furthermore, the condominiums in *Kirkland* were offered with the promise of a rental pooling agreement. *Id*. at 1294. Pursuant to that pooling agreement, "investors theoretically stood to profit from the development as a whole even if their individual units remained unoccupied . . . ." *Id*. No such pooling agreement, or for that matter, any other collateral agreement, exists in this case.

In short, Plaintiffs have failed to carry their burden of establishing the existence of a common enterprise. Accordingly, the Court need not address the third prong of *Howey* and

concludes that the transactions in this case do not constitute "investment contracts" within the meaning of the federal securities laws. Although the pre-contract representations made by Defendants Aldeguer, REIG, TME and others may amount to common law fraud, they do not change the fundamental economic reality of what transpired in this case. At the end of the day, none of the representations in this case alter the fact that Plaintiffs bought individual condominium units, without any collateral agreements. Afer closing, they were free to make use of their unit as they pleased, subject only to whatever leasehold obligation was then in place. Such a sale of real estate does not implicate the federal securities laws. Accordingly, Defendants are entitled to a judgment as a matter of law on Counts I, II and III of the Second Amended Complaint.

**V. Conclusion**

For the foregoing reasons, it is **ORDERED** that Defendants' Motions for Partial Summary Judgment (Docs. 94, 96, and 99) are **GRANTED**. Defendants are entitled to a judgment as a matter of law on Counts I, II and III of the Second Amended Complaint.

It is **FURTHER ORDERED** that, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise its supplement jurisdiction over Counts IV through XII of the Second Amended Complaint. Accordingly, Counts IV through XII are hereby **DISMISSED** without prejudice, with each party to bear its own costs and attorneys' fees. Plaintiffs may re-file these claims in an appropriate state court.

The Clerk of the Court is directed to enter a final judgment in favor of Defendants Jill More, Development Resources Group, LLC, Legacy Dunes Condominium, LLC, Michael K. Halpin, James E. Wear, Timothy S. Tinsley, Geneva Hospitality Management, LLC, Sal Sardina

and Chandra Webster and against Plaintiffs on Counts I, II and III of the Second Amended Complaint.

The Clerk of the Court is further directed to close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on August 18, 2009.

Copies furnished to:

Counsel of Record
Unrepresented Party

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE